**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JUANA HERNANDEZ, AS** ) | |
| **ADMINISTRATRIX OF THE** ) | |
| **ESTATE OF DANNY NICACIO** ) | |
| **and ARMANDO MAISONET,** ) | |
|     **Plaintiffs** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 05-40141-FDS** |
| ) | |
| **SCOTTSDALE INSURANCE** ) | |
| **COMPANY and UTICA** ) | |
| **MUTUAL INSURANCE** ) | |
| **COMPANY,** ) | |
|     **Defendants.** ) | |

**AFFIDAVIT OF CARYN L. DAUM, ESQ.**

I, Caryn L. Daum, depose and state as follows:

1.    I am an attorney in the law firm of Robinson & Cole LLP.  I am counsel of record for Scottsdale Insurance Company in this action.

2.    Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Declaratory Judgment Complaint filed in the instant action in the Worcester Superior Court, Civil Action No. 05-0758B.  This matter was removed to this Court on or about August 18, 2005.  The parties are awaiting a certified copy of the Worcester Superior Court docket, and intend to provide that to the Court as soon as possible.

3.    Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the Second Amended Complaint and Demand for Jury Trial in the action entitled <u>Juana Hernandez, as Administratrix of the Estate of Danny Nicacio or Danny Guzman, et al. v. Kahr, Inc., et al.</u>, Worcester Civil Action No. 02-01747.

4.      Attached hereto as <u>Exhibit 3</u> is true and correct copy of the Second Amended Complaint and Demand for Jury Trial in the action entitled <u>Armando Maisonet v. Kahr, Inc., et al.,</u> Worcester Civil Action No. 02-02025.

5.      Attached hereto as <u>Exhibit 4</u> is a certified copy of the Commercial Lines Policy issued by Scottsdale Insurance Company, Policy No. CLS0499959, to its named insured, Saielo, Inc. d/b/a Kahr and d/b/a Saielo Manufacturing Industries, covering the Policy period of January 12, 1998 to January 12, 1999, and renewed for the period of January 12, 1999 to January 12, 2000.

Signed under the penalties of perjury this 6th day of September, 2005.

<u>/s/ Caryn L. Daum</u>_____
Caryn L. Daum

# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                                    WORCESTER SUPERIOR COURT
                                                 CIVIL ACTION NO.

| | | |
|---|---|---|
| JUANA HERNANDEZ, AS ADMINISTRATRIX OF THE ESTATE OF DANNY NICACIO and ARMANDO MAISONET, Plaintiffs | ) ) ) ) ) ) ) | |
| v. | ) ) ) | COMPLAINT and DEMAND FOR JURY TRIAL |
| SCOTTSDALE INSURANCE COMPANY, UTICA MUTUAL INSURANCE CO. Defendants | ) ) ) ) | |

This is a MGL c. 231A declaratory judgment action in which the plaintiffs seek the Court's determination of the coverage obligations of the defendant insurers relative to insured Saeilo, Inc. d/b/a Kahr Arms Auto Ordnance.

THE PARTIES

1.  Plaintiff's decedent, Danny Nicacio, died on December 24, 1999, as a result of being shot with an unserialized Kahr Arms handgun on December 24, 1999. At the time he resided in Worcester, Worcester County, Massachusetts.

2.  Plaintiff Juana Hernandez is the mother of decedent and the Administratrix of his Estate, having been so appointed by order of the Probate Court in Worcester County on January 29, 2002. She sues in her representative capacity. She has her usual place of home and abode in Worcester, Worcester County, Massachusetts.

3.  Plaintiff Armando Maisonet, with a usual place of home and abode in Worcester, Worcester County, Massachusetts, was seriously wounded by gunshot with an unserialized Kahr Arms handgun also on December 24, 1999.

4.  Defendant Scottsdale Insurance Company is an Arizona corporation with its principal place of business in Scottsdale, Arizona that does substantial business in the Commonwealth of Massachusetts. At all times material to this Complaint Scottsdale was an insurer of defendant Saeilo, Inc. d/b/a Kahr Arms, a Worcester area defendant in tort actions brought by the plaintiffs.

5.   Defendant Utica Mutual Insurance Company is a Massachusetts corporation with offices at 401 Edgewater Place, Suite 200, Wakefield Massachusetts. At all times material to this Complaint Utica was an insurer of defendant Saeilo, Inc., d/b/a Kahr Arms a Worcester area defendant in tort actions brought by the plaintiffs.

6.   Defendants' Insured, Saeilo, Inc., d/b/a Kahr Arms Auto Ordnance at all times material hereto manufactured 9mm and .40 cal. Handguns.

## JURISDICTION

7.   Jurisdiction against Scottsdale Insurance is based on the Massachusetts Long Arm Statute.

## FACTS

8.   In March 1999 Kahr hired Mark Cronin, an individual addicted to crack cocaine and had encounters with the criminal justice system.

9.   Cronin was hired to do polish and assembly of firearms at Kahr's facilities, and Cronin had access to all of the various components necessary to assemble firearms before they were serialized, including frames and slides as part of the manufacturing process.

10.  Cronin, in order to supply his cocaine addiction, gradually began to steal component parts from Kahr Arms before serialization.

11.  He located the necessary unserialized firearms components at Kahr Arms, including frames, slides and other component parts and ferried them out of the Kahr Arms facility in his clothing before completing an unserialized firearm outside Kahr's facility.

12.  Cronin was able to steal component parts and assemble them outside Kahr's facility because defendants' insured, Saeilo, Inc. d/b/a Kahr Arms et al.:

  -   did not conduct criminal background or general background checks on prospective employees and hired persons with criminal records;
  -   did not test present or prospective employees for indications of drug addiction;
  -   did not safeguard handguns and their components with metal detectors, x-ray machines, or other devices capable of detecting handguns or components secreted on persons or in their effects;
  -   did not have a security guard to check employees upon the completion of their shift to prevent theft of handguns or handgun components;
  -   did not keep clear and current inventory tracking records which would timely reveal unauthorized removal of weapons or weapons parts from the premises;

-   did not supervise its employees/did not have television security cameras; and
-   allowed individuals with criminal backgrounds and individuals addicted to illegal, controlled substances to work, manufacture, assemble and come in contact with handguns and handgun components in prohibition of the Federal Gun Control Act of 1968.

13. On a day in November 1999, Cronin provided an unserialized seven shot 9mm firearm to Jachimczyk in exchange for approximately $80 worth of cocaine.

14. Jachimczyk then traded the 9mm to his drug dealer/supplier Edwin Novas, in exchange for two bundles of 'dope' [heroin] the same day.

15. On 12/24/99 Edwin Novas fired multiple rounds from the 9mm Kahr weapon Cronin had ferried out of Kahr's facility and then assembled, severely injuring plaintiff Armando Maisonet and mortally wounding Danny Guzman.

16. It is the position of the plaintiffs that coverage for indemnity and defense is owed by defendants Scottsdale and Utica to insured Saeilo, Inc. d/b/a Kahr Arms with respect to claims set out in: Worcester Superior Court Action 02-2025 (Maisonet action) and Worcester Superior Court Action 02-01747 (Hernandez action). Both actions claim harm as a result of Kahr Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, and failing to conduct background checks or conduct random drug testing on its workforce.

17. Both actions were amended to allege unfair and deceptive trade practices under 93A and 176D by defendants.

18. It is the position of the defendants that no such coverage is afforded to Saeilo, Inc. et al.

19. Another Kahr employee, Scott R. Anderson, has also testified that he too gradually stole component parts from Kahr Arms and assembled various weapons outside Kahr's facility.

20. Both Cronin and Anderson have pleaded guilty to stealing firearms from Kahr Arms and have been convicted in federal court.

21. On March 23, 2000, U.S. Magistrate the Honorable Charles B. Swartwood, III, found in his Memorandum of Probable Cause and Decision of Government's Motion For Detention and Findings of Fact at paragraphs 1,2,3,4 and 5 that the 9mm firearm used in the homicide of Danny Guzman was the Kahr Arms 9mm provided by Cronin.



22.    On 1/15/02 a Worcester Superior Grand Jury returned an indictment of Novas for Danny Nicacio's death with the following offenses identified: 1) Murder, 1st degree; 2) Assault, armed, intent to rob; 3) Dang weapon, possess gun, no license, on person/in MV; 4) Dang weapon, possess/transfr gun/ammo, no ID card; 5) Assault & Battery, dangerous weapon.

23.    The parts that Cronin stole and assembled into a 9mm weapon, which was used to maim Armando Maisonet and kill Danny Guzman, was not a product placed in the stream of commerce subject to a coverage exclusion.

24.    On March 1, 2004, counsel for plaintiffs submitted via certified mail a demand letter, pursuant to M.G.L. c.93A, to Ms. Mary Ledwith, senior claims specialist at Utica Mutual Insurance Company, an insurer of defendant Saeilo, Inc. d/b/a Kahr Arms and Auto Ordnance Corp, demanding $1 million for each plaintiff.

25.    On March 31, 2004, plaintiff received a response letter from Tucker Heifetz & Saltzman, LLP, which indicated it was representing Utica Insurance Group, and rejecting plaintiffs' demand on the basis of an alleged "products-completed operations hazard" exclusion.

26.    On October 24, 2003, counsel for plaintiffs submitted via certified mail a demand letter pursuant to M.G.L. c.93A to Leigh Foster of Scottsdale Insurance, an insurer of defendant Saeilo, Inc. d/b/a Kahr Arms and Auto Ordnance Corp, demanding $1 million for each plaintiff.

27.    On November 24, 2003, plaintiff received a letter from Robinson and Cole, LLP, which indicated it was representing Scottsdale Insurance Company, and rejecting plaintiffs' demand on the basis of an "products-completed operations hazard" exclusion.

## COUNT I
## DECLARATORY JUDGMENT

28.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 27 of the complaint into this count.

29.    A controversy exists between the parties as to insurance coverage.

WHEREFORE plaintiffs request that this Court determine the rights among the parties pursuant to G.L. c.231A, and make any award of attorney fees and costs it deems just.

Respectfully submitted,
Plaintiffs by their attorneys,

_____
Hector E. Pineiro, Esquire, BBO # 555315
Robert H. Beadel, Esquire, BBO # 632447
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600

# EXHIBIT 2



# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                                          WORCESTER SUPERIOR COURT
                                                       CIVIL ACTION NO. 02-01747

JUANA HERNANDEZ, AS ADMINISTRATRIX )
OF THE ESTATE OF DANNY NICACIO or )
DANNY GUZMAN, MARK ZARROW, ESQ. AS )
GUARDIAN OF TAMMY NICACIO, )
AND GLENDA LEE PAGAN AS MOTHER AND )
NEXT FRIEND OF SELENA NICACIO, )
          Plaintiffs )
           )          **SECOND AMENDED**
           )          **COMPLAINT and**
           )          **DEMAND FOR JURY TRIAL**
           )
v. )
           )
KAHR INC., D/B/A, KAHR ARMS, INC., )
KAHR AUTO ORDNANCE CORP., )
SAEILO, INC., )
SAEILO MACHINERY MA, INC., )
SAEILO MACHINERY USA, INC., )
SAEILO MANUFACTURING INDUSTRIES, )
MACHINE INDUSTRIES, INC., )
SAEILO EQUITY INVESTMENTS, LP )
ONE UP ENTERPRISES, INC., )
MARK CRONIN, )
ROBERT JACHIMCZYK, and )
EDWIN NOVAS, )
SCOTTSDALE INSURANCE COMPANY, )
GENERAL STAR MANAGEMENT CO., )
UTICA MUTUAL INSURANCE CO. )
          Defendants )

     This is a wrongful death action arising from the corporate defendants' negligence in operating a firearm manufacturing business.

## THE PARTIES

1.    Plaintiff decedent, Danny Nicacio also known as Danny Guzman, a natural person who died on December 24, 1999, as a result of gunshot wounds, resided in Worcester, Worcester County, Massachusetts.

2.    Plaintiff Juana Hernandez is the mother of decedent and the Administratrix of his estate, having been so appointed by order of the Probate Court in Worcester County on January 29, 2002. Exhibit 1. She sues in her representative capacity. She has her usual place of home and abode in Worcester, Worcester County, Massachusetts.



3.  At the time of his death, plaintiff decedent had sired two daughters, Selena Nicacio and Tammy Nicacio.

4.  Plaintiff Tammy Nicacio has a usual place of home and abode in Southbridge, Worcester County, Massachusetts.

5.  Plaintiff Selena Nicacio has a usual place of residence in Jayuya, Commonwealth of Puerto Rico. She was at all times material to this complaint a resident of Worcester, Worcester County, Massachusetts.

6.  Plaintiff Mark Zarrow, Esquire, is a duly licensed attorney in the Commonwealth of Massachusetts with a usual place of business at 34 Mechanic Street, Worcester, Worcester County, Massachusetts.

7.  Plaintiff Mark Zarrow, Esquire is the guardian of Tammy Nicacio by virtue of a decree ordered by the Worcester Probate and Family Court of The Massachusetts Trial Court on January 2, 2002. Exhibit 2.

8.  Plaintiff Glenda Lee Pagan is the Mother and Next friend of plaintiff Selena Nicacio, who resides in the Commonwealth of Puerto Rico. She is suing on behalf of her minor daughter.

9.  Defendant Kahr Inc. d/b/a Kahr Arms or Kahr Auto Ordnance is a wholly owned subsidiary of Saeilo, Inc., and was organized in the State of Delaware in 1994, according to the Foreign Corporation Certificate (hereafter "FCC") filed with the Office of the Massachusetts Secretary of State.

10. As of May 13, 1999, Kook Jin Moon held seventy-nine percent of Saeilo, Inc. stock (82% as of August 31, 1999). Saeilo, Inc. is the corporate parent of Kahr Inc. d/b/a Kahr Arms or Kahr Auto-Ordnance Corporation. According to an annual firearms manufacturing and export report of the Bureau of Alcohol, Tobacco and Firearms in 1998, Saeilo, Inc. manufactured 7,386 pistols, of which 5,414 were 9mm, two were .380 cal. and 1,970 were .50 cal.

11. Defendant Machine Industries, Inc. held eighteen percent of Saeilo, Inc. stock as of May 13, 1999. Machine Industries, Inc. is located at 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA. Robert Michael Runyon is president and director of Machine Industries, Inc. Mr. Runyon is also identified as a director of Saeilo, Inc. in that entity's Foreign Corporation Certificate filed with the Secretary of State of Massachusetts on March 18, 1999. His business address is listed as 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA.

12. Defendant One Up Enterprises, Inc., also located at 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA., is a holding company for Saeilo Inc. and Saeilo Machinery (USA), Inc. According to Dunn & Bradstreet, Robert Michael Runyon is and has been president of Defendant One Up Enterprises, Inc. from 1977 to present. One Up has over 10 wholly or majority owned subsidiaries. Two of the major ones are News World Communications, Inc. Washington D.C. and Ginseng Up Corporation, New York, NY, started in 1981.

13. According to the Foreign Corporations Certificate ("FCC"), Kahr Inc.'s principal office is located at 630 Route 303, Blauvelt, New York 10913. Saeilo Equity Investments, LP also has its offices at 630 Route 303, Blauvelt, New York 10913. Its principal place of business is located at 184 Prescott St., Worcester, MA, and its assembly plant is located at 130 Goddard Memorial Drive, Worcester, MA.

14. According to its FCC, Kahr Inc.'s president is Kook Jin Moon, whose residential address is 550 E. Sunnyside Lane, Irvington, NY 10533. Kahr Inc.'s Secretary and Treasurer is Soji Wada, whose residential address is listed as 5 Moody Street, Worchester (sic), MA 01606.

15. According to the MA Foreign Corporation Annual Report (hereafter "FCAP"), certified 6/14/00, the president of Kahr Inc. is Frank Harris, whose business address is 201 Mountain View Ave. Wallkill, N.Y. 12589. Kook Jin Moon is named as Director and his business address is listed as 50 E Sunnyside Irvington, NY 10533. Kahr Inc.'s treasurer and clerk is Janet Wada with a business address of 48 Barnes Ave #3, Worcester, MA 01605. On the FCAP Kahr Inc.'s resident agent in the Commonwealth of Massachusetts is also listed as H/Q Corporate Services, Inc., 9 Crestway Road, E. Boston, MA 02128.

16. Defendant, Saeilo, Machinery MA, Inc. became a duly organized corporation in the State of Delaware in 1987. The president of Saeilo, Machinery MA, Inc. is listed as Soji Wada of 161 Providence Street, Worcester, Worcester County, Massachusetts. The treasurer is Soji Wada of the same address. A major shareholder is One Up Enterprises, Inc. The resident Agent/Clerk of Saeilo, Machinery MA, Inc. is CT Corporation System of 101 Federal Street, Boston, MA 02110. Hereafter, reference to Saeilo will also mean Saeilo Manufacturing Industries, the entity's Internet marketing name.

17. Defendant, Saeilo Machinery (USA), Inc. became a duly organized corporation in the State of New York in 1981. The president of Saeilo Machinery (USA), Inc. is listed as Soon Jung Hong of 36719 Ruschin Dr., Newark, CA. Also identified as president of Saeilo Machinery (USA), Inc. in a September 10, 1996 FFL Application to the BATF is David Konn. David Konn was a speaker at the International Leadership Conference in New York on the issue of "One Community One Family" after the Sept. 11 tragedy. The treasurer of Saeilo Machinery (USA), Inc. is William Lee Flowers of 42-17 Bowne Street, Flushing, NY. The resident agent of this company is Chris Garcia of 184 Prescott Street, Worcester, Worcester County, Massachusetts.

18.    According to the Chief Financial Officer of Saeilo Machinery, (USA) Inc., in a September 19, 1997 letter to an Inspector of the Bureau of Alcohol, Tobacco and Firearms, The only significant shareholders of Saeilo Machinery are One Up Enterprises, Inc. and Saeilo (USA), Inc. The only individual other than the officers and directors of Saeilo Machinery who exercises, "directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation..." as specified in 18 U.S.C. section 923(d)(1)(B), is Kook Jin Moon, who has an ownership interest in Saeilo (USA), Inc. and is president of Saeilo, Inc. an affiliate of Saeilo Machinery. A copy of that September 19, 1997 letter is attached as Exhibit 3.

19.    Defendant, Saeilo, Inc. became a duly organized corporation in the State of Delaware in 1992. Kook Jin Moon is listed as president with an address of 630 Rte 303, Blauvelt, N.Y. 10913. Soji Wada of 184 Prescott Street, Worcester, Worcester County, Massachusetts is listed as Treasurer, and the resident Agent/Clerk of this company is listed as HIQ Corporate, 1205 Tucker Road, North Dartmouth, MA 02747.

20.    From approximately April of 1994, until August of 1999, defendants Saeilo Machinery (USA), Inc., Saeilo Machinery MA, Inc., Saeilo, Inc. and Kahr, Inc. maintained a principal place of business at 184 Prescott Street, and more recently at Goddard Memorial Drive, Worcester, Worcester County, Massachusetts.

21.    From approximately August of 1999, until the present, defendants Saeilo Machinery (USA), Inc., Saeilo Machinery MA, Inc., Saeilo, Inc. and Kahr, Inc. have maintained a place of manufacture at 130 Goddard Memorial Drive, Worcester, Worcester County, Massachusetts.

22.    Defendant Robert Jachimczyk at all times relevant hereto had a principal place of abode at 5 Jade Hill Rd., Auburn, MA.

23.    Defendant Mark Cronin at all times relevant hereto had a principal place of abode at 44 Huntington Avenue, Apt. 1B, Worcester, MA. At all times relevant to the Complaint, Mark Cronin was an employee of Kahr Arms, Inc., acting within the scope of his employment.

24.    Defendant Edwin Novas, identified as the shooter of decedent, at all times relevant hereto had a principal place of abode at 6 Elizabeth Street, Worcester, MA. Mr. Novas is still at large. A Grand Jury indictment concluded that Novas did shoot and kill plaintiff decedent Danny Guzman and did also shoot Armando Maisonet, Jr. with said handgun on December 24, 1999. This information is derived from Grand Jury Indictment No. 02-0038-1.

25.    On information and belief defendant Scottsdale Insurance Company, an entity added as a defendant per order of Justice Billings on April 23, 2004, is an Arizona corporation with its principal place of business in Scottsdale, Arizona that does business in the Commonwealth of Massachusetts. Scottsdale is an insurer of defendant Saeilo, Inc. d/b/a Kahr and d/b/a Saeilo Manufacturing Industries (Insured amended to read SMI-MA Inc.)

26.    On information and belief defendant General Star Management Company, an entity added as a defendant per order of Justice Billings on April 23, 2004, is a Connecticut corporation with its principal place of business in Stamford Connecticut that does substantial business in the Commonwealth of Massachusetts, and is an insurer of defendant Kahr Arms.

27.    Based on information and belief defendant Utica Mutual Insurance Company is a Massachusetts corporation with offices at 401 Edgewater Place, Suite 200, Wakefield Massachusetts and an insurer of defendants Saeilo USA and Saeilo, Inc.

## JURISDICTION/LONG ARM STATUTE

28.    Jurisdiction against the corporate defendants is based on the Massachusetts Long Arm Statute.

## VENUE

29.    Venue in this action properly lies in Worcester or the next judicial district contiguous to where either of the parties lives pursuant to G.L. c. 223 ss. 2.

## FACTS

### KAHR INC. AND ALL CORPORATE DEFENDANTS

30.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 29 of the Complaint into the statement of facts.

31.    At all times material to this matter, the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did manufacture and sell handguns under the brand name of Kahr Arms.

32.    The defendants at all times material hereto were the sole manufacturers of the Kahr Arms line of handguns. Kahr Arms promotional literature displayed and distributed from the defendants' Internet web site describes these weapons as a patented line of compact, powerful and precision-engineered handguns. (Exhibit 4)

33.    Kahr Arms' promotional literature describes the defendants' handguns under a headline banner of the motto: "ABSOLUTE CONCEALED POWER." (Exhibit 4)

34.    Kahr Arms' promotional literature states that Kahr Inc. specializes in the manufacturing of .45 caliber, .40 caliber and 9mm handguns. (Exhibit 4)

35.    The Chief Designer of Kahr Inc., Justin Moon is a principal of the company according to company promotional materials. (Exhibit 4)

36. The defendants' promotional literature boasts that Kahr Arms' weapons are the "the smallest, flattest, most reliable full power compact handguns made." (Exhibit 4)

37. The defendants' promotional literature states that Kahr Arms incorporates "professional technical expertise into all of its operations" and "unmatched combination of power and performance."

38. At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, had sole and exclusive possession and control of certain premises in the city of Worcester, Worcester County, Massachusetts, where they manufactured the Kahr Arms line of handguns.

39. At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did keep the handgun components and machinery necessary for production and shipment of finished Kahr handguns at 184 Prescott Street, Worcester, MA and at 130 Goddard Memorial Drive, Worcester, MA and at no other place.

40. At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did manufacture their Kahr Arms line of handguns under license by the Unites States Bureau of Alcohol, Tobacco and Firearms (hereafter "the BATF").

## SERIAL NUMBERS AND GUN LICENSES

41. The defendants' handgun manufacturing operation was, at all times material hereto, subject to various federal law and regulations the requirements of which include:

- stamping or casting of a unique serial number into the frame of each handgun produced;
- transfer of each handgun produced only to a person duly licensed to possess that individual weapon;
- positive measures to prevent and detect the unlawful transfer within handgun manufacturing facilities of handguns to persons not licensed to possess them
- reporting the theft or the unexplained disappearance from inventory of any handgun to the BATF.

42. Typically, in Massachusetts, law enforcement authorities can trace the possession history of a legally owned handgun by means of the weapon's serial number and the owners' license records.

43. The possession history of a handgun becomes more difficult after the weapon is stolen or if it does not have the required serial number.

44. Thus, handguns not stamped with serial numbers have value to criminals because they do not implicate the registered owner when used in the commission of a crime.

## RECOVERY OF STOLEN GUNS WITHOUT SERIAL NUMBERS TRACED TO KAHR ARMS

45.    **Recovery of Firearm #1** – In early December, 1999, officers of the Worcester Police Department, conducted a traffic stop of Robert Jachimczyk in Worcester, MA, and searched the vehicle. The police recovered, from underneath the front seat, a Kahr Arms K-40 .40 caliber handgun with a full magazine of ammunition. There was no serial number engraved or cast on the weapon. The police also recovered what they believed to be a small quantity of marijuana from the car. During a search incident to the arrest of the driver of vehicle, the police recovered what they believed to be small quantities of crack cocaine and powder cocaine.

46.    **Recovery of Firearm #2** - At the end of December, 1999, officers of the Worcester Police Department recovered a firearm from the yard of an apartment building in the vicinity of Main Street, in Worcester, MA. The firearm was found by a four-year-old child, who lived in the apartment building. The firearm had a round of ammunition in the chamber. The firearm was identified as a Kahr Arms 9mm handgun. There was no serial number engraved or cast on the weapon. See Memorandum of Probable Cause and Decision on Government's Motion for Detention, Criminal Action No. 00-1623-CBS, dated 3/23/00 and signed by The Honorable Charles B. Swartwood, III, Magistrate Judge. A Copy of that Memorandum is attached as Exhibit 5.

47.    Both recovered firearms, submitted by the Worcester Police Department to the Massachusetts State Police Firearms Identification Section, test-fired with no malfunctions noted.

48.    Detective James Heffernan, of the Worcester Police Department, has custody of both of recovered weapons in this case. Detective Heffernan told Special Agent Curran of the BATF that neither weapon has an engraved or cast serial number. Also, he told Special Agent Curran that the name "Kahr" is prominently displayed on the slide of each weapon.

49.    On March 13, 2000, Special Agent Curran observed both firearms and noted that there was no serial number or any marking on the receiver of the firearms. Special Agent Curran could see the name "Kahr" prominently displayed on the slide of both firearms.

## LACK OF THEFT PREVENTION MEASURES OR EMPLOYEE BACKGROUND CHECKS

50.    Upon information and belief, at all times material hereto, the defendants:
-    did not conduct criminal background or general background checks on prospective employees and hired persons with criminal records;
-    did not test present or prospective employees for indications of drug addiction;
-    did not safeguard handguns and their components with metal detectors, x-ray machines, or other devices capable of detecting handguns or components secreted on persons or in their effects;
-    did not have a security guard to check employees upon the completion of their shift to prevent theft of handguns or handgun components;
-    did not keep clear and current inventory tracking records which would

- timely reveal unauthorized removal of weapons or weapons parts from the premises;
- did not supervise its employees/did not have television security cameras; and
- allowed individuals with criminal backgrounds and individuals addicted to illegal, controlled substances to work, manufacture, assemble and come in contact with handguns and handgun components

51. It is logical and foreseeable that a gun manufacturing plant not employing human or mechanical devices (e.g. X-ray machines, metal detector machines, hand held metal detectors), not checking employees upon the conclusion of their work shift to prevent theft, allowing unqualified employees to participate in the assembly of manufacturing firearms, is more likely to suffer gun/gun component theft. It is equally foreseeable that stolen weapons from a Federal Firearms Licensee could end up being used in the commission of crimes.

52. It is foreseeable that handguns lacking a serial number or handgun components not yet stamped with a serial number will be used in future crimes.

## CARELESS INVENTORY TRACKING AT KAHR ARMS

53. On or about February 8, 1999, ATF Special Agent Michael P. Curran responded to Kahr Arms at 184 Prescott St. in Worcester, MA on a report of 10 lost firearms from a UPS shipment originating from Kahr Arms. The weapons shipped on December 17, 1998, did not arrive at the intended destination. Five of the missing weapons were 9mm. and five were .40 cal. Discussions between Special Agent Curran and Kahr Arms representatives revealed that in the year prior to February 8, 1999, there had been 15 or 16 shipments of firearms that never reached their intended destination.

54. From February of 1998 to February of 1999, approximately 16 shipments of handguns from Kahr Arms to legal buyers failed to arrive at their points of destination and there has been no accounting for the weapons lost.

55. In December 1998, Kahr reported to the United States Bureau of Alcohol, Tobacco and Firearms (BATF) that 10 handguns, which Kahr Arms had shipped from Worcester, MA did not reach their destination.

56. According to one April 2, 2000, news article from the Worcester Sunday Telegram, "as many as 17 Kahr shipments may not have reached their destinations." In another article, dated April 29, 2000, Worcester Police Detective Capt. Paul F. Campbell said that, "going back to 1998, as many as 50 weapons manufactured at the plant may be missing. I'm just trying to find out how many are missing and what happened to them." In the same article, Shaun Sutner a Telegram & Gazette reported wrote about a reporter who "was able to proceed through the public entrance one recent afternoon without being greeted by a security guard or passing through a metal detector. The reporter signed the guest book, then waited unaccompanied for several minutes before a manager told him to leave the premises". In another instance, Kahr shipped a 'Tommy gun' that never arrived. Worcester Telegram & Gazette, May 11, 2000.

57.   Prior to April 1, 2000, Kahr did not use inventory-tracking records, which would timely reveal unauthorized removal/loss of weapons or weapons parts from its premises.

58.   On March 16, 2000, inspectors of the Federal Bureau of Alcohol, Tobacco and Firearms reviewed records of the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. The records indicated that the 9mm. handgun bearing serial number GC0913 was theoretically still in Kahr's secured weapons inventory, though it had already been stolen by Scott Anderson.

59.   On March 16, 2000, the Worcester Police Department confirmed security problems at the Kahr Arms facility had been discovered and Kahr had been ordered by WPD to take corrective action. Among the shortcomings the department identified were unsecured storage of handgun components, and inadequate tracking of handgun components.

60.   On or about April 1, 2000, Captain Paul F. Campbell of the Worcester Police Department who was responsible for overseeing corrections to Kahr Arms security system stated that the department had found record keeping at the Kahr Arms plant at 130 Goddard Memorial Drive to be so "shoddy" that it was possible to remove handguns from inventory without detection. At all times material weapons were stolen because of Kahr's shoddy inventory system that allowed criminals to steal weapons without detection.

61.   The Violent Crime Control and Law Enforcement Act of 1994 included a requirement for Federal Firearm Licensees to report theft or loss of firearms from their inventory or collection to the ATF and local law enforcement within forty-eight (48) hours after discovery. However, not until April 7, 2000, and April 8, 2000, did Kahr Inc.'s Randall Cassidy report to the Worcester Police Department and to the Bureau of Alcohol, Tobacco & Firearms that forty-one (41) handguns manufactured years earlier with serial numbers were missing from the inventory of the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. These include but are not limited to: three 9mm handguns made between 10/3/95 and 12/19/95; nine 9mm handguns and one .40 cal. made between 1/17/97 and 8/21/97; one 9mm made in 1998, three 9mm made between 1/20/99 and 9/23/99 and one .40 cal made on 7/19/99. (Exhibit 6).

62.   At all times material to this matter, the defendants' inventory tracking system at the Kahr Arms plant in Worcester did not reveal the unauthorized removal of weapons or weapon components from the inventory. In particular, the inventory system did not safeguard against illicit removal of weapons before identification numbers were engraved or cast into them as required by law before such firearms can be released into the stream of commerce.

<u>MARK CRONIN</u>

63.   On or about March of 1999, the defendants, acting by and through Kahr, Inc., did hire one Mark M. Cronin to work at the Kahr Arms manufacturing facility in Worcester.

64. Public Court records revealed that Mr. Cronin had previously been arrested on various charges and had an extensive criminal background:

- Probate and Family Court records indicate that as early as December, 1995, Mr. Cronin was addicted to cocaine and was habitually stealing money to support his cocaine habit.

- In addition, in the Complaint for Divorce filed on or about July 2, 1996, Stephanie Cronin alleges, among other things, that "On or about December, 1995, the defendant (Mark Cronin) had a serious addiction to (crack)."

- Assault and battery in March of 1998, in Worcester. The case was continued without a finding, on condition that Mr. Cronin undergo assessment and counseling for alcohol abuse.

- Domestic assault and battery in November of 1997 in Worcester. The case was continued without a finding after the defendant admitted to facts sufficient to prove the charge, on condition that he seek counseling for anger management.

- In 1998, an operating under the influence charge was continued without a finding (1 year probation, 24D Program)

- Also in 1998 Cronin filed a guilty plea to operating vehicle after suspension of license.

- Also in 1998 a charge of giving a false name to a police officer was dismissed.

- On July 29, 1999 Stephanie Cronin filed a complaint in the Worcester Division of the Commonwealth of Massachusetts, Probate and Family Court, against Mark Cronin, Defendant. The complaint alleges, among other things, that Mark Cronin violated a previous order of support by "not reporting new 2nd job as well as overtime at current position at Saeilo on Prescott St. in Worcester."

65. These records of prior arrests were public records that were readily available to the agents, servants and employees of the defendants to determine whether Mr. Cronin was suitable for employment at their handgun manufacturing facility and to determine whether, under federal law, his criminal record disqualified him from such employment. Section 922 of the Gun Control Act of 1968, Public Law 90-618, Title 18, U.S. Code (which would have been in effect in 1999), makes it unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year or been convicted in any court of a misdemeanor crime of domestic violence, to ship, transport or possess any firearm or ammunition or to receive any firearm or ammunition. Clearly, the policy behind this law is to prevent criminals like Mr. Cronin from handling handguns. A simple record review would have revealed that Mr. Cronin should not be working in a gun manufacturing facility.

## A COOPERATING WITNESS (JACHIMCZYK) LEADS INVESTIGATORS TO KAHR EMPLOYEE, MARK CRONIN

66. On or about December 2, 1999, the Worcester Police Department recovered a loaded Kahr Arms .40 caliber handgun with no serial number from a motor vehicle in the possession of one Robert Jachimczyk.

67. According to Docket 9962CR012118, on or about December 2, 1999, before Judge Elliott L. Zide, Robert W. Jachimczyk was charged with the following offenses: 1) Possession of Cocaine; 2) Possession of Marijuana; 3) possession of a Kahr .40 cal. handgun with one full magazine without a Firearm ID; 4) operating a motor vehicle with a suspended license; 5) Failed to use care, in violation of C9 18 of the City or town of Worcester. An additional count for 269/10/J Firearm, Carry without a license c 269 Section 10 was dismissed upon the Commissioner's request.

68. In or about December, 1999, ATF Special Agent Curran was contacted by the Worcester Police Department, in relation to the recovered firearms and had an opportunity to interview a Cooperating Witness (Jachimczyk).

69. On or about December 29, 1999, Jachimczyk provided Special Agent Curran with the following information in relation to firearms. On evening of December 1, 1999, Jachimczyk exchanged two "half grams" of cocaine, valued at approximately $80, for a firearm which was provided to Jachimczyk by Mark Cronin (hereinafter Cronin). Jachimczyk has known Cronin for several years.

70. Jachimczyk reported that shortly after obtaining the firearm from Cronin, the weapon was seized by the Worcester Police Department in the course of a traffic stop. Jachimczyk went on to provide additional information about an earlier transaction involving Cronin in which Cronin provided a seven shot 9mm firearm to Jachimczyk in exchange for approximately $80 worth of cocaine. This weapon, as well, did not have a serial number. This exchange took place a few months earlier than the December, 1999 exchange. Jachimczyk traded the 9mm to a third-party, in exchange for two bundles of 'dope' [heroin].

71. On or about March 3, 2000, Jachimczyk provided Special Agent Curran with the following information. Specifically, in November 1999, Cronin approached Jachimczyk at the Green Island Pub in Worcester, MA, and asked Jachimczyk if he would like to buy a firearm. Cronin told Jachimczyk he worked at a local firearm manufacturer. Cronin told Jachimczyk that he had taken the firearm out of the company, that he "does it all the time, and that [he] can just walk out with them." Cronin told Jachimczyk that the firearm he had for sale does not have a serial number because it bypassed the serial number stamping process at the factory. Cronin told Jachimczyk that the firearm was a 9mm caliber. Cronin told Jachimczyk that he knew the firearm functioned because he test-fired it at work. Jachimczyk and Cronin went to a Worcester residence where Jachimczyk was staying, and made the exchange.

72. Jachimczyk provided Cronin with 2 'half grams' of powder cocaine in exchange for the 9mm Kahr Arms firearm. After the exchange, Cronin drove Jachimczyk to a third-party's house, at which point Jachimczyk went into an apartment where he traded the firearm to a third-party for 2 bundles of heroin. Cronin stayed in the car during this transaction. Following the exchange, Jachimczyk returned to the car operated by Cronin.

73.    Again, in connection with the proffer agreement, Jachimczyk provided information in relation to a second transaction with Cronin. On December 1, 1999, Cronin came into the Green Island Pub and asked Jachimczyk if he wanted to purchase another firearm. Cronin stated that it was a bigger firearm, a .40 caliber, and it was his personal gun. Jachimczyk and Cronin agreed to trade two 'half grams' of cocaine for the firearm. Cronin left the bar and returned shortly thereafter with the firearm. Cronin stated that he had to go home and get the firearm.

74.    Cronin returned to the bar a short while later and showed Jachimczyk the firearm. Jachimczyk and Cronin left the bar and left in the car operated by Jachimczyk. A short distance from the bar, Cronin removed a safety lock from the weapon and gave the firearm to Jachimczyk, who placed it under the front seat of the car. Jachimczyk gave Cronin 2 'half-grams' of powder cocaine, as well as a crack cocaine rock, in exchange for the firearm. Following the exchange, Jachimczyk and Cronin drove back to the bar. Cronin went inside the bar, leaving Jachimczyk outside in the car.

75.    Shortly thereafter, the Worcester Police Department stopped the car operated by Jachimczyk and recovered a firearm from underneath the front seat. Jachimczyk was provided with a photocopy of a photograph of Cronin and identified the person depicted as Mark Cronin.

76.    Jachimczyk has a criminal record. In addition to the offenses described above, in 1995, Jachimczyk was arrested for possession of marijuana and operating under the influence of liquor. Both charges were dismissed. Jachimczyk has history of drug use, including the use of heroin, cocaine, crack, and marijuana. In addition, Jachimczyk has distributed controlled substances and supplied various customers in the past.

77.    Law enforcement agents provided Jachimczyk with a hidden recording device, which enabled law enforcement agents to monitor and record conversations between Jachimczyk and others. On March 8, 2000, at the direction of law enforcement, Jachimczyk went to Cronin's apartment and engaged Cronin in a conversation in relation to the firearms, which Cronin provided to Jachimczyk. Jachimczyk told Cronin that Jachimczyk and Jachimczyk 's friend had been subpoenaed to provide information in relation to the origin of the firearms. Among other things, Cronin encouraged Jachimczyk to falsely tell authorities that Jachimczyk obtained "the gun off some guy off the street."

78.    Cronin admitted in the tape recording that he provided Jachimczyk with the guns: "[G]ranted, I shouldn't have got you the gun, but second of all it's not like the minute you asked me you got it. It was a couple of months in between from that second from that next gun." Also, during the conversation, Cronin removed from a nearby bureau a loaded magazine and demonstrated that a magazine holds six rounds of ammunition.



79. Because of his cooperation in convicting Cronin, on October 30, 2000, Jachimczyk received the following sentences for his crimes:

Drug possession class B: guilty plea, sentenced to pre trial probation consisting of 6 months in House of Corrections, 12 days to serve, balance suspended until 10/23/02

Class D: guilty plea, sentenced to pre trial probation consisting of 6 months in House of Corrections, 12 days to serve, balance suspended until 10/23/02

Carrying firearm without a license c. 269 Section 10 (which carries a mandatory jail term of a year in House of Correction for a first offense): dismissed upon request of Commonwealth

Carrying firearm without a federal ID card Section 10(G): guilty plea -- 6 mo. House of Correction, 12 days to be served, credit time served/ balance suspended and 2 years probation

Ultimately, in violation of his probationary terms, Jachimczyk was reprobated on June 13, 2001.

80. On or about March 16, 2000, Mark Cronin was arrested on charges of stealing handguns from the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester. He later pleaded guilty and was convicted.

81. In summary, in mid-October of 1999, Mark Cronin did in the course of his employment at the defendants' Worcester plant, obtain a Kahr Arms 9 millimeter handgun with no identification numbers cast or engraved into the body of the gun.

79. Mr. Cronin obtained the 9mm in violation of federal and state law and as a direct and proximate result of defendants' failure to have such reasonable measures in place for the prevention, deterrence, or detection of handgun theft as are prevalent throughout the handgun manufacturing industry in Massachusetts and the United States - metal detectors, X-ray scanners, effective inventory tracking, etc. In addition, defendant Kahr Arms failed to adequately supervise or monitor him.

80. By his own admissions and as shown by other evidence in the federal district court, Mr. Cronin removed the 9mm handgun from the Kahr Arms facility in Worcester with the intent of exchanging it for crack cocaine.

81. In October or November of 1999, Mr. Cronin introduced the 9 millimeter handgun into the stream of commerce, selling the stolen gun to Robert Jachimczyk, in exchange for one gram of cocaine - Mr. Jachimczyk in turn traded this firearm to a third party, defendant Edwin Novas in exchange for heroin with deadly consequences. The identity of this third party is unknown to the plaintiff but upon information and belief the party was Edwin Novas, a Dominican national, who is a fugitive from justice. Mr. Novas had had numerous encounters with the criminal justice system in the Commonwealth of Massachusetts months before December 24, 1999.

## DANNY GUZMAN IS KILLED WITH A STOLEN KAHR ARMS HANDGUN

82.   On December 24, 1999, at approximately 1:54 a.m., Danny Guzman, an innocent bystander, was shot in the 800 block of Main Street in Worcester in front of the Tropigala nightclub with the 9 mm handgun defendant Cronin had easily stolen from his employer, defendant Kahr Inc.  Tragically, Danny Guzman was pronounced dead at St. Vincent's Hospital in Worcester, Massachusetts at approximately 0212 of a single gunshot wound to the chest which created two (2) holes in his heart – one entrance, one exit.  The attending physicians listed the mechanism of injury as a "? 9 mm bullet".

83.   At the time of this senseless and preventable homicide, Kahr Arms manufactured 13 different types of 9 mm handguns.

84.   On or about December 30, 1999, the Worcester Police Department recovered a loaded Kahr Arms 9 millimeter handgun (similar to the 7 round magazine K9 model) with no serial number in a lot on Benefit Street in Worcester, near the place where Mr. Guzman was shot. The gun was found by a four year-old child.  Ballistics tests determined that this very Kahr handgun fired the shot that struck and killed Danny Guzman.  A photo of a K9 model 9 mm is attached as Exhibit 7.

85.   On March 23, 2000, the Honorable Charles B. Swartwood, III, found in his Memorandum of Probable Cause and Decision of Government's Motion For Detention and Findings of Fact at paragraphs 1,2,3,4 and 5 that the 9mm firearm used in the homicide of Danny Guzman was the Kahr Arms 9mm provided by Cronin.  Specifically at paragraph 2, Judge Swartwood, III writes, "In late December 1999, a four year old child found a loaded 9 mm Kahr firearm in the yard of an apartment building in the vicinity of Main Street, Worcester, MA.  This weapon was traced to a homicide outside the Tropicala (sic) Night Club located in the Main South area of Worcester."  Exhibit 5 at p. 2.

86.   As late as September 2000, the WPD continued with its active investigation into handguns lost or stolen from Kahr Arms at 130 Goddard Memorial Drive, Worcester, Massachusetts.

## SCOTT ANDERSON- ANOTHER KAHR EMPLOYEE PLEADS GUILTY TO STEALING GUNS FROM KAHR

87.   On or about March of 1999, the defendants, acting by and through Kahr, Inc., did hire one Scott R. Anderson to work at the Kahr Arms manufacturing facility in Worcester.

88.   On March 16, 2000, ATF Agents and Worcester Police Department officers, in connection with an investigation regarding firearm thefts from Kahr Arms, interviewed Scott Anderson, a Kahr Arms employee.

89.   ATF Special Agent Thomas Lyster and Worcester Police Department Captain Paul Campbell interviewed Anderson in a conference room at Kahr Arms.  Special Agent Lyster advised Anderson that he was implicated in the theft of firearms at Kahr Arms, and he told Anderson that he was not under arrest.

90.   Anderson admitted stealing a Kahr Arms handgun approximately four or five months before
      the interview (March 16, 2000). Anderson said that the handgun was in a box in his bedroom
      closet. Anderson admitted that he stole a slide for another Kahr Arms handgun that he had
      legally purchased. Anderson provided a written statement to law enforcement and admitted
      taking the Kahr Arms handgun and slide from his place of employment, Kahr Arms.

91.   Following the interview, ATF Agents accompanied Anderson to his residence. Anderson
      gave verbal consent and also signed a form authorizing ATF Agents to enter and search his
      apartment. After signing the agreement, Anderson brought ATF Agents Thomas Lyster and
      Seref McDowell into his apartment. Anderson retrieved a Kahr Arms semi-automatic
      handgun, model MK9 9mm, serial number GC0913, and an additional slide for a Kahr Arms
      model K9 handgun that was unlawfully taken from Kahr Arms. Anderson turned over
      firearm and additional slide to Special Agent Lyster.

92.   On March 16, 2000, special agents of the Federal Bureau of Alcohol, Tobacco and Firearms
      interviewed Scott Anderson. Anderson confessed that he had stolen a 9mm Kahr Arms
      handgun and a major handgun component from the Kahr Arms plant. The BATF agents
      recovered such a weapon, bearing serial number GC0913, from Mr. Anderson's home.

93. On April 27, 2000, Scott Anderson was charged in the U. S. Massachusetts District Court, with stealing a 9mm handgun from the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. Anderson pleaded guilty. On March 20, 2001, he was sentenced to nine months home detention as part of a three-year probation for stealing the firearm.

### COUNT I – KAHR INC., D/B/A, KAHR ARMS, INC. or KAHR AUTO ORDNANCE
### GROSS NEGLIGENCE/ NEGLIGENT HIRING AND SUPERVISION/
### RESPONDEAT SUPERIOR/WRONGFUL DEATH, G.L. c.229, Section 2

94. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 93.

95. As a result of Kahr Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

96. As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

97. As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT II – SAEILO, INC.
### GROSS NEGLIGENCE/ NEGLIGENT HIRING AND SUPERVISION/
### RESPONDEAT SUPERIOR/WRONGFUL DEATH, G.L. c.229, Section 2

98. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 97.

99. As a result of Saeilo, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.



100.  As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

101.  As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT III – SAEILO MACHINERY MA, INC.
### WRONGFUL DEATH, G.L. c.229, Section 2

102.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 101.

103.  As a result of Saeilo Machinery MA, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

104.  As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

105.  As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT IV - SAEILO MACHINERY USA, INC.
### WRONGFUL DEATH, G.L. c.229, Section 2

106.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 105.

107.    As a result of Saeilo Machinery USA, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

108.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

109.    As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

## COUNT V - SAEILO MANUFACTURING INDUSTRIES
## WRONGFUL DEATH, G.L. c.229, Section 2

110.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 109

111.    As a result of Saeilo Manufacturing Industries' wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

112.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.



113.   As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

## COUNT VI - MACHINE INDUSTRIES, INC.
### WRONGFUL DEATH, G.L. c.229, Section 2

114.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 113

115.   As a result of Machine Industries, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

116.   As a direct and proximate result, an unlicensed, serial number-less 9 mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

117.   As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

## COUNT VII - SAEILO EQUITY INVESTMENTS, LP
### WRONGFUL DEATH, G.L. c.229, Section 2

118.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 117

119.  As a result of Saeilo Equity Investments, LP's wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

120.  As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

121.  As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

## COUNT VIII - ONE UP ENTERPRISES, INC.
## WRONGFUL DEATH, G.L. c.229, Section 2

122.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 121.

123.  As a result of One Up Enterprises, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

124.  As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.



125.    As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

**COUNT IX – EDWIN NOVAS**
**NEGLIGENCE/HOMICIDE/WRONGFUL DEATH**
**GEN. LAWS c.229, Section 2**

126.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 125.

127.    As a direct and proximate result of the carelessness and negligence of Edwin Novas, who negligently or intentionally discharged a Kahr 9mm handgun, Daniel Guzman suffered grievous injury and eventual death, and the daughters of Daniel Guzman, and Juana Hernandez, individually, have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

**COUNT X – MARK CRONIN**
**NEGLIGENCE/WRONGFUL DEATH**
**GEN. LAWS c.229, Section 2**

128.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 127.

129.    As a direct and proximate result of the carelessness and negligence of Mark Cronin, who negligently intentionally placed a Kahr 9mm handgun into the stream of commerce, when it was likely and foreseeable that it would be used in a crime, Daniel Guzman suffered grievous injury and eventual death, and the daughters of Daniel Guzman, and Juana Hernandez, individually, have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

## COUNT XI – ROBERT JACHIMCZYK
### NEGLIGENCE/WRONGFUL DEATH
### GEN. LAWS c.229, Section 2

130.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 129.

131.    As a direct and proximate result of the carelessness and negligence of Robert Jachimczyk, who negligently intentionally placed a Kahr 9mm handgun into the stream of commerce, when it was likely and foreseeable that it would be used in a crime, Daniel Guzman suffered grievous injury and eventual death, and the daughters of Daniel Guzman, and Juana Hernandez, individually, have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

## COUNT XII – ALL DEFENDANTS
### JOINT AND SEVERAL LIABILITY

132.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 131 into this count.

133.    As direct result of the joint negligence of the defendants in this action, Daniel Guzman, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death.

## COUNT XIII - KAHR INC., D/B/A, KAHR ARMS, INC. or KAHR AUTO ORDNANCE and SAEILO, INC.
### PUBLIC NUISANCE

134.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 133 into this count.

135.    Kahr Arms' utter lack of security and lax practices have caused injury to the public, and specific injury to decedent Daniel Guzman and the plaintiffs by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

136.    Kahr Arms' behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT XIV – ALL CORPORATE DEFENDANTS
## PUBLIC NUISANCE

137.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 136 into this count.

138.   The corporate defendants' utter lack of security and lax practices have caused injury to the public, and specific injury to decedent Daniel Guzman and the plaintiffs by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

139.   This behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT XV
## UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)
## SCOTTSDALE INSURANCE COMPANY ("SCOTTSDALE")

140.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 139 into this count.

141.   Scottsdale's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

142.   Scottsdale has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

143.   Plaintiff suffered damages as a result of Scottsdale's unfair or deceptive conduct.

## COUNT XVI
## UNFAIR INSURANCE PRACTICES UNDER G.L.c.93A
## SCOTTSDALE INSURANCE COMPANY ("SCOTTSDALE")

144.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 143 into this count.

145.   Scottsdale's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

146. Plaintiff contends Scottsdale is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

147. Scottsdale has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

148. Plaintiff has suffered damages as a result of Scottsdale's unfair or deceptive conduct.

## COUNT XVII
### UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)
### GENERAL STAR MANAGEMENT COMPANY ("GENERAL STAR")

149. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 148 into this count.

150. General Star's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

151. General Star has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

152. Plaintiff has suffered damages as a result of General Star's unfair or deceptive conduct.

## COUNT XVIII
### UNFAIR INSURANCE PRACTICES UNDER G.L.C.93A
### GENERAL STAR MANAGEMENT COMPANY ("GENERAL STAR")

153. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 152 into this count.

154. General Star's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

155. Plaintiff contends General Star is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

156.  General Star has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

157.  Plaintiff has suffered damages as a result of General Star's unfair or deceptive conduct.

**COUNT XIX**
**UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)**
**UTICA MUTUAL INSURANCE COMPANY ("UTICA")**

158.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 157 into this count.

159.  Utica's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

160.  Utica has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

161.  Plaintiff has suffered damages as a result of Utica's unfair or deceptive conduct.

**COUNT XX**
**UNFAIR INSURANCE PRACTICES UNDER G.L.C.93A**
**UTICA MUTUAL INSURANCE COMPANY ("UTICA")**

162.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 161 into this count.

163.  Utica's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

164.  Plaintiff contends Utica is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

165.  Utica has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

166.  Plaintiff has suffered damages as a result of Utica's unfair or deceptive conduct.

## COUNT XXI
## REQUEST FOR DECLARATORY DETERMINATIONS UNDER G.L.c.231a

167.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 166 into this count.

168.  Plaintiff has been informed by representatives of Scottsdale and Utica that coverage is being denied Kahr Arms et al. relative to the instant action, on the basis of various alleged exclusions contained in their respective policies of insurance.

169.  Scottsdale and Utica contend there is no coverage afforded their respective insureds on grounds that a so-called "completed product" exclusion applies.

170.  A real controversy has arisen as to whether or not this exclusion applies in the instant dispute.

171.  On information and belief, after carefully reviewing the policies of both carriers (Scottsdale and Utica) plaintiff believes that the exclusion claimed has no merit.

172.  Plaintiff is requesting that the Court make a determination regarding the application of the exclusion and consequently the obligations of the insurers Scottsdale and Utica.

173.  Also, plaintiff hereby requests a binding declaration by this Court that General Star's eroding policy of insurance, which is being used to finance Kahr's defense in this action, not be further depleted by: 1) any work or appearances related to disputes of insurance coverage; and 2) any work or appearances related to defense of plaintiff's 93A claims.

## DEMANDS FOR RELIEF

The Plaintiffs hereby respectfully request the following relief:

1.  All compensatory damages recoverable;

2.  All punitive damages recoverable (in an amount no less than five thousand dollars pursuant to the tenets of as provided in M.G.L. c. 229 § 2);

3.  Compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent;

4.  The reasonable funeral and burial expenses of the decedent as provided in M.G.L. c. 229 § 2;

5.  All attorney's fees, costs and expenses allowable;

6.  A binding declaration of the inapplicablility of the completed product exclusion and the coverage obligations of insurance carriers Scottsdale and Utica;

7.      A binding declaration that General Star's eroding policy of insurance, which is being used to finance Kahr's defense in this action, not be further depleted by: 1) any work or appearances related to disputes of insurance coverage; and 2) any work or appearances related to defense of plaintiff's 93A claims.

8.      Any and all other relief as the Court deems just and proper.


**PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS RAISED IN THE COMPLAINT.**


                                        Respectfully submitted,
                                        Plaintiffs' Co-counsel,


                                        _____
                                        Hector E. Pineiro, Esquire, BBO # 555315
                                        Robert H. Beadel, Esquire, BBO # 632447
                                        807 Main Street
                                        Worcester, MA 01610
                                        Tel. (508) 770-0600

                                        And

                                        Dennis Henigan, Esquire, Director, Legal Action Project
                                        Brian J. Siebel, Esquire
                                        Daniel R. Vice, Esquire
                                        Brady Center To Prevent Gun Violence
                                        1250 Eye St., N.W., Suite 802
                                        Washington, D.C. 20005
                                        Tel. (202) 289-7319

# EXHIBIT 1

Commonwealth of Massachusetts
The Trial Court
Probate and Family Court Department

_____ Division

Docket No. _____

## Administration With/Without Sureties

Name of Decedent _____

Domicile at Death _____
_____ Street and No. _____ City or Town _____ County _____

Date of Death _____

Name and address of Petitioner(s) _____
_____ Status _____

Heirs at law or next of kin of deceased including surviving spouse:

| Name | Residence (minors and incompetents must be so designated) | Relationship |
|------|-----------------------------------------------------------|--------------|
| Tammy | | |
| | | |

[X] The petitioner(s) hereby certify that a copy of this document, along with a copy of the decedent's death certificate has been sent by _underlined certified mail_ to the Department of Public Welfare, P.O. Box 86, Essex Station, Boston, Massachusetts 02112.

Petitioner(s) pray(s) that he/she/they or some other suitable person _____
of _____ in the County of _____
administrat___ of said estate with/without surety on his/her/their bond(s) and certif___ be appointed under the penalties of perjury that the foregoing statements are true to the best of his/her/their knowledge and belief.

Date _____

Signature(s) _____

The undersigned hereby assent to the foregoing petition.

## DECREE

All persons interested having been notified in accordance with the law or having assented and no objections being made thereto, it is decreed that _____
_____ County of _____
be appointed administrat___ of said estate first giving bond
_____ sureties for the due performance of said trust.

Date _____

_____
JUSTICE OF THE PROBATE AND FAMILY COURT

# EXHIBIT 2

Commonwealth of Massachusetts
The Trial Court
Probate and Family Court Department

Division _____

Docket No. _O_2_P2_000_

## Guardianship of Minor With — Without — Sureties

Name of Ward(s):

(1) _Tammy L. Moore_          Residence _55 Worcester St. So. Tolbridge, MA 01772_    Date of Birth _____

(2) _____

(3) _____

*If the petitioner is an agency then only one ward is permitted on each petition. Each ward must have the same mother and father to be listed on the same petition.

PETITIONER(S) _Holly Walski_ , 31 Gwen Street, Worcester, MA Grandmother
                        (PRINT Name(s) of Petitioner(s), and street address(es))          (relationship to ward)

List the names of parents, if known, otherwise name grandparents, sisters, brothers, aunts, or uncles (who are over 18).

| Name | Residence | Relationship |
|---|---|---|
| Tammy L. Atrocco c/o Holly Walski 31 Worcester St. So. Bridge | | mother |
| Danny Guzman | | father - deceased |

The minor(s) is/are — not — entitled to benefits, estate, or income paid or payable by or through the United States Veterans Administration. I/We certify that the ward's estate — does — does not — exceed $100.00.

WHEREFORE, the petitioner(s) pray(s) that _Mark Zarrow, Esquire of 30 Mechanic Street Worcester_ a suitable person — be appointed the guardian of the minor(s) — and the estate — with custody — with — without — surety on the bond — the parent(s) being unfit. MA

Date _Nov 11, 2001_          _____          _____
                        (signature of petitioner [1])          (signature of petitioner [2])

### Nomination of Ward(s)

Then personally appeared _____ minor(s) being above the age of fourteen years, who nominate(s) _____ to be his, her, their guardian.

Before me, _____
                        (signature of minor)

NOTARY PUBLIC/JUSTICE OF THE PEACE          My Commission Expires _____

### Parental Assent

I/We, the surviving parent(s) — spouse — of the minor hereby assent(s) to the granting of the foregoing petition

Date _1/30/01_          _Holly Walski_          _____
        (sig)                (signature of parent)                (signature of parent)

### DECREE

All persons interested having been notified in accordance with the law or having assented and no objections being made thereto.

It is decreed that _____          Mark Zarrow _____

of _____Worcester,_____          In the County of Worcester

be appointed _permanent_ guardian — with custody — of the person — and of the estate — of the above-named minor(s), first giving bond with _out_ sureties for the due performance of the trust. 

it is further ordered _____

Date _January 2, 2002_          _____

# EXHIBIT 3



Saello Machinery
(USA) Inc

September 13th, 1997

Inspector ████████
Bureau of Alcohol, Tobacco and Firearms
5 World Trade Center  5th floor
New York, New York 10048-0901

Dear ████████

Thank you for the booklets and forms which you sent as a follow up to your
meeting of August 25th 1997 with Messrs. Kunn and Oikeman.

This is in response to your request for information concerning significant
shareholders of Saello Machinery (USA) Inc. ("Saello Machinery"). The only significant
shareholders of Saello Machinery are One-Up Enterprises Inc. and Saello (USA) Inc.
The only individual other than the officers and directors of Saello Machinery who
exercises, "directly or indirectly, the power to direct or cause the direction of the
management and policies of the corporation", as specified in a U.S.C. section
921(a)(9)(B), is Kock Jin Moon, who has an ownership interest in Saello (USA) Inc. and is
president of Saello, Inc., an affiliate of Saello Machinery. Saello, Inc. already holds an
FFL and Mr. Moon's information is therefore already on file.

As we believe was explained, our intention is to import Saello's sporting rifles and
firearms as well as manufacture them. While the regulations would not allow us to
do this under the name of the American entity that first obtained a licence, we plan to
use existing distribution channels wherever we would like to conduct import and
distribution activities through a different corporation.

The requested information concerning Mr. Oikeman is enclosed.

If I can be of further assistance in expediting this matter, please do not hesitate to
contact me.

Sincerely.

████████

Chief Financial Officer



# EXHIBIT 4



MADE WITH PRIDE
IN THE U.S.A.

MK40 The smallest
40S&W pistol in the world!

New!!
K9 Polymer Frame
Less than 16 ounces

# ABSOLUTE
# CONCEALED
# POWER

When the unexpected happens. Kahr's unmatched combination of power and performance can save your life. Kahr pistols are the smallest, flattest, most reliable full power compact pistols made.

Despite their diminutive size, Kahr pistols perform outstandingly and feel so good in the hand because key elements such as ergonomics, balance and accuracy were addressed in the earliest design stages. The unique cocking cam system provides a safe double action only trigger stroke, fast to fire in critical defensive situations.

Kahr pistols are duty ready right out of the box. Kahr's two newest products the micro-compact MK40 and the K9 polymer frame are now available. Kahr's K9 polymer frame weighs in at less than 16 ounces and has one of the slimmest profiles of any defensive handgun. All of Kahr's pistols are backed by our Limited Lifetime Warranty. For more information, see your dealer today.



Kahr Ordnance Corporation

KAHR ARMS



...tensive Testing
Quality is never compromised in the making of
the Kahr.

The development of the Kahr handgun
involved numerous testing sessions during
which 10,000 rounds of ammunition were fired
through a single Kahr pistol. Each Kahr model
has been extensively tested to assure the relia-
bility, function, accuracy and safety of each
component and of the final product.

As a result, Kahr has produced the most reli-
able compact firearm in the world today. We, at
Kahr, have total confidence in the durability
and long-term reliability of our Kahr pistols.

## The Final Product –
## Concealed Power

The designer's first priority for the Kahr pistol
was concealed power, and that is the final
product.

The union of advanced design, quality materi-
als and proper construction makes Kahr the
smallest, thinnest, most reliable full power
compact pistol.

Reliability. Unless the gun is 100% reliable, all
else is meaningless. Kahr pistols have proven
their reliability in testing by Federal, State and
local agencies.

Size. Ergonomically, the Kahr compact pistol
excels. The gun is easy to shoot well, and com-
fortable to carry for extended periods due to its
thin profile.

Power. Despite their diminutive size, Kahr pis-
tols deliver full size ballistic performance.

So, when it comes to protecting your life,
choose concealed power. Choose the gun
marked KAHR.

Absolute Concealed Power!





**Caliber:** 9mm **Capacity:** 7+1  **Operation:** Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  **Trigger Weight:** Approx. 7.10 lbs  **Barrel:** 3.5", polygonal rifling; 1:10 right-hand twist  **Length O/A:** 5.8"  **Height:** 4.5"  **Slide Width:** .90"  **Weight:** Pistol 15.8 ounces, Magazine 1.9 ounces  **Construction:** Polymer frame, stainless steel slide  **Grips:** textured polymer  **Sights:** Low profile, white bar-dot (tritium night sights optional)  **Finish:** Matte stainless steel  **Magazines:** 2 - Stainless, 7-round  **Warranty:** Limited Lifetime

*KP9093, Polymer Frame, Stainless Slide,
Elite 98 Trigger*



**Caliber:** .40 S&W **Capacity:** 5+1  **Operation:** Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  **Trigger Weight:** Approx. 7.10 lbs  **Barrel:** 3.6", polygonal rifling; 1:15 right-hand twist  **Length O/A:** 5.25"  **Height:** 4.0"  **Slide Width:** .94"  **Weight:** Pistol 23.1 ounces, Magazine 1.9 ounces  **Construction:** Stainless steel  **Grips:** Wraparound, textured nylon  **Sights:** Low profile, white bar-dot (tritium night sights optional)  **Finish:** Matte stainless steel  **Magazines:** 1 each: 5-round flush baseplate & 6-round grip extension  **Warranty:** Limited Lifetime

*M4043, Stainless Steel / M4048, Stainless Elite 98*



**Caliber:** .40 S&W **Capacity:** 5+1  **Operation:** Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  **Trigger Weight:** Approx. 7.10 lbs  **Barrel:** 3.5", polygonal rifling; 1:15 right-hand twist  **Length O/A:** 5.1"  **Height:** 4.55"  **Slide Width:** .94"  **Weight:** Pistol 24.1 ounces, Magazine 1.9 ounces  **Construction:** Ordnance steel or stainless steel  **Grips:** Wraparound, soft polymer (exotic wood optional)  **Sights:** Low profile, white bar-dot (tritium night sights optional)  **Finish:** Matte black, matte stainless steel  **Magazines:** 2 - Stainless, 6-round  **Warranty:** Limited Lifetime

*K4040, Matte Black / K4043, Stainless Steel
K4046, Stainless Elite 98*



**Caliber:** 9mm **Capacity:** 6+1  **Operation:** Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  **Trigger Weight:** Approx. 7.10 lbs  **Barrel:** 3", polygonal rifling; 1:10 right-hand twist  **Length O/A:** 5.3"  **Height:** 4.0"  **Slide Width:** .90"  **Weight:** Pistol 22.1 ounces, Magazine 1.9 ounces  **Construction:** Stainless steel  **Grips:** Wraparound, textured nylon  **Sights:** Low profile, white bar-dot (tritium night sights optional)  **Finish:** Matte stainless steel  **Magazines:** 1 each: 5-round flush baseplate & 7-round grip extension  **Warranty:** Limited Lifetime

*M9093, Stainless Steel / M9096, Stainless Elite 98*



**Caliber:** 9mm **Capacity:** 7+1  **Operation:** Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  **Trigger Weight:** Approx. 7.10 lbs  **Barrel:** 3.5", polygonal rifling; 1:10 right-hand twist  **Length O/A:** 5.8"  **Height:** 4.5"  **Slide Width:** .90"  **Weight:** Pistol 22.1 ounces, Magazine 1.9 ounces  **Construction:** Ordnance steel or stainless steel  **Grips:** Wraparound, soft polymer (exotic wood optional)  **Sights:** Low profile, white bar-dot (tritium night sights optional)  **Finish:** Matte black, matte stainless steel  **Magazines:** 2 - Stainless, 7-round  **Warranty:** Limited Lifetime

*K9090, Matte Black / K9093, Stainless Steel
K9096, Stainless Elite 98*

## Kahr's Premium Stainless Models – The Elite 98 Series

The Elite 98 Series is Kahr's latest responding handgun, and the polished stainless steel finish and Elite 98 etching are available on the following Kahr models - the K9, MK9, K40 and the MK40. The lustrous finish, with laser engraving, complements our innovative designs and solid construction.

**State-of-the-Art Engineering.** The intricate cocking trigger system provides a trigger stroke unsurpassed in smoothness even by custom pistols. Its patented offset recoil lug design, which puts the shooter's hand close to the centerline of the bore, and the ergonomically designed soft polymer grips provide comfort and control comparable to full-sized handguns. The trigger stroke has been reduced to 3/8" from 1/2" to provide faster firing in critical defensive situations. And the Elite 98's low profile bar-dot sights are easy to see, yet virtually snag-free.

**All Stainless Steel Construction.** Kahr's patented computer-aided designs are precision computer machined in stainless steel. All Kahr pistols are U.S.-made for outstanding performance and long-lasting reliability and are backed by Kahr Arms' Limited Lifetime Warranty.



If you value your life, carry the gun you can live with – KAHR.

Kahr's design and quality manufacturing provides unmatched concealed power in a compact handgun.

## Unique Design

Six U.S. Patents cover Kahr's unique locking, firing, and extraction systems. The incomparable cocking cam trigger system employs a cam to both unlock the passive safety and complete cocking and releasing the firing pin. The system provides a "safe" and unbelievably smooth double action only trigger stroke, fast to fire in critical defensive situations.

Kahr's patented "offset barrel" design places the trigger mechanism beside the barrel lug, raising the shooter's hand close to the centerline of the bore. This, with the ergonomically designed grips, results in a remarkable degree of shooting comfort and control with reduced muzzle flip and felt recoil.

A patented self-cleaning extractor, specially designed so that powder residue is forced away from the extractor, assures that the extractor will continue to function, shot after shot. Furthermore, the extractor is designed so that it employs the slide itself to limit its movement so that failures to extract are nearly impossible.

These innovations, found only in the Kahr pistol, give the Kahr shooter an advantage in critical self-defensive situations.

## Precision Machined

Kahr pistols' main components are precision computer machined to the tightest tolerances, utilizing the programming and tooling capabilities of CNC machining centers. Machined parts, cut exactly to the engineering blueprint, assure proper assembly and peak performance of the Kahr pistol.



Each Kahr slide is CNC machined from solid bar stock.



Maker of the World famous "Tommy Gun"

http://www.auto-ordnance.com
http://www.tommygun.com

### Thompson 1927A-1, 1927A-1C

### Thompson M1

### Thompson 1927A-1 "Commando"

### Thompson 1911A1 "WWII Parkerized"

### Thompson 1911A1 .45 ACP "Standard"

### Thompson 1911A1 .45 ACP "Deluxe"



Blauvelt New York

# THE COMPANY

## COMPANY PROFILE

**Kahr Arms**, an innovative firearms manufacturer, was founded on fifteen years of manufacturing service in precision metalworking industries. Kahr incorporates the inherited professional, technical expertise into all of its operations.



Worcester, Massachusetts

**Kahr's parent company**, established in 1981, has been a leading supplier of computer numerical control (CNC) machine tools and applications engineering. In 1986, the company expanded by forming a manufacturing division which provides quality contract machining, manufacturing and assembly services for diverse industries, including aerospace, automotive, electronics, medical equipment, scientific instrumentation and telecommunications. This division offers in-house engineering and precision tooling services, as well as, secondary operations that complement the machining and manufacturing capabilities.

Kahr's corporate headquarters are located in Blauvelt, New York. Production and assembly operations are located in Worcester, Massachusetts, in the region commonly known as "Gun Valley."

Kahr Arms . P O Box 220, Blauvelt, NY 10913
Tel. 914-353-7770 / Fax: 914-353-7833 / E-mail  kahrho@compuserve.com

http. www.kahr.com comp_profilepage.html



*Features & Technology of Kahr Arms*

VALUE GUNS

# Kahr Slide

Also precision computer machined, the Kahr slide is cut from 4140 Cr-Mo Alloy Steel and 416 Stainless Steel bar stock. This component is heat-treated and tempered to optimize durability.



The combination of the engineering design, quality materials, and precise manufacturing results in the component's toughness and compact size. Kahr's slide is the slimmest design among the major pistol brands.

Kahr quality, unmatched at any price.

◄◄ Previous    Next ►►

Kahr Arms   P O  Box 220, Blauvelt, NY 10913
Tel 914-353-7770 / Fax: 914-353-7833 / E-mail: kahrho@compuserve.com

http://www.kahr.com/vg_slidepage.html



*Features & Technology of Kahr Arms*

VALUE GUIDE

## Kahr Slide

**A**lso precision computer machined, the Kahr slide is cut from 4140 Cr-Mo Alloy Steel and 416 Stainless Steel bar stock. This component is heat-treated and tempered to optimize durability.

The combination of the engineering design, quality materials, and precise manufacturing results in the component's toughness and compact size. Kahr's slide is the slimmest design among the major pistol brands.

Kahr quality, unmatched at any price.



◄◄ Previous    Next ►►

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKETED

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| vs. | CRIMINAL ACTION NO. 00-1523-CBS |
| MARK M. CRONIN, Defendant. | |

MEMORANDUM OF PROBABLE CAUSE AND
DECISION ON GOVERNMENT'S MOTION FOR DETENTION
March 23, 2000

SWARTWOOD, M.J.

I.  Nature of the Offense and the Government's Motion

On March 15, 2000, a Criminal Complaint was filed, charging Mark M. Cronin ("Mr. Cronin"), with stealing a firearm from a licensed manufacturer in violation of 18 U.S.C. § 924(m).

At Mr. Cronin's initial appearance on March 16, 2000, in connection with this Complaint, the Government moved for a detention hearing pursuant to 18 U.S.C. §§ 3142 (f)(1)(A)(Mr. Cronin is charged with a crime of violence, (f)(2)(A)(risk of flight) and (f)(2)(B)(risk that Mr. Cronin will obstruct or attempt to obstruct justice or threaten or intimidate a perspective witness).  The Government further asserts that it is entitled to



the rebuttable presumption contained in 18 U.S.C. 3142(e) in detaining Mr. Cronin on the grounds of dangerousness.

On March 21, 2000, a consolidated hearing was held in connection with Mr. Cronin's right to a preliminary examination (probable cause hearing) in accordance with Fed. R. Crim. P. 5.1 and Mr. Cronin's right to a hearing on the Government's motion for detention. At this hearing, Michael P. Curran, Special Agent of the United States Bureau of Alcohol, Tobacco and Firearms ("ATF"), testified on behalf of the Government and was cross-examined by Mr. Cronin's counsel.

## II.    Findings of Fact

1.    In early December 1999, as a result of a traffic stop, Worcester Police officers found a 40 caliber Kahr firearm under the front seat of an automobile then being operated by an individual who subsequently became a cooperating witness ("CW"). Also recovered in this traffic stop were a quantity of drugs. Govt. Exs. 1 (bottom picture) and 4.

2.    In late December 1999, a four year old child found a loaded 9mm Kahr firearm in the yard of an apartment building in the vicinity of Main Street, Worcester, Massachusetts. This weapon was traced to a homicide outside the Tropicala Night Club located in the Main South area of Worcester. Govt. Exs. 1 (top picture) and 1.

3.    Both firearms were subsequently test-fired without any malfunctions. Govt. Exs. 2 and 3.

4.    Neither of the recovered firearms had serial numbers as required of federally licensed manufacturers.  Govt. Exs. 1 and 4

5.    Saeilo, Inc., which uses the trade name Kahr Arms/AutoOrdance ("Kahr") is a federally licensed firearms manufacturer with a facility located in Worcester, Massachusetts. Govt. Ex. 4.

6.    Mr. Cronin was employed at Kahr from March 1999 until the end of February 2000, when he was fired because of a disagreement with his employer.   Govt. Ex. 6.

7.    After the Worcester Police discovered the 40 cal. Kahr firearm and a quantity of drugs in the CW's automobile, he agreed to cooperate and told law enforcement officials that he had purchased both firearms from Mr. Cronin in exchange for a quantity of drugs.  Govt. Ex. 4.

8.    The CW further agreed with ATF Special Agents to wear a wire and engage Mr. Cronin in a conversation concerning the sale of the Kahr firearms.   On March 6, 2000, the CW went to Mr. Cronin's residence where his conversation with Mr. Cronin was recorded. During this conversation, Mr. Cronin encouraged the CW to make up a story concerning how he obtained the 40 cal. Kahr firearm and admitted selling the two firearms to the CW.  Govt. Ex. 4.

9.    Mr. Cronin was arrested on March 16, 2000 and after signing a waiver of his Miranda rights, he gave a statement to Special Agent Curran admitting that he had stolen two firearms and ammunition from his employer, Kahr; that he obtained the firearms prior to a serial number being affixed to the firearms as required

- 3 -

by federal law; and that he sold the firearms to the CW    Govt. Ex. 5.

10.    The CW, who is an admitted, habitual drug user, told law enforcement officials that he purchased the Kahr firearms from Mr. Cronin in exchange for drugs.    Govt. Ex. 4.    Mr. Cronin told Special Agent Curran that he sold the Kahr firearms to the CW for cash.    Govt. Ex. 5.

11.    As a result of the execution of a search warrant of Mr. Cronin's apartment, the following items were seized: a trigger lock, 15 rounds of 9mm ammunition, a separate lot of 13 rounds of 45 cal. and 9mm ammunition, a 40 cal. pistol magazine with 10 rounds of ammunition and another 40 cal. pistol magazine with 2 rounds of ammunition.

### III. Probable Cause

As a result of Mr. Cronin's recorded conversation with the CW admitting that he stole two firearms and ammunition from his employer and from his voluntary written statement admitting these offenses, I find probable cause for the offense for which he is charged in this Complaint.

### IV.  Discussion of Whether Mr. Cronin Should Be Detained

#### 1.  History and Characteristics

Mr. Cronin is twenty-eight years old and was born in Worcester, Massachusetts on September 6, 1971. Mr. Cronin has lived in Worcester all of his life except from approximately 1992-1993 when he lived in Rutland, Vermont.

- 4 -

Mr. Cronin's father lives in Arizona and Mr. Cronin last saw his father approximately thirteen years ago.

Mr. Cronin lives in a basement apartment at his mother's residence at 44 Huntington Avenue, Worcester, Massachusetts and maintains daily contact with his mother and his eleven year old half sister, who both live in the main part of the residence at 44 Huntington Avenue.

Mr. Cronin was married in 1994 and he and his wife have been separated for the past two and one-half years. Mr. Cronin and his wife have one child, Kassie, age five, and Mr. Cronin adopted Mrs. Cronin's other son, Kevin, age ten. Mr. Cronin provides support for both children.

As noted earlier, Mr. Cronin was employed at Kahr Arms from March 1999 until late February 2000. Prior to that employment, Mr. Cronin worked as a carpet installer for approximately six months and prior to that, at Astra Pharmaceutical in Westboro, Massachusetts for three years. At the time of Mr. Cronin's arrest, he was unemployed.

Mr. Cronin has no record of criminal convictions.

2. <u>Whether Mr. Cronin Poses A Danger to the Community</u>

First, the Government argues that the rebuttable presumption in 18 U.S.C. § 3142(e) applies to this case because there is sufficient evidence to warrant a finding that Mr. Cronin allegedly

sold firearms in exchange for drugs.¹ I disagree. First, Mr. Cronin is being charged with stealing firearms from a licensed manufacturer in violation of 18 U.S.C. § 924(m) and not with any drug offenses. Section 3142(e) may be invoked only in connection with offenses for which the defendant has been charged. United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Second, even if I took the position that Section 3142(e) may apply if there is probable cause to believe that a defendant committed an offense enumerated therein for which he was not charged, I do not find that the Government has established probable cause to believe that Mr. Cronin violated Section 924(c). I tend to believe Mr. Cronin's voluntarily signed statement admitting this offense in which he stated clearly that he sold the guns to the CW for cash. After Mr. Cronin was arrested, he had no reason to lie to the ATF since I am sure he did not understand any subtle legal difference between selling firearms for cash or selling firearms in exchange for drugs. Mr. Cronin seemed to be forthright in his statement to Special Agent Curran, in not only admitting the offense but revealing a location outside of his apartment where he had hidden one of the firearms. Therefore, even if I were to adopt the Government's argument that Section 3142(e) may be invoked in connection with an offense for which the defendant has not been

---

¹Section 3142(e) provides there is a rebuttable presumption that a defendant is a risk of flight and danger to the community if there is probable cause to believe that the person committed an offense under 18 U.S.C. § 924(c)(use or possession of firearm in connection with drug trafficking crime).

charged, I would not find that it applies in this case. I will now
address whether Mr. Cronin may be held on dangerous grounds.

Mr. Cronin argues that he has not been charged with a crime of
violence under 18 U.S.C. § 3142(f)(1)(A) and therefore, the
Government cannot seek to detain him on dangerousness grounds. In
support of his position, Defendant argues that the Court must look
to the nature of the offense with which a defendant has been
charged and that theft of a firearm is not a crime of violence.
The Government, on the other hand, argues that the Court may
consider the facts underlying the offense for which the defendant
has been charged and determine on a case-by-case basis whether a
defendant has been charged with a crime of violence.

For sentencing purposes, the First Circuit has held that in
determining whether an offense is a crime of violence, the trial
court "should employ a 'formal categorical approach', that is, look
to the statutory definition of the offense. United States v.
Sacko, 178 F.3d 1, 3 (1999). However, the court may go beyond the
statutory definition in "those cases where the statute encompasses
both violent felonies (e.g. generic burglary) and non-violent
felonies (e.g., burglary of a vehicle rather than a building)."
Id. The great weight of authority favors applying the categorical
approach for purposes of determining whether an offense is a crime
of violence under Section 3142(f)(1)(A). See United States v.
Singleton, 182 F.3d 7, 11 (D.C.Cir. 1999) and cases cited therein.

Although most courts apply the categorical approach, there is
a split of authority as to whether gun related offenses which do

- 7 -

not involve the use of the firearm constitute "crimes of violence" for purposes of Section 3142(f)(1)(A). At the same time, I have not found any cases which hold that violation of Section 924(g) constitutes a "crime of violence". However, I do not need to resolve this issue because even assuming that Mr. Cronin has been charged with a crime of violence, I find that there are conditions that can be imposed for Mr. Cronin's release that will assure the safety of any person or persons in the community. I make this finding, in part, because Mr. Cronin no longer works at Kahr Arms and therefore, has no access to firearms. Furthermore, when Mr. Cronin's residence was searched pursuant to a warrant, no firearms were found and the police seized all materials they found relating to firearms.

The Government also argues that Mr. Cronin should be detained pursuant to 18 U.S.C. § 3142(f)(2)(B)(threat to obstruct justice). I do not accept the Government's argument that Mr. Cronin's suggestion to the CW that he lie to the police as to how he obtained the 40 cal. Kahr firearm is sufficient evidence for me to find that Mr. Cronin poses a risk to either obstruct justice or intimidate witnesses. This statement was made during a friendly conversation in which the CW and Mr. Cronin discussed in some detail various aspects of the problems the CW faced as a result of the Worcester Police finding the 40 cal. Kahr firearm in the CW's automobile. In fact, during the course of Mr. Cronin's recorded conversation with the CW, Mr. Cronin seemed to acknowledge that the CW or his girlfriend or their lawyer would eventually reveal Mr.

- 8 -

Cronin's name to police as the source of the 40 cal. Kahr firearm. Gov't. Ex. 4, Transcript pp 13-15. Therefore, I do not find that the Government has presented evidence that Mr. Cronin poses a risk of obstructing justice or intimidating witnesses as provided in Section 3142(f)(2)(B).

I further find that Mr. Cronin does not pose a risk of flight. First, Mr. Cronin has lived practically all of his life in Worcester, where his mother, half sister, two children and wife reside. Second, Mr. Cronin has never failed to appear in Court as required. Third, Mr. Cronin has voluntarily admitted the offense for which he is presently charged. Therefore, considering the totality of those circumstances, I cannot find that Mr. Cronin poses a risk of flight.

### 3. Proposed Conditions of Release

I have scheduled a further hearing on Friday, March 24, 2000 at 2:45 p.m. at which I will consider conditions for Mr. Cronin's release. Presumptively those conditions would include: (1) a $2,000 cash surety bond; (2) a third-party custodian; (3) regular reporting to Pretrial Services; (4) random drug testing; (5) curfew; (6) that he seek employment; (7) that he refrain from any possession or use of illegal drugs; (8) that he refrain from excessive use of alcohol; (9) that he not possess a firearm, ammunition or other destructive device; (10) that his travel be restricted; (11) that he not commit any local, state or federal

criminal offenses, and (12) that he report any arrests or change of
residence to Pretrial Services within twenty-four hours.

CHARLES B. SWARTWOOD, III
MAGISTRATE JUDGE

# EXHIBIT 6

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL TOBACCO AND FIREARMS

FIREARMS THEFT/RECOVERY REPORT

RECOVERY ( )   FFL THEFT #: F 2000 000 07 - 3

DUTY AGENT ___KEATING___   DATE OF REPORT ___4-8-00___   TIME 20:11

CALLER ___CASSEDAY RANDALL___   TEL : 917-353-7770   POSITION LEGAL DIR

FFL # ___604 35456___   COMPANY NAME ___KAHR ARMS___

FFL ADDRESS: ___130 GODDARD MEMORIAL DRIVE___

CITY: ___WORCESTER___   STATE ___MA___ - ___01603___

LOCATION WHERE THEFT OCCURRED: ___SAME___

CITY: _____   STATE _____   ZIP: _____

POLICE DEPT. NOTIFIED: ___WORCESTER POLICE___   REPORT # 0091153

DATE/TIME OF THEFT ___4-7-00___   ___1015___   # OF FIREARMS STOLEN ___41___

TYPE OF THEFT: ROBBERY ( )   BURGLARY ( )   LARCENY ( )   MISSING INVENTORY: ✓

# OF INJURIES: _____   # OF DEATHS: _____   (IF APPLICABLE)

REMARKS: _____

RECOVERY INFORMATION:

DATE RECOVERY REPORTED TO ATF: _____   POLICE NOTIFIED: YES ( )  NO ( )

DUTY AGENT: _____   # RECOVERED: _____

CALLER'S NAME: _____   TEL #: _____

DESCRIPTION OF FIREARM

| TYPE | MANUFACTURER | MODEL | CALIBER GAUGE | SERIAL # | RECOVERY ONLY | |
|------|-------------|-------|---------------|----------|------|------|
| | | | | | *TOR | **TOR |
| | SEE ATTACHED LIST | | | | | |
| | | | | | | |
| | | | | | | |

* TYPE OF RECOVERY:  F  (FOUND INVENTORY)    P  (RETURNED BY POLICE)
** DATE OF RECOVERY

P. 02/06

BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

# FEDERAL FIREARMS LICENSEE THEFT/LOSS REPORT

All entries must be in ink. Please read notices and instructions on reverse carefully before completing this form

**SECTION A - FEDERAL FIREARMS LICENSEE INFORMATION**

FEDERAL FIREARMS LICENSE NUMBER
6 - 04 - 014 - 07 - 2D - 35454

FEDERAL FIREARMS LICENSEE TELEPHONE NUMBER (area code)
508 - 795 - 3919

TRADE/CORPORATE NAME AND ADDRESS OF FEDERAL FIREARMS LICENSEE (Address should reflect the number, street, city, State and ZIP code)

KAHR ARMS
130 GODDARD MEMORIAL DRIVE
WORCESTER      MA    01603

NAME, ADDRESS AND TELEPHONE NUMBER OF PERSON MAKING REPORT (Address should reflect the number, street and city, State and ZIP code. Include area code in the telephone number.)

RANDALL G. CASSEDAY
630 RTE. 303              914 - 353 - 7770 X 2
BLAUVELT NY 10913

**SECTION B - THEFT/LOSS INFORMATION**

| | DATE | TIME | DESCRIPTION OF INCIDENT |
|---|---|---|---|
| DISCOVERED | 4/7/2000 | 10:15 AM | ☐ ROBBERY  ☒ LARCENY |
| POLICE REPORT NUMBER | (4/7/2000) | 5:00 PM | ☐ BURGLARY  ☐ OTHER |
| | #2091153 | | |
| REPORTED TO ATF HOTLINE | 4/8/2000 | 12:30 PM | ATF HOTLINE INCIDENT NUMBER |
| | | | F2000 000 0793 |

NAME AND ADDRESS OF LOCAL AUTHORITY TO WHOM REPORTED
WORCESTER MA POLICE DEPT.
9-11 LINCOLN SQ.
WORCESTER    MA    01608

**SECTION C - DESCRIPTION OF FIREARMS**

| ACQUISITION DATE | MANUFACTURER | MODEL | CALIBER/GAUGE | SERIAL NUMBER |
|---|---|---|---|---|
| 11/10/99 | KAHR | MK9 | 9 mm | GC0913 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**CERTIFICATION**

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I ALSO UNDERSTAND THAT FAILURE TO REPORT THE THEFT OR LOSS OF A FIREARM FROM MY INVENTORY OR COLLECTION WITHIN 48 HOURS AFTER THE THEFT OR LOSS DISCOVERED IS A VIOLATION OF 18 U.S.C. § 923 (2)(5) PUNISHABLE AS A FELONY.

| AUTHORIZED SIGNATURE | DATE |
|---|---|
| Randall G. Casseday | 4/7/0 |

ATF F 3310.11 (12-94)

ORIGINAL - FORWARD

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**FEDERAL FIREARMS LICENSEE THEFT/LOSS REPORT**

All entries must be in ink. Please read notices and instructions on reverse carefully before completing this form.

**SECTION A - FEDERAL FIREARMS LICENSEE INFORMATION**

FEDERAL FIREARMS LICENSE NUMBER
6-04-014-07-2D-35456

FEDERAL FIREARMS LICENSEE TELEPHONE NUMBER (area code)
508-795-3919

TRADE/CORPORATE NAME AND ADDRESS OF FEDERAL FIREARMS LICENSEE (Address should reflect the number, street, city, State and ZIP code)

KAHR ARMS
130 GODDARD MEMORIAL DRIVE
WORCESTER MA 01603

NAME, ADDRESS AND TELEPHONE NUMBER OF PERSON MAKING REPORT (Address should reflect the number, street, city, State and ZIP code. Include area code in the telephone number.)

RANDALL G. CASSEDAY
830 RTE. 303
BLAUVELT NY 10913          914-353-7770 X. 20

**SECTION B - THEFT/LOSS INFORMATION**

| | DATE | TIME | DESCRIPTION OF INCIDENT |
|---|---|---|---|
| DISCOVERED | APRIL 7, 2000 | 19:15 pm | |
| POLICE REPORT NUMBER | REPORTED ON APRIL 7, 2000 5:00 pm F200183 | | ☐ ROBBERY ☐ LARCENY ☐ BURGLARY ☒ OTHER |
| REPORTED TO ATF HOTLINE | APRIL 8 2000 12:30 pm | | ATF HOTLINE INCIDENT NUMBER F2000 800 0793 |

NAME AND ADDRESS OF LOCAL AUTHORITY TO WHOM REPORTED
WORCESTER, MA POLICE DEPT.
9-11 LINCOLN SG.
WORCESTER, MA 01608

**SECTION C - DESCRIPTION OF FIREARMS**

| ACQUISITION DATE | MANUFACTURER | MODEL | CALIBER/GAUGE | SERIAL NUMBER |
|---|---|---|---|---|
| 10/3/95 | KAHR | K9 | 9 mm | AB0068 |
| 12/28/95 | KAHR | K9 | 9 mm | AE2115 |
| 1/11/96 | KAHR | K9 | 9 mm | AE2267 |
| 9/11/96 | KAHR | K9 | 9 mm | AE2660 |
| 3/8/96 | KAHR | K9 | 9 mm | AE2710 |

**CERTIFICATION**

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I ALSO UNDERSTAND THAT FAILURE TO REPORT THE THEFT OR LOSS OF A FIREARM FROM MY INVENTORY OR COLLECTION WITHIN 48 HOURS AFTER THE THEFT OR LOSS IS DISCOVERED IS A VIOLATION OF 18 U.S.C. § 923 (g)(6) PUNISHABLE AS A FELONY.

| AUTHORIZED SIGNATURE | DATE |
|---|---|
| Randall G. Casseday | 4/7 |

ATF F 3310.11 (12-94)

FEDERAL FIREARMS LICENSEE THEFT/LOSS CONTINUATION SHEET

| ACQUISITION DATE | MANUFACTURER | MODEL | CALIBER/GAUGE | SERIAL NUMBER |
|---|---|---|---|---|
| 3/8/96 | KAHR | K9 | 9 mm | AE 2719 |
| 5/20/96 | KAHR | K9 | 9 mm | AE 4073 |
| 5/23/96 | KAHR | K9 | 9 mm | AE 4091 |
| 1/17/97 | KAHR | K9 | 9 mm | AF 0778 |
| 3/28/96 | KAHR | K9 | 9 mm | AG0108 |
| 3/28/96 | KAHR | K9 | 9 mm | AG0109 |
| 3/25/96 | KAHR | K9 | 9 mm | AG 0117 |
| 1/17/97 | KAHR | K9 | 9 mm | AG 0334 |
| 10/8/97 | KAHR | K9 | 9 mm | BH 0316 |
| 10/8/97 | KAHR | K9 | 9 mm | AH 0327 |
| 7/22/96 | KAHR | K9 | 9 mm | AM 0293 |
| 10/22/96 | KAHR | K9 | 9 mm | AM 1432 |
| 1/21/97 | KAHR | K9 | 9 mm | AP 0242 |
| 2/25/97 | KAHR | K9 | 9 mm | AR 0173 |
| 2/28/97 | KAHR | K9 | 9 mm | AR 0309 |
| 3/6/97 | KAHR | K9 | 9 mm | AR 0315 |
| 2/16/99 | KAHR | K9 | 9 mm | AR 2940 |
| 9/20/99 | KAHR | K9 | 9 mm | AX 0399 |
| 11/21/96 | KAHR | K40 | 40 S&W | DA 1517 |
| 1/15/97 | KAHR | K40 | 40 S&W | DB 0082 |
| 1/15/97 | KAHR | K40 | 40 S&W | DB 0096 |
| 2/24/97 | KAHR | K40 | 40 S&W | DF 0876 |
| 7/9/99 | KAHR | K40 | 40 S&W | DF 3635 |
| 1/20/99 | KAHR | ~~MK9~~ | 9mm | ~~B 0706~~ |

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I ALSO UNDERSTAND THAT FAILURE TO REPORT THE THEFT OR LOSS OF A FIREARM FROM MY INVENTORY OR COLLECTION WITHIN 48 HOURS AFTER THE THEFT OR LOSS'S DISCOVERED IS A VIOLATION OF 18 U.S.C. 923 (g)(6) PUNISHABLE AS A FELONY.

AUTHORIZED SIGNATURE

_Randall W. Cascada_

ATF F 3310.11A (12-94)

DATE 4/7

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
FEDERAL FIREARMS LICENSEE THEFT/LOSS CONTINUATION SHEET

| ACQUISITION DATE | MANUFACTURER | MODEL | CALIBER/GAUGE | SERIAL NUMBER |
|---|---|---|---|---|
| 8/19/99 | KEHR | MK9 | 9mm | |
| 9/23/99 | KEHR | MK9 | 9mm | G00443 |
| 11/9/95 | KEHR | MK9 | 9mm | GC0888 |
| 9/14/99 | KAHR | K9 | 9mm | PROTO 10 |
| 6/10/99 | KAHR | MK9 | 9mm | PROTO MK3 |
| 4/23/96 | KEHR | PK9 | 9mm | YA0044 |
| 8/21/97 | KAHR | .K9 | 9mm | AE1450 |
| 6/13/97 | KEHR | K9 | 9mm | AJ5244 |
| 3/4/97 | KAHR | K40 | 40 S&W | DA1384 |
| 12/19/95 | KAHR | K40 | 40 S&W | DB0216 |
| 5/15/97 | KAHR | K9 | 9mm | AE1914 |
| | | K9 | 9mm | AL0149 |

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I ALSO UNDERSTAND THAT FAILURE TO REPORT THE THEFT OR LOSS OF A FIREARM FROM MY INVENTORY OR COLLECTION WITHIN 48 HOURS AFTER THE THEFT OR LOSS IS DISCOVERED IS A VIOLATION OF 18 U.S.C. 923 (SXT) PUNISHABLE AS A FELONY.

AUTHORIZED SIGNATURE

*Randall R. Cusedey*

ATF F 3310.11A (12-94)

DATE  4/7/

User ID:   ROLUCAS
04/10/2000 13:29:19

License Number    9 04    027    07    20   35456

*0435456*

EIN:

Licensee Name:  SAEILO, INC

Business Name:  KAHR ARMS

Premises Address |

Street:  130 GODDARD MEMORIAL DR

City:  WORCESTER

*OE.*

State: MA      Zip Code: 015050000

Mailing Address |

Street:  130 GODDARD MEMORIAL DR

City:  WORCESTER

State: MA      Zip Code: 015050000

Add Date          Change Date          Expiration Date     Inspection Date     Renewal Receive Date   Renewal Date
03/15/1999        03/25/1999           04/01/2002          09/07/1999          03/25/1999



Date: April 10, 2000

FFL Theft Number: F20000000793

## FFL THEFT/LOSS SUMMARY

Entered Date: April 08, 2000

### GENERAL INFORMATION

Type of Theft: LOSSES OF INVENTORY NOT
ASSOCIATED WITH A CRIME

Date of Theft: 04/07/2000
Date Reported: 04/08/2000
Date 3310 Received: 04/10/2000

Field Division: BOSTON
ATF I.N.
Est. Passport Stolen: 4
Number Injured:            Number Killed:

### CALLER INFORMATION

Name: RANDALL CASSEDAY
Title:
Phone: (914) 353-7770
Owner:

### POLICE DEPT INFORMATION

Name: WORCESTER POLICE DEPARTMENT
Est. Number: 009.1102

### THEFT LOCATOR

Address:

### DEALER INFORMATION

Business Name: KAHR ARMS
Licensee Name: SAEILO, INC
FFL Number: 60435456
Address: 130 GODDARD MEMORIAL DR
WORCESTER MA 01605-0000
Day Phone: (508) 795-3919     Fax:
Evening Phone:
Dealer may be associated with 8 other Interstate FFL Thefts.

### METHOD OF OPERATION

---

Theft of 10 or more firearms requires an investigation to be conducted utilizing an investigation number
assigned by the appropriate field office.

If an investigation is opened, please provide the opening report, reflecting the FFL Theft/Loss Report Number listed
above, to the Stolen Firearms Program/Crime Gun Analysis Branch along with the name of the case investigator.

For a recovered firearm, an investigation should only be opened on those firearms recovered within two years of the
theft/loss report and/or where there is a suspect associated with the recovery. The field office's general firearms
investigation number may be used to report information on a recovery that does not merit investigation.

| | | | |
|---|---|---|---|
| ~HR ARMS | K? | ? | PISTOL |
| 5 KAHR ARMS | K? | ? | PISTOL |
| 6 KAHR ARMS | K9 | ? | PISTOL |
| 7 KAHR ARMS | K? | ? | PISTOL |
| 8 KAHR ARMS | K? | ? | PISTOL |
| 9 KAHR ARMS | K9 | ? | PISTOL |
| 10 KAHR ARMS | K9 | ? | PISTOL |
| 11 KAHR ARMS | K9 | ? | PISTOL |
| 12 KAHR ARMS | K? | ? | PISTOL |
| 13 KAHR ARMS | K9 | ? | PISTOL |
| 14 KAHR ARMS | K9 | ? | PISTOL |
| 15 KAHR ARMS | K9 | ? | PISTOL |
| 16 KAHR ARMS | K? | ? | PISTOL |
| 17 KAHR ARMS | K9 | ? | PISTOL |
| 18 KAHR ARMS | K9 | ? | PISTOL |
| 19 KAHR ARMS | K9 | ? | PISTOL |
| 20 KAHR ARMS | K9 | ? | PISTOL |
| 21 KAHR ARMS | K9 | ? | PISTOL |
| 22 KAHR ARMS | K9 | ? | PISTOL |
| 23 KAHR ARMS | K9 | ? | PISTOL |
| 24 KAHR ARMS | K9 | ? | PISTOL |
| 25 KAHR ARMS | K40 | 40 | PISTOL |
| 26 KAHR ARMS | K40 | 40 | PISTOL |
| 27 KAHR ARMS | K40 | 40 | PISTOL |
| 28 KAHR ARMS | K40 | 40 | PISTOL |
| 29 KAHR ARMS | K40 | 40 | PISTOL |
| 30 KAHR ARMS | K9 | 40 | PISTOL |
| 31 KAHR ARMS | K9 | ? | PISTOL |
| 32 KAHR ARMS | K9 | ? | PISTOL |
| 33 KAHR ARMS | K? | ? | PISTOL |
| 34 KAHR ARMS | K9 | ? | PISTOL |
| 35 KAHR ARMS | K9 | ? | PISTOL |
| KAHR ARMS | K9 | ? | PISTOL |
| KAHR ARMS | K? | ? | PISTOL |
| KAHR ARMS | K40 | 40 | PISTOL |
| KAHR ARMS | K40 | 40 | PISTOL |
| KAHR ARMS | K? | ? | PISTOL |
| KAHR ARMS | K9 | ? | PISTOL |

Weapons Removered Weapon
Weapons Removered: 0

FFL Theft FD00000007?3

# EXHIBIT 7

Site Map    Dealers

Page 1 of 2

# E9094A

## E9. 9mm Economy model. Duo-Tone
### Matte black frame and matte stainless steel slide



- Parts
- Holsters
- Magazines
- Wood Grips
- Wrap Around Non-Slip Grip
- Ported Barrel

- Use of Kahrs
- THE GUNS OF Same Kahrs

The Kahr E9 is an economized version of the Kahr K9, based on the same design platform with the same reliability, accuracy and performance. Appearance features have been modified for greater product affordability.

"A" at the end of the item number denotes a spent case is included with the pistol.

Download PDF Spec Sheet

If you need to download the latest Acrobat Reader for viewing PDFs, click here

| Caliber | 9mm (9 x 19 Parabellum) |
|---|---|
| Capacity | 7 + 1 |
| Operation | Trigger cocking DAO; lock breech; "Browning - type" recoil lug; passive striker block; no magazine disconnect |
| Barrel Length | 3.5", polygonal rifling; 1-10 right-hand twist |
| O/A | 6.0" |
| Height | 4.5" |
| Slide Width | .90" |
| Weight | Pistol 23.1 ounces. Magazine 1.9 ounces |
| Grips | Wraparound, textured soft polymer |
| Sights | Drift adjustable rear sight, pinned-in polymer front sight |

Finish          Duo-Tone, matte black on frame, matte stainless steel on slide

Magazines       7 round capacity, stainless steel body, rugged polymer base and follower
                (Same magazine as the K9, #K820)

Warranty        Limited Lifetime

The Elite 98 performs as well as it looks. The polished stainless steel finish and laser etching are available on all Kahr Elite 98 pistols - the K9, MK9, K40 and the MK40. The lustrous finish complements our innovative designs and solid construction. The feed ramp on the barrel is polished to a high luster to insure reliable feeding with all types of ammo. Laser engraving provides the finishing touch to the polished stainless steel - for an appearance as impressive as its capabilities.

**State-of-the-Art Engineering.** The unique cocking cam system on Kahr pistols provides a trigger stroke unsurpassed in smoothness even by custom pistols. The patented, offset recoil lug design - which puts the shooter's hand close to the centerline of the bore - and the ergonomically designed, grip provides comfort and control comparable to full-sized handguns. And the Elite 98's low-profile bar-dot sights are easy to see, yet virtually snag-free.

**All Stainless Steel Construction.** Kahr's patented computer-aided designs are carried out in all stainless steel quality with computer-machined precision to give you defensive firearms you can carry with confidence. All Kahr pistols are U.S.-made for outstanding performance and long-lasting reliability and are backed by Kahr Arm's Limited Lifetime Warranty.

Kahr Arms: P.O. Box 220, Blauvelt, NY 10913
Sales & Marketing 845-353-7770  Technical Support 508-795-3919  E-MAIL

# M9093A

MK9. matte stainless steel



- Parts
- Holsters
- Magazines
- Grip Extension
- Wood Grips
- Wrap Around Non-Slip Grip
- Tritium Sights
- Stainless Steel Guide Rod

- MK9 SERIES

- PD9 Testing Result
- NEW FROM KAHR ARMS - THE MICRO K9

"A" at the end of the item number denotes a spent case is included with the pistol.

Download PDF Spec Sheet

If you need to down load the latest Adobe Reader for using PDFs, click here

| | |
|---|---|
| Caliber | 9mm (9 x 19) |
| Capacity | 6+1, 7+1 (magazine with grip extension) |
| Operation | Trigger cocking DAO: lock breech; "Browning - type" recoil lug; passive striker block; no magazine disconnect |
| Barrel | 3.0", polygonal rifling; 1-10 right-hand twist |
| Length O/A | 5.3" |
| Height | 4.0" |
| Slide Width | .90" |
| Weight | Pistol 22.1 ounces. Magazine 1.9 ounces |
| Grips | Wraparound, textured hard nylon |
| Sights | Low profile, white bar-dot combat sights (tritium night sights optional) |
| Finish | Stainless steel |
| Magazines | 1 each: 6-round flush baseplate and 7-round grip extension |
| Warranty | Limited Lifetime |

Kahr Arms, P.O. Box 220, Blauvelt, NY 10913
Sales & Marketing 845-353-7770   Technical Support 508-795-3919   www.

# EXHIBIT 3

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| WORCESTER, SS. | WORCESTER SUPERIOR COURT |
| | CIVIL ACTION NO. 02-2025 |

ARMANDO MAISONET,              )
       Plaintiffs              )      SECOND AMENDED
                               )      COMPLAINT and
                               )      DEMAND FOR JURY TRIAL
                               )
· v.              )
                               )
KAHR INC., D/B/A, KAHR ARMS, INC.,              )
KAHR AUTO ORDNANCE CORP.,              )
SAEILO, INC.,              )
SAEILO MACHINERY MA, INC.,              )
SAEILO MACHINERY USA, INC.,              )
SAEILO MANUFACTURING INDUSTRIES,              )
MACHINE INDUSTRIES, INC.,              )
SAEILO EQUITY INVESTMENTS, LP              )
ONE UP ENTERPRISES, INC.,              )
MARK CRONIN,              )
ROBERT JACHIMCZYK, and              )
EDWIN NOVAS,              )
SCOTTSDALE INSURANCE COMPANY,              )
GENERAL STAR MANAGEMENT CO.,              )
UTICA MUTUAL INSURANCE CO.              )
       Defendants              )

       This negligence action stems from gunshot wounds suffered by plaintiff because of corporate and individual negligence.

## THE PARTIES

1.     Plaintiff Armando Maisonet has a usual place of home and abode in Worcester, Worcester County, Massachusetts.

2.     Defendant Kahr Inc. d/b/a Kahr Arms or Kahr Auto Ordnance is a wholly owned subsidiary of Saeilo, Inc., and was organized in the State of Delaware in 1994, according to the Foreign Corporation Certificate (hereafter "FCC") filed with the Office of the Massachusetts Secretary of State.

3.   As of May 13, 1999, Kook Jin Moon (son of the Rev. Sun Myung Moon, founder of the Unification Church) held seventy-nine percent of Saeilo, Inc. stock (82% as of August 31, 1999). Saeilo, Inc. is the corporate parent of Kahr Inc. d/b/a Kahr Arms or Kahr Auto-Ordnance Corporation. According to an annual firearms manufacturing and export report of the Bureau of Alcohol, Tobacco and Firearms in 1998, Saeilo, Inc. manufactured 7,386 pistols, of which 5,414 were 9mm, two were .380 cal. and 1,970 were .50 cal.

4.   Defendant Machine Industries, Inc. held eighteen percent of Saeilo, Inc. stock as of May 13, 1999. Machine Industries, Inc. is located at 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA. Robert Michael Runyon is president and director of Machine Industries, Inc. Mr. Runyon is also identified as a director of Saeilo, Inc. in that entity's Foreign Corporation Certificate filed with the Secretary of State of Massachusetts on March 18, 1999. His business address is listed as 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA.

5.   Defendant One Up Enterprises, Inc., also located at 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA., is a holding company for many of the Unification Church's businesses, including wholly owned subsidiaries Saeilo Inc. and Saeilo Machinery (USA), Inc. According to Dunn & Bradstreet, Robert Michael Runyon is and has been president of Defendant One Up Enterprises, Inc. from 1977 to present. One Up has over 10 wholly or majority owned subsidiaries. Two of the major ones are News World Communications, Inc. Washington D.C. and Ginseng Up Corporation, New York, NY, started in 1981.

6.   According to the Foreign Corporations Certificate ("FCC"), Kahr Inc.'s principal office is located at 630 Route 303, Blauvelt, New York 10913. Saeilo Equity Investments, LP also has its offices at 630 Route 303, Blauvelt, New York 10913. Its principal place of business is located at 184 Prescott St., Worcester, MA, and its assembly plant is located at 130 Goddard Memorial Drive, Worcester, MA.

7.   According to its FCC, Kahr Inc.'s president is Kook Jin Moon, whose residential address is 550 E. Sunnyside Lane, Irvington, NY 10533. Kahr Inc.'s Secretary and Treasurer is Soji Wada, whose residential address is listed as 5 Moody Street, Worchester (sic), MA 01606.

8.   According to the MA Foreign Corporation Annual Report (hereafter "FCAP"), certified 6/14/00, the president of Kahr Inc. is Frank Harris, whose business address is 201 Mountain View Ave. Wallkill, N.Y. 12589. Kook Jin Moon is named as Director and his business address is listed as 50 E Sunnyside Irvington, NY 10533. Kahr Inc.'s treasurer and clerk is Janet Wada with a business address of 48 Barnes Ave #3, Worcester, MA 01605. On the FCAP Kahr Inc.'s resident agent in the Commonwealth of Massachusetts is also listed as H/Q Corporate Services, Inc., 9 Crestway Road, E. Boston, MA 02128.

9.    Defendant, Saeilo, Machinery MA, Inc. became a duly organized corporation in the State of Delaware in 1987. The president of Saeilo, Machinery MA, Inc. is listed as Soji Wada of 161 Providence Street, Worcester, Worcester County, Massachusetts. The treasurer is Soji Wada of the same address. A major shareholder is One Up Enterprises, Inc. The resident Agent/Clerk of Saeilo, Machinery MA, Inc. is CT Corporation System of 101 Federal Street, Boston, MA 02110. Hereafter, reference to Saeilo will also mean Saeilo Manufacturing Industries, the entity's Internet marketing name.

10.    Defendant, Saeilo Machinery (USA), Inc. became a duly organized corporation in the State of New York in 1981. The president of Saeilo Machinery (USA), Inc. is listed as Soon Jung Hong of 36719 Ruschin Dr., Newark, CA. Also identified as president of Saeilo Machinery (USA), Inc. in a September 10, 1996 FFL Application to the BATF is David Konn. David Konn is identified in Unification News for December 2001 as a speaker at the International Leadership Conference in New York on the issue of "One Community One Family" after the Sept. 11 tragedy. The treasurer of Saeilo Machinery (USA), Inc. is William Lee Flowers of 42-17 Bowne Street, Flushing, NY. The resident agent of this company is Chris Garcia of 184 Prescott Street, Worcester, Worcester County, Massachusetts.

11.    According to the Chief Financial Officer of Saeilo Machinery, (USA) Inc., in a September 19, 1997 letter to an Inspector of the Bureau of Alcohol, Tobacco and Firearms, The only significant shareholders of Saeilo Machinery are One Up Enterprises, Inc. and Saeilo (USA), Inc. The only individual other than the officers and directors of Saeilo Machinery who exercises, "directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation…" as specified in 18 U.S.C. section 923(d)(1)(B), is Kook Jin Moon, who has an ownership interest in Saeilo (USA), Inc. and is president of Saeilo, Inc. an affiliate of Saeilo Machinery. A copy of that September 19, 1997 letter is attached as Exhibit 1.

12.    Defendant, Saeilo, Inc. became a duly organized corporation in the State of Delaware in 1992. Kook Jin Moon is listed as president with an address of 630 Rte 303, Blauvelt, N.Y. 10913. Soji Wada of 184 Prescott Street, Worcester, Worcester County, Massachusetts is listed as Treasurer, and the resident Agent/Clerk of this company is listed as HIQ Corporate, 1205 Tucker Road, North Dartmouth, MA 02747.

13.    From approximately April of 1994, until August of 1999, defendants Saeilo Machinery (USA), Inc., Saeilo Machinery MA, Inc., Saeilo, Inc. and Kahr, Inc. maintained a principal place of business at 184 Prescott Street, and more recently at Goddard Memorial Drive, Worcester, Worcester County, Massachusetts.

14.    From approximately August of 1999, until the present, defendants Saeilo Machinery (USA), Inc., Saeilo Machinery MA, Inc., Saeilo, Inc. and Kahr, Inc. have maintained a place of manufacture at 130 Goddard Memorial Drive, Worcester, Worcester County, Massachusetts.

15.  Defendant Robert Jachimczyk at all times relevant hereto had a principal place of abode at 5 Jade Hill Rd., Auburn, MA.

16.  Defendant Mark Cronin at all times relevant hereto had a principal place of abode at 44 Huntington Avenue, Apt. 1B, Worcester, MA.   At all times relevant to the Complaint, Mark Cronin was an employee of Kahr Arms, Inc., acting within the scope of his employment.

17.  Defendant Edwin Novas, identified as the shooter, at all times relevant hereto had a principal place of abode at 6 Elizabeth Street, Worcester, MA.  Mr. Novas is still at large.  A Grand Jury indictment concluded that Novas did shoot and kill an individual known as Danny Guzman

18.  Defendant Edwin Novas did also shoot and seriously wound the plaintiff, Armando Maisonet, Jr. with said handgun on December 24, 1999.

19.  On information and belief defendant Scottsdale Insurance Company, an entity added as a defendant per order of Justice Billings on April 23, 2004, is an Arizona corporation with its principal place of business in Scottsdale, Arizona that does business in the Commonwealth of Massachusetts.  Scottsdale is an insurer of defendant Saeilo, Inc. d/b/a Kahr and d/b/a Saeilo Manufacturing Industries (Insured amended to read SMI-MA Inc.)

20.  On information and belief defendant General Star Management Company, an entity added as a defendant per order of Justice Billings on April 23, 2004, is a Connecticut corporation with its principal place of business in Stamford Connecticut that does substantial business in the Commonwealth of Massachusetts, and is an insurer of defendant Kahr Arms.

21.  Based on information and belief defendant Utica Mutual Insurance Company is a Massachusetts corporation with offices at 401 Edgewater Place, Suite 200, Wakefield Massachusetts and an insurer of defendants Saeilo USA and Saeilo, Inc.

## FACTS

22.  Plaintiff Armando Maisonet, Jr. was standing alone at the bar at the Tropigala nightclub, when he was approached by Edwin Novas, an individual he had never met before.

23.  Edwin Novas tapped Mr. Maisonet on the elbow, and said, "I don't like you.  Let's take this outside!"

24.  Mr. Maisonet did not know what Edwin Novas wanted, as he had never spoken with him or met him before.

25.  Mr. Maisonet followed Novas outside to see what he wanted.  Outside Edwin Novas began to tug something from the waist of his pants.

4

26.   Immediately upon seeing this, Mr. Maisonet quickly turned around and proceeded to re-enter the Tropigala, intending to distance himself from Novas.

27.   Mr. Maisonet heard four to five shots as he re-entered the club.  However a full minute went by before he realized he had been hit by one of the bullets in the shoulder.

28.   The bullet pierced Mr. Maisonet's left shoulder from the rear, and exited in front, causing substantial damage to Mr. Maisonet's arm and a titanium rod was inserted in his upper arm to replace lost bone.

## JURISDICTION/LONG ARM STATUTE

29.   Jurisdiction against the corporate defendants is based on the Massachusetts Long Arm Statute.

## VENUE

30.   Venue in this action properly lies in Worcester or the next judicial district contiguous to where either of the parties lives pursuant to G.L. c. 223 ss. 2.

## KAHR INC. AND ALL CORPORATE DEFENDANTS

31.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 30 of the Complaint into the statement of facts.

32.   At all times material to this matter, the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did manufacture and sell handguns under the brand name of Kahr Arms.

33.   The defendants at all times material hereto were the sole manufacturers of the Kahr Arms line of handguns.  Kahr Arms promotional literature displayed and distributed from the defendants' Internet web site describes these weapons as a patented line of compact, powerful and precision-engineered handguns.  (Exhibit 2)

34.   Kahr Arms' promotional literature describes the defendants' handguns under a headline banner of the motto: "ABSOLUTE CONCEALED POWER." (Exhibit 2)

35.   Kahr Arms' promotional literature states that Kahr Inc. specializes in the manufacturing of .45 caliber, .40 caliber and 9mm handguns. (Exhibit 2)

36.   The Chief Designer of Kahr Inc., Justin Moon (son of the Rev. Sun Myung Moon) is a principal of the company according to company promotional materials. (Exhibit 2)

37.   The defendants' promotional literature boasts that Kahr Arms' weapons are the "smallest, flattest, most reliable full power compact handguns made." (Exhibit 2)

5

38.   The defendants' promotional literature states that Kahr Arms incorporates "professional technical expertise into all of its operations" and "unmatched combination of power and performance."

39.   At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, had sole and exclusive possession and control of certain premises in the city or Worcester, Worcester County, Massachusetts, where they manufactured the Kahr Arms line of handguns.

40.   At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did keep the handgun components and machinery necessary for production and shipment of finished Kahr handguns at 184 Prescott Street, Worcester, MA and at 130 Goddard Memorial Drive, Worcester, MA and at no other place.

41.   At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did manufacture their Kahr Arms line of handguns under license by the Unites States Bureau of Alcohol, Tobacco and Firearms (hereafter "the BATF").

## SERIAL NUMBERS AND GUN LICENSES

42.   The defendants' handgun manufacturing operation was, at all times material hereto, subject to various federal law and regulations the requirements of which include:

-   stamping or casting of a unique serial number into the frame of each handgun produced;
-   transfer of each handgun produced only to a person duly licensed to possess that individual weapon;
-   positive measures to prevent and detect the unlawful transfer within handgun manufacturing facilities of handguns to persons not licensed to possess them
-   reporting the theft or the unexplained disappearance from inventory of any handgun to the BATF.

43.   Typically, in Massachusetts, law enforcement authorities can trace the possession history of a legally owned handgun by means of the weapon's serial number and the owners' license records.

44.   The possession history of a handgun becomes more difficult after the weapon is stolen or if it does not have the required serial number.

45.   Thus, handguns not stamped with serial numbers have value to criminals because they do not implicate the registered owner when used in the commission of a crime.

## RECOVERY OF STOLEN GUNS WITHOUT SERIAL NUMBERS TRACED TO KAHR ARMS

46.   **Recovery of Firearm #1** – In early December, 1999, officers of the Worcester Police Department, conducted a traffic stop of Robert Jachimczyk in Worcester, MA, and searched the vehicle.  The police recovered, from underneath the front seat, a Kahr Arms K-40 .40 caliber handgun with a full magazine of ammunition.  There was no serial number engraved or cast on the weapon.  The police also recovered what they believed to be a small quantity of marijuana from the car.  During a search incident to the arrest of the driver of vehicle, the police recovered what they believed to be small quantities of crack cocaine and powder cocaine.

47.   **Recovery of Firearm #2** - At the end of December, 1999, officers of the Worcester Police Department recovered a firearm from the yard of an apartment building in the vicinity of Main Street, in Worcester, MA.  The firearm was found by a four-year-old child, who lived in the apartment building. The firearm had a round of ammunition in the chamber. The firearm was identified as a Kahr Arms 9mm handgun. There was no serial number engraved or cast on the weapon.  See Memorandum of Probable Cause and Decision on Government's Motion for Detention, Criminal Action No. 00-1623-CBS, dated 3/23/00 and signed by The Honorable Charles B. Swartwood, III, Magistrate Judge.  A Copy of that Memorandum is attached as Exhibit 3.

48.   Both recovered firearms, submitted by the Worcester Police Department to the Massachusetts State Police Firearms Identification Section, test-fired with no malfunctions noted.

49.   Detective James Heffernan, of the Worcester Police Department, has custody of both of recovered weapons in this case.  Detective Heffernan told Special Agent Curran of the BATF that neither weapon has an engraved or cast serial number.  Also, he told Special Agent Curran that the name "Kahr" is prominently displayed on the slide of each weapon.

50.   On March 13, 2000, Special Agent Curran observed both firearms and noted that there was no serial number or any marking on the receiver of the firearms. Special Agent Curran could see the name "Kahr" prominently displayed on the slide of both firearms.

## LACK OF THEFT PREVENTION MEASURES OR EMPLOYEE BACKGROUND CHECKS

51.   Upon information and belief, at all times material hereto, the defendants:
   -   did not conduct criminal background or general background checks on prospective employees and hired persons with criminal records;
   -   did not test present or prospective employees for indications of drug addiction;
   -   did not safeguard handguns and their components with metal detectors, x-ray machines, or other devices capable of detecting handguns or components secreted on persons or in their effects;
   -   did not have a security guard to check employees upon the completion of their shift to prevent theft of handguns or handgun components;
   -   did not keep clear and current inventory tracking records which would

timely reveal unauthorized removal of weapons or weapons parts from the premises;
- did not supervise its employees/did not have television security cameras; and
- allowed individuals with criminal backgrounds and individuals addicted to illegal, controlled substances to work, manufacture, assemble and come in contact with handguns and handgun components

52.  It is logical and foreseeable that a gun manufacturing plant not employing human or mechanical devices (e.g. X-ray machines, metal detector machines, hand held metal detectors), not checking employees upon the conclusion of their work shift to prevent theft, allowing unqualified employees to participate in the assembly of manufacturing firearms, is more likely to suffer gun/gun component theft. It is equally foreseeable that stolen weapons from a Federal Firearms Licensee could end up being used in the commission of crimes.

53.  It is foreseeable that handguns lacking a serial number or handgun components not yet stamped with a serial number will be used in future crimes.

## CARELESS INVENTORY TRACKING AT KAHR ARMS

54.  On or about February 8, 1999, ATF Special Agent Michael P. Curran responded to Kahr Arms at 184 Prescott St. in Worcester, MA on a report of 10 lost firearms from a UPS shipment originating from Kahr Arms. The weapons shipped on December 17, 1998, did not arrive at the intended destination. Five of the missing weapons were 9mm. and five were .40 cal. Discussions between Special Agent Curran and Kahr Arms representatives revealed that in the year prior to February 8, 1999, there had been 15 or 16 shipments of firearms that never reached their intended destination.

55.  From February of 1998 to February of 1999, approximately 16 shipments of handguns from Kahr Arms to legal buyers failed to arrive at their points of destination and there has been no accounting for the weapons lost.

56.  In December 1998, Kahr reported to the United States Bureau of Alcohol, Tobacco and Firearms (BATF) that 10 handguns, which Kahr Arms had shipped from Worcester, MA did not reach their destination.

57.  According to one April 2, 2000, news article from the Worcester Sunday Telegram, "as many as 17 Kahr shipments may not have reached their destinations." In another article, dated April 29, 2000, Worcester Police Detective Capt. Paul F. Campbell said that, "going back to 1998, as many as 50 weapons manufactured at the plant may be missing. I'm just trying to find out how many are missing and what happened to them." In the same article, Shaun Sutner a Telegram & Gazette reported wrote about a reporter who "was able to proceed through the public entrance one recent afternoon without being greeted by a security guard or passing through a metal detector. The reporter signed the guest book, then waited unaccompanied for several minutes before a manager told him to leave the premises". In another instance, Kahr shipped a 'Tommy gun' that never arrived. Worcester Telegram & Gazette, May 11, 2000.

8



58. Prior to April 1, 2000, Kahr did not use inventory-tracking records, which would timely reveal unauthorized removal/loss of weapons or weapons parts from its premises.

59. On March 16, 2000, inspectors of the Federal Bureau of Alcohol, Tobacco and Firearms reviewed records of the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. The records indicated that the 9mm. handgun bearing serial number GC0913 was theoretically still in Kahr's secured weapons inventory, though it had already been stolen by Scott Anderson.

60. On March 16, 2000, the Worcester Police Department confirmed security problems at the Kahr Arms facility had been discovered and Kahr had been ordered by WPD to take corrective action. Among the shortcomings the department identified were unsecured storage of handgun components, and inadequate tracking of handgun components.

61. On or about April 1, 2000, Captain Paul F. Campbell of the Worcester Police Department who was responsible for overseeing corrections to Kahr Arms security system stated that the department had found record keeping at the Kahr Arms plant at 130 Goddard Memorial Drive to be so "shoddy" that it was possible to remove handguns from inventory without detection. At all times material weapons were stolen because of Kahr's shoddy inventory system that allowed criminals to steal weapons without detection.

62. The Violent Crime Control and Law Enforcement Act of 1994 included a requirement for Federal Firearm Licensees to report theft or loss of firearms from their inventory or collection to the ATF and local law enforcement within forty-eight (48) hours after discovery. However, not until April 7, 2000, and April 8, 2000, did Kahr Inc.'s Randall Cassidy report to the Worcester Police Department and to the Bureau of Alcohol, Tobacco & Firearms that forty-one (41) handguns manufactured years earlier with serial numbers were missing from the inventory of the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. These include but are not limited to: three 9mm handguns made between 10/3/95 and 12/19/95; nine 9mm handguns and one .40 cal. made between 1/17/97 and 8/21/97; one 9mm made in 1998, three 9mm made between 1/20/99 and 9/23/99 and one .40 cal made on 7/19/99. (Exhibit 4). At all times material to this matter, the defendants' inventory tracking system at the Kahr Arms plant in Worcester did not reveal the unauthorized removal of weapons or weapon components from the inventory. In particular, the inventory system did not safeguard against illicit removal of weapons before identification numbers were engraved or cast into them as required by law before such firearms can be released into the stream of commerce.

## MARK CRONIN

63. On or about March of 1999, the defendants, acting by and through Kahr, Inc., did hire one Mark M. Cronin to work at the Kahr Arms manufacturing facility in Worcester.

64.  Public Court records revealed that Mr. Cronin had previously been arrested on various charges and had an extensive criminal background:

-  Probate and Family Court records indicate that as early as December, 1995, Mr. Cronin was addicted to cocaine and was habitually stealing money to support his cocaine habit.

-  In addition, in the Complaint for Divorce filed on or about July 2, 1996, Stephanie Cronin alleges, among other things, that "On or about December, 1995, the defendant (Mark Cronin) had a serious addiction to (crack)."

-  Assault and battery in March of 1998, in Worcester. The case was continued without a finding, on condition that Mr. Cronin undergo assessment and counseling for alcohol abuse.

-  Domestic assault and battery in November of 1997 in Worcester. The case was continued without a finding after the defendant admitted to facts sufficient to prove the charge, on condition that he seek counseling for anger management.

-  In 1998, an operating under the influence charge was continued without a finding (1 year probation, 24D Program)

-  Also in 1998 Cronin filed a guilty plea to operating vehicle after suspension of license.

-  Also in 1998 a charge of giving a false name to a police officer was dismissed.

-  On July 29, 1999 Stephanie Cronin filed a complaint in the Worcester Division of the Commonwealth of Massachusetts, Probate and Family Court, against Mark Cronin, Defendant. The complaint alleges, among other things, that Mark Cronin violated a previous order of support by "not reporting new 2nd job as well as overtime at current position at Saeilo on Prescott St. in Worcester."

65.  These records of prior arrests were public records that were readily available to the agents, servants and employees of the defendants to determine whether Mr. Cronin was suitable for employment at their handgun manufacturing facility and to determine whether, under federal law, his criminal record disqualified him from such employment. Section 922 of the Gun Control Act of 1968, Public Law 90-618, Title 18, U.S. Code (which would have been in effect in 1999), makes it unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year or been convicted in any court of a misdemeanor crime of domestic violence, to ship, transport or possess any firearm or ammunition or to receive any firearm or ammunition. Clearly, the policy behind this law is to prevent criminals like Mr. Cronin from handling handguns. A simple record review would have revealed that Mr. Cronin should not be working in a gun manufacturing facility.

## A COOPERATING WITNESS (JACHIMCZYK) LEADS INVESTIGATORS TO KAHR EMPLOYEE, MARK CRONIN

66.  On or about December 2, 1999, the Worcester Police Department recovered a loaded Kahr Arms .40 caliber handgun with no serial number from a motor vehicle in the possession of one Robert Jachimczyk.

67. According to Docket 9962CR012118, on or about December 2, 1999, before Judge Elliott L. Zide, Robert W. Jachimczyk was charged with the following offenses: 1) Possession of Cocaine; 2) Possession of Marijuana; 3) possession of a Kahr .40 cal. handgun with one full magazine without a Firearm ID; 4) operating a motor vehicle with a suspended license; 5) Failed to use care, in violation of C9 18 of the City or town of Worcester. An additional count for 269/10/J Firearm, Carry without a license c 269 Section 10 was dismissed upon the Commissioner's request.

68. In or about December, 1999, ATF Special Agent Curran was contacted by the Worcester Police Department, in relation to the recovered firearms and had an opportunity to interview a Cooperating Witness (Jachimczyk).

69. On or about December 29, 1999, Jachimczyk provided Special Agent Curran with the following information in relation to firearms. On evening of December 1, 1999, Jachimczyk exchanged two "half grams" of cocaine, valued at approximately $80, for a firearm which was provided to Jachimczyk by Mark Cronin (hereinafter Cronin). Jachimczyk has known Cronin for several years.

70. Jachimczyk reported that shortly after obtaining the firearm from Cronin, the weapon was seized by the Worcester Police Department in the course of a traffic stop. Jachimczyk went on to provide additional information about an earlier transaction involving Cronin in which Cronin provided a seven shot 9mm firearm to Jachimczyk in exchange for approximately $80 worth of cocaine. This weapon, as well, did not have a serial number. This exchange took place a few months earlier than the December, 1999 exchange. Jachimczyk traded the 9mm to a third-party, in exchange for two bundles of 'dope' [heroin].

71. On or about March 3, 2000, Jachimczyk provided Special Agent Curran with the following information. Specifically, in November 1999, Cronin approached Jachimczyk at the Green Island Pub in Worcester, MA, and asked Jachimczyk if he would like to buy a firearm. Cronin told Jachimczyk he worked at a local firearm manufacturer. Cronin told Jachimczyk that he had taken the firearm out of the company, that he "does it all the time, and that [he] can just walk out with them." Cronin told Jachimczyk that the firearm he had for sale does not have a serial number because it bypassed the serial number stamping process at the factory. Cronin told Jachimczyk that the firearm was a 9mm caliber. Cronin told Jachimczyk that he knew the firearm functioned because he test-fired it at work. Jachimczyk and Cronin went to a Worcester residence where Jachimczyk was staying, and made the exchange.

72. Jachimczyk provided Cronin with 2 'half grams' of powder cocaine in exchange for the 9mm Kahr Arms firearm. After the exchange, Cronin drove Jachimczyk to a third-party's house, at which point Jachimczyk went into an apartment where he traded the firearm to a third-party for 2 bundles of heroin. Cronin stayed in the car during this transaction. Following the exchange, Jachimczyk returned to the car operated by Cronin.

73. Again, in connection with the proffer agreement, Jachimczyk provided information in relation to a second transaction with Cronin. On December 1, 1999, Cronin came into the Green Island Pub and asked Jachimczyk if he wanted to purchase another firearm. Cronin stated that it was a bigger firearm, a .40 caliber, and it was his personal gun. Jachimczyk and Cronin agreed to trade two 'half grams' of cocaine for the firearm. Cronin left the bar and returned shortly thereafter with the firearm. Cronin stated that he had to go home and get the firearm.

74. Cronin returned to the bar a short while later and showed Jachimczyk the firearm. Jachimczyk and Cronin left the bar and left in the car operated by Jachimczyk. A short distance from the bar, Cronin removed a safety lock from the weapon and gave the firearm to Jachimczyk, who placed it under the front seat of the car. Jachimczyk gave Cronin 2 'half-grams' of powder cocaine, as well as a crack cocaine rock, in exchange for the firearm. Following the exchange, Jachimczyk and Cronin drove back to the bar. Cronin went inside the bar, leaving Jachimczyk outside in the car.

75. Shortly thereafter, the Worcester Police Department stopped the car operated by Jachimczyk and recovered a firearm from underneath the front seat. Jachimczyk was provided with a photocopy of a photograph of Cronin and identified the person depicted as Mark Cronin.

76. Jachimczyk has a criminal record. In addition to the offenses described above, in 1995, Jachimczyk was arrested for possession of marijuana and operating under the influence of liquor. Both charges were dismissed. Jachimczyk has history of drug use, including the use of heroin, cocaine, crack, and marijuana. In addition, Jachimczyk has distributed controlled substances and supplied various customers in the past.

77. Law enforcement agents provided Jachimczyk with a hidden recording device, which enabled law enforcement agents to monitor and record conversations between Jachimczyk and others. On March 8, 2000, at the direction of law enforcement, Jachimczyk went to Cronin's apartment and engaged Cronin in a conversation in relation to the firearms, which Cronin provided to Jachimczyk. Jachimczyk told Cronin that Jachimczyk and Jachimczyk 's friend had been subpoenaed to provide information in relation to the origin of the firearms. Among other things, Cronin encouraged Jachimczyk to falsely tell authorities that Jachimczyk obtained "the gun off some guy off the street."

78. Cronin admitted in the tape recording that he provided Jachimczyk with the guns: "[G]ranted, I shouldn't have got you the gun, but second of all it's not like the minute you asked me you got it. It was a couple of months in between from that second from that next gun." Also, during the conversation, Cronin removed from a nearby bureau a loaded magazine and demonstrated that a magazine holds six rounds of ammunition.

79. Because of his cooperation in convicting Cronin, on October 30, 2000, Jachimczyk received the following sentences for his crimes:

Drug possession class B: guilty plea, sentenced to pre trial probation consisting of 6 months in House of Corrections, 12 days to serve, balance suspended until 10/23/02

Class D: guilty plea, sentenced to pre trial probation consisting of 6 months in House of Corrections, 12 days to serve, balance suspended until 10/23/02

Carrying firearm without a license c. 269 Section 10 (which carries a mandatory jail term of a year in House of Correction for a first offense): dismissed upon request of Commonwealth

Carrying firearm without a federal ID card Section 10(G): guilty plea – 6 mo. House of Correction, 12 days to be served, credit time served/ balance suspended and 2 years probation

Ultimately, in violation of his probationary terms, Jachimczyk was reprobated on June 13, 2001.

80.    On or about March 16, 2000, Mark Cronin was arrested on charges of stealing handguns from the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester. He later pleaded guilty and was convicted.

81.    In summary, in mid-October of 1999, Mark Cronin did in the course of his employment at the defendants' Worcester plant, obtain a Kahr Arms 9 millimeter handgun with no identification numbers cast or engraved into the body of the gun.

82.    Mr. Cronin obtained the 9mm in violation of federal and state law and as a direct and proximate result of defendants' failure to have such reasonable measures in place for the prevention, deterrence, or detection of handgun theft as are prevalent throughout the handgun manufacturing industry in Massachusetts and the United States - metal detectors, X-ray scanners, effective inventory tracking, etc. In addition, defendant Kahr Arms failed to adequately supervise or monitor him.

83.    By his own admissions and as shown by other evidence in the federal district court, Mr. Cronin removed the 9mm handgun from the Kahr Arms facility in Worcester with the intent of exchanging it for crack cocaine.

84.    In October or November of 1999, Mr. Cronin introduced the 9 millimeter handgun into the stream of commerce, selling the stolen gun to Robert Jachimczyk, in exchange for one gram of cocaine - Mr. Jachimczyk in turn traded this firearm to a third party, defendant Edwin Novas in exchange for heroin with deadly consequences. The identity of this third party is unknown to the plaintiff but upon information and belief the party was Edwin Novas, a Dominican national, who is a fugitive from justice. Mr. Novas had had numerous encounters with the criminal justice system in the Commonwealth of Massachusetts months before December 24, 1999.

85. On December 24, 1999, at approximately 1:54 a.m., Danny Guzman, an innocent bystander, was shot in the 800 block of Main Street in Worcester in front of the Tropigala nightclub. Guzman was killed by the same 9 mm handgun that injured Armando Novas. This was a gun that Cronin had easily stolen from his employer, defendant Kahr Inc. Tragically, Danny Guzman was pronounced dead at St. Vincent's Hospital in Worcester, Massachusetts at approximately 0212 of a single gunshot wound to the chest which created two (2) holes in his heart – one entrance, one exit. The attending physicians listed the mechanism of injury as a "? 9 mm bullet".

86. At the time of this senseless and preventable homicide, Kahr Arms manufactured 13 different types of 9 mm handguns.

87. On or about December 30, 1999, the Worcester Police Department recovered a loaded Kahr Arms 9 millimeter handgun (similar to the 7 round magazine K9 model) with no serial number in a lot on Benefit Street in Worcester, near the place where Mr. Guzman was shot. The gun was found by a four year old child. Ballistics tests determined that this very Kahr handgun fired the shot that struck and killed Danny Guzman. A photo of a K9 model 9 mm is attached as Exhibit 5.

88. On March 23, 2000, the Honorable Charles B. Swartwood, III, found in his Memorandum of Probable Cause and Decision of Government's Motion For Detention and Findings of Fact at paragraphs 1,2,3,4 and 5 that the 9mm firearm used in the homicide of Danny Guzman was the Kahr Arms 9mm provided by Cronin. Specifically at paragraph 2, Judge Swartwood, III writes, "In late December 1999, a four year old child found a loaded 9 mm Kahr firearm in the yard of an apartment building in the vicinity of Main Street, Worcester, MA. This weapon was traced to a homicide outside the Tropicala (sic) Night Club located in the Main South area of Worcester." Exhibit 3 at p. 2.

89. As late as September 2000, the WPD continued with its active investigation into handguns lost or stolen from Kahr Arms at 130 Goddard Memorial Drive, Worcester, Massachusetts.

## SCOTT ANDERSON- ANOTHER KAHR EMPLOYEE PLEADS GUILTY TO STEALING GUNS FROM KAHR

90. On or about March of 1999, the defendants, acting by and through Kahr, Inc., did hire one Scott R. Anderson to work at the Kahr Arms manufacturing facility in Worcester.

91. On March 16, 2000, ATF Agents and Worcester Police Department officers, in connection with an investigation regarding firearm thefts from Kahr Arms, interviewed Scott Anderson, a Kahr Arms employee.

92. ATF Special Agent Thomas Lyster and Worcester Police Department Captain Paul Campbell interviewed Anderson in a conference room at Kahr Arms. Special Agent Lyster advised Anderson that he was implicated in the theft of firearms at Kahr Arms, and he told Anderson that he was not under arrest.

14

93.  Anderson admitted stealing a Kahr Arms handgun approximately four or five months before the interview (March 16, 2000). Anderson said that the handgun was in a box in his bedroom closet. Anderson admitted that he stole a slide for another Kahr Arms handgun that he had legally purchased. Anderson provided a written statement to law enforcement and admitted taking the Kahr Arms handgun and slide from his place of employment, Kahr Arms.

94.  Following the interview, ATF Agents accompanied Anderson to his residence. Anderson gave verbal consent and also signed a form authorizing ATF Agents to enter and search his apartment. After signing the agreement, Anderson brought ATF Agents Thomas Lyster and Seref McDowell into his apartment. Anderson retrieved a Kahr Arms semi-automatic handgun, model MK9 9mm, serial number GC0913, and an additional slide for a Kahr Arms model K9 handgun that was unlawfully taken from Kahr Arms. Anderson turned over firearm and additional slide to Special Agent Lyster.

95.  On March 16, 2000, special agents of the Federal Bureau of Alcohol, Tobacco and Firearms interviewed Scott Anderson. Anderson confessed that he had stolen a 9mm. Kahr Arms handgun and a major handgun component from the Kahr Arms plant. The BATF agents recovered such a weapon, bearing serial number GC0913, from Mr. Anderson's home.

96.  On April 27, 2000, Scott Anderson was charged in the U. S. Massachusetts District Court, with stealing a 9mm handgun from the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. Anderson pleaded guilty. On March 20, 2001, he was sentenced to nine months home detention as part of a three-year probation for stealing the firearm.

### COUNT 1 – KAHR INC., D/B/A. KAHR ARMS, INC. or KAHR AUTO ORDNANCE NEGLIGENCE/ NEGLIGENT HIRING AND SUPERVISION/ RESPONDEAT SUPERIOR

97.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 93.

98.  As a result of Kahr Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks, failing to supervise employees, and failing report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

99.  As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the wounding of Armando Maisonet.

## COUNT 2 – SAEILO, INC.
## NEGLIGENCE/ NEGLIGENT HIRING AND SUPERVISION/
## RESPONDEAT SUPERIOR

100. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 99.

101. As a result of Saeilo, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

102. As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the wounding of Armando Maisonet.

## COUNT 3 – SAEILO MACHINERY MA, INC.
## NEGLIGENCE

103. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 102.

104. As a result of Saeilo Machinery MA, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

105. As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the wounding of Armando Maisonet.

## COUNT 4 - SAEILO MACHINERY USA, INC.
## NEGLIGENCE

106. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 105.

107.   As a result of Saeilo Machinery USA, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

108.   As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the wounding of Armando Maisonet.

## COUNT 5 - SAEILO MANUFACTURING INDUSTRIES
## NEGLIGENCE

109.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 108

110.   As a result of Saeilo Manufacturing Industries' wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

111.   As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the wounding of Armando Maisonet.

## COUNT 6 - MACHINE INDUSTRIES, INC.
## NEGLIGENCE

112.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 111

113.   As a result of Machine Industries, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

114.    As a direct and proximate result, an unlicensed, serial number-less 9 mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the wounding of Armando Maisonet.

## COUNT 7 - SAEILO EQUITY INVESTMENTS, LP
## NEGLIGENCE

115.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 114

116.    As a result of Saeilo Equity Investments, LP's wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

117.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the wounding of Armando Maisonet.

## COUNT 8 - ONE UP ENTERPRISES, INC.
## NEGLIGENCE

118.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 117.

119.    As a result of One Up Enterprises, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

120.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the wounding of Armando Maisonet.

## COUNT 9 – EDWIN NOVAS
## NEGLIGENCE/TORTIOUS ASSAULT AND BATTERY

121.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 120.

122.    As a direct and proximate result of the carelessness and negligence of Edwin Novas, who negligently or intentionally discharged a Kahr 9mm handgun, Armando Maisonet suffered grievous injury.

## COUNT 10 – MARK CRONIN
## NEGLIGENCE

123.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 122.

124.    As a direct and proximate result of the carelessness and negligence of Mark Cronin, who negligently intentionally placed a Kahr 9mm handgun into the stream of commerce, when it was likely and foreseeable that it would be used in a crime, Armando Maisonet suffered grievous injury.

## COUNT 11 – ROBERT JACHIMCZYK
## NEGLIGENCE

125.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 124.

126.    As a direct and proximate result of the carelessness and negligence of Robert Jachimczyk, who negligently intentionally placed a Kahr 9mm handgun into the stream of commerce, when it was likely and foreseeable that it would be used in a crime, Armando Maisonet suffered grievous injury.

## COUNT 12 - KAHR INC., D/B/A, KAHR ARMS, INC. or KAHR AUTO ORDNANCE
## PUBLIC NUISANCE

127.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 126 into this count.

128.    Kahr Arms' utter lack of security and lax practices have caused injury to the public, and specific injury to plaintiff Armando Maisonet by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

129.    Kahr Arms' behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT 13 – SAEILO, INC.
### PUBLIC NUISANCE

130.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 129 into this count.

131.  This defendant's lack of security and lax practices have caused injury to the public, and specific injury to Armando Maisonet and the plaintiff by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

132.  This defendant's behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT 14 - SAEILO MACHINERY MA, INC.
### PUBLIC NUISANCE

133.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 132 into this count.

134.  This defendant's lack of security and lax practices have caused injury to the public, and specific injury to Armando Maisonet and the plaintiff by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

135.  This defendant's behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT 15 – SAEILO MACHINERY USA, INC.
### PUBLIC NUISANCE

136.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 135 into this count.

137.  This defendant's lack of security and lax practices have caused injury to the public, and specific injury to Armando Maisonet and the plaintiff by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.



138. This defendant's behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT 16 – SAEILO MANUFACTURING INDUSTRIES
### PUBLIC NUISANCE

139. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 138 into this count.

140. This defendant's lack of security and lax practices have caused injury to the public, and specific injury to Armando Maisonet and the plaintiff by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

141. This defendant's behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT 17 – MACHINE INDUSTRIES, INC.
### PUBLIC NUISANCE

142. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 141 into this count.

143. This defendant's lack of security and lax practices have caused injury to the public, and specific injury to Armando Maisonet and the plaintiff by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

144. This defendant's behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT 18 – SAEILO EQUITY INVESTMENTS, LP
### PUBLIC NUISANCE

145. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 144 into this count.

146.    This defendant's lack of security and lax practices have caused injury to the public, and specific injury to Armando Maisonet and the plaintiff by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

147.    This defendant's behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT 19 – ONE UP ENTERPRISES, INC.
### PUBLIC NUISANCE

148.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 147 into this count.

149.    This defendant's lack of security and lax practices have caused injury to the public, and specific injury to Armando Maisonet and the plaintiff by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

150.    This defendant's behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT 20 –EDWIN NOVAS
### NEGLIGENT INFLICTION/INTENTIONAL INFLICTION
### OF EMOTIONAL DISTRESS

151.    The plaintiff incorporates by reference the allegations contained in paragraphs 1 through 150 of the complaint into this count.

152.    As a direct and proximate result of the negligent or intentional outrageous conduct of the defendant the plaintiff suffered severe emotional distress, trauma and humiliation.

## COUNT 21 – ALL DEFENDANTS
### JOINT AND SEVERAL LIABILITY

153.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 152 into this count.

154.    As direct result of the joint negligence of the defendants in this action, Armando Maisonet has suffered serious injury and permanent damage.

## COUNT 22
## UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)
## SCOTTSDALE INSURANCE COMPANY ("SCOTTSDALE")

155.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 154 into this count.

156.   Scottsdale's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

157.   Scottsdale has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

158.   Plaintiff suffered damages as a result of Scottsdale's unfair or deceptive conduct.

## COUNT 23
## UNFAIR INSURANCE PRACTICES UNDER G.L.c.93A
## SCOTTSDALE INSURANCE COMPANY ("SCOTTSDALE")

159.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 158 into this count.

160.   Scottsdale's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

161.   Plaintiff contends Scottsdale is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

162.   Scottsdale has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

163.   Plaintiff has suffered damages as a result of Scottsdale's unfair or deceptive conduct.

## COUNT 24
## UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)
## GENERAL STAR MANAGEMENT COMPANY ("GENERAL STAR")

164.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 163 into this count.

165. General Star's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

166. General Star has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

167. Plaintiff suffered damages as a result of General Star's unfair or deceptive conduct.

## COUNT 25
## UNFAIR INSURANCE PRACTICES UNDER G.L.C.93A
## GENERAL STAR MANAGEMENT COMPANY ("GENERAL STAR")

168. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 167 into this count.

169. General Star's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

170. Plaintiff contends General Star is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

171. General Star has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

172. Plaintiff has suffered damages as a result of General Star's unfair or deceptive conduct.

## COUNT 26
## UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)
## UTICA MUTUAL INSURANCE COMPANY ("UTICA")

173. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 172 into this count.

174. Utica's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

175. Utica has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

176. Plaintiff has suffered damages as a result of Utica's unfair or deceptive conduct.

## COUNT 27
## UNFAIR INSURANCE PRACTICES UNDER G.L.C.93A
## UTICA MUTUAL INSURANCE COMPANY ("UTICA")

177. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 176 into this count.

178. Utica's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

179. Plaintiff contends Utica is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

180. Utica has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

181. Plaintiff has suffered damages as a result of Utica's unfair or deceptive conduct.

## COUNT 28
## REQUEST FOR DECLARATORY DETERMINATIONS UNDER G.L.c.231a

182. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 181 into this count.

183. Plaintiff has been informed by representatives of Scottsdale and Utica that coverage is being denied Kahr Arms et al. relative to the instant action, on the basis of various alleged exclusions contained in their respective policies of insurance.

184. Scottsdale and Utica contend there is no coverage afforded their respective insureds on grounds that a so-called "completed product" exclusion applies.

185. A real controversy has arisen as to whether or not this exclusion applies in the instant dispute.

186. On information and belief, after carefully reviewing the policies of both carriers (Scottsdale and Utica) plaintiff believes that the exclusion claimed has no merit.

187. Plaintiff is requesting that the Court make a determination regarding the application of the exclusion and consequently the obligations of the insurers Scottsdale and Utica.



188.    Also, plaintiff hereby requests a binding declaration by this Court that General Star's eroding policy of insurance, which is being used to finance Kahr's defense in this action, not be further depleted by: 1) any work or appearances related to disputes of insurance coverage; and 2) any work or appearances related to defense of plaintiff's 93 A claims.

<u>DEMANDS FOR RELIEF</u>

The Plaintiff hereby respectfully requestS the following relief:

1.   All compensatory damages recoverable;

2.   All punitive damages recoverable (in an amount no less than five thousand dollars pursuant to the tenets of as provided in M.G.L. c. 229 § 2);

3.   All attorney's fees, costs and expenses allowable;

4.   A binding declaration of the inapplicablility of the completed product exclusion and the coverage obligations of insurance carriers Scottsdale and Utica;

5.   A binding declaration that General Star's eroding policy of insurance, which is being used to finance Kahr's defense in this action, not be further depleted by: 1) any work or appearances related to disputes of insurance coverage; and 2) any work or appearances related to defense of plaintiff's 93 A claims.

6.   Any and all other relief as the Court deems just and proper.

<u>PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS RAISED IN THE COMPLAINT.</u>

Respectfully submitted,
Plaintiff Armando Maisonet by his attorneys,

_____
Hector E. Pineiro, Esquire, BBO # 555315
Robert H. Beadel, Esquire, BBO # 632447
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600

26

# EXHIBIT 1

_Worcester_ **Division**

**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court Department**

Docket No. _02P0200 AD1_

_Filed Jan 22, 2002_

## Administration With/~~Without~~ Sureties

Name of Decedent _Danny Guzman_

Domicile at Death _17 Queen Street Worcester, MA_ _Wor._ _01610_
(Street and No.)    (City or Town)    (County)    (Zip)

Date of Death _12/24/99_

Name and address of Petitioner(s) _Irena Hernandez_
_17 Queen Street Apt 1 Worcester MA     01610_

Status _Mother_

Heirs at law or next of kin of deceased including surviving spouse:

| Name | Residence (minors and incompetents must be so designated) | Relationship |
|---|---|---|
| Tammy Nicacio Guzman | 35 Worcester Street Apt 3 Southbridge MA | minor Daught |
| Celena Nicacio Guzman | 91 Murry Ave Apt 12 Worcester Avenue Worcester 01610 | minor Days |

☒ The petitioner(s) hereby certify _✓_ that a copy of this document, along with a copy of the decedent's death certificate has been sent by certified mail to the Department of Public Welfare, P.O. Box 86, Essex Station, Boston, Massachusetts 02112.

Petitioner(s) pray(s) that ~~he/she/they or some other suitable person~~ _____
of _Worcester_ in the County of _Worcester_ _____ be appointed administra _trix_ of said estate with/without surety on his/her/their bond(s) and certif _ies_ _____ under the penalties of perjury that the foregoing statements are true to the best of his/her/their knowledge and belief.

Date _4/28/2000_

Signature(s) _____
x _Irena Hernandez_

The undersigned hereby assent to the foregoing petition.

_Walker on behalf of Tammy Nicacio_     x _Glenda Pajan_  _9/20/01_
_9/7/11 Guzman_     _Glenda Pajan fn Selena Nicac_

### DECREE

All persons interested having been notified in accordance with the law or having assented and no objections being made thereto, it is decreed that _Irena Hernandez_ _____
County of _Worcester_ _____ be appointed administra _trix_ of said estate first giving bond with _____ sureties for the due performance of said trust.

Date _January 29, 2002_     _Ronald W. King_

P1 (8/92)     JUSTICE OF THE PROBATE AND FAMILY COURT

# EXHIBIT 2

**Commonwealth of Massachusetts**
The Trial Court

_____ Division
Probate and Family Court Department
Guardianship of Minor With – Without – Sureties     Docket No. _02PR 0005_

Name of Ward(s)*
(1). _Tammy L. Norcia_     Residence
_35 Worcester Stret Southbridge, MA 01550_     Date of Birth _1/2_
(2) _____
(3) _____

*If the petitioner is an agency then only one ward is permitted on each petition. Each ward must have the same mother and father to be listed on the same petition.

PETITIONER(S) _Fiona Hernandez, 17 Orem Street, Worcester, MA over_
(PRINT Name(s) of Petitioner(s) and street address(es))
_____ _____ _____ _Grandmother_
(city or town)          (state)          (zip code)          (relationship to ward)

List the names of parents, if known, otherwise name grandparents, sisters, brothers, aunts, or uncles (who are over 18):
Name          Residence          Relationship
_Tammy L. Atiaces_ c/o Holly Kaleski 35 Worcester St Southbridge _Mother_
_Danny Guzman_          _Father, deceased_

The minor(s) is/are – not – entitled to benefits, estate, or income paid or payable by or through the United States Veterans Administration. I/We certify that the ward's estate – does – does not – exceed $100.00.
WHEREFORE, the petitioner(s) pray(s) that he/she/they – or some other suitable person – be appointed the guardian of the minor(s) – and the estate – with custody – with – without – surety on the bond – the parent(s) being unfit.
_Mark Zarrow, Esquire of 39 Mechanic Street Worcester, MA_
Date _Fiona 7-17-00_     _Fiona Hernandez_     _Abuara Hernandez_
(signature of petitioner) (1)          (signature of petitioner (2))

Nomination of Ward(s)
Then personally appeared _____
(PRINT name of child(ren))
minor(s) being above the age of fourteen years, who nominate(s)
_____ (PRINT name of nominee) _____ to be his/her/their guardian.
Before me, _____ (signature of minor)
NOTARY PUBLIC/JUSTICE OF THE PEACE _____ My Commission Expires _____

Parental Assent
I/We, the surviving parent(s) – spouse – of the minor hereby assent(s) to the granting of the foregoing petition.
Date _1/30/01_     _Holly Waleski_
Alert          (signature of parent)
_Holly Waleski for Tammy_     _____ (signature of parent)

DECREE
All persons interested having been notified in accordance with the law or having assented and no objections being made thereto,
It is decreed that _____
of _____ Worcester, _____ _Mark Zarrow_
in the County of Worcester
be appointed _permanent_ guardian – with custody – of the person – and of the estate – of the above – named minor(s), first giving bond with _out_ sureties for the due performance of the trust.
It is further ordered _____

Date _January 2, 2002_

# EXHIBIT 3



**Saello Machinery (USA) Inc**

620 Route 303
Blauvelt N.Y. 10913
USA

Phone: (914) 353 7770 x 258
Fax: (914) 353 7803

September 19th, 1997

Inspector ▓▓▓▓▓▓
Bureau of Alcohol, Tobacco and Firearms
6 World Trade Center · 6th floor
New York, New York 10048-0951

Dear ▓▓▓▓▓▓

Thank you for the booklets and forms which you sent as a follow up to your meeting of August 26th 1997 with Messrs Konn and Dikeman.

This is in response to your request for information concerning significant shareholders of Saello Machinery (USA) Inc. ("Saello Machinery"). The only significant shareholders of Saello Machinery are One Up Enterprises Inc and Saello (USA) Inc. The only individual other than the officers and directors of Saello Machinery who exercises, "directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation" as specified in 18 U.S.C. section 923(d)(1)(B), is Kook Jin Moon who has an ownership interest in Saello (USA) Inc and is president of Saello, Inc. an affiliate of Saello Machinery. Saello, Inc. already holds an FFL, and Mr Moon's information is therefore already on file.

As I believe was explained in the meeting, we intend to distribute Kahr firearms as well as manufacture them. While the ▓▓▓▓▓▓▓▓▓▓▓ operations do this under the name Kahr Arms we feel that ▓▓▓▓▓▓▓▓▓▓▓ the existing distribution channels, therefore, we would like to ▓▓▓▓▓▓ to carry out our distribution activities through a different corporate entity.

The requested information concerning our business is enclosed.

If I can be of further assistance in expediting this matter, please do not hesitate to contact me.

Sincerely,



Chief Financial Officer

18



19

# EXHIBIT 4



# ABSOLUTE CONCEALED POWER

When the unexpected happens, Kahr's unmatched combination of power and performance can save your life. Kahr pistols are the smallest, flattest, most reliable full power compact pistols made.

Despite their diminutive size, Kahr pistols perform outstandingly and feel so good in the hand because key elements such as ergonomics, balance and accuracy were addressed in the earliest design stages. The unique cocking cam system provides a safe double action only trigger stroke, fast to fire in critical defensive situations.

Kahr pistols are duty ready right out of the box. Kahr's two newest products the micro-compact MK40 and the K9 polymer frame are now available. Kahr's K9 polymer frame weighs in at less than 16 ounces and has one of the slimmest profiles of any defensive handgun. All of Kahr's pistols are backed by our Limited Lifetime Warranty. For more information, see your dealer today!



**MK9**
M9093, stainless steel
M9094, Elite '98



**K9**
K9093, stainless steel
K9094, Elite '98



**K9 Polymer Frame**
KP9093, polymer frame
and stainless steel slide



**MK40**
M4043, stainless steel
M4044, Elite '98



**K40**
K4043, stainless steel
K4044, Elite '98



Auto-Ordnance Corporation



Kahr 9mm pistol approved by the NYCPD



## Extensive Testing

Quality is never compromised in the making of the Kahr.

The development of the Kahr handgun involved numerous testing sessions during which 10,000 rounds of ammunition were fired through a single Kahr pistol. Each Kahr model has been extensively tested to assure the reliability, function, accuracy and safety of each component and of the final product.

As a result, Kahr has produced the most reliable compact firearm in the world today. We, at Kahr, have total confidence in the durability and long-term reliability of our Kahr pistols.

## The Final Product – Concealed Power

The designer's first priority for the Kahr pistol was concealed power, and that is the final product.

The union of advanced design, quality materials and proper construction makes Kahr the smallest, thinnest, most reliable full power compact pistol.

**Reliability.** Unless the gun is 100% reliable, all else is meaningless. Kahr pistols have proven their reliability in testing by Federal, State and local agencies.

**Size.** Ergonomically, the Kahr compact pistol excels. The gun is easy to shoot well, and comfortable to carry for extended periods due to its thin profile.

**Power.** Despite their diminutive size, Kahr pistols deliver full size ballistic performance.

So, when it comes to protecting your life, choose concealed power. Choose the gun marked KAHR.

**Absolute Concealed Power!**





Caliber: 9mm  Capacity: 7+1  Operation: Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  Trigger Weight: Approx. 7-10 lbs  Barrel: 3.5", polygonal rifling; 1-10 right-hand twist  Length O/A: 6.0"  Height: 4.5"  Slide Width: .90"  Weight: Pistol 15.8 ounces, Magazine 1.9 ounces  Construction: Polymer frame, stainless steel slide  Grips: Textured polymer  Sights: Low profile, white bar-dot (tritium night sights optional)  Finish: Matte stainless steel  Magazines: 2 - Stainless, 7-round  Warranty: Limited Lifetime

**KP9093, Polymer Frame, Stainless Slide, Elite 98' Trigger**

Caliber: .40 S&W  Capacity: 5+1  Operation: Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  Trigger Weight: Approx. 7-10 lbs  Barrel: 3.08", polygonal rifling; 1-18 right-hand twist  Length O/A: 5.35"  Height: 4.0"  Slide Width: .94"  Weight: Pistol 23.1 ounces, Magazine 1.9 ounces  Construction: Stainless steel  Grips: Wraparound, textured nylon  Sights: Low profile, white bar-dot (tritium night sights optional)  Finish: Matte stainless steel  Magazines: 1 each 5-round flush baseplate & 6-round grip extension  Warranty: Limited Lifetime

**M4043, Stainless Steel / M4046, Stainless Elite 98'**

Caliber: .40 S&W  Capacity: 6+1  Operation: Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  Trigger Weight: Approx. 7-10 lbs  Barrel: 3.5", polygonal rifling; 1-18 right-hand twist  Length O/A: 6.1"  Height: 4.55"  Slide Width: .94"  Weight: Pistol 24.1 ounces, Magazine 1.9 ounces  Construction: Ordnance steel or stainless steel  Grips: Wraparound, soft polymer (exotic wood optional)  Sights: Low profile, white bar-dot (tritium night sights optional)  Finish: Matte black, matte stainless steel  Magazines: 2 - Stainless, 6-round  Warranty: Limited Lifetime

**K4040, Matte Black / K4043, Stainless Steel K4046, Stainless Elite 98'**

Caliber: 9mm  Capacity: 6+1  Operation: Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  Trigger Weight: Approx. 7-10 lbs  Barrel: 3", polygonal rifling; 1-10 right-hand twist  Length O/A: 5.3"  Height: 4.0"  Slide Width: .90"  Weight: Pistol 22.1 ounces, Magazine 1.9 ounces  Construction: Stainless steel  Grips: Wraparound, textured nylon  Sights: Low profile, white bar-dot (tritium night sights optional)  Finish: Matte stainless steel  Magazines: 1 each 5-round flush baseplate & 7-round grip extension  Warranty: Limited Lifetime

**M9093, Stainless Steel / M9096, Stainless Elite 98'**



Caliber: 9mm  Capacity: 7+1  Operation: Trigger cocking DAO; locked breech; "Browning-type" recoil lug; passive striker block; no magazine disconnect  Trigger Weight: Approx. 7-10 lbs  Barrel: 3.5", polygonal rifling; 1-10 right-hand twist  Length O/A: 6.0"  Height: 4.5"  Slide Width: .90"  Weight: Pistol 22.1 ounces, Magazine 1.9 ounces  Construction: Ordnance steel or stainless steel  Grips: Wraparound, soft polymer (exotic wood optional)  Sights: Low profile, white bar-dot (tritium night sights optional)  Finish: Matte black, matte stainless steel  Magazines: 2 - Stainless, 7-round  Warranty: Limited Lifetime

**K9090, Matte Black / K9093, Stainless Steel K9096, Stainless Elite 98'**

## Kahr's Premium Stainless Models – The Elite 98 Series

The Elite 98 Series is Kahr's fastest responding handgun, and the polished stainless steel finish and laser etching are available on the following Kahr models - the K9, MK9, K40 and the MK40. The lustrous finish with laser engraving, complements our innovative designs and solid construction.

**State-of-the-Art Engineering.** The unique cocking cam system provides a trigger stroke unsurpassed in smoothness even by custom pistols. The patented, offset recoil lug design, which puts the shooter's hand close to the centerline of the bore, and the ergonomically designed, soft polymer grips provide comfort and control comparable to full-sized handguns. The trigger stroke has been reduced to 3/8" from 1/2" to provide faster firing in critical defensive situations. And the Elite 98's low-profile bar-dot sights are easy to see, yet virtually snag-free.

**All Stainless Steel Construction.** Kahr's patented computer-aided designs are precision computer machined in stainless steel. All Kahr pistols are U.S.-made for outstanding performance and long-lasting reliability and are backed by Kahr Arms.





If you value your life, carry the gun you can live with – KAHR.

Kahr's design and quality manufacturing provides unmatched concealed power in a compact handgun.

## Unique Design

Six U.S. Patents cover Kahr's unique locking, firing, and extraction systems. The incomparable cocking cam trigger system employs a cam to both unlock the passive safety and complete cocking and releasing the firing pin. The system provides a "safe" and unbelievably smooth double action only trigger stroke, fast to fire in critical defensive situations.

Kahr's patented "offset barrel" design places the trigger mechanism beside the barrel lug, raising the shooter's hand close to the centerline of the bore. This, with the ergonomically designed grips, results in a remarkable degree of shooting comfort and control with reduced muzzle flip and felt recoil.

A patented self-cleaning extractor, specially designed so that powder residue is forced away from the extractor, assures that the extractor will continue to function, shot after shot. Furthermore, the extractor is designed so that it employs the slide itself to limit its movement so that failures to extract are nearly impossible.

These innovations, found only in the Kahr pistol, give the Kahr shooter an advantage in critical self-defensive situations.

## Precision Machined

Kahr pistols' main components are precision computer machined to the tightest tolerances, utilizing the programming and tooling capabilities of CNC machining centers. Machined parts, cut exactly to the engineering blueprint, assure proper assembly and peak performance of the Kahr pistol.



Each Kahr slide is CNC machined from solid bar stock.

# Auto-Ordnance Corporation



## Maker of the World famous "Tommy Gun"

http://www.auto-ordnance.com
http://www.tommygun.com



### Thompson 1927A-1 / 1927A-1C

Shown with optional 50 round drum magazine

### Thompson M1

Model TM1



### Thompson 1911A1 "WWII Parkerized"

Model 1911PKZ

### Thompson 1927A1 "Commando"





### Thompson 1911A1 .45 ACP "Standard"

Model T1911

### Thompson 1911A1 .45 ACP "Deluxe"

Model 1911WG3

Kahr Arms / Company Profile



Blauvelt, New York

# THE COMPANY

## COMPANY PROFILE

**K**ahr Arms, an innovative firearms manufacturer, was founded on fifteen years of manufacturing service in precision metalworking industries. Kahr incorporates the inherited professional, technical expertise into all of its operations.



Worcester, Massachusetts

Kahr's parent company, established in 1981, has been a leading supplier of computer numerical control (CNC) machine tools and applications engineering. In 1986, the company expanded by forming a manufacturing division which provides quality contract machining, manufacturing and assembly services for diverse industries, including aerospace, automotive, electronics, medical equipment, scientific instrumentation and telecommunications. This division offers in-house engineering and precision tooling services, as well as, secondary operations that complement the machining and manufacturing capabilities.

Kahr's corporate headquarters are located in Blauvelt, New York. Production and assembly operations are located in Worcester, Massachusetts, in the region commonly known as "Gun Valley."

Kahr Arms : P.O. Box 220, Blauvelt, NY 10913
Tel: 914-353-7770 / Fax: 914-353-7833 / E-mail: kahrhq@compuserve.com



*Features & Technology of Kahr Arms*

# VALUE GUNS

## Kahr Slide

Also precision computer machined, the Kahr slide is cut from 4140 Cr-Mo Alloy Steel and 416 Stainless Steel bar stock. This component is heat-treated and tempered to optimize durability.



The combination of the engineering design, quality materials, and precise manufacturing results in the component's toughness and compact size. Kahr's slide is the slimmest design among the major pistol brands.

Kahr quality, unmatched at any price.

Kahr Arms : P.O. Box 220, Blauvelt, NY 10913
Tel: 914-353-7770 / Fax: 914-353-7833 / E-mail: kahrho@compuserve.com

Kahr Arms / Kahr Slide



*Features & Technology of Kahr Arms*

# VALUE GUNS

## Kahr Slide

Also precision computer machined, the Kahr slide is cut from 4140 Cr-Mo Alloy Steel and 416 Stainless Steel bar stock. This component is heat-treated and tempered to optimize durability.



The combination of the engineering design, quality materials, and precise manufacturing results in the component's toughness and compact size. Kahr's slide is the slimmest design among the major pistol brands.

Kahr quality, unmatched at any price.

Kahr Arms : P.O. Box 220, Blauvelt, NY 10913
Tel: 914-353-7770 / Fax: 914-353-7833 / E-mail: kahrho@compuserve.com

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKETED

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| vs. | ) CRIMINAL ACTION |
| | ) NO. 00-1623-CBS |
| MARK M. CRONIN, | ) |
|     Defendant, | ) |
| | ) |

MEMORANDUM OF PROBABLE CAUSE AND
DECISION ON GOVERNMENT'S MOTION FOR DETENTION
March 23, 2000

SWARTWOOD, M.J.

I.  Nature of the Offense and the Government's Motion

On March 15, 2000, a Criminal Complaint was filed, charging Mark M. Cronin ("Mr. Cronin"), with stealing a firearm from a licensed manufacturer in violation of 18 U.S.C. § 924(m).

At Mr. Cronin's initial appearance on March 16, 2000, in connection with this Complaint, the Government moved for a detention hearing pursuant to 18 U.S.C. §§ 3142 (f)(1)(A)(Mr. Cronin is charged with a crime of violence, (f)(2)(A)(risk of flight) and (f)(2)(B)(risk that Mr. Cronin will obstruct or attempt to obstruct justice or threaten or intimidate a perspective witness). The Government further asserts that it is entitled to



the rebuttable presumption contained in 18 U.S.C. 3142(e) in detaining Mr. Cronin on the grounds of dangerousness.

On March 21, 2000, a consolidated hearing was held in connection with Mr. Cronin's right to a preliminary examination (probable cause hearing) in accordance with Fed. R. Crim. P. 5.1 and Mr. Cronin's right to a hearing on the Government's motion for detention. At this hearing, Michael P. Curran, Special Agent of the United States Bureau of Alcohol, Tobacco and Firearms ("ATF"), testified on behalf of the Government and was cross-examined by Mr. Cronin's counsel.

## II.  Findings of Fact

1.   In early December 1999, as a result of a traffic stop, Worcester Police officers found a 40 caliber Kahr firearm under the front seat of an automobile then being operated by an individual who subsequently became a cooperating witness ("CW").   Also recovered in this traffic stop were a quantity of drugs.   Govt. Exs. 1 (bottom picture) and 4.

2.   In late December 1999, a four year old child found a loaded 9mm Kahr firearm in the yard of an apartment building in the vicinity of Main Street, Worcester, Massachusetts.   This weapon was traced to a homicide outside the Tropicala Night Club located in the Main South area of Worcester.   Govt. Exs. 1 (top picture) and 4.

3.   Both firearms were subsequently test-fired without any malfunctions.   Govt. Exs. 2 and 3.

- 2 -

4.    Neither of the recovered firearms had serial numbers as required of federally licensed manufacturers. Govt. Exs. 1 and 4.

5.    Saeilo, Inc., which uses the trade name Kahr Arms/AutoOrdance ("Kahr") is a federally licensed firearms manufacturer with a facility located in Worcester, Massachusetts. Govt. Ex. 4.

6.    Mr. Cronin was employed at Kahr from March 1999 until the end of February 2000, when he was fired because of a disagreement with his employer. Govt. Ex. 6.

7.    After the Worcester Police discovered the 40 cal. Kahr firearm and a quantity of drugs in the CW's automobile, he agreed to cooperate and told law enforcement officials that he had purchased both firearms from Mr. Cronin in exchange for a quantity of drugs. Govt. Ex. 4.

8.    The CW further agreed with ATF Special Agents to wear a wire and engage Mr. Cronin in a conversation concerning the sale of the Kahr firearms. On March 8, 2000, the CW went to Mr. Cronin's residence where his conversation with Mr. Cronin was recorded. During this conversation, Mr. Cronin encouraged the CW to make up a story concerning how he obtained the 40 cal. Kahr firearm and admitted selling the two firearms to the CW. Govt. Ex. 4.

9.    Mr. Cronin was arrested on March 16, 2000 and after signing a waiver of his Miranda rights, he gave a statement to Special Agent Curran admitting that he had stolen two firearms and ammunition from his employer, Kahr; that he obtained the firearms prior to a serial number being affixed to the firearms as required

- 3 -

by federal law; and that he sold the firearms to the CW.   Govt. Ex. 6.

10.   The CW, who is an admitted, habitual drug user, told law enforcement officials that he purchased the Kahr firearms from Mr. Cronin in exchange for drugs.   Govt. Ex. 4.   Mr. Cronin told Special Agent Curran that he sold the Kahr firearms to the CW for cash.   Govt. Ex. 6.

11.   As a result of the execution of a search warrant of Mr. Cronin's apartment, the following items were seized: a trigger lock, 15 rounds of 9mm ammunition, a separate lot of 13 rounds of 45 cal. and 9mm ammunition, a 40 cal. pistol magazine with 10 rounds of ammunition and another 40 cal. pistol magazine with 2 rounds of ammunition.

### III. Probable Cause

As a result of Mr. Cronin's recorded conversation with the CW admitting that he stole two firearms and ammunition from his employer and from his voluntary written statement admitting these offenses, I find probable cause for the offense for which he is charged in this Complaint.

### IV. Discussion of Whether Mr. Cronin Should Be Detained

#### 1. History and Characteristics

Mr. Cronin is twenty-eight years old and was born in Worcester, Massachusetts on September 6, 1971. Mr. Cronin has lived in Worcester all of his life except from approximately 1992-1993 when he lived in Rutland, Vermont.

Mr. Cronin's father lives in Arizona and Mr. Cronin last saw his father approximately thirteen years ago.

Mr. Cronin lives in a basement apartment at his mother's residence at 44 Huntington Avenue, Worcester, Massachusetts and maintains daily contact with his mother and his eleven year old half sister, who both live in the main part of the residence at 44 Huntington Avenue.

Mr. Cronin was married in 1994 and he and his wife have been separated for the past two and one-half years. Mr. Cronin and his wife have one child, Kassie, age five, and Mr. Cronin adopted Mrs. Cronin's other son, Kevin, age ten. Mr. Cronin provides support for both children.

As noted earlier, Mr. Cronin was employed at Kahr Arms from March 1999 until late February 2000. Prior to that employment, Mr. Cronin worked as a carpet installer for approximately six months and prior to that, at Astra Pharmaceutical in Westboro, Massachusetts for three years. At the time of Mr. Cronin's arrest, he was unemployed.

Mr. Cronin has no record of criminal convictions.

2.  Whether Mr. Cronin Poses A Danger to the Community

First, the Government argues that the rebuttable presumption in 18 U.S.C. § 3142(e) applies to this case because there is sufficient evidence to warrant a finding that Mr. Cronin allegedly

sold firearms in exchange for drugs.[1]  I disagree.  First,  Mr.
Cronin is being charged with stealing firearms from a licensed
manufacturer in violation of 18 U.S.C. § 924(m) and not with any
drug offenses.  Section 3142(e) may be invoked only in connection
with offenses for which the defendant has been charged.  United
States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  Second,
even if I took the position that Section 3142(e) may apply if there
is probable cause to believe that a defendant committed an offense
enumerated therein for which he was not charged, I do not find that
the Government has established probable cause to believe that Mr.
Cronin violated Section 924(c).  I tend to believe Mr. Cronin's
voluntarily signed statement admitting this offense in which he
stated clearly that he sold the guns to the CW for cash.  After Mr.
Cronin was arrested, he had no reason to lie to the ATF since I am
sure he did not understand any subtle legal difference between
selling firearms for cash or selling firearms in exchange for
drugs.  Mr. Cronin seemed to be forthright in his statement to
Special Agent Curran, in not only admitting the offense but
revealing a location outside of his apartment where he had hidden
one of the firearms.  Therefore, even if I were to adopt the
Government's argument that Section 3142(e) may be invoked in
connection  with an offense for which the defendant has not been

---

[1]Section 3142(e) provides there is a rebuttable presumption that a
defendant is a risk of flight and danger to the community if there is probable
cause to believe that the person committed an offense under 18 U.S.C. §
924(c)(use or possession of firearm in connection with drug trafficking crime).

charged, I would not find that it applies in this case. I will now address whether Mr. Cronin may be held on dangerous grounds.

Mr. Cronin argues that he has not been charged with a crime of violence under 18 U.S.C. § 3142(f)(1)(A) and therefore, the Government cannot seek to detain him on dangerousness grounds. In support of his position, Defendant argues that the Court must look to the nature of the offense with which a defendant has been charged and that theft of a firearm is not a crime of violence. The Government, on the other hand, argues that the Court may consider the facts underlying the offense for which the defendant has been charged and determine on a case-by-case basis whether a defendant has been charged with a crime of violence.

For sentencing purposes, the First Circuit has held that in determining whether an offense is a crime of violence, the trial court "should employ a `formal categorical approach', that is, look to the statutory definition of the offense. <u>United States v. Sacko</u>, 178 F.3d 1, 3 (1999). However, the court may go beyond the statutory definition in "those cases where the statute encompasses both violent felonies (e.g. generic burglary) and non-violent felonies (e.g., burglary of a vehicle rather than a building)." <u>Id.</u> The great weight of authority favors applying the categorical approach for purposes of determining whether an offense is a crime of violence under Section 3142(f)(1)(A). See <u>United States v. Singleton</u>, 182 F.3d 7, 11 (D.C.Cir. 1999) and cases cited therein.

Although most courts apply the categorical approach, there is a split of authority as to whether gun related offenses which do

- 7 -

not involve the use of the firearm constitute "crimes of violence" for purposes of Section 3142(f)(1)(A). At the same time, I have not found any cases which hold that violation of Section 924(m) constitutes a "crime of violence". However, I do not need to resolve this issue because even assuming that Mr. Cronin has been charged with a crime of violence, I find that there are conditions that can be imposed for Mr. Cronin's release that will assure the safety of any person or persons in the community. I make this finding, in part, because Mr. Cronin no longer works at Kahr Arms and therefore, has no access to firearms. Furthermore, when Mr. Cronin's residence was searched pursuant to a warrant, no firearms were found and the police seized all materials they found relating to firearms.

The Government also argues that Mr. Cronin should be detained pursuant to 18 U.S.C. § 3142(f)(2)(B) (threat to obstruct justice). I do not accept the Government's argument that Mr. Cronin's suggestion to the CW that he lie to the police as to how he obtained the 40 cal. Kahr firearm is sufficient evidence for me to find that Mr. Cronin poses a risk to either obstruct justice or intimidate witnesses. This statement was made during a friendly conversation in which the CW and Mr. Cronin discussed in some detail various aspects of the problems the CW faced as a result of the Worcester Police finding the 40 cal. Kahr firearm in the CW's automobile. In fact, during the course of Mr. Cronin's recorded conversation with the CW, Mr. Cronin seemed to acknowledge that the CW or his girlfriend or their lawyer would eventually reveal Mr.

- 8 -

Cronin's name to police as the source of the 40 cal. Kahr firearm.
Govt. Ex. 4, Transcript pp 13-15.  Therefore, I do not find that
the Government has presented evidence that Mr. Cronin poses a risk
of obstructing justice or intimidating witnesses as provided in
Section 3142(f)(2)(B).

I further find that Mr. Cronin does not pose a risk of flight.
First, Mr. Cronin has lived practically all of his life in
Worcester, where his mother, half sister, two children and wife
reside.  Second, Mr. Cronin has never failed to appear in Court as
required.  Third, Mr. Cronin has voluntarily admitted the offense
for which he is presently charged.  Therefore, considering the
totality of those circumstances, I cannot find that Mr. Cronin
poses a risk of flight.

                    3.  Proposed Conditions of Release

I have scheduled a further hearing on Friday, March 24, 2000
at 2:45 p.m. at which I will consider conditions for Mr. Cronin's
release.  Presumptively those conditions would include: (1) a
$2,000 cash surety bond; (2) a third-party custodian; (3) regular
reporting to Pretrial Services; .(4) random drug testing; (5)
curfew; (6) that he seek employment; (7) that he refrain from any
possession or use of illegal drugs; (8) that he refrain from
excessive use of alcohol; (9) that he not possess a firearm,
ammunition or other destructive device; (10) that his travel be
restricted; (11) that  he not commit any local, state or federal

criminal offenses; and (12) that he report any arrests or change of residence to Pretrial Services within twenty-four hours.

CHARLES B. SWARTWOOD, III
MAGISTRATE JUDGE

# EXHIBIT 6

APR-06-2000  21:21                                                          P.01/06

# Worcester

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## FIREARMS THEFT/RECOVERY REPORT

RECOVERY ( )              FFL THEFT # F 2000 000 0793

DUTY AGENT: KEATING   DATE OF REPORT: 4-8-00   TIME: 2011

CALLER: CASSEDAY  RANDALL   TEL: 914-353-7770   POSITION: LEGAL DEP
        LAST      FIRST      MI

FFL # 604 35456   COMPANY NAME: KAHR ARMS

FFL ADDRESS: 130 GODDARD MEMORIAL DRIVE

CITY: WORCESTER              STATE MA   ZIP: 01603

LOCATION WHERE THEFT OCCURRED: SAME

CITY: _____ STATE _____ ZIP: _____

POLICE DEPT. NOTIFIED: WORCESTER POLICE   REPORT #: 0091153

DATE/TIME OF THEFT: 4-7-00   1015   # OF FIREARMS STOLEN: 41

TYPE OF THEFT: ROBBERY ( )  BURGLARY ( )  LARCENY ( )  MISSING INVENTORY ( ✓ )
# OF INJURIES: _____  # OF DEATHS: _____ (IF APPLICABLE)
REMARKS: _____

## RECOVERY INFORMATION:

DATE RECOVERY REPORTED TO ATF: _____  POLICE NOTIFIED:  YES ( )  NO ( )
DUTY AGENT: _____  # RECOVERED: _____
CALLER'S NAME: _____  TEL #: _____

## DESCRIPTION OF FIREARM

| TYPE | MANUFACTURER | MODEL | CALIBER GAUGE | SERIAL # | RECOVERY ONLY | |
|------|--------------|-------|---------------|----------|-----------|---------|
|      |              |       |               |          | * TOR | ** DOR |
|      | SEE ATTACHED |       | LIST          |          |       |        |
|      |              |       |               |          |       |        |
|      |              |       |               |          |       |        |

* TYPE OF RECOVERY:  F (FOUND INVENTORY)   P (RETURNED BY POLICE)
** DATE OF RECOVERY

APR-06-2000  21:22                                                              P.02/06

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
## FEDERAL FIREARMS LICENSEE THEFT/LOSS REPORT

All entries must be in ink. Please read notices and instructions on reverse carefully before completing this form.

### SECTION A - FEDERAL FIREARMS LICENSEE INFORMATION

| FEDERAL FIREARMS LICENSE NUMBER | FEDERAL FIREARMS LICENSEE TELEPHONE NUMBER (Include area code) |
|---|---|
| 6-04-014-07-12D-35456 | 508-795-3949 |

TRADE/CORPORATE NAME AND ADDRESS OF FEDERAL FIREARMS LICENSEE (Address should reflect the number, street and city, State and ZIP code)

KAHR  ARMS
130  GODDARD  MEMORIAL  DRIVE
WORCESTER      MA    01603

NAME, ADDRESS AND TELEPHONE NUMBER OF PERSON MAKING REPORT (Address should reflect the number, street addr, city, State and ZIP code. Include area code in the telephone number.)

RANDALL  G.  CASSEDAY          914-353-7770 X.20
630  RTE.  303
BLAUVELT  NY  10913

### SECTION B - THEFT/LOSS INFORMATION

|  | DATE | TIME | DESCRIPTION OF INCIDENT |
|---|---|---|---|
| DISCOVERED | 4/7/2000 | 10:15 AM | ☐ ROBBERY  ☒ LARCENY |
| POLICE REPORT NUMBER | (4/7/2000) #0091153 | 5:00 PM | ☐ BURGLARY  ☐ OTHER |
| REPORTED TO ATF HOTLINE | 4/8/2000 | 12:30 PM | ATF HOTLINE INCIDENT NUMBER F2000 000 0793 |

NAME AND ADDRESS OF LOCAL AUTHORITY TO WHOM REPORTED

WORCESTER  MA    POLICE  DEPT.
9-11  LINCOLN  SQ.
WORCESTER      MA    01608

### SECTION C - DESCRIPTION OF FIREARMS

| ACQUISITION DATE | MANUFACTURER | MODEL | CALIBER/GAUGE | SERIAL NUMBER |
|---|---|---|---|---|
| 11/10/99 | KAHR | MK9 | 9 mm | GC0913 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

### CERTIFICATION

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I ALSO UNDERSTAND THAT FAILURE TO REPORT THE THEFT OR LOSS OF A FIREARM FROM MY INVENTORY OR COLLECTION WITHIN 48 HOURS AFTER THE THEFT OR LOSS DISCOVERED IS A VIOLATION OF 18 U.S.C. § 923 (g)(6) PUNISHABLE AS A FELONY.

| AUTHORIZED SIGNATURE | DATE |
|---|---|
| Randall G. Casseday | 4/7/0 |

ATF F 3310.11 (12-94)

ORIGINAL - FORWARD

APR-08-2000  21:22                                                    P.03/06

## DEPARTMENT OF THE TREASURY
### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
## FEDERAL FIREARMS LICENSEE THEFT/LOSS REPORT

All entries must be in ink. Please read notice and instructions on reverse carefully before completing this form.

**SECTION A - FEDERAL FIREARMS LICENSEE INFORMATION**

FEDERAL FIREARMS LICENSE NUMBER
6 - 04 - 014 - 07 - 2D - 35456

FEDERAL FIREARMS LICENSEE TELEPHONE NUMBER (Inc area code)
508 - 795 - 3919

TRADE/CORPORATE NAME AND ADDRESS OF FEDERAL FIREARMS LICENSEE (Address should reflect the number, street address, city, State and ZIP code)

KAHR ARMS
130 GODDARD MEMORIAL DRIVE
WORCESTER        MA       01603

NAME, ADDRESS AND TELEPHONE NUMBER OF PERSON MAKING REPORT (Address should reflect the number, street address, city, State and ZIP code. Include area code in the telephone number.)

RANDALL G. CASSEDAY
630 RTE. 303
BLAUVELT NY 10913            914 - 353 - 7770 X. 20

**SECTION B - THEFT/LOSS INFORMATION**

| | DATE | TIME | DESCRIPTION OF INCIDENT |
|---|---|---|---|
| DISCOVERED | APRIL 7, 2000 | 10:15 AM | ☐ ROBBERY  ☐ LARCENY |
| POLICE REPORT NUMBER | REPORTED BY APRIL 7, 2000 #0091153 | 5:00 PM | ☐ BURGLARY  ☒ OTHER |
| REPORTED TO ATF HOTLINE | APRIL 8 2000 | 12:30 PM | ATF HOTLINE INCIDENT NUMBER F2000 000 0793 |

NAME AND ADDRESS OF LOCAL AUTHORITY TO WHOM REPORTED

WORCESTER, MA POLICE DEPT.
9-11 LINCOLN SQ.
WORCESTER, MA 01608

**SECTION C - DESCRIPTION OF FIREARMS**

| ACQUISITION DATE | MANUFACTURER | MODEL | CALIBER/GAUGE | SERIAL NUMBER |
|---|---|---|---|---|
| 10/3/95 | KAHR | K9 | 9 mm | AB 0065 |
| 12/28/95 | KAHR | K9 | 9 mm | AE 2113 |
| 1/11/96 | KAHR | K9 | 9 mm | AE 2267 |
| 9/11/96 | KAHR | K9 | 9 mm | AE 2669 |
| 3/8/96 | KAHR | K9 | 9 mm | AE 2710 |

**CERTIFICATION**

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I ALSO UNDERSTAND THAT FAILURE TO REPORT THE THEFT OR LOSS OF A FIREARM FROM MY INVENTORY OR COLLECTION WITHIN 48 HOURS AFTER THE THEFT OR LOSS DISCOVERED IS A VIOLATION OF 18 U.S.C. § 923 (g)(6) PUNISHABLE AS A FELONY.

AUTHORIZED SIGNATURE
Randall G. Casseday

DATE
4/7/

ATF F 3310.11 (12-94)

ORIGINAL - FORWARD

APR-26-2000  21:22          BUREAU OF ALCOHOL, TOBACCO &  FIREARMS          P.84/86

## FEDERAL FIREARMS LICENSEE THEFT/LOSS CONTINUATION SHEET

| ACQUISITION DATE | MANUFACTURER | MODEL | CALIBER/ GAUGE | SERIAL NUMBER |
|---|---|---|---|---|
| 3/8/96 | KAHR | K9 | 9 mm | AE 2719 |
| 5/20/96 | KAHR | K9 | 9 mm | AE 4073 |
| 5/23/96 | KAHR | K9 | 9 mm | AE 4097 |
| 1/17/97 | KAHR | K9 | 9 mm | AF 0886 |
| 3/28/96 | KAHR | K9 | 9 mm | AG0108 |
| 3/28/96 | KAHR | K9 | 9 mm | AG0109 |
| 3/28/96 | KAHR | K9 | 9 mm | AG 0117 |
| 1/17/97 | KAHR | K9 | 9 mm | AG 0834 |
| 10/8/97 | KAHR | K9 | 9 mm | AH 0316 |
| 10/8/97 | KAHR | K9 | 9 mm | AH 0317 |
| 7/22/96 | KAHR | K9 | 9 mm | AM 0293 |
| 10/22/96 | KAHR | K9 | 9 mm | AM 1482 |
| 1/28/97 | KAHR | K9 | 9 mm | AP 0242 |
| 2/25/97 | KAHR | K9 | 9 mm | AR 0173 |
| 2/28/97 | KAHR | K9 | 9 mm | AR 0309 |
| 3/6/97 | KAHR | K9 | 9 mm | AR 0315 |
| 2/16/99 | KAHR | K9 | 9 mm | AR 2940 |
| 9/20/99 | KAHR | K9 | 9 mm | AX 0399 |
| 11/21/96 | KAHR | K40 | 40 S&W | DA 1517 |
| 1/15/97 | KAHR | K40 | 40 S&W | DB 0082 |
| 1/15/97 | KAHR | K40 | 40 S&W | DB 0096 |
| 2/24/97 | KAHR | K40 | 40 S&W | DF 0876 |
| 7/9/99 | KAHR | K40 | 40 S&W | DF 3625 |
| 1/20/99 | KAHR | MK9 | 9mm | GB 0306 |

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I ALSO UNDERSTAND THAT FAILURE TO REPORT THEFT OR LOSS OF A FIREARM FROM MY INVENTORY OR COLLECTION WITHIN 48 HOURS AFTER THE THEFT OR LOSS IS DISCOVERED IS A VIOLATION OF 18 U.S.C. 923 (g)(6) PUNISHABLE AS A FELONY.

| AUTHORIZED SIGNATURE | DATE |
|---|---|
| Randall P. Casaday | 4/7 |

ATF F 3310.11A (12-94)          U.S.C.

ORIGINAL FORWARD TO ATF

APR-06-2000  21:23

P.05/06

FORM APPROVED: OMB No. 1512-0524 (0

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

FEDERAL FIREARMS LICENSEE THEFT/LOSS CONTINUATION SHEET

| ACQUISITION DATE | MANUFACTURER | MODEL | CALIBER/ GAUGE | SERIAL NUMBER |
|---|---|---|---|---|
| 8/19/99 | KAHR | MK9 | 9 mm | G 0443 |
| 9/23/99 | KAHR | MK9 | 9 mm | GC 0888 |
| 11/9/95 | KAHR | K9 | 9 mm | PROTO 10 |
| 9/14/98 | KAHR | MK9 | 9 mm | PROTO M63 |
| 6/10/99 | KAHR | PK9 | 9 cm m | YA 0044 |
| 4/23/96 | KAHR | K9 | 9 mm | AE 1450 (RS/ AT |
| 8/21/97 | KAHR | K9 | 9 mm | AJ 8244 |
| 6/13/97 | KAHR | K40 | 40 S&W | DA 1384 |
| 3/4/97 | KAHR | K40 | 40 S&W | DB 0216 |
| 12/19/95 | KAHR | K9 | 9 mm | AE 1914 |
| 5/15/97 | KAHR | K9 | 9 mm | AL 0149 |

I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT. I ALSO UNDERSTAND THAT FAILURE TO REPORT THE THEFT OR LOSS OF A FIREARM FROM MY INVENTORY OR COLLECTION WITHIN 48 HOURS AFTER THE THEFT OR LOSS IS DISCOV. ERED IS A VIOLATION OF 18 U.S.C. 923 (g)(6) PUNISHABLE AS A FELONY.

AUTHORIZED SIGNATURE

ATF F 3310.11A (12-94)

DATE  4/7/c

User ID:    RDLUCAS
04/10/2000 13:29:19

License Number:    6 04   027   07   20   35456

*0435456*

N:

Licensee Name:  SAEILO, INC

Business Name:  KAHR ARMS

Premises Address |

*OF.*

Street:  130 GODDARD MEMORIAL DR

City:  WORCESTER            State: MA     Zip Code: 016050000

Mailing Address |

Street:  130 GODDARD MEMORIAL DR

City:  WORCESTER            State: MA     Zip Code: 016050000

| Add Date 3/18/1983 | Change Date 03/26/1999 | Expiration Date 04/01/2002 | Inspection Date 09/07/1999 | Renewal Receive Date | Renewal Date 03/26/1999 |
|---|---|---|---|---|---|



Phone: (800) 788-7133    Fax: (800) 578-7223
Print Date: April 10, 2000

## TFL THEFT/LOSS SUMMARY

FFL Theft Number: F20000000793          Entered Date: April 08, 2000

### GENERAL INFORMATION

Type of Theft: LOSSES OF INVENTORY NOT/
               ASSOCIATED WITH A CRIME

Date of Theft: 04/07/2000

Date Reported: 04/08/2000

3310 Received: 04/10/2000

Field Division: BOSTON

ATF I.N.:

Est. Weapons Stolen: 41

Number Injured:          Number Killed:

### CALLER INFORMATION

Name: RANDALL CASSEDAY

Title:

Phone: (914) 355-7770

Other:

### POLICE DEPT INFORMATION

Name: WORCESTER POLICE DEPARTMENT

Inc. Number: 0091153

### THEFT LOCATION

Address:

### DEALER INFORMATION

Business Name: KAHR ARMS

Licensee Name: SAEILO, INC

FFL Number: 60435456

Address: 130 GODDARD MEMORIAL DR
         WORCESTER MA 01605-0000

Day Phone: (508) 795-3919     Fax:

Evening Phone:

Dealer may be associated with 8 other interstate/FFL Thefts.

### METHOD OF OPERATION

---

Theft of 10 or more firearms requires an investigation to be conducted utilizing an investigation number
assigned by the appropriate field office.

If an investigation is opened, please provide the opening report, reflecting the FFL Theft/Loss Report Number listed
above, to the Stolen Firearms Program/Crime Gun Analysis Branch along with the name of the case investigator.

For a recovered firearm, an investigation should only be opened on those firearms recovered within two years of the
theft/loss report and/or when there is a suspect associated with the recovery. The field office's general firearms
investigation number may be used to report information on a recovery that does not merit investigation.

| | | | | |
|---|---|---|---|---|
| 1 KAHR ARMS | K9 | 9 | AB0068 | PISTOL |
| 2 KAHR ARMS | | 9 | AE1113 | STOL |
| 3 KAHR ARMS | | 9 | AE2267 | PISTOL |
| 4 KAHR ARMS | K9 | 9 | AE2669 | PISTOL |
| 5 KAHR ARMS | K9 | 9 | AE2710 | PISTOL |
| 6 KAHR ARMS | K9 | 9 | AE2719 | PISTOL |
| 7 KAHR ARMS | K9 | 9 | AE4073 | PISTOL |
| 8 KAHR ARMS | K9 | 9 | AE4097 | PISTOL |
| 9 KAHR ARMS | K9 | 9 | AF0116 | PISTOL |
| 10 KAHR ARMS | K9 | 9 | AG0103 | PISTOL |
| 11 KAHR ARMS | K9 | 9 | AG0109 | PISTOL |
| 12 KAHR ARMS | K9 | 9 | AG0117 | PISTOL |
| 13 KAHR ARMS | K9 | 9 | AG0834 | PISTOL |
| 14 KAHR ARMS | K9 | 9 | AH0116 | PISTOL |
| 15 KAHR ARMS | K9 | 9 | AH0327 | PISTOL |
| 16 KAHR ARMS | K9 | 9 | AH0293 | PISTOL |
| 17 KAHR ARMS | K9 | 9 | AM1AE | PISTOL |
| 18 KAHR ARMS | K9 | 9 | AP0242 | PISTOL |
| 19 KAHR ARMS | K9 | 9 | AR0173 | PISTOL |
| 20 KAHR ARMS | K9 | 9 | AR0309 | PISTOL |
| 21 KAHR ARMS | K9 | 9 | AR0315 | PISTOL |
| 22 KAHR ARMS | K9 | 9 | AR2940 | PISTOL |
| 23 KAHR ARMS | K9 | 9 | AX0399 | PISTOL |
| 24 KAHR ARMS | K9 | 9 | | PISTOL |
| 25 KAHR ARMS | K40 | 40 | DA1517 | PISTOL |
| 26 KAHR ARMS | K40 | 40 | DB0082 | PISTOL |
| 27 KAHR ARMS | K40 | 40 | DB0096 | PISTOL |
| 28 KAHR ARMS | K40 | 40 | DF0576 | PISTOL |
| 29 KAHR ARMS | K40 | 40 | DF3625 | PISTOL |
| 30 KAHR ARMS | K9 | 9 | GB0306 | PISTOL |
| 31 KAHR ARMS | K9 | 9 | GB0443 | PISTOL |
| 32 KAHR ARMS | K9 | 9 | GC0833 | PISTOL |
| 33 KAHR ARMS | K9 | 9 | PROTO10 | PISTOL |
| 34 KAHR ARMS | K9 | 9 | PROTOM63 | PISTOL |
| 35 KAHR ARMS | K9 | 9 | YA0044 | PISTOL |
| 36 KAHR ARMS | K9 | 9 | AE1450 | PISTOL |
| 37 KAHR ARMS | K9 | 9 | AJ0244 | PISTOL |
| KAHR ARMS | K40 | 40 | DA1384 | PISTOL |
| KAHR ARMS | K40 | 40 | DB0216 | PISTOL |
| KAHR ARMS | K9 | 9 | AE1914 | PISTOL |
| KAHR ARMS | K9 | 9 | AL0149 | PISTOL |

Icates Recovered Weapon
al Weapons Recovered: 0

# EXHIBIT 7

E9094

Page 1 of 2

Site Map    Dealers

ABSOLUTE CONCEALED POWER · *KAHR ARMS*

# E9094A

### E9, 9mm Economy model, Duo-Tone
### Matte black frame and matte stainless steel slide



- Parts
- Holsters
- Magazines
- Wood Grips
- Wrap Around Non-Slip Grip
- Ported Barrel

- House of KAHRS
- THE GUNS OF KAHR ARMS

The Kahr E9 is an economized version of the Kahr K9, based on the same design platform with the same reliability, accuracy and performance. Appearance features have been modified for greater product affordability.

"A" at the end of the item number denotes a spent case is included with the pistol.



Download
PDF Spec. Sheet

If you need to download the latest Acrobat Reader for viewing PDFs, click here.

| | |
|---|---|
| Caliber | 9mm (9 x 19 Parabellum) |
| Capacity | 7 + 1 |
| Operation | Trigger cocking DAO; lock breech; "Browning - type" recoil lug; passive striker block; no magazine disconnect |
| Barrel | 3.5", polygonal rifling; 1-10 right-hand twist |
| Length O/A | 6.0" |
| Height | 4.5" |
| Slide Width | .90" |
| Weight | Pistol 23.1 ounces, Magazine 1.9 ounces |
| Grips | Wraparound, textured soft polymer |
| Sights | Drift adjustable rear sight, pinned-in polymer front sight |

E9094

| | |
|---|---|
| Finish | Duo-tone, matte black on frame, matte stainless steel on slide |
| Magazines | 7 round capacity, stainless steel body, rugged polymer base and follower (Same magazine as the K9, #K820) |
| Warranty | Limited Lifetime |

Kahr Arms: P.O. Box 220, Blauvelt, NY 10913
Sales & Marketing: 845-353-7770 / Technical Support: 508-795-3919 / E-MAIL

M9096

The Elite 98 performs as well as it looks. The polished stainless steel finish and laser etching are available on all Kahr Elite 98 pistols - the K9, MK9, K40 and the MK40. The lustrous finish complements our innovative designs and solid construction. The feed ramp on the barrel is polished to a high luster to insure reliable feeding with all types of ammo. Laser engraving provides the finishing touch to the polished stainless steel - for an appearance as impressive as its capabilities.

**State-of-the-Art Engineering.** The unique cocking cam system on Kahr pistols provides a trigger stroke unsurpassed in smoothness even by custom pistols. The patented, offset recoil lug design - which puts the shooter's hand close to the centerline of the bore - and the ergonomically designed, grip provides comfort and control comparable to full-sized handguns. And the Elite 98's low-profile bar-dot sights are easy to see, yet virtually snag-free.

**All Stainless Steel Construction.** Kahr's patented computer-aided designs are carried out in all stainless steel quality with computer-machined precision to give you defensive firearms you can carry with confidence. All Kahr pistols are U.S.-made for outstanding performance and long-lasting reliability and are backed by Kahr Arm's Limited Lifetime Warranty.

Kahr Arms: P.O. Box 220, Blauvelt, NY 10913
Sales & Marketing: 845-353-7770 / Technical Support: 508-795-3919 / E-MAIL

M9093

Site Map    Dealers

ABSOLUTE CONCEALED POWER · *KAHR ARMS*

# M9093A

## MK9, matte stainless steel



- Parts
- Holsters
- Magazines
- Grip Extension
- Wood Grips
- Wrap Around Non-Slip Grip
- Tritium Sights
- Stainless Steel Guide Rod

- House of KAHRS

———————————————
- Drop Testing Result
- NEW FROM KAHR ARMS - THE 'MICRO' K9

"A" at the end of the item number denotes a spent case is included with the pistol.

Download PDF Spec Sheet 

If you need to download the latest Acrobat Reader for viewing PDFs, click here.

| | |
|---|---|
| Caliber | 9mm (9 x 19) |
| Capacity | 6+1, 7+1 (magazine with grip extension) |
| Operation | Trigger cocking DAO; lock breech; "Browning - type" recoil lug; passive striker block; no magazine disconnect |
| Barrel | 3.0". polygonal rifling; 1-10 right-hand twist |
| Length O/A | 5.3" |
| Height | 4.0" |
| Slide Width | .90" |
| Weight | Pistol 22.1 ounces. Magazine 1.9 ounces |
| Grips | Wraparound, textured hard nylon |
| Sights | Low profile. white bar-dot combat sights (tritium night sights optional) |
| Finish | Stainless steel |
| Magazines | 1 each: 6-round flush baseplate and 7-round grip extension |
| Warranty | Limited Lifetime |

Kahr Arms: P.O. Box 220, Blauvelt, NY 10913
Sales & Marketing: 845-353-7770 / Technical Support: 508-795-3919 / E-MAIL

# EXHIBIT 4



SCOTTSDALE INSURANCE COMPANY®

Home Office:
One Nationwide Plaza • Columbus, Ohio 43215

Administrative Office:
8877 North Gainey Center Drive • Scottsdale, Arizona 85258

A STOCK COMPANY

# Commercial Lines Policy

THIS POLICY CONSISTS OF: DECLARATION, COMMON POLICY CONDITIONS, ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF: ONE OR MORE COVERAGE FORMS, APPLICABLE FORMS AND ENDORSEMENTS.

# ADDENDUM

**Some internal notes, or stamps, or typing on the declaration sheet may appear.  The Intended use for these is internal only and may not have been a part of the policy received by the insured.**

**Policy fees, or Inspections Fees, or Taxes, or addition Instructional stamps may have appeared on the policy received by the insured, but may not appear on this copy.**

| Renewal of Number | | Policy Number |
|---|---|---|
| NEW | **SCOTTSDALE INSURANCE COMPANY®**<br>8877 N. Gainey Center Drive, Scottsdale, Arizona 85258<br>1-800-423-7675 (outside Arizona)<br>A STOCK COMPANY | **CLS0499959** |

**COMMON POLICY DECLARATIONS**

**ITEM 1.  Named Insured and Mailing Address**

SAEILO, INC.(SEE  UTS-SP-1)
184 PRESCOTT STREET
WORCESTER, MA 01605

**Agent Name and Address**

CRUMP INS SVC OF BOSTON, INC.
121 HIGH STREET

BOSTON, MA 02110                                      Agent No. _____ 20006

| ITEM 2.  Policy Period | From:  01/12/1998 | To:  01/12/1999 | Term:  365 DAYS |
|---|---|---|---|

12:01 A.M., Standard Time at your mailing address.

**Business Description:**  MACHINE SHOP/GUN MAKER

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage. This premium may be subject to adjustment.

| Coverage Part(s) | Premium |
|---|---|
| Commercial General Liability Coverage Part | $ 9,376 |
| Commercial Property Coverage Part | $ NOT COVERED |
| Commercial Crime Coverage Part | $ NOT COVERED |
| Commercial Inland Marine Coverage Part | $ NOT COVERED |
| Commercial Auto (Business Auto or Truckers) Coverage Part | $ NOT COVERED |
| Commercial Garage Coverage Part | $ NOT COVERED |
| Professional Liability Coverage Part | $ NOT COVERED |
| | $ |
| | $ |
| | $ |
| Total Policy Premium: | $ 9,376.00 |
| INSPECTION FEE | $ 75.00 |
| 4% MASSACHUSETTS STATE TAX | $ 375.04 |
| | $ |
| | $ |

Form(s) and Endorsement(s) made a part of this policy at time of issue:

See Schedule of Forms and Endorsements

BOSTON, MA

Countersigned: _____04/21/1998_____    By _____
                              DATE                                      AUTHORIZED REPRESENTATIVE

VED

THIS COMMON POLICY DECLARATION AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

OPS-D-1 (8-86)                         HOME OFFICE

**THIS IS A TRUE AN**

*Joyce Kuhlman*



## SCOTTSDALE INSURANCE COMPANY®

## SCHEDULE OF FORMS AND ENDORSEMENTS

Policy No. _____ CLS0499959 _____

Effective Date: _____ 01/12/1998 _____
12:01 A.M., Standard Time

Named Insured SAEILO, INC.(SEE  UTS-SP-1) _____

Agent No. _____ 20006 _____

COMMON FORMS

| | | |
|---|---|---|
| CLS-J-2 | 11-95 | Common Policy Jacket |
| OPS-D-1 | 8-96 | Common Policy Dec |
| UTS-SP-2 | 12-95 | Forms & Endorsement Schedule |
| UTS-SP-1 | 8-96 | Named Insured Schedule |
| UTS-246s | 6-97 | Amend Endts No Med Pay Excl |

GENERAL LIABILITY FORMS

| | | |
|---|---|---|
| CLS-SD-1L | 9-97 | GL Supplemental Dec |
| CLS-SP-1L | 10-93 | GL Ext Supplemental Dec |
| CG 00 01 | 1-96 | General Liab Cov |
| CG 21 04 | 11-85 | Excl-Prod-Completed Ops Hazard |
| GLS-152s | 12-96 | Amend To Other Ins Condition |
| UTS-128s | 10-97 | Optional Provisions Endt |

## ADDITIONAL FORMS

UTS-SP-2 (12-95)                                      HOME OFFICE



**SCOTTSDALE INSURANCE COMPANY®**

## SCHEDULE OF NAMED INSUREDS

Policy No. _____ CLS0499959 _____

Named Insured SAEILO, INC.(SEE  UTS-SP-1) _____

Effective Date: _____ 01/12/1998 _____
12:01 A.M., Standard Time

Agent No. _____ 20006 _____

SAEILO, INC. DBA KAHR AND DBA SAEILO MANUFACTURING INDUSTRIES

# SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT NO.**_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (STANDARD TIME) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 | NOON | | |
| | | | | A.M. | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDATORY ENDORSEMENTS
### (Without Medical Payments Exclusion)

This endorsement lists several endorsements that modify your policy as follows:

IL 00 17 11 85

## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

### A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**E. PREMIUMS**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THE POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

GLS-58s (12-93)

# LEAD CONTAMINATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This endorsement excludes "occurrences" at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured; or from the operations of the insured, which result in:

a. "Bodily Injury" arising out of the ingestion, inhalation or absorption of lead in any form;

b. "Property Damage" arising from any form of lead;

c. "Personal Injury" arising from any form of lead;

d. "Advertising Injury" arising from any form of lead;

e. **Medical Payments** arising from any form of lead;

f. Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

g. Any loss, cost or expense arising out of any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

CG 21 47 10 93

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to paragraph **2.**, Exclusions of **COVERAGE A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I—Coverages):

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph **2.**, Exclusions of **COVERAGE B—PERSONAL AND ADVERTISING INJURY LIABILITY** (Section I—Coverages):

This insurance does not apply to:

"Personal injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

GLS-74s (11-92)

# COMMERCIAL GENERAL LIABILITY CONDITIONS AMENDMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

The CONDITION entitled **When We Do Not Renew** is deleted in its entirety.

IL 00 21 11 94

# NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART

1. The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material" if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

(3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any

"nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

GLS-30s (1-97)

## CONTRACTORS SPECIAL CONDITIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following condition is added to **SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS** section of the policy:

**CONTRACTORS SPECIAL CONDITIONS**

You will obtain certificates of insurance from all independent contractors providing evidence of:

1. Limits of Insurance equal to or greater than the limits provided by this policy; and

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

2.  Coverage equal to or greater than the coverages provided by this policy.

Failure to comply with this condition does not alter the coverage provided by this policy. However, should you fail to comply a premium charge will be made. This premium charge will be based on the "total cost" of all work sublet.

"Total cost" means the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work and all fees, bonuses or commissions paid.

UTS-74g (8-95)

## PUNITIVE OR EXEMPLARY DAMAGE EXCLUSION

This policy does not apply to a claim of or indemnification for punitive or exemplary damages.

Punitive or exemplary damages also include any damages awarded pursuant to statute in the form of double, treble or other multiple damages in excess of compensatory damages.

If suit is brought against any insured for a claim falling within coverage provided under the policy, seeking both compensatory and punitive or exemplary damages, then the Company will afford a defense to such action; however, the Company will have no obligation to pay for any costs, interest or damages attributable to punitive or exemplary damages.

UTS-131g (3-92)

## ASBESTOS EXCLUSION

The coverage afforded by this policy does not apply to bodily injury, personal injury or property damage arising out of:

1.  Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos; or

2.  The use of asbestos in construction or manufacturing any good, product or structure; or

3.  The removal of asbestos from any good, product or structure; or

4.  The manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The coverage afforded by the policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense of claim or suit related to any of the above.

|  | |
| --- | --- |
| AUTHORIZED REPRESENTATIVE | DATE |

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983



# SCOTTSDALE INSURANCE COMPANY®

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

Policy No. **CLS0499959**

Effective Date: **01/12/1998**
12:01 A.M., Standard Time

Named Insured **SAEILO, INC.(SEE UTS-SP-1)**

Agent No. **20006**

### Item 1. Limits of Insurance

| Coverage | Limit of Liability | |
|---|---|---|
| Aggregate Limits of Liability | $ **EXCLUDED** | Products/Completed Operations Aggregate |
| | $ **1,000,000** | General Aggregate (other than Products/Completed Operations) |
| Coverage A - Bodily Injury and Property Damage Liability | $ **1,000,000** | any one occurrence subject to the Products/Completed Operations and General Aggregate Limits of Liability |
| Fire Damage Liability | $ **100,000** | any one fire subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| Coverage B - Personal and Advertising Injury Liability | $ **1,000,000** | any one person or organization subject to the General Aggregate Limits of Liability |
| Coverage C - Medical Payments | $ **1,000** | any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

### Item 2. Form of Business and Location of Premises

Form of Business:

☐ Individual     ☐ Partnership or Joint Venture     ☐ Limited Liability Company
☒ Organization (other than Partnership, Joint Venture or Limited Liability Company)

Location of All Premises You Own, Rent or Occupy:
184 PRESCOTT STREET, WORCESTER, MA 01605

**See Schedule of Locations**

### Item 3. Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:
**See Schedule of Forms and Endorsements**

### Item 4. Premiums

| | | |
|---|---|---|
| Coverage Part Premium: | $ | 9,376 |
| Other Premium: | $ | |
| Total Premium: | $ | 9,376 |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

CLS-SD-1L (9-97)                    HOME OFFICE



## SCOTTSDALE INSURANCE COMPANY®

# COMMERCIAL GENERAL LIABILITY COVERAGE PART
# EXTENSION OF SUPPLEMENTAL DECLARATIONS

Policy No. ___CLS0499959___

Effective Date: ___01/12/1998___
12:01 A.M., Standard Time

Named Insured ___SAEILO, INC.(SEE  UTS-SP-1)___

Agent No. ___20006___

| Prem. No. 1 | Bldg. No. 1 | Class Code 97220 | Exposure 400,000 | Basis PAYROLL | |
|---|---|---|---|---|---|
| Class Description: MACHINE SHOPS | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | 8.07 | 3,228 |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |
| | | | | EXCLUDED | EXCLUDED |
| Prem. No. 1 | Bldg. No. 1 | Class Code 53271 | Exposure 3,500,000 | Basis SALES | |
| Class Description: Firearms MFG. | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | 1.69 | $5,915. |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |
| | | | | EXCLUDED | EXCLUDED |
| Prem. No. 1 | Bldg. No. 1 | Class Code 61217 | Exposure 1,600 | Basis AREA | |
| Class Description: BUILDINGS OR PREMISES - BANK OR OFFICE - MERCANTILE OR MANUFACTURING - MAINTAINED BY THE INSURED (LESSOR'S RISK ONLY) - OTHER THAN NOT-FOR-PROFIT (PRODUCTS/COMPLETED OPERATIONS ARE SUBJECT TO THE GENERAL AGGREGATE LIMIT) | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | 1.69 | $  233. |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |
| | | | | INCLUDED | INCLUDED |
| Prem. No. | Bldg. No. | Class Code | Exposure | Basis | |
| Class Description: | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | | |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |
| | | | | | |

CLS-SP-1L (10-93)                    HOME OFFICE

COMMERCIAL GENERAL LIABILITY
CG 00 01 01 96

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I – COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

#### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

**(2)** The "bodily injury" or "property damage" occurs during the policy period.

**c.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

#### 2. Exclusions

This insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

Copyright, Insurance Services Office, Inc., 1994

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### d. Workers Compensation and Similar Laws

Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

### f. Pollution

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

(ii) If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraph (d)(i) does not apply to "bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids are intentionally discharged, dispersed or released, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent to be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor.

Copyright, Insurance Services Office, Inc., 1994
CG 00 01 01 96    □

Subparagraphs **(a)** and **(d)(i)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Damage to Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Copyright, Insurance Services Office, Inc., 1994

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (Section III).

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

b. This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

a. "Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

Copyright, Insurance Services Office, Inc., 1994     CG 00 01 01 96     □

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement; or

(5) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

b. "Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

c. Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

## COVERAGE C. MEDICAL PAYMENTS

### 1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

### 2. Exclusions

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard".

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.

2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

5. All costs taxed against the insured in the "suit".

6. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

   (1) Agrees in writing to:

      (a) Cooperate with us in the investigation, settlement or defense of the "suit";

      (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

      (c) Notify any other insurer whose coverage is available to the indemnitee; and

      (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

   (2) Provides us with written authorization to:

      (a) Obtain records and other information related to the "suit"; and

      (b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph 2.b.(2) of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages), such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in paragraph f. above, are no longer met.

Copyright, Insurance Services Office, Inc., 1994
CG 00 01 01 96    □

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

   **a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

     **(1)** "Bodily injury" or "personal injury":

       **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

       **(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph **(1)(a)** above;

       **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

       **(d)** Arising out of his or her providing or failing to provide professional health care services.

     **(2)** "Property damage" to property:

       **(a)** Owned, occupied or used by,

       **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

     you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   **b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

   **c.** Any person or organization having proper temporary custody of your property if you die, but only:

     **(1)** With respect to liability arising out of the maintenance or use of that property; and

     **(2)** Until your legal representative has been appointed.

   **d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   **a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

   **b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

Copyright, Insurance Services Office, Inc., 1994

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

Copyright, Insurance Services Office, Inc., 1994

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

#### a. Primary Insurance

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

#### b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

#### c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

Copyright, Insurance Services Office, Inc., 1994

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertising injury" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

c. All parts of the world if:

(1) The injury or damage arises out of:

(a) Goods or products made or sold by you in the territory described in a. above; or

    Copyright, Insurance Services Office, Inc., 1994    CG 00 01 01 96    ☐

    **(b)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; and

    **(2)** The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    **b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

    **a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

    **b.** Your fulfilling the terms of the contract or agreement.

**8.** "Insured contract" means:

    **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

    **b.** A sidetrack agreement;

    **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    **e.** An elevator maintenance agreement;

    **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

    **(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

    **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

        **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

        **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

    **(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**9.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**10.** "Loading or unloading" means the handling of property:

    **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

 Copyright, Insurance Services Office, Inc., 1994

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, water-craft or "auto" to the place where it is finally de-livered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not at-tached to the aircraft, watercraft or "auto".

11. "Mobile equipment" means any of the following types of land vehicles, including any attached ma-chinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, main-tained primarily to provide mobility to perma-nently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently at-tached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building clean-ing, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the fol-lowing types of permanently attached equip-ment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building clean-ing, geophysical exploration, lighting and well servicing equipment.

12. "Occurrence" means an accident, including con-tinuous or repeated exposure to substantially the same general harmful conditions.

13. "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person oc-cupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slan-ders or libels a person or organization or dis-parages a person's or organization's goods, products or services; or

e. Oral or written publication of material that vio-lates a person's right of privacy.

14. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property dam-age" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical pos-session; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your con-tract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

   **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

   **(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**15.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**16.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**17.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**18.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   **(1)** You;

   **(2)** Others trading under your name; or

   **(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**19.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**b.** The providing of or failure to provide warnings or instructions.

Copyright, Insurance Services Office, Inc., 1994

Received Jun 10 03:29PM (05:52) on RFAX4       (5) for 'RJJ'    WORKSRV1 printed RJJ3578   620AD on Jun 10 03:35PM 1998 *  Pg 3/7
    06/10/98  WED 18:34 FAX 617    4643                        CRUMP INS BOSTON             →→→ RJJOHNSON              ☎003



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

CG 21 04 11 85

## EXCLUSION-PRODUCTS-COMPLETED OPERATIONS HAZARD

This endorsement modifies insurance provided under the following:

   COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard."

X  _____    Date ! 1-9-98
    Sam Wada

X  _____    1-7-98
    Michael Bontot
    witness



CG 21 04 11 85                 Copyright, Insurance Services Office, Inc., 1984              Page 1 of 1
                                            INSURED

☎004                           CRUMP INS BOSTON                    61742584643 XVA 12:21 IRA  86/60/10

 SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT NO.** _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
|  |  |  |  |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT TO OTHER INSURANCE CONDITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Condition **4. Other Insurance of SECTION IV–COMMERCIAL GENERAL LIABILITY CONDITIONS** is deleted in its entirety and is replaced by the following:

**4. Other Insurance**

**a. Primary Insurance**

This insurance is primary except when b. below applies.

**b. Excess Insurance**

This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(3) If the loss arises out of the maintenance or use of aircraft, "auto" or watercraft to the extent not subject to Exclusion **g.** of Coverage A (Section I); or

(4) That is valid and collectible insurance available to you under any other policy.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all other insurance.

If a loss occurs involving two or more policies, each of which states that its insurance will be excess, then our policy will contribute on a pro rata basis.

_____ / _____

AUTHORIZED REPRESENTATIVE                DATE

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

GLS-152s (12-96)

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.**_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## OPTIONAL PROVISIONS ENDORSEMENT

The following special provisions (indicated by an X) apply to this policy.

### SCHEDULE

☒ Bodily Injury, Property Damage, Personal Injury and Advertising Injury Liability Deductible Endorsement

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| Bodily Injury Liability | $ | 500 per claimant |
| Property Damage Liability | $ | 500 per claimant |
| Personal Injury Liability | $ | 500 per claimant |
| Advertising Injury Liability | $ | 500 per claimant |

☒ Service of Suit Clause

Service of Process will be accepted by: _____

INSURANCE COMMISSIONER STATE OF MASSACHUSETTS _____ , and

Service of Process will be mailed to: _____

INSURANCE COMMISSIONER STATE OF MASSACHUSETTS _____ .

☒ Minimum and Advance Premium Endorsement

Minimum Premium $ _____ 9,376 _____

☒ Minimum Earned Premium

Minimum Earned Premium _____ 25 _____ % of the advanced premium.

GLS-94s (8-96)

## BODILY INJURY, PROPERTY DAMAGE, PERSONAL INJURY AND ADVERTISING INJURY LIABILITY DEDUCTIBLE ENDORSEMENT

This insurance modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

APPLICATION OF ENDORSEMENT (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury," "property damage," "personal injury," and "advertising injury," however caused.):
NO LIMITATION

1. Our obligation under the Bodily Injury Liability, Property Damage Liability, Personal Injury Liability and Advertising Injury Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts **stated in the Schedule above** as applicable to such coverages, and the Limits of Insurance applicable to Each Occurrence

or offense for such coverages will be reduced by the amount of such deductible. Aggregate Limits for such coverages shall not be reduced by the application of such deductible amount.

2. The deductible amounts apply to damages and all legal and loss adjustment expenses.

3. The deductible amounts stated in the Schedule above apply under the Bodily Injury Liability, Property Damage Liability, Personal Injury Liability and Advertising Injury Liability Coverages, respectively, to all damages because of "bodily injury," or "personal injury" sustained by one person, or to all damages because of "property damage" sustained by one person, any

organization, or association or any individual member of any organization or association as the result of any one "occurrence."

4. The terms of this insurance, including those with respect to our right and duty to defend any "suits" seeking those damages and your duties in the event of an "occurrence," offense, claim or "suit," apply irrespective of the application of the deductible amount.

5. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

## SERVICE OF SUIT CLAUSE

UTS-9g (5-96)

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due under this policy, the Company at the request of the insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give the Court jurisdiction. All matters which arise will be determined in accordance with the law and practice of the Court. In a suit instituted against any one of them under this contract, the Company agrees to abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

Pursuant to any statute of any state, territory or district of the United States of America which makes a provision, the Company will designate the Superintendent, Commis-

sioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the insured (or reinsured) or any beneficiary arising out of this contract of insurance (or reinsurance).

The officer named in the Schedule above is authorized and directed to accept service of process on behalf of the Company.

Having accepted service of process on behalf of the Company, the officer is authorized to mail the process or a true copy to the individual named in the Schedule above.

## MINIMUM AND ADVANCE PREMIUM ENDORSEMENT

GLS-47s(4-97)

This endorsement modifies Conditions provided under the following:

COMMERICAL GENERAL LIABILITY COVERAGE PART

Item b. of the Premium Audit Condition (under SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS) is changed to read:

b. The advance premium for this Coverage Part is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable to us on

notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured, subject to the minimum premium as defined below. For purposes of this policy, the terms advance premium, earned premium, and minimum premium are defined as follows:



Advance Premium - The premium that is stated in the policy Declarations and payable in full by the first Named Insured at the inception of the policy.

Earned Premium - The premium that is developed by applying the rate(s) scheduled in the policy to the actual premium basis for the audit period.

Minimum Premium - The lowest premium for which this insurance will be written for the Policy Period

stated in Item 2. of the Declarations. This minimum premium is equal to 100% (unless a different percentage (%) is shown in the SCHEDULE above) of the advance premium including any premium adjustments made by endorsement to this policy during the policy period. Premium adjustments do not include the audit premium developed for the Policy Period stated in Item 2. of the Declarations.

---

UTS-199g (8-94)

## MINIMUM EARNED PREMIUM

Provision A. 5. of the CANCELLATION Condition contained in the COMMON POLICY CONDITIONS is deleted in its entirety and replaced with the following:

### A. CANCELLATION

5. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the Insured cancels, the refund may be less than pro rata. However, if this policy is canceled at the request of the Insured, the total retained by the Company shall not be less than the percentage of the advanced premium listed in the Schedule above.

/

_____          _____
AUTHORIZED REPRESENTATIVE                                    DATE



Advance Premium - The premium that is stated in the policy Declarations and payable in full by the first Named Insured at the inception of the policy.

Earned Premium - The premium that is developed by applying the rate(s) scheduled in the policy to the actual premium basis for the audit period.

Minimum Premium - The lowest premium for which this insurance will be written for the Policy Period

stated in Item 2. of the Declarations. This minimum premium is equal to 100% (unless a different percentage (%) **is shown in the SCHEDULE above**) of the advance premium including any premium adjustments made by endorsement to this policy during the policy period. Premium adjustments do not include the audit premium developed for the Policy Period stated in Item 2. of the Declarations.

---

## MINIMUM EARNED PREMIUM

UTS-199g (8-94)

Provision A. 5. of the CANCELLATION Condition contained in the **COMMON POLICY CONDITIONS** is deleted in its entirety and replaced with the following:

**A. CANCELLATION**

5. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the Insured cancels, the refund may be less than pro rata. However, if this policy is canceled at the request of the Insured, the total retained by the Company shall not be less than the percentage of the advanced premium **listed in the Schedule above.**

---

AUTHORIZED REPRESENTATIVE          DATE

UTS-128s (10-97)

 SCOTTSDALE INSURANCE COMPANY®

**ENDORSEMENT
NO.** ___1___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| CLS0499959 | 01/12/1998 | SABILLO, INC. (SEE UTS-SP-1) | 20006 |

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS HEREBY UNDERSTOOD AND AGREED THAT THE GENERAL AGGREGATE LIMIT IS AMENDED TO READ $2,000,000.


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.


_/_ 10/02/1998 DC

AUTHORIZED REPRESENTATIVE        DATE
HOME OFFICE

UTS-3g (3-92)

## RENEWAL CERTIFICATE

**SCOTTSDALE INSURANCE COMPANY®**
8877 North Gainey Center Drive, Scottsdale, Arizona 85258
A STOCK COMPANY

**Policy Number**
**CLS0499959**

**Item 1. Named Insured and Mailing Address:**

SAEILO INC. (SEE UTS-SP-1)
184 PRESCOTT STREET

WORCESTER            MA  01605

**Agent Name and Address:**

CRUMP INS SVC OF BOSTON, INC.
121 HIGH STREET
BOSTON, MA 02110

Agent No: _____ 20006

| Item 2. Policy Period | From: 01/12/1999 | To: 01/12/2000 |
|---|---|---|

**12:01 A.M. Standard Time at the address of the NAMED INSURED as stated herein.**

In consideration of the renewal premium stated, the above numbered policy is renewed for the period specified, subject to the terms and conditions thereof, except as otherwise specified herein.

| Premium |
|---|
| $      8,438.00 |

4% MASS TAX    337.52

☐ No changes from previous term.

☒ Changes on endorsement below are applicable with above inception date.

```
UTS-246S(9-98)REPLACES UTS-246S(6-97)
CLS-SD-1L(9-98)REPLACES CLS-SD-1L(9-97)
UTS-128S(10-97)AMENDED
CLS-SP-1L(10-93)AMENDED
CG-2160(04-98)ADDED     EXCLUSION YEAR 2000 COMPUTER-RELATED & OTHER ELECTRONIC PROBLEMS
CG-2104(11-85)ADDED     EXCLUSION PRODUCTS-COMPLETED OPERATIONS HAZARD
UTS-SP-1(8-86)ADDED     NAME INSURED SCHEDULE
UTS-3G(3-92)ADDED       ENDORSEMENT #1
```

Countersigned ___01/14/1999 CDT___    By _____
DATE                          AUTHORIZED REPRESENTATIVE



UTS-1 (4-94)              HOME OFFICE              

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.** 01

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| CLS0499959 | 01/12/1999 | SAEILO INC. (SEE UTS-SP-1) | 20006 |

1) COPELCO LEASING, ONE MEDIQ PLAZA, PENNSAUKEN, NJ 08110

2) CREATIVE FUNDING, 26776 W TWELVE MILE RD., SOUTHFIELD, MI 48034

3) SCOTTSMAN GROUP, P.O. BOX 986,  BALTIMORE, MD 21203

4) FIRST BANK RICHMOND SB, P.O. BOX 1145,  RICHMOND, IN  47374-1145

5) ADVANTA LEASING, 1020 LAUREL OAK ROAD,  VOORHEES, NJ

6) ALEX.INC (THE AMERICAN LEASE EXCHANGE) AT&T CAPITAL
SHAWMUT BANK, GREYROCK CAPITAL GRP/BUS. LEASING GRP.
9245 SW NIMBUS AVE.,  BEVERTOWN, OR 97008

/ 01/13/1999

AUTHORIZED REPRESENTATIVE    DATE
HOME OFFICE

UTS-3g (3-92)    + CC 2010   attached

POLICY NUMBER:  CLS0499959

COMMERCIAL GENERAL LIABILITY
CG 20 10 03 97

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

| Name of Person or Organization: |
| --- |
| SEE FORM UTS-3G FOR ADDITIONAL INSUREDS |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Who Is An Insured (Section II)** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

CG 20 10 03 97

Copyright, Insurance Services Office, Inc., 1996
HOME OFFICE

Page 1 of 1



# SCOTTSDALE INSURANCE COMPANY®

## SCHEDULE OF NAMED INSUREDS

Policy No. __CLS0499959__

Effective Date: ____01/12/1999____

12:01 A.M., Standard Time

Named Insured __SABILO INC. (SEE UTS-SP-1)__

Agent No. ____20006____

SAEILO, INC. D/B/A KAHR AND D/B/A SAEILO MANUFACTURING INDUSTRIES

UTS-SP-1 (8-95)

HOME OFFICE

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.** _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| CLS0499959 | 01/12/1999 | SAEILO INC. (SEE UTS-SP-1) | 20006 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDATORY ENDORSEMENTS
### (Without Medical Payments Exclusion)

This endorsement lists several endorsements that modify your policy as follows:

IL 00 17 11 85

## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

### A.  CANCELLATION

1.  The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2.  We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    a.  Ten (10) days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b.  Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

3.  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4.  Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5.  If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less

than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6.  If notice is mailed, proof of mailing will be sufficient proof of notice.

### B.  CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C.  EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D.  INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1.  Make inspections and surveys at any time;

2.  Give you reports on the conditions we find; and

3.  Recommend changes.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

UTS-246s (9-98)

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1.  Are safe or healthful; or

2.  Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**E. PREMIUMS**

The first Named Insured shown in the Declarations:

1.  Is responsible for the payment of all premiums; and

2.  Will be the payee for any return premiums we pay.

**F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THE POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

GLS-58a (12-93)

---

## LEAD CONTAMINATION EXCLUSION

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

This endorsement excludes "occurrences" at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured; or from the operations of the insured, which result in:

a.  "Bodily Injury" arising out of the ingestion, inhalation or absorption of lead in any form;

b.  "Property Damage" arising from any form of lead;

c.  "Personal Injury" arising from any form of lead;

d.  "Advertising Injury" arising from any form of lead;

e.  Medical Payments arising from any form of lead;

f.  Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

g.  Any loss, cost or expense arising out of any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

UTS-246a (9-96)

CG 21 47 10 93

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to paragraph 2., Exclusions of **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I - Coverages):**

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph 2., Exclusions of **COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY (Section I - Coverages):**

This insurance does not apply to:

"Personal injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

GLS-74a (11-92)

## COMMERCIAL GENERAL LIABILITY CONDITIONS AMENDMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

The CONDITION entitled When We Do Not Renew is deleted in its entirety.

IL 00 21 11 94

## NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART

1. The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material" if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

UTS-246a (9-98)

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material," "Special nuclear material" or "by-product material."

"Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

GLS-30s (6-88)

# CONTRACTORS SPECIAL CONDITIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following condition is added to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** section of the policy:

**CONTRACTORS SPECIAL CONDITIONS**

You will obtain certificates of insurance from all independent contractors providing evidence of:

1. Limits of insurance equal to or greater than the limits provided by this policy; and

2. Coverage equal to or greater than the coverages provided by this policy.

Failure to comply with this condition does not alter the coverage provided by this policy. However, should you fail to comply, a premium charge will be made. The premium charge will be computed by multiplying the "total cost" of all work sublet that fails to meet the above condition, by the rate per $1000 payroll for the applicable classification of the work performed.

If the policy does not contain the applicable classification and rate, we will multiply our usual and customary rate per $1000 payroll for that classification, by the net modification factor, if any, applied to the policy rates.

"Total cost" means the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work and all fees, bonuses or commissions paid.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

UTS-246s (9-88)

UTS-74g (8-95)

## PUNITIVE OR EXEMPLARY DAMAGE EXCLUSION

This policy does not apply to a claim of or indemnification for punitive or exemplary damages.

Punitive or exemplary damages also include any damages awarded pursuant to statute in the form of double, treble or other multiple damages in excess of compensatory damages.

If suit is brought against any insured for a claim falling within coverage provided under the policy, seeking both compensatory and punitive or exemplary damages, then the Company will afford a defense to such action. However, the Company will have no obligation to pay for any costs, interest or damages attributable to punitive or exemplary damages.

UTS-131g (3-92)

## ASBESTOS EXCLUSION

The coverage afforded by this policy does not apply to bodily injury, personal injury or property damage arising out of:

1. Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos;

2. The use of asbestos in construction or manufacturing any good, product or structure;

3. The removal of asbestos from any good, product or structure; or

4. The manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The coverage afforded by the policy does not apply to payment for the investigation or defense of any loss, injury or damage or any cost, fine or penalty or for any expense of claim or suit related to any of the above.

_____/_____
AUTHORIZED REPRESENTATIVE                DATE

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983

UTS-246s (9-95)



# SCOTTSDALE INSURANCE COMPANY®

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

Policy No. **CLS0499959**                    Effective Date **01/12/1999**
                                            12:01 A.M., Standard Time

Named Insured **SAEILO INC. (SEE UTS-SP-1)**    Agent No. **20006**

### Item 1. Limits of Insurance

| Coverage | Limit of Liability | |
|---|---|---|
| **Aggregate Limits of Liability** | $ **EXCLUDED** | Products/Completed Operations Aggregate |
| | $ **2,000,000** | General Aggregate (other than Products/Completed Operations) |
| **Coverage A - Bodily Injury and Property Damage Liability** | $ **1,000,000** | any one occurrence subject to the Products/Completed Operations and General Aggregate Limits of Liability |
| **Damage to Premises Rented to You Limit** | $ **100,000** | any one premises subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| **Coverage B - Personal and Advertising Injury Liability** | $ **1,000,000** | any one person or organization subject to the General Aggregate Limits of Liability |
| **Coverage C - Medical Payments** | $ **5,000** | any one person or subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

### Item 2. Form of Business and Location of Premises

Form of Business:

☐ Individual        ☐ Partnership or Joint Venture        ☐ Limited Liability Company

☒ Organization (other than Partnership, Joint Venture or Limited Liability Company)

Location of All Premises You Own, Rent or Occupy:
184 PRESCOTT STREET, WORCESTER, MA

### Item 3. Forms and Endorsements

Form(s) and Endorsement(s) made a part of this policy at time of issue:
   See Schedule of Forms and Endorsements

### Item 4. Premiums

| | | |
|---|---|---|
| Coverage Part Premium: | $ | 8,438 |
| Other Premium: | $ | |
| Total Premium: | $ | 8,438 |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

CLS-SD-1L (9-98)                    HOME OFFICE

COMMERCIAL GENERAL LIABILITY
CG 21 60 04 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising directly or indirectly out of:

**a.** Any actual or alleged failure, malfunction or inadequacy of:

**(1)** Any of the following, whether belonging to any insured or to others:

**(a)** Computer hardware, including microprocessors;

**(b)** Computer application software;

**(c)** Computer operating systems and related software;

**(d)** Computer networks;

**(e)** Microprocessors (computer chips) not part of any computer system; or

**(f)** Any other computerized or electronic equipment or components; or

**(2)** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **2.a.(1)** of this endorsement

due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

**b.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **2.a.** of this endorsement.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – PRODUCTS-COMPLETED OPERATIONS HAZARD

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

This insurance does not apply to "bodily injury" or "property damage" included within the "products-completed operations hazard".

          Copyright, Insurance Services Office, Inc., 1984                   □



# SCOTTSDALE INSURANCE COMPANY®

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## EXTENSION OF SUPPLEMENTAL DECLARATIONS

Policy No. ___CLS0499959___

Effective Date: ___01/12/1999___
12:01 A.M., Standard Time

Named Insured SAEILO INC. (SEE UTS-SP-1)___

Agent No. ___20006___

| Prem. No. 1 | Bldg. No. 1 | Class Code 97220 | Exposure 400,000 | Basis PAYROLL | |
|---|---|---|---|---|---|
| **Class Description:** MACHINE SHOPS | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | 7.263 | 2,905 |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |
| | | | | EXCLUDED | EXCLUDED |
| Prem. No. 1 | Bldg. No. 1 | Class Code 53271 | Exposure 3,500,000 | Basis SALES | |
| **Class Description:** FIREARMS MANUFACUTRING | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | 1.521 | 5,324 |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |
| | | | | EXCLUDED | EXCLUDED |
| Prem. No. 1 | Bldg. No. 1 | Class Code 61217 | Exposure 1,600 | Basis AREA | |
| **Class Description:** BUILDING OR PREMISES BANK OR OFFICE MERCANTILE OR MANUFACTURING(LESSOR'S RISK ONLY)OTHER THAN NOT-FOR-PROFIT PRODUCTS/COMPLETED OPERATIONS ARE SUBJECT TO THE GENERAL AGGREGATE LIMIT | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | 1.31 | 209 |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |
| | | | | INCLUDED | INCLUDED |
| Prem. No. | Bldg. No. | Class Code | Exposure | Basis | |
| **Class Description:** | | | | Premises/Operations | |
| | | | | Rate | Premium |
| | | | | | |
| | | | | Products/Comp Operations | |
| | | | | Rate | Premium |

CLS-SP-1L (10-93)

HOME OFFICE

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.** _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| CLS0499959 | 01/12/1999 | SAEILO INC. (SEE UTS-SP-1) | 20006 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## OPTIONAL PROVISIONS ENDORSEMENT

The following special provisions (indicated by an "X") apply to this policy.

### SCHEDULE

☒ **Bodily Injury, Property Damage, Personal Injury and Advertising Injury Liability Deductible Endorsement**

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| Bodily Injury Liability | $ 1,000 | per claimant |
| Property Damage Liability | $ 1,000 | per claimant |
| Personal Injury Liability | $ 1,000 | per claimant |
| Advertising Injury Liability | $ 1,000 | per claimant |

☒ **Service of Suit Clause**

Service of Process will be accepted by: COMMISSIONER OF INSURANCE

STATE OF MASSACHUSETTS _____ , and

Service of Process will be mailed to: COMMISSIONER OF INSURANCE

STATE OF MASSACHUSETTS _____

☒ **Minimum and Advance Premium Endorsement**
Minimum Premium _____ 8,438.00 _____ %

☒ **Minimum Earned Premium**
Minimum Earned Premium _____ 25 _____ % of the advanced premium.

---

## BODILY INJURY, PROPERTY DAMAGE, PERSONAL INJURY AND ADVERTISING INJURY LIABILITY DEDUCTIBLE ENDORSEMENT

GLS-94s (8-95)

This insurance modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury," "property damage," "personal injury," and "advertising injury," however caused.):
NO LIMITATION

1. Our obligation under the Bodily Injury Liability, Property Damage Liability, Personal Injury Liability and Advertising Injury Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages, and the Limits of Insurance applicable to Each Occurrence or offense for such coverages will be reduced by the amount of such deductible. Aggregate Limits for such coverages shall not be reduced by the application of such deductible amount.

2. The deductible amounts apply to damages and all legal and loss adjustment expenses.

3. The deductible amounts stated in the Schedule above apply under the Bodily Injury Liability, Property Damage Liability, Personal Injury Liability and Advertising Injury Liability Coverages, respectively, to all damages because of "bodily injury," or "personal injury" sustained by one person, or to all damages because of "property damage" sustained by one person, any organization, or association or any individual member of any organization or association as the result of any one "occurrence."

4. The terms of this insurance, including those with respect to our right and duty to defend any "suits" seeking damages and your duties in the event of an "occurrence," offense, claim or "suit," apply irrespective of the application of the deductible amount.

UTS-128s (10-97)

5. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

## SERVICE OF SUIT CLAUSE
UTS-9g (5-88)

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due under this policy, the Company at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give the Court jurisdiction. All matters which arise will be determined in accordance with the law and practice of the Court. In a suit instituted against any one of them under this contract, the Company agrees to abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

Pursuant to any statute of any state, territory or district of the United States of America which makes a provision, the Company will designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured (or reinsured) or any beneficiary arising out of this contract of insurance (or reinsurance).

The officer named in the Schedule above is authorized and directed to accept service of process on behalf of the Company.

Having accepted service of process on behalf of the Company, the officer is authorized to mail the process or a true copy to the individual named in the Schedule above.

## MINIMUM AND ADVANCE PREMIUM ENDORSEMENT
GLS-47a(4-97)

This endorsement modifies Conditions provided under the following:

COMMERICAL GENERAL LIABILITY COVERAGE PART

Item b. of the Premium Audit Condition (under SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS) is changed to read:

b. The advance premium for this Coverage Part is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable to us on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured, subject to the minimum premium as defined below. For purposes of this policy, the terms advance premium, earned premium, and minimum premium are defined as follows:

Advance Premium - The premium that is stated in the policy Declarations and payable in full by the first Named Insured at the inception of the policy.

Earned Premium - The premium that is developed by applying the rate(s) scheduled in the policy to the actual premium basis for the audit period.

Minimum Premium - The lowest premium for which this insurance will be written for the Policy Period stated in Item 2. of the Declarations. This minimum premium is equal to 100% (unless a different percentage (%) is shown in the SCHEDULE above) of the advance premium including any premium adjustments made by endorsement to this policy during the policy period. Premium adjustments do not include the audit premium developed for the Policy Period stated in Item 2. of the Declarations.

## MINIMUM EARNED PREMIUM
UTS-119g (8-94)

Provision A. 5. of the CANCELLATION Condition contained in the COMMON POLICY CONDITIONS is deleted in its entirety and replaced with the following:

A. CANCELLATION

5. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the Insured cancels, the refund may be less than pro rata. However, if this policy is canceled at the request of the Insured, the total retained by the Company shall not be less than the percentage of the advanced premium listed in the Schedule above.

UTS-128a (10-97)

AUTHORIZED REPRESENTATIVE                          DATE

Page 2 of 2

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.** 2

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| CLS0499959 | 01/12/1998 | SAEILO INC., ETAL | 20006 |

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS HEREBY UNDERSTOOD AND AGREED THAT FORM CG2028 IS ADDED TO THIS POLICY PER THE ATTACHED.

ALL OTHER TERMS AND CONDITIONS STIPULATED IN THIS POLICY SHALL REMAIN UNCHANGED.

/ 03/03/1999 JEN

AUTHORIZED REPRESENTATIVE          DATE
HOME OFFICE

UTS-3g (3-92)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

CG 20 28 11 85

## ADDITIONAL INSURED-LESSOR OF LEASED EQUIPMENT

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Name of Person or Organization:**

COPELCO LEASING
ONE MEDIQ PLAZA
PENNSAUKEN, NJ 08110
    CREATIVE FUNDING
26776 W. TWELVE MILE ROAD
SOUTHFIELD, MI 480348
    WILLIAMS SCOTMAN, INC.
P.O. BOX 986
BALTIMORE, MD 21203

FIRST BANK RICHMOND S B
P.O. BOX 1145
RICHMOND, IN 47374-1145
    ADVANTA LEASING
1020 LAUREL OAK ROAD
VOORHEES, NJ
    ALEX INC (THE AMERICAN LEASE EXCHANGE),
AT&T CAPITAL CORP, SHAWMUT BANK GREYROCK CAPITAL
GRP/BUS. LEASING GRP. 9245 SW NIMBUS AVE
BEVERTOWN, OR 97008

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability arising out of the maintenance, operation or use by you of equipment leased to you by such person(s) or organization(s), subject to the following additional exclusions:
This insurance does not apply:
1. To any "occurrence" which takes place after the equipment lease expires;
2. To "bodily injury" or "property damage" arising out of the sole negligence of the person or organization shown in the Schedule.

Copyright, Insurance Services Office, Inc., 1984

HOME OFFICE

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.** 3

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| CLS0499959 | 01/12/1999 | SAEILO INC. | 20006 |

IN CONSIDERATION OF THE ADDITIONAL PREMIUM OF $100.00, IT IS HEREBY UNDERSTOOD AND AGREED THAT FORM CG2010 IS ADDED TO THIS POLICY PER THE ATTACHED.

ALL OTHER TERMS AND CONDITIONS STIPULATED IN THIS POLICY SHALL REMAIN UNCHANGED.

03/18/1999 JEN

AUTHORIZED REPRESENTATIVE          DATE
HOME OFFICE

UTS-3g (3-92)

POLICY NUMBER:  CLS0499959

COMMERCIAL GENERAL LIABILITY
CG 20 10 03 97

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

Name of Person or Organization:
THE CIT GROUP/EQUIPMENT FINANCING INC.
900 ASHWOOD PARKWAY, SUITE 600
ATLANTA, GA 30338

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

Who Is An Insured (Section II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

Copyright, Insurance Services Office, Inc., 1996
HOME OFFICE

# Scottsdale Insurance Company
## AUDIT ENDORSEMENT

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (STANDARD TIME) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 A.M. | NOON | | |
| CLS0499959 | 1 | 12 | 1999 | X | | KAHR AND SAEILO ETAL (DBA) | 20006 |

**PAGE** 1 **OF** 1

**ENDORSEMENT TYPE:** Annual

**AUDIT TERM FROM** 01/12/1998 **TO** 01/12/1999

| CLASSIFICATION | RATE TYPE | RATE | PREMIUM BASIS | PREMIUM |
|---|---|---|---|---|
| 61217 | | 0.00000 | 0 | 0 |
| 61217 | | 0.00000 | 0 | 233 |
| 97220 | All Other | 8.07000 | 620,126 | 5,004 |
| 97220 | PR/CO | 0.00000 | 0 | 0 |
| 53271 | All Other | 1.69000 | 3,632,144 | 6,138 |
| 53271 | PR/CO | 0.00000 | 0 | 0 |

**NOTES:**



| REG. DESK | CODING | | FILE |
|---|---|---|---|
| | | | |

04/05/1999          lsr

Earned Premium: 11,375
Deposit Premium: 9,376
Premium Adjustment: 1,999 AP
Billing Date: 04/23/1999

AUTHORIZED REPRESENTATIVE          DATE

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.___4___**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| CLS0499959 | 05/14/1999 | SAEILO, INC. | 20006 |

IN CONSIDERATION OF NO CHANGE IN PREMIUM IT IS HEREBY UNDERSTOOD AND AGREED THAT THE FOLLOWING LOCATION IS ADDED TO THE POLICY EFFECTIVE 5/14/99

LOCATION #2

130 GODDARD MEMORIAL BLVD
WORCESTER, MA  01604

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.  PREMIUM ADJUSTMENT TO BE MADE AT AUDIT.

_____     _____
AUTHORIZED REPRESENTATIVE                    DATE
HOME OFFICE

**Scottsdale Insurance Company**

# AUDIT ENDORSEMENT

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (STANDARD TIME) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 | NOON | | |
| CLSO499959 | 1 | 12 | 1999 | A.M. X | | KAHR AND SAEILO ETAL (DBA) | 20006 |

PAGE   1   OF   1

**ENDORSEMENT TYPE:**   Annual Revised

**AUDIT TERM FROM**   01/12/1998   **TO**   01/12/1999

| CLASSIFICATION | RATE TYPE | RATE | PREMIUM BASIS | PREMIUM |
|---|---|---|---|---|
| 61217 | | 0.00000 | 0 | 0 |
| 61217 | | 0.00000 | 0 | 233 |
| 97220 | All Other | 8.07000 | 499,523 | 4,031 |
| 97220 | PR/CO | 0.00000 | 0 | 0 |
| 53271 | All Other | 1.69000 | 3,632,144 | 6,138 |
| 53271 | PR/CO | 0.00000 | 0 | 0 |

**NOTES:**   8/23 audit revised based on Vendors revisions.

| REG. DESK | CODING | | FILE |
|---|---|---|---|
| | | | |

08/23/1999          Tlh

TINA HACHEY AUG 23 1999 PREM AUDIT

**Earned Premium:**          10,402
**Deposit Premium:**          9,376
**Premium Adjustment:**       1,026 AP
**Billing Date:**          09/10/1999

_____     _____

AUTHORIZED REPRESENTATIVE          DATE

 **SCOTTSDALE INSURANCE COMPANY®**

**ENDORSEMENT NO.** 5

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| CLS0499959 | 09/02/1999 | SAEILO INC. | 20008 |

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS HEREBY UNDERSTOOD AND AGREED THAT THE NAMED INSURED IS AMENDED TO READ:

SMI-MA INC.

ALL OTHER TERMS AND CONDITIONS STIPULATED IN THIS POLICY SHALL REMAIN UNCHANGED.

12/10/1999 JEN

AUTHORIZED REPRESENTATIVE
HOME OFFICE

DATE

UTS-3g (3-92)

# Scottsdale Insurance Company
# AUDIT ENDORSEMENT

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (STANDARD TIME) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 | NOON | | |
| CLSO499959 | 1 | 12 | 2000 | A.M. X | | SMI MA INC | 20006 |

PAGE    1   OF    1

ENDORSEMENT TYPE:    Annual

AUDIT TERM FROM   01/12/1999    TO   01/12/2000

| CLASSIFICATION | RATE TYPE | RATE | PREMIUM BASIS | PREMIUM |
|---|---|---|---|---|
| 61217 | All Other | 0.00000 | 0 | 209 |
| 61217 | PR/CO | 0.00000 | 0 | 0 |
| 97220 | All Other | 7.25300 | 981,978 | 7,122 |
| 97220 | PR/CO | 0.00000 | 0 | 0 |
| 53271 | All Other | 1.52100 | 7,013,066 | 10,667 |
| 53271 | PR/CO | 0.00000 | 0 | 0 |
| Additional Insured | | 0 | 0.00000 | 0 | 100 |

| REG. DESK | CODING | | FILE |
|---|---|---|---|
| | | | |
| 03/27/2000 | | T1h | |

Earned Premium:    18,098
Deposit Premium:    8,538
Premium Adjustment:    9,560 AP
Billing Date:    04/14/2000

AUTHORIZED REPRESENTATIVE          DATE

# Scottsdale Insurance Company
# AUDIT ENDORSEMENT

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (STANDARD TIME) | | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 | NOON | | | |
| CLS0499959 | 1 | 12 | 2000 | A.M. X | | | SMI MA INC | 20006 |

PAGE   1   OF   1

**ENDORSEMENT TYPE:**    Annual Revised

**AUDIT TERM FROM**  01/12/1999   **TO**  01/12/2000

| CLASSIFICATION | RATE TYPE | RATE | PREMIUM BASIS | PREMIUM |
|---|---|---|---|---|
| 61217 | All Other | 0.00000 | 0 | 209 |
| 61217 | PR/CO | 0.00000 | 0 | 0 |
| *97220 | All Other | 7.25300 | 742,062 | 5,382 |
| *97220 | PR/CO | 0.00000 | 0 | 0 |
| *53271 | All Other | 1.52100 | 3,165,766 | 4,815 |
| *53271 | PR/CO | 0.00000 | 0 | 0 |
| Additional Insured | 0 | 0.00000 | 0 | 100 |

NOTES:    *Audit revised based on DC info.

| REG. DESK | CODING | UW | FILE |
|---|---|---|---|
| | | | |

10/04/2000

| | |
|---|---|
| Earned Premium: | 10,506 |
| Deposit Premium: | 8,538 |
| Premium Adjustment: | 1,968 AP |
| Billing Date: | 04/14/2000 |

AUTHORIZED REPRESENTATIVE          DATE

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                              President