## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUANA HERNANDEZ, AS ADMINISTRATRIX OF THE ESTATE OF DANNY NICACIO and ARMANDO MAISONET, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) CIVIL ACTION NO. 05-40141-FDS |
| SCOTTSDALE INSURANCE COMPANY and UTICA MUTUAL INSURANCE COMPANY, | ) ) ) ) |
| Defendants. | ) ) ) |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12 (b)(6), OR TO STAY ACTION IF NOT DISMISSED IN ITS ENTIRETY

Defendants Scottsdale Insurance Company ("Scottsdale") and Utica Mutual Insurance Company ("Utica") (collectively, "Defendants"), by and through their counsel, hereby submit this reply memorandum in support of their Joint Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), or to Stay Action if Not Dismissed in its Entirety.

## INTRODUCTION

Defendants submit this reply brief to address (i) Plaintiffs' incorrect interpretation of the "products-completed operations hazard" exclusion, (ii) Plaintiffs' improper efforts to introduce materials outside of the confines of the complaint in opposing Defendants' motion to dismiss, (iii) Plaintiffs' untimely and baseless efforts to remand this case to state court; and (iv) the additional need to stay this action because of recent legislation that bars the underlying claims for which Plaintiffs are seeking coverage.

BOST1-873207-2

As explained at Discussion Section I, <u>infra</u>, Plaintiffs' incorrectly claim that the subject gun (the "Kahr Handgun") must have been completed at time it left Saielo d/b/a Kahr, Inc. ("Saielo") for the "products-completed operations hazard" exclusion to apply.  No such requirement exists under the subject policies, as the exclusion applies separately to products (which include parts) and completed service operations.  In cannot be disputed that the exclusion applies to the Saielo's product at issue in this case (i.e., the Kahr Handgun and its parts), and bars any recovery by Plaintiffs.  Indeed, as explained in Discussion Section II, <u>infra</u>, recent case law confirms the application of the products exclusion in this case.

In addition, as explained at Discussion Section III, <u>infra</u>, Plaintiffs have failed to demonstrate that they have standing to pursue this declaratory judgment action.  They are not insureds under Defendants' policies, and do not have a judgment against Defendants' insureds.  Plaintiffs have also, as explained at Discussion Section IV, <u>infra</u>, sought improperly to rely upon documents and affidavits that are not within the confines of the complaint.  Such documents and affidavits are not properly submitted on a motion to dismiss, and should be rejected by the Court.[1]

Moreover, Plaintiffs seek (without filing a motion) to remand this case to state court.  Their efforts in this regard are, as explained at Discussion Section V, <u>infra</u>, untimely and improper.  Finally, as explained at Discussion Section VI, <u>infra</u>, this case should be stayed if Defendants' motion to dismiss is not granted.  Such a stay is in the interests of judicial economy as the issues in this case will be rendered moot should Plaintiffs fail to prevail in the underlying action.

---

[1] Defendants are also filing herewith a motion to strike the extraneous materials filed with Plaintiffs' opposition.

**DISCUSSION**

**I.      The Product Exclusion Does Not Require That A Product Be "Completed"**

In its Opposition, the Plaintiffs argue that the endorsement entitled "EXCLUSION-PRODUCTS-COMPLETED OPERATIONS HAZARD" is not applicable because Plaintiffs claim that the stolen component parts did not constitute a "completed product", and that there was therefore no trigger of the exclusion.  Plaintiffs have, however, incorrectly interpreted the wording of the product exclusion, as there is no requirement that a product be "completed."  The product exclusion, for example, expressly includes parts, and Plaintiffs admit that their claims arise from Saielo gun parts.  (See Opposition at 4.)  In addition, it cannot be disputed that the subject gun constitutes a Saielo product, as Plaintiffs admit the subject gun was a Kahr handgun, i.e., a Saielo product.  (See Opposition at 3-4.)

**A.      The Products-Completed Operations Hazard Exclusion Applies Separately to Products and Completed Operations**

The Defendants' policies both contain an endorsement entitled "EXCLUSION – PRODUCTS COMPLETED-OPERATIONS HAZARD".  This endorsement (hereinafter, the "Products Exclusion") states that:  "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products completed-operations hazard.'"

The terms "products completed-operations hazard" is defined in pertinent part as follows:

16.      "Products completed-operations hazard":

    a.      Includes all "bodily injury" and "property damage" occurring away from your premises you own or rent and arising out of "**your product**" _**or**_ "**your work**" except:

        (1)      **Products** that are still in your physical possession; or

        (2)      **Work** that has not been completed or abandoned….

(Emphasis added.)  The exclusion applies separately to "your product" and "your work", and

defines these terms as follows:

>    20.    "Your product" means:
>
>    a.    **Any goods or products**, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
>    (1)    You;
>    (2)    Others trading under your name; and
>    (3)    A person or organization whose business or assets you have acquired; and
>
>    b.    Containers (other than vehicles), materials, **parts** or equipment furnished in connection with such goods or products.
>
>    "Your product" includes:
>
>    a.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and
>
>    b.    The providing or failure to provide warnings or instructions.
>
>    21.    "Your work" means:
>
>    a.    **Work** or operations performed by you or on your behalf; and
>
>    b.    Materials, parts or equipment furnished in connection with **such work** or operations.
>
>    "Your work" includes:
>
>    a.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work" …

(Emphasis added.)

The "products completed-operations hazard" exclusion addresses "your product" and

"your work" separately.  The "products hazard" includes bodily injury and property damage

arising out of the named insured's "products" or reliance upon a representation or warranty made

at any time with respect thereto, but only if the bodily injury or property damage occurs away

4

from the premises owned by or rented to the named insured and after the insured no longer has physical possession of such "products".[2]  See Simplex Technologies, Inc. v. Liberty Mutual Insurance Company, 429 Mass. 196, 198 (1999).

"Completed-operations" hazards, which are to be distinguished from "products" hazards, relate to the insured's "work".  "Completed-operations" relate to injuries arising from the insured's service "operations which do not involve goods or products manufactured, sold, handled or distributed by the insured."  See Frontier Insulation Contractors, Inc. v. Merchants Mutual Insurance Company, 91 N.Y.2d 169, 176 (1997); see also Henderson, Insurance Protection for Products Liability and Completed Operations – What Every Lawyer Should Know, 50 Neb. L. Rev. 415, 434.  Courts have routinely held that the standard definition of the provision indicates that it only applies only to construction or maintenance type of work.  See, e.g., American Red Cross v. Travelers Indemnity Co., 816 F. Supp. 755, 760 (DDC 1993) (plain language of the completed operations hazard provision indicates that it is intended to apply to construction and maintenance work, such as work performed on the premises of others by contractors and subcontractors); Federal Kemper Ins. Co. v. Jones, 777 F. Supp. 405, 412 (M.D. Pa. 1991) ("completed operations coverage is a service company's equivalent of product hazard coverage."); Pacific Indemnity Co. v. Linn, 766 F. 2d 754, 764 (3d Cir. 1985) ("clause intended to cover businesses that perform contracts at premises other than their own."); CPS Chem. Co. v. Continental Insurance Co., 489 A.2d 1265, 1290 (Law Div. 1984) (stating that the "exclusion refers to accidents caused by defective workmanship which arises after completion of work by the insured on construction or service contracts.").

---

[2] As indicated in the exclusion, there is no requirement in the applicable Policies that the insured must "relinquish" possession of the product, as is suggested by Plaintiffs in their Opposition.  The unambiguous wording of the Products Exclusion simply states that the product must no longer be in the insured's physical possession.

Since the underlying cases relate to Saielo's products as opposed to services, the "your product" portion, as opposed to "your work" portion, of the "products completed operations hazard" exclusion applies. Thus, the requirement relating to <u>work</u> being completed is simply not applicable. The product exclusion is applicable as long as the claims in the underlying cases arise out of Saielo's product. There can be no dispute that this is the case.

**B.  The "Products Hazard" Portion Of The Products Exclusion Excludes Coverage For Bodily Injury Arising Out Of The Kahr Handgun Or Its Parts**

> **(i)  The Kahr Handgun And Its Parts Are Included In The Definition Of "Your Product"**

In their Opposition, Plaintiffs argue that stolen gun parts, which were later assembled into a handgun, are not "completed products." (See Opposition, p. 2). As set forth above, the Products Exclusion indicates that the word "completed" applies only to the "your work" portion of the exclusion and not to the "your product" portion of the provision. Therefore, there is no requirement that the "product" be "completed" before the exclusion is triggered.

With respect to products, the Products Exclusion states that it excludes coverage for all "bodily injury"… occurring away from your premises you own or rent and arising out of "your product"… except:

> (1)  Products that are still in your physical possession.

Furthermore, "[y]our product" means:

> a.  **Any goods or products**, other than real property, **manufactured, sold, handled, distributed** or disposed of by:
>
> (1)  You;
> (2)  Others trading under your name; and
> (3)  A person or organization whose business or assets you have acquired; and
>
> b.  Containers (other than vehicles), **materials, parts or equipment furnished in connection with such goods or products.**

"Your product" includes:

a.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

b.    The providing or failure to provide warnings or instructions.

The provision provides that "your product" includes all goods or products "manufactured, sold, handled, distributed or disposed of by" Saielo, as well as all "materials, parts or equipment furnished in connection with such goods or products." Therefore, it cannot be disputed that the Kahr Handgun and its component parts, which were stolen, are "products" under the "products completed-operations hazard" exclusion.[3]

### (ii)    It Cannot Be Disputed That The Injuries At Issue In The Underlying Actions Arose Out Of The Kahr Handgun Made From The Stolen Component Parts

As explained in Defendants' memorandum of law in support of their motion to dismiss, the Products Exclusion applies to any claims that "arise out of" Saielo's product, i.e. its guns or gun parts. As set forth in Brazas Sporting Arms, Inc. v. American Empire Surplus Lines, Inc. and as explained in Defendants' memorandum of law in support of their joint motion to dismiss, under Massachusetts law, "arising out of" "indicates a wider range of causation than the concept of proximate causation in tort law." See Brazas Sporting Arms, Inc. v. American Empire Surplus Lines, Inc., 220 F. 3d 1, 7 (1st Cir. 2000). It is generally understood to mean originating from, "growing out of," "flowing from," "incident to," or "having connection with." See id. In interpreting the phrase "arising out of" in the context of the Brazas case, and also in the context of the instant case, this Court must consider the "source from which the plaintiff's personal

---

[3] It is undisputed that the component parts of the handgun had been manufactured and handled by Saielo prior to them being stolen. Plaintiffs admit in their Opposition that "[i]t is beyond dispute that Cronin stole "parts" or "pieces" of two firearms from Kahr… Specifically, he took the parts from a cabinet … and took [them] home in a jacket and built a handgun. It took several days to take all of the necessary parts to construct a gun." (See Opposition, p. 4).

injury originates rather than the specific theories of liability alleged in the complaint [of the underlying civil action." See id.

In Brazas, the Court held that firearms were the immediate source of the plaintiffs' injuries, and the fact that the plaintiffs contrived a theory of liability that targeted Brazas for its alleged participation in flooding the firearms market, could not affect the application of the exclusion provision. The same holds true for the instant case. Despite the fact that the Plaintiffs have contrived a theory of liability by characterizing their claims as "premises liability" claims (See Opposition, p. 8), such cannot affect the application of the Products Exclusion. Furthermore, the Plaintiffs are overlooking the simple fact that the Kahr Handgun, which was made from the component parts stolen from Saielo's facility, was the immediate source of the plaintiffs' injuries. Therefore, as was the case in Brazas, the exclusion is applicable.

Furthermore, even if this Court were to entertain plaintiffs' argument that the claims are "premises liability" claims and not manufacturing claims, these claims would still be excluded from coverage under the Policies. The Plaintiff in Brazas tried a similar tactic, claiming that the underlying action was not directed at Brazas' products, but at its general manner of doing business. This is exactly what the Plaintiffs are attempting to do here by attacking Saielo's general manner of doing business.[4] However, in Brazas, both the United States District Court for the District of Massachusetts and the First Circuit Court of Appeals refused to draw any such distinction when analyzing the applicability of the exclusion. In Brazas, the District Court stated as follows:

> Plaintiff argues that the [underlying litigation] was not directed at
> Brazas products, but at its general manner of doing business.

---

[4] Plaintiffs are claiming that Saielo was negligent for not conducting criminal background checks; for not performing drug tests on employees; for not safeguards the handguns and their component parts with metal detectors; for not having a security guard to check employees; for not keeping clear inventory record; for not supervising employees with security cameras. (See Opposition, p. 2).

> Again, while the argument is imaginative, it loses force upon reflection. The New York litigation charges Brazas with participating in an intentional or reckless course of distribution of its products with resulting injury. Only by a distortion of language and logic can plaintiff suggest that the injuries sued upon do not "arise from" the distribution of Brazas products, off Brazas premises.

Brazas, 59 F. Supp. 2d at 226.

On appeal, the First Circuit noted that the "the New York civil actions accuse Brazas of making bad business decisions…" The First Circuit indicated that such allegations were irrelevant as the court must consider what the source of the personal injury is rather than the specific theories of liability. See Brazas, 220 F.3d at 7. Therefore, in the instant case, regardless of how Plaintiffs characterize their claims, e.g. as premises liability claims or manufacturing claims, it cannot be disputed that the source of plaintiffs' injuries originated with the Kahr Handgun which was made up of stolen component parts from Saielo's facility. There is therefore no coverage for such claims, and Defendants' joint motion to dismiss should be granted.

## II.   Recent Case Law Further Supports Dismissal Of Plaintiffs' Claims.

Along with Brazas, Berretta v. Federal Ins. Co. and Massachusetts Bay Ins. Co. v. Bushmaster (all of which are  discussed in Defendants' memorandum of law in support of their joint motion to dismiss), the most recent addition to the body of case law which provides guidance concerning the applicability of the "products completed-operations hazard exclusion" to gun manufacturers is Taurus Holdings, Inc. v. United States Fidelity and Guaranty Company, 367 F.3d 1252 (11th Cir. 2004), certified question answered by, remanded by Taurus Holdings v. United States Fid. & Guar. Co., 2005 Fla. LEXIS 1781 (Sept. 22, 2005).

9

In <u>Taurus</u>, the United States Court of Appeals for the Eleventh Circuit certified the following question to the Florida Supreme Court:

> Does a products-completed operations hazard exclusion in a commercial general liability policy of insurance bar coverage and therefore eliminate an insurer's duty to defend the insured gun manufacturer in suits alleging negligence, negligent supervision, negligent marketing, negligent distribution, negligent advertising, negligent entrustment, public and private nuisance, failure to warn, false advertising and unfair and deceptive trade practices based on the insured's on-premises business practices?

The Florida Supreme Court, following <u>Brazas</u>, <u>Berretta</u> and <u>Massachusetts Bay</u>, held that the answer to such question is "yes", as the "products completed-operations hazard" exclusion operates to exclude coverage for claims against a gun manufacturer where the injuries alleged were caused by the defendant's guns. Since the Policies at issue in the instant case exclude coverage for bodily injury arising from Saielo's product or the component parts of the product, the holdings in <u>Brazas</u>, <u>Berretta</u>, <u>Massachusetts Bay</u> and now <u>Taurus</u>, all support dismissal of the instant case.

## III.    Plaintiffs Lack Standing To Pursue This Declaratory Judgment Action

In their Complaint, Plaintiffs seek to have this Court decide the issue of whether Scottsdale's and Utica's denial of coverage to their insured, Saeilo, was proper. Plaintiffs, however, have no legal standing to bring such an action under c. 231A, §1 as the Plaintiffs do not have any personal rights that will be directly affected by the declaratory judgment. Plaintiffs are not insureds under either Scottsdale's or Utica's policy, nor do they possess any judgments against any party insured by Scottsdale or Utica.

Instead, Plaintiffs claim that they are intended beneficiaries of Scottsdale and Utica's policies. This is incorrect. Unless and until there is a judgment, which would give rise to a reach-and-apply action, or an assignment of Saeilo's rights to the plaintiffs, Plaintiffs have no

basis to bring a declaratory judgment action looking for an advisory opinion as to whether, if

they prevail on their claims, the insurance will be available.

**IV.    This Court Should Not Consider Any Of The Affidavits And Other Additional Materials Presented By Plaintiffs With Their Opposition, As These Materials Are Outside The Scope Of A Rule 12(b)(6) Motion To Dismiss**

Generally, a court will not consider materials beyond the Complaint on a Rule 12(b)(6)

motion, unless the Complaint's allegations are expressly linked to and dependent on the

document.  See Beddall v. State Street Bank and Trust, 137 F.3d 12 (1st Cir. 1998).  In this case,

Defendants attached only the subject insurance policies and underlying complaints to their

motion to dismiss as such are an integral part of Plaintiffs' complaint in this action.  Reliance

upon such documents in connection with a motion to dismiss is permissible.  Id.

Unlike Defendants, Plaintiffs have submitted numerous documents with their Opposition

that are clearly outside the scope of a Rule 12(b)(6) motion, including but not limited to,

deposition transcripts from deponents in the Underlying Actions and affidavits of purported

"legal" and other "firearms" experts.[5]  Such documents are well beyond the scope of what is

permissible on a motion to dismiss, and should be disregarded by the Court.  Id.

As a backup, Plaintiffs also appear to request that this Court convert the Defendants'

Rule 12(b)(6) motion to dismiss into a motion for summary judgment so that the Court can

consider Plaintiffs' extraneous submissions.  Defendants urge this Court to decline Plaintiffs'

invitation to convert Defendants' motion into one of summary judgment.  Defendants' motion is

properly filed under Rule 12(b)(6), and should be decided in accordance therewith.  In addition,

if the Court were to decide to convert the Defendants' Rule 12(b)(6) motion into a Rule 56

---

[5] Defendants further submit that the affidavit submitted by Plaintiffs' purported legal expert, Stephen M.A. Woodworth, Esq., is inappropriate and should be not considered by this Court under any circumstances.  See Biomedical Polymers, Inc. v. Evergreen Industries, Inc., 976 F. Supp. 98 (D. Mass. 1997) (it is within the Court's discretion to strike a legal expert's affidavit because such affidavits invade the province of the Court by couching legal arguments as expert testimony.)

motion, Defendants' request that they be given adequate time to address the additional issues raised by Plaintiffs in their Opposition through discovery and further motion practice.

**V.    Plaintiffs' Request For A Remand Is Untimely And Improper**

In their Opposition, Plaintiffs request (without filing a motion) that this Court remand this action to the Worcester Superior Court, on the grounds that there are similar parallel actions pending in that court. (See Opposition, Section D, p. 15). Plaintiffs' request is untimely and improper.

This Court should deny Plaintiffs' request for remand as any such motion must be filed within thirty days of the opposing party filing of notice of removal in federal court. 28 U.S.C. §1447(a)(b). Defendants' filed their Notice of Removal with this Court on August 18, 2005. Therefore, according to §1447(a)(b), any motion for remand should have been made by September 18, 2005. Therefore, Plaintiffs' request for remand is untimely. In addition, Plaintiffs' request for remand is improper as Plaintiffs have set forth no proper basis for remand. It is undisputed that this case was properly removed based upon diversity jurisdiction, and Plaintiffs have not demonstrated any proper basis for defeating such diversity jurisdiction.

**VI.    This Case Should Be Stayed Pending A Resolution Of The Underlying Actions**

In its Opposition, Plaintiffs claim that this case should be not stayed. However, until a decision is rendered in the Underlying Actions as to whether Saielo is liable for the Plaintiffs' injuries, it would be a waste of judicial resources to litigate the issue as to whether there is coverage available to Saielo from Scottsdale and Utica in the event of a potential future judgment.[6] Obviously, if Saielo is found to have no liability in the Underlying Actions, then the

---

[6] At this time, another insurance carrier is defending Saielo. Therefore, neither Scottsdale nor Utica will have any obligation to defend until that carrier's policy is exhausted.

question of insurance coverage would be moot. Therefore, this declaratory judgment action should be stayed in the interest of judicial economy.

Recent developments in the Underlying Actions further supports Defendants' request that the instant case be stayed. On October 26, 2005, Congress passed the Protection of Lawful Commerce in Arms Act ("PLCAA"), which bars claims such as Plaintiffs against gun manufacturers. Scottsdale and Utica's insured, Saielo, has filed a Motion to Dismiss in the Underlying Actions on the grounds that the PLCAA requires immediate dismissal of those suits. A copy of the Hernandez motion to dismiss is attached hereto for the Court's reference.[7] The outcome of that Motion to Dismiss will determine whether the instant case can proceed. If the Worcester Superior Court finds that the PLCAA requires dismissal of the Worcester suits, then the instant declaratory judgment action filed by the Plaintiffs against Saielo's insurers would be moot.

## CONCLUSION

For each of the foregoing reasons, and the reasons set forth in Defendants' memorandum of law in support of their motion to dismiss, Defendants Scottsdale Insurance Company and Utica Mutual Insurance Company respectfully request that the Court grant their motion to dismiss. If the Court does not grant Defendants' motion to dismiss, Defendants respectfully request that the Court stay this action pending the resolution of the underlying cases.

---

[7] Since the Motion to Dismiss filed in the Maisonet action is exactly the same as the one in the Hernandez action, Defendants are only attaching the motion filed in the Hernandez action.

Respectfully submitted,

**Scottsdale Insurance Company**,          **Utica Mutual Insurance Company**,
By Its Attorneys,                          By Its Attorney,

/s/ Caryn L. Daum                          /s/ James T. Scamby
John W. Steinmetz (BBO #568108)            James T. Scamby (BBO #629144)
Caryn L. Daum (BBO #647001)                Tucker, Heifetz & Saltzman, LLP
Robinson & Cole LLP                        Three School Street
One Boston Place                           Boston, MA 02108
Boston, MA 02108                           (617) 557-9696
(617) 557-5900

Dated:  November 18, 2005

## CERTIFICATE OF SERVICE

I, Caryn L. Daum, hereby certify that a true and accurate copy of the foregoing document

was served by first-class mail, postage prepaid, on this 18th day of November, 2005, upon:

Héctor E. Piñeiro, Esq.
Law Office of Héctor E. Piñeiro
807 Main Street
Worcester, MA 01610

/s/ Caryn L. Daum
Caryn L. Daum

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
C.A. NO. WOCV2002-01747
Session C

JUANA HERNANDEZ, ADMINISTRATRIX, et al.,

Plaintiffs,

v.

KAHR INC., et al.,

Defendants.

and

SAEILO, INC. D/B/A/ KAHR ARMS AND
AUTO ORDNANCE CORP.,

Defendant/Third-Party Plaintiff,

v.

TROPIGALA NIGHTCLUB, BEN MERCEDES,
30 DE MAYO, INC. and its successors in interest
and GERTRUDE LEVITSKY,

Third-Party Defendants.

**MEMORANDUM OF LAW
IN SUPPORT OF
DEFENDANT'S MOTION TO
DISMISS OR, IN THE
ALTERNATIVE, FOR
JUDGMENT ON THE
PLEADINGS**

## INTRODUCTION AND BACKGROUND

Defendant has moved to dismiss or, in the alternative, for judgment on the pleadings on

the ground that the Protection of Lawful Commerce in Arms Act ("PLCAA" or "the Act")

requires immediate dismissal of this case. [1]

---

[1] The PLCAA became law on October 26, 2005, 2005.  A copy is attached as Exhibit 1
hereto.

This case results from Edwin Novas' murder of Danny Guzman. Second Amended Complaint ¶¶ 81 and 85, attached hereto as Exhibit 2 with selected exhibits. The misnamed defendant Saeilo, Inc. d/b/a Kahr Arms and Auto Ordnance is a manufacturer of handguns under the brand name of Kahr Arms. *Id.* at ¶¶ 31-32. In 1999, the defendant hired Mark Cronin to work at its facility at 184 Prescott Street in Worcester, Massachusetts. *Id.* at ¶ 63. During his employment, Cronin stole various handgun components from the defendant, which he then used to assemble a Kahr MKP 9 mm pistol, a crime for which he was charged and then pleaded guilty. *Id.* at ¶ 80. Before capture for this criminal act, Cronin sold the weapon to a third party, Robert Jachimczyk, for "2 'half grams' of powder cocaine."[2] *Id.* at ¶ 72. Subsequently, Jachimczyk sold the weapon to a fourth party, Edwin Novas, an individual with a significant criminal history, for "2 bundles of heroin." *Id.* at ¶¶ 72 and 81. According to plaintiffs, Novas "is a fugitive from justice" for his subsequent use of this pistol to murder Danny Guzman. *Id.* at 81 and 82 ("Mr. Novas had had numerous encounters with the criminal justice system in the Commonwealth of Massachusetts months before December 24, 1999[, the day of Guzman's murder].")

Congress passed the Act to "prohibit civil liability actions from being brought *or continued* against manufacturers, distributors, dealers, or importers of firearms or ammunition for damages, injunctive or other relief resulting from the misuse of their products by others." Preamble to PLCAA (emphasis added).

The Act is broad in its scope. The breadth of the Act was the subject of significant debate in Congress. This case was used as an example by both proponents and opponents of the Act. All agreed that passage of the Act would not allow a case such as this to survive a motion

---

[2] Jachimczyk was also arrested and pleaded guilty to various offenses related to the incident. Second Amended Complaint at ¶ 79.

to dismiss.[3]  Among other immunity provisions, the Act requires immediate dismissal of all

pending actions for negligence and public nuisance, such as those underlying this complaint,

with limited, inapplicable exceptions.  This much was admitted by plaintiffs' counsel.

## RELEVANT CONGRESSIONAL FINDINGS AND PURPOSE

The Act enumerates the following Congressional findings:

> 5) Businesses . . . should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

PLCAA §§ 2(a)(5).

Congress listed the following as purposes of the Act:

3) To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed or intended.

4) To prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce.

PLCAA §§ 2(b)(3) & (b)(4).

Congress has unambiguously indicated its intention to end litigation against

manufacturers whose products are misused by third parties, in this case Guzman's murderer,

---

[3]  While the statement of a single legislator does not control the issue of legislative intent, combining it with those of other legislators and any Congressional committee reports constitutes some evidence. *See generally Chrysler v. Brown*, 441 U.S. 281, 99 S.Ct. 1905, 1722 (1979); *see also Boston Lic. Bd. v. Boston*, 17 Mass.App.Ct. 10, 16 (1983).  Although the defendant believes that the plain wording of the statute mandates immediate dismissal of this action, here, all legislative comments about the Act's effect on cases such as this, including comments by both supporters and opponents of the Act, in addition to Congressional committee testimony by ***Danny Guzman's own counsel***, Dennis Henigan, unequivocally state that Congress intended that the Act preempt cases such as this.  Accordingly, the defendant respectfully requests that the Court judicially notice the Act's legislative record and history, which includes the Floor testimony of various Senators and Representatives (exhibit 3) and the Congressional committee testimony of plaintiff Guzman's counsel (exhibit 4).  *Blue Hills Cem., Inc. v. Board of*

mandating dismissal of this action. *Liberty Cablevision of Puerto Rico, Inc. v. Caguas*, 417 F.3d 216, 220 (1st Cir. 2005).

## **ARGUMENT**

I.    THE ACT'S PLAIN LANGUAGE MANDATES DISMISSAL OF THIS ACTION

The PLCAA prohibits the institution of a "qualified civil liability action" in any state or federal court and provides that any such "action that is pending on the date of enactment of this Act shall be ***immediately*** dismissed by the court in which the action was brought or is currently pending." PLCAA, § 3(a) & (b) (emphasis added).  With limited inapplicable exceptions, discussed below, a "qualified civil liability action" is a "civil action . . . brought by any person against a manufacturer or seller of a [firearm or component parts of a firearm that have been shipped or transported in interstate or foreign commerce] . . . for damages, injunctive or declaratory relief, abatement, . . . or any other relief, resulting from [its] criminal or unlawful misuse." *Id.*, §§ 4(4) and 4(5).

This case falls squarely within the plain language of a "qualified civil liability action" barred by the PLCAA.  Defendant is a manufacturer whose component parts for firearms have been shipped or transported in interstate or foreign commerce.  *See* Second Amended Complaint at ¶ 32 ("The defendants at all times material hereto were the sole manufacturers of the Kahr Arms line of handguns");[4] Complaint at ¶ 36 ("At all times material hereto the defendants . . . did keep the handgun components and machinery necessary for production and shipment of finished

---

*Registration*, 379 Mass. 368, 477 (1979) ("Although there is no evidence in the record of legislative history, we may take judicial notice of such history").

[4] "At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did manufacture their Kahr Arms line of handguns under license by the United States Bureau of Alcohol, Tobacco and Firearms[.]")  Second Amended Complaint at ¶ 40.

Kahr handguns at 184 Prescott Street, Worcester, MA"); PLCAA, § 4(2)("The term

'manufacturer' means . . . a person who is engaged in the business of manufacturing the product

in interstate or foreign commerce and who is licensed to engage in business as such a

manufacturer under chapter 44 of title 18, United States Code").

As described in the Second Amended Complaint, this case is a wrongful death action

resulting from the criminal acts of third parties. "In October or November of 1999, Mr. Cronin[,

then an employee of the defendant, sold the] 9 millimeter handgun . . . to Robert Jachimczyk, in

exchange for one gram of cocaine – Mr. Jachimczyk in turn traded this firearm to a third party,

defendant Edwin Novas in exchange for heroin with deadly consequences. . . . [Novas] is a

fugitive from justice [for the murder of Mr. Guzman.]" Second Amended Complaint ¶ 81.

"Danny Guzman . . . was shot [by Novas] with the 9mm handgun defendant [Cronin] had easily

**stolen** from his employer, defendant Kahr Inc." *Id.* at ¶¶ 82 & 85 (emphasis added).

Additionally, plaintiffs seek recovery for public nuisance.[5] *Id.* at ¶¶ 134-139. In other words,

this case is a civil action for relief "resulting from the criminal or unlawful misuse" of firearms

or their components. *See* PLCAA, § 4(9) ("'unlawful misuse' means conduct that violates a

statute, ordinance, or regulation as it relates to the use of a qualified product").


<u>NONE OF THE ACT'S NARROW EXCEPTIONS APPLIES IN THIS CASE</u>

Because this case is a "qualified civil liability action" prohibited by the PLCAA,

defendant asks the Court to immediately dismiss the case, with prejudice, or grant judgment in

its favor.

---

[5] "The corporate defendants' conduct [caused] specific injury to decedent Daniel Guzman and
the plaintiffs by providing the criminal market with difficult to trace guns, knowing stolen guns
would likely be used in the commission of crimes." Second Amended Complaint at ¶ 137.

A qualified civil liability action shall not include:

> 1. An "action brought against a transferor convicted under section 924(h), of title 18, United States Code, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted."

The defendant has not been convicted under 18 U.S.C. Section 924(h) or any comparable statute. Plaintiff does not even so allege. The unambiguous language of 5(A)(i) refers only to entities that sell or transfer firearms to individuals who they *know* will use them in violent or drug trafficking crime. *See* 18 U.S.C. § 924(h). Here, plaintiffs admit that Cronin was criminally prosecuted for *stealing* the subject firearm. Second Amended Complaint ¶¶ 81 and 82. By definition, there was no sale. Moreover, nowhere in the Second Amended Complaint do plaintiffs plead, or even suggest, that the defendant *knowingly sold or transferred* the subject firearm *with knowledge* that it would be used to perpetrate violent and/or drug offenses. Instead, plaintiffs plead a negligence cause of action, which is explicitly barred by the Act.

> 2. An "action against a seller for negligent entrustment or negligence *per se.*"

The exception listed under 5(A)(ii) of the Act allows for lawsuits alleging "negligent entrustment" or "negligence *per se*" against the seller of a firearm. Here, plaintiffs do not allege a negligent entrustment or negligence *per se* cause of action. If plaintiffs subsequently allege these causes of action, they must fail because the defendant never entrusted the firearm or any component parts to Novas. Cronin entrusted the firearm to Jachimczyk, who in turn entrusted it to Novas.

The Act defines negligent entrustment as:

The supplying of a qualified product by a seller for use by another person when the seller knows or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.

6

Plaintiffs do not plead that the defendant sold the subject pistol to anyone; instead, they

acknowledge that it was stolen, *supra.*

Moreover, this Court previously dismissed plaintiffs' causes of action for negligent

hiring, which should doom any negligent entrustment theory of liability. The plaintiffs concede

that Cronin was not convicted of any of the charges brought against him in 1998 and 1999.

Second Amended Complaint at ¶ 61. Rather, the only crime for which Cronin was ever

convicted was "operating a vehicle after suspension of license." *Id.* United States Magistrate

Judge Charles Swartwood III decided, in a probable cause ruling attached to plaintiffs' Second

Amended Complaint, Exhibit 2, that Cronin had "no record of criminal convictions."

Plaintiffs fail under the negligence *per se* exception for yet another reason. While

negligence *per se* is understood as negligence based on the violation of a statute, regulation or

other law, Massachusetts law does not recognize negligence *per se* in the context of violation of

a statute:

> It has long been the rule . . . that violation of a statute does not by itself establish a
> breach of duty, for it does not constitute negligence *per se* . . . Rather, violation of
> a statute . . . is only 'some evidence' of the defendant's negligence as to all
> consequences the statute was intended to prevent.

*Bennett v. Eagle Brook Country Store, Inc.*, 408 Mass. 355, 358-59 (1990).

> 3. <u>An action in which a manufacturer or seller of a qualified product knowingly
> violated a State or Federal Statute applicable to the sale or marketing of the
> product, and the violation was a proximate cause of the harm for which relief is
> sought[.]</u>

To qualify for this exception to the Act's preemptive effect, plaintiff must show that a

"*statute applicable to the sale and marketing of [firearms or their components]*" was

*knowingly violated* by the defendants. PLCAA § 5(A)(iii). Because of plaintiffs' inability to

carry this burden, this action must be dismissed.

Plaintiffs identify one statute in the Second Amended Complaint, the Violent Crime Control and Law Enforcement Act of 1994. 18 U.S.C. § 923(g)(6) ("Each licensee shall report the theft or loss of a firearm from the licensee's inventory or collection, within 48 hours after the theft or loss is **discovered**, to the Secretary and to the appropriate local authorities"); (Pub.L. 103-322, § 110305, Sept. 13, 1994) (emphasis added); Second Amended Complaint ¶ 61.[6] This statute, however, imposes liability when a Federal Firearm Licensee ("FFL") fails to report the theft or loss of a firearm from its inventory within forty-eight (48) hours after **discovery** of the loss.    There is no allegation that the defendant **knew** that the firearm stolen by Cronin was missing and failed to report the loss upon discovery.

Plaintiffs do not plead, and cannot plead, that the defendants knew that any of these firearms were missing and failed to report this fact to the appropriate authorities within forty-eight (48) hours of discovery. Finally, the only firearm that proximately caused injury was the firearm stolen by Cronin, which was later used by Novas to shoot Maisonet and murder Guzman.[7] This firearm was stolen from the defendant.  Proximate cause is broken by Cronin's, Jachimczyk's, and Novas' criminal actions.  At best, plaintiffs suggest that the defendant was negligent in not tracking the other firearms, yet do not plead a knowing violation of a statute with respect to any firearm, let alone the one firearm that matters.

---

[6] This alleged statutory violation is not "applicable to the sale and marketing" of firearms. Statutes concerning lost firearms are manifestly different from statutes governing selling and marketing practices.  Nevertheless, because the defendant did not violate this statute as a matter of law, the following analysis is provided.

[7] The Kahr firearm alleged to have been used by Novas to murder Guzman was stolen by Cronin *before it was serialized* (Second Amended Complaint (¶¶ 45, 48 and 71) and, therefore, it could not have been one of the *serialized* firearms identified by plaintiff in 61¶ of the Second Amended Complaint.

8

Plaintiffs further argue that the defendant was negligent in failing to serialize the firearm, in transferring the firearm to a prohibited person, and in failing to implement "positive measures to prevent . . . unlawful transfer." Second Amended Complaint at ¶ 42. Again, these are allegations of negligence. Moreover, plaintiffs do not identify a single violation of any statute applicable to the sale and marketing of firearms. Nevertheless, each allegation is unsupportable on its merits.

Regulations require that manufacturers serialize firearms and record them <u>after completion</u>. This is obviously not possible when a firearm has been stolen <u>before</u> completion. Plaintiffs' allegations of lax security to prevent theft and the lack of a sophisticated inventory system do not trigger the statute's exception. These measures are not required by law or regulation. Instead, plaintiffs appear to be arguing that the failure to implement these measures made it less likely that the defendant would timely serialize a firearm, timely record a firearm, or timely report the theft of a firearm. At worst, it might constitute evidence that through alleged negligence, the full reach of the statute was not realized; it does not constitute any evidence of a knowing violation that proximately caused the harm in this case.

Cronin stole a frame ***during*** the manufacturing process. Further, plaintiffs admit that the subject firearm was ***stolen***. Second Amended Complaint at ¶ 80. Accordingly, by plaintiffs' own admission, the defendant could not have ***knowingly*** failed to serialize and record the non-existent firearm.

Finally, plaintiffs have argued that Cronin's background check should have disclosed that he was a prohibited transferee of a firearm. As a preliminary matter, there is no law that imposes a duty upon a firearms manufacturer to conduct background checks on employees or to have their employees submit to a drug test. Accordingly, even if Cronin's past made him a prohibited

purchaser, the defendant did not violate any statute. The defendant neither sold the subject

firearm to Cronin nor voluntarily transferred it to him. Additionally, plaintiff' allegations that

the defendant was negligent in its failure to conduct a background check when hiring Mr.

Cronin, forecloses any argument that the defendant was aware of Mr. Cronin's alleged criminal

history or past drug use and/or that the defendant *knowingly* violated any statute with regard to

its hiring and employment Mr. Cronin.[8]

> 4. <u>An action for breach of contract or warranty in connection with the purchase of the product</u>

This case does not concern these causes of action.

> 5. <u>An action . . . resulting directly from a defect in design or manufacture</u>

This case does not raise a products liability claim.

II.    <u>PLAINTIFFS, THROUGH COUNSEL, HAVE JUDICIALLY ADMITTED THAT THE ACT PREEMPTS ANY ACTION UNDER THE FACTS OF THIS CASE</u>

In sworn testimony before the United States Congress, Dennis A. Henigan, counsel of

record for these plaintiffs, testified as follows:

> Brady Center attorneys represent Danny Guzman's family in a wrongful death suit against Kahr Arms, charging Kahr with negligence in completely failing to screen its employees for criminal history and in maintaining a security system so inadequate that employees repeatedly were able to walk out of the plant with unserialized guns. In April, 2003, a Massachusetts trial judge denied Kahr's motion to dismiss the suit, finding it supported by general principles of Massachusetts law. It is now in pretrial discovery. ***Had immunity legislation been passed, the ruling of the Massachusetts court would have been nullified and Danny Guzman's family would be denied the right to justice*** against a gun

---

[8] Even if such a statutory violation was alleged (which plaintiff has not and cannot) it would not be "applicable to the sale and marketing" of firearms, thereby removing it from this exception to the PLCAA.

maker that allowed drug criminals to 'help themselves' to free lethal weaponry. Testimony of Dennis A. Henigan before the House Subcommittee on Commercial and Administrative Law in Opposition to Immunity Provisions of the Act, March 15, 2005, attached hereto as Exhibit 4.

Mr. Henigan's testimony before Congress properly characterizes this case as one brought in negligence; accordingly, it must be dismissed under the Act. Additionally, he admits that the Act immunizes the defendant from this suit. Mr. Henigan's testimony is not only significant because it properly frames the issues, but because it constitutes a judicial admission on behalf of his client.

Massachusetts recognizes the judicial admission. *See Turner Falls Ltd. Partnership v. Board of Assessors of Montague*, 54 Mass.App.Ct. 732 (2002). Massachusetts also recognizes that a lawyer can bind the client through representations made. *Id.* Here, there is compelling reason to bind plaintiffs to Mr. Henigan's testimony. Mr. Henigan was testifying before the United States Congress. He was testifying against a bill that he indicated would result in the dismissal of this action. This testimony, that an action of this type could not be sustained, entered the deliberative mix of the legislative body.[9] The defendant respectfully submits that it

---

[9] *See, e.g.,* Floor Statement of Senator Edward Kennedy: "If passed, the bill forces the dismissal of a lawsuit filed by the family of Massachusetts victim Danny Guzman[;]" Floor Statement of Senator Diane Feinstein: "[W]ith these proposed changes, the case against Kahr Arms would be dismissed. Floor Statement of Senator Richard Durbin: "Do you know what happens to that lawsuit by the family of Danny Guzman against that arms manufacturer if we pass this bill? It is immediately removed. They have no rights in court to pursue that[;]" Floor Statement of Senator Michael DeWine: "If this bill passes, however, the widow and children of Danny Guzman would be out of court[;]"Floor Statement of Senator Reed: this "legislation effectively denies people, such as the family of Danny Guzman, their day in court[.]" Speech of Hon. Cliff Stearns of Florida in the House of Representatives, October 20, 2005: "I want the Congressional Record to clearly reflect some specific examples of the type of predatory lawsuits this bill will immediately stop. The bill was drafted to require courts where these cases are pending or filed to dismiss them on their own motions, what the lawyers call *sua sponte*. One of the primary purposes of this

would be unreasonable to allow Mr. Henigan to testify before Congress that a measure would

result in the dismissal of this action, and then to argue before this Court that the passage of that

very measure does not result in the dismissal of this action.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests the immediate dismissal of

this action and all other relief that this Court deems just and proper.


Respectfully submitted,

**RENZULLI LAW FIRM**


John F. Renzulli, Esq. *Pro hac vice*
Christopher Renzulli, Esq. *Pro hac vice*
Christopher J. Sovak, Esq. *Pro hac vice*
300 East 42nd Street, 17th Floor
New York, New York 10017

(212) 599-5533 (tel.)
(212) 599-6385 (fax)

---

legislation is to not force defendants to incur the additional costs and delay of filing motions and arguing, and certainly not to go through costly trials and appeals of cases that the bill requires be dismissed forthwith. The predatory lawsuits that this bill will stop are an abuse of courts and law-abiding businesses and individuals…Yet another example is the cases of *Hernandez v. Kahr Arms and Maisonet v. Kahr* Arms pending in State court in Massachusetts. Here a manufacturer, Kahr Arms, whose products are used by law enforcement across America, is being sued for a criminal shooting at a well-known gang hangout with a long history of drug use, drug dealing and violence. The criminal shooting was committed with an unfinished, but functioning firearm assembled from individual parts that were stolen from the factory over time by an ex-employee. Following the incident, James A. McNally of the ATF Boston Field Office told the local newspaper that theft from reputable gun manufacturers such as Kahr Arms is relatively rare. He went on to say, ``[Kahr Arms] is the victim. They're not the problem.''--Worcester Telegraph& Gazette at p. 1, March 18, 2000.

and

**CORNELL & GOLLUB**

Peter M. Durney, Esq. BBO#: 139260
Patricia Hartnett, Esq. BBO# 568206
75 Federal Street
Boston, MA 02110
(617) 482-8100
Attorneys for SAEILO, INC. D/B/A
KAHR ARMS AND AUTO ORDNANCE CORP.

## CERTIFICATE OF TIMELY FILING AND SERVICE

I, Patricia A. Hartnett, attorney for the defendant Saeilo, Inc. d/b/a Kahr Arms Auto Ordnance ("Kahr Arms") hereby certify that on the 3rd day of November, 2005, a true copy of the foregoing of Memorandum In Support of Defendant's Motion to Dismiss or, In the Alternative, for Judgment on the Pleadings was served by first-class mail unless otherwise indicated, postage prepaid, directed to:

Hector E. Pineiro, Esq. (via overnight courier)
Robert H. Beadel, Esq.
Law Office of Hector Pineiro
807 Main Street
Worcester, MA 01610

Dennis Henigan, Esq.
Brian J. Siebel, Esq.
Daniel R. Vice, Esq.
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street NW, Suite 1100
Washington, DC 20005

William Rogers, Esq.
Arthur S. Wells, Esq.
Mirick, O'Connell
100 Front Street
Worcester, MA 01608

Robert N. Meltzer, Esq.
P.O. Box 1459
Framingham, MA 01701

John F. Renzulli, Esq.
Christopher Renzulli, Esq.
Christopher Sovak, Esq.
Renzullli, Pisciotti & Renzulli, LLP
300 East 42nd Street
New York, NY 10017

Jordan H. Weinstein, Esq.
Seymour Weinstein, Esq.
WEINSTEIN & WEINSTEIN
10 Mechanic Street
Worcester, MA 01608

Joseph J. Brennan, Jr., Esq.
285 Main Street
Worcester, MA 04608

John McCormack, Esq.
Sloane & Walsh
3 Center Plaza
Boston, MA 02108

John W. Steinmetz, Esq.
Brian P. McDonough, Esq.
Robinson & Cole LLP
One Boston Place
Boston, MA 02108

Samuel M. Furgang, Esq.
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
Boston, MA 02114

I hereby further certify that this document is filed within the time standards set forth in Standing Order 1-88 of the Superior Court Department.

Patricia A. Hartnett

# EXHIBIT 1

Westlaw.

2005 CONG US S 397                                              Page 1

109th CONGRESS, 1st Session

United States Library of Congress

S 397
Engrossed in Senate
July 29, 2005

S. 397

AN ACT

To prohibit civil liability actions from being brought or continued against manufacturers, distributors, dealers, or importers of firearms or ammunition for damages, injunctive or other relief resulting from the misuse of their products by others.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the 'Protection of Lawful Commerce in Arms Act'.

SEC. 2. FINDINGS; PURPOSES.

(a) Findings- Congress finds the following:
    (1) The Second Amendment to the United States Constitution provides that the right of the people to keep and bear arms shall not be infringed.
    (2) The Second Amendment to the United States Constitution protects the rights of individuals, including those who are not members of a militia or engaged in military service or training, to keep and bear arms.
    (3) Lawsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals.
    (4) The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act.
    (5) Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.
    (6) The possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 CONG US S 397                                                    Page 2

109th CONGRESS, 1st Session

constitutional right and civil liberty, invites the disassembly and
destabilization of other industries and economic sectors lawfully competing in the
free enterprise system of the United States, and constitutes an unreasonable
burden on interstate and foreign commerce of the United States.

(7) The liability actions commenced or contemplated by the Federal Government,
States, municipalities, and private interest groups and others are based on
theories without foundation in hundreds of years of the common law and
jurisprudence of the United States and do not represent a bona fide expansion of
the common law. The possible sustaining of these actions by a maverick judicial
officer or petit jury would expand civil liability in a manner never contemplated
by the framers of the Constitution, by Congress, or by the legislatures of the
several States. Such an expansion of liability would constitute a deprivation of
the rights, privileges, and immunities guaranteed to a citizen of the United
States under the Fourteenth Amendment to the United States Constitution.

(8) The liability actions commenced or contemplated by the Federal Government,
States, municipalities, private interest groups and others attempt to use the
judicial branch to circumvent the Legislative branch of government to regulate
interstate and foreign commerce through judgments and judicial decrees thereby
threatening the Separation of Powers doctrine and weakening and undermining
important principles of federalism, State sovereignty and comity between the
sister States.

(b) Purposes- The purposes of this Act are as follows:

(1) To prohibit causes of action against manufacturers, distributors, dealers,
and importers of firearms or ammunition products, and their trade associations,
for the harm solely caused by the criminal or unlawful misuse of firearm products
or ammunition products by others when the product functioned as designed and
intended.

(2) To preserve a citizen's access to a supply of firearms and ammunition for
all lawful purposes, including hunting, self-defense, collecting, and competitive
or recreational shooting.

(3) To guarantee a citizen's rights, privileges, and immunities, as applied to
the States, under the Fourteenth Amendment to the United States Constitution,
pursuant to section 5 of that Amendment.

(4) To prevent the use of such lawsuits to impose unreasonable burdens on
interstate and foreign commerce.

(5) To protect the right, under the First Amendment to the Constitution, of
manufacturers, distributors, dealers, and importers of firearms or ammunition
products, and trade associations, to speak freely, to assemble peaceably, and to
petition the Government for a redress of their grievances.

(6) To preserve and protect the Separation of Powers doctrine and important
principles of federalism, State sovereignty and comity between sister States.

(7) To exercise congressional power under art. IV, section 1 (the Full Faith
and Credit Clause) of the United States Constitution.

SEC. 3. PROHIBITION ON BRINGING OF QUALIFIED CIVIL LIABILITY ACTIONS IN FEDERAL OR
STATE COURT.

(a) In General- A qualified civil liability action may not be brought in any
Federal or State court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109th CONGRESS, 1st Session

   (b) Dismissal of Pending Actions- A qualified civil liability action that is
pending on the date of enactment of this Act shall be immediately dismissed by the
court in which the action was brought or is currently pending.

SEC. 4. DEFINITIONS.

  In this Act:
   (1) ENGAGED IN THE BUSINESS- The term 'engaged in the business' has the
meaning given that term in section 921(a)(21) of title 18, United States Code,
and, as applied to a seller of ammunition, means a person who devotes, time,
attention, and labor to the sale of ammunition as a regular course of trade or
business with the principal objective of livelihood and profit through the sale or
distribution of ammunition.
   (2) MANUFACTURER- The term 'manufacturer' means, with respect to a qualified
product, a person who is engaged in the business of manufacturing the product in
interstate or foreign commerce and who is licensed to engage in business as such a
manufacturer under chapter 44 of title 18, United States Code.
   (3) PERSON- The term 'person' means any individual, corporation, company,
association, firm, partnership, society, joint stock company, or any other entity,
including any governmental entity.
   (4) QUALIFIED PRODUCT- The term 'qualified product' means a firearm (as
defined in subparagraph (A) or (B) of section 921(a)(3) of title 18, United States
Code), including any antique firearm (as defined in section 921(a)(16) of such
title), or ammunition (as defined in section 921(a)(17)(A) of such title), or a
component part of a firearm or ammunition, that has been shipped or transported in
interstate or foreign commerce.
   (5) QUALIFIED CIVIL LIABILITY ACTION-
(A) IN GENERAL- The term 'qualified civil liability action' means a civil action
or proceeding or an administrative proceeding brought by any person against a
manufacturer or seller of a qualified product, or a trade association, for
damages, punitive damages, injunctive or declaratory relief, abatement,
restitution, fines, or penalties, or other relief' resulting from the criminal or
unlawful misuse of a qualified product by the person or a third party, but shall
not include--
(i) an action brought against a transferor convicted under section 924(h) of title
18, United States Code, or a comparable or identical State felony law, by a party
directly harmed by the conduct of which the transferee is so convicted;
(ii) an action brought against a seller for negligent entrustment or negligence
per se;
(iii) an action in which a manufacturer or seller of a qualified product knowingly
violated a State or Federal statute applicable to the sale or marketing of the
product, and the violation was a proximate cause of the harm for which relief is
sought, including--
(I) any case in which the manufacturer or seller knowingly made any false entry
in, or failed to make appropriate entry in, any record required to be kept under
Federal or State law with respect to the qualified product, or aided, abetted, or
conspired with any person in making any false or fictitious oral or written
statement with respect to any fact material to the lawfulness of the sale or other
disposition of a qualified product; or
(II) any case in which the manufacturer or seller aided, abetted, or conspired
with any other person to sell or otherwise dispose of a qualified product,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109th CONGRESS, 1st Session

knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18, United States Code;
(iv) an action for breach of contract or warranty in connection with the purchase of the product;
(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or
(vi) and action or proceeding commenced by the Attorney General to enforce the provisions of chapter 44 of title 18 or chapter 53 of title 26, United States Code.
(B) NEGLIGENT ENTRUSTMENT- As used in subparagraph (A)(ii), the term ' negligent entrustment' means the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.
(C) RULE OF CONSTRUCTION- The exceptions enumerated under clauses (i) through (v) of subparagraph (A) shall be construed so as not to be in conflict, and no provision of this Act shall be construed to create a public or private cause of action or remedy.
(D) MINOR CHILD EXCEPTION- Nothing in this Act shall be construed to limit the right of a person under 17 years of age to recover damages authorized under Federal or State law in a civil action that meets 1 of the requirements under clauses (i) through (v) of subparagraph (A).
   (6) SELLER- The term 'seller' means, with respect to a qualified product--
(A) an importer (as defined in section 921(a)(9) of title 18, United States Code) who is engaged in the business as such an importer in interstate or foreign commerce and who is licensed to engage in business as such an importer under chapter 44 of title 18, United States Code;
(B) a dealer (as defined in section 921(a)(11) of title 18, United States Code) who is engaged in the business as such a dealer in interstate or foreign commerce and who is licensed to engage in business as such a dealer under chapter 44 of title 18, United States Code; or
(C) a person engaged in the business of selling ammunition (as defined in section 921(a)(17)(A) of title 18, United States Code) in interstate or foreign commerce at the wholesale or retail level.
   (7) STATE- The term 'State' includes each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands, and any other territory or possession of the United States, and any political subdivision of any such place.
   (8) TRADE ASSOCIATION- The term 'trade association' means--
(A) any corporation, unincorporated association, federation, business league, professional or business organization not organized or operated for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual;
(B) that is an organization described in section 501(c)(6) of the Internal Revenue

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 109th CONGRESS, 1st Session

Code of 1986 and exempt from tax under section 501(a) of such Code; and
(C) 2 or more members of which are manufacturers or sellers of a qualified
product.
     (9) UNLAWFUL MISUSE- The term 'unlawful misuse' means conduct that violates a
statute, ordinance, or regulation as it relates to the use of a qualified product.

SEC. 5. CHILD SAFETY LOCKS.

   (a) SHORT TITLE- This section may be cited as the 'Child Safety Lock Act of
2005'.

   (b) PURPOSES- The purposes of this section are--
     (1) to promote the safe storage and use of handguns by consumers;
     (2) to prevent unauthorized persons from gaining access to or use of a
handgun, including children who may not be in possession of a handgun; and
     (3) to avoid hindering industry from supplying firearms to law abiding
citizens for all lawful purposes, including hunting, self-defense, collecting, and
competitive or recreational shooting.

   (c) FIREARMS SAFETY-
     (1) MANDATORY TRANSFER OF SECURE GUN STORAGE OR SAFETY DEVICE- Section 922 of
title 18, United States Code, is amended by inserting at the end the following:

   '(z) SECURE GUN STORAGE OR SAFETY DEVICE-
     '(1) IN GENERAL- Except as provided under paragraph (2), it shall be unlawful
for any licensed importer, licensed manufacturer, or licensed dealer to sell,
deliver, or transfer any handgun to any person other than any person licensed
under this chapter, unless the transferee is provided with a secure gun storage or
safety device (as defined in section 921(a)(34)) for that handgun.
     '(2) EXCEPTIONS- Paragraph (1) shall not apply to--
'(A)(i) the manufacture for, transfer to, or possession by, the United States, a
department or agency of the United States, a State, or a department, agency, or
political subdivision of a State, of a handgun; or
'(ii) the transfer to, or possession by, a law enforcement officer employed by an
entity referred to in clause (i) of a handgun for law enforcement purposes
(whether on or off duty); or
'(B) the transfer to, or possession by, a rail police officer employed by a rail
carrier and certified or commissioned as a police officer under the laws of a
State of a handgun for purposes of law enforcement (whether on or off duty); or
'(C) the transfer to any person of a handgun listed as a curio or relic by the
Secretary pursuant to section 921(a)(13); or
'(D) the transfer to any person of a handgun for which a secure gun storage or
safety device is temporarily unavailable for the reasons described in the
exceptions stated in section 923(e), if the licensed manufacturer, licensed
importer, or licensed dealer delivers to the transferee within 10 calendar days
from the date of the delivery of the handgun to the transferee a secure gun
storage or safety device for the handgun.
     '(3) LIABILITY FOR USE-
'(A) IN GENERAL- Notwithstanding any other provision of law, a person who has
lawful possession and control of a handgun, and who uses a secure gun storage or
safety device with the handgun, shall be entitled to immunity from a qualified

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109th CONGRESS, 1st Session

civil liability action.
'(B) PROSPECTIVE ACTIONS- A qualified civil liability action may not be brought in
any Federal or State court.
'(C) DEFINED TERM- As used in this paragraph, the term 'qualified civil liability
action'--
'(i) means a civil action brought by any person against a person described in
subparagraph (A) for damages resulting from the criminal or unlawful misuse of the
handgun by a third party, if--
'(I) the handgun was accessed by another person who did not have the permission or
authorization of the person having lawful possession and control of the handgun to
have access to it; and
'(II) at the time access was gained by the person not so authorized, the handgun
had been made inoperable by use of a secure gun storage or safety device; and
'(ii) shall not include an action brought against the person having lawful
possession and control of the handgun for negligent entrustment or negligence per
se.'.
        (2) CIVIL PENALTIES- Section 924 of title 18, United States Code, is amended--
(A) in subsection (a)(1), by striking 'or (f)' and inserting '(f), or (p)'; and
(B) by adding at the end the following:

    '(p) PENALTIES RELATING TO SECURE GUN STORAGE OR SAFETY DEVICE-
        '(1) IN GENERAL-
'(A) SUSPENSION OR REVOCATION OF LICENSE; CIVIL PENALTIES- With respect to each
violation of section 922(z)(1) by a licensed manufacturer, licensed importer, or
licensed dealer, the Secretary may, after notice and opportunity for hearing--
'(i) suspend for not more than 6 months, or revoke, the license issued to the
licensee under this chapter that was used to conduct the firearms transfer; or
'(ii) subject the licensee to a civil penalty in an amount equal to not more than
$2,500.
'(B) REVIEW- An action of the Secretary under this paragraph may be reviewed only
as provided under section 923(f).
    '(2) ADMINISTRATIVE REMEDIES- The suspension or revocation of a license or the
imposition of a civil penalty under paragraph (1) shall not preclude any
administrative remedy that is otherwise available to the Secretary.'.
        (3) LIABILITY; EVIDENCE-
(A) LIABILITY- Nothing in this section shall be construed to--
(i) create a cause of action against any Federal firearms licensee or any other
person for any civil liability; or
(ii) establish any standard of care.
(B) EVIDENCE- Notwithstanding any other provision of law, evidence regarding
compliance or noncompliance with the amendments made by this section shall not be
admissible as evidence in any proceeding of any court, agency, board, or other
entity, except with respect to an action relating to section 922(z) of title 18,
United States Code, as added by this subsection.
(C) RULE OF CONSTRUCTION- Nothing in this paragraph shall be construed to bar a
governmental action to impose a penalty under section 924(p) of title 18, United
States Code, for a failure to comply with section 922(z) of that title.

    (d) EFFECTIVE DATE- This section and the amendments made by this section shall
take effect 180 days after the date of enactment of this Act.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 CONG US S 397

109th CONGRESS, 1st Session

SEC. 6. ARMOR PIERCING AMMUNITION.

(a) Unlawful Acts- Section 922(a) of title 18, United States Code, is amended by striking paragraphs (7) and (8) and inserting the following:

'(7) for any person to manufacture or import armor piercing ammunition, unless--
'(A) the manufacture of such ammunition is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;
'(B) the manufacture of such ammunition is for the purpose of exportation; or
'(C) the manufacture or importation of such ammunition is for the purpose of testing or experimentation and has been authorized by the Attorney General;
'(8) for any manufacturer or importer to sell or deliver armor piercing ammunition, unless such sale or delivery--
'(A) is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;
'(B) is for the purpose of exportation; or
'(C) is for the purpose of testing or experimentation and has been authorized by the Attorney General;'.

(b) Penalties- Section 924(c) of title 18, United States Code, is amended by adding at the end the following:

'(5) Except to the extent that a greater minimum sentence is otherwise provided under this subsection, or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries armor piercing ammunition, or who, in furtherance of any such crime, possesses armor piercing ammunition, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime or conviction under this section--
'(A) be sentenced to a term of imprisonment of not less than 15 years; and
'(B) if death results from the use of such ammunition--
'(i) if the killing is murder (as defined in section 1111), be punished by death or sentenced to a term of imprisonment for any term of years or for life; and
'(ii) if the killing is manslaughter (as defined in section 1112), be punished as provided in section 1112.'.

(c) Study and Report-
(1) STUDY- The Attorney General shall conduct a study to determine whether a uniform standard for the testing of projectiles against Body Armor is feasible.
(2) ISSUES TO BE STUDIED- The study conducted under paragraph (1) shall include--
(A) variations in performance that are related to the length of the barrel of the handgun or center-fire rifle from which the projectile is fired; and
(B) the amount of powder used to propel the projectile.
(3) REPORT- Not later than 2 years after the date of enactment of this Act, the Attorney General shall submit a report containing the results of the study conducted under this subsection to--

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 CONG US S 397                                              Page 8

  109th CONGRESS, 1st Session

(A) the chairman and ranking member of the Committee on the Judiciary of the
Senate; and
(B) the chairman and ranking member of the Committee on the Judiciary of the House
of Representatives.

Passed the Senate July 29, 2005.

Attest:

Secretary.

109th CONGRESS

1st Session

                                S. 397
                                AN ACT
To prohibit civil liability actions from being brought or continued against
manufacturers, distributors, dealers, or importers of firearms or ammunition for
damages, injunctive or other relief resulting from the misuse of their products by
others.

2005 CONG US S 397

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                           WORCESTER SUPERIOR COURT
                                         CIVIL ACTION NO. 02-01747

JUANA HERNANDEZ, AS ADMINISTRATRIX )
OF THE ESTATE OF DANNY NICACIO or   )
DANNY GUZMAN, MARK ZARROW, ESQ. AS )
GUARDIAN OF TAMMY NICACIO,          )
AND GLENDA LEE PAGAN AS MOTHER AND )
NEXT FRIEND OF SELENA NICACIO,      )
              Plaintiffs            )        SECOND AMENDED
                                    )        COMPLAINT and
                                    )        DEMAND FOR JURY TRIAL
                                    )
                                    )
v.                                  )
                                    )
KAHR INC., D/B/A, KAHR ARMS, INC.,  )
KAHR AUTO ORDNANCE CORP.,           )
SAEILO, INC.,                       )
SAEILO MACHINERY MA, INC.,          )
SAEILO MACHINERY USA, INC.,         )
SAEILO MANUFACTURING INDUSTRIES,    )
MACHINE INDUSTRIES, INC.,           )
SAEILO EQUITY INVESTMENTS, LP       )
ONE UP ENTERPRISES, INC.,           )
MARK CRONIN,                        )
ROBERT JACHIMCZYK, and              )
EDWIN NOVAS,                        )
SCOTTSDALE INSURANCE COMPANY,       )
GENERAL STAR MANAGEMENT CO.,        )
UTICA MUTUAL INSURANCE CO.          )
              Defendants            )

This is a wrongful death action arising from the corporate defendants' negligence in operating a firearm manufacturing business.

## THE PARTIES

1. Plaintiff decedent, Danny Nicacio also known as Danny Guzman, a natural person who died on December 24, 1999, as a result of gunshot wounds, resided in Worcester, Worcester County, Massachusetts.

2. Plaintiff Juana Hernandez is the mother of decedent and the Administratrix of his estate, having been so appointed by order of the Probate Court in Worcester County on January 29, 2002. Exhibit 1. She sues in her representative capacity. She has her usual place of home and abode in Worcester, Worcester County, Massachusetts.

1

3.  At the time of his death, plaintiff decedent had sired two daughters, Selena Nicacio and Tammy Nicacio.

4.  Plaintiff Tammy Nicacio has a usual place of home and abode in Southbridge, Worcester County, Massachusetts.

5.  Plaintiff Selena Nicacio has a usual place of residence in Jayuya, Commonwealth of Puerto Rico. She was at all times material to this complaint a resident of Worcester, Worcester County, Massachusetts.

6.  Plaintiff Mark Zarrow, Esquire, is a duly licensed attorney in the Commonwealth of Massachusetts with a usual place of business at 34 Mechanic Street, Worcester, Worcester County, Massachusetts.

7.  Plaintiff Mark Zarrow, Esquire is the guardian of Tammy Nicacio by virtue of a decree ordered by the Worcester Probate and Family Court of The Massachusetts Trial Court on January 2, 2002. Exhibit 2.

8.  Plaintiff Glenda Lee Pagan is the Mother and Next friend of plaintiff Selena Nicacio, who resides in the Commonwealth of Puerto Rico. She is suing on behalf of her minor daughter.

9.  Defendant Kahr Inc. d/b/a Kahr Arms or Kahr Auto Ordnance is a wholly owned subsidiary of Saeilo, Inc., and was organized in the State of Delaware in 1994, according to the Foreign Corporation Certificate (hereafter "FCC") filed with the Office of the Massachusetts Secretary of State.

10. As of May 13, 1999, Kook Jin Moon held seventy-nine percent of Saeilo, Inc. stock (82% as of August 31, 1999). Saeilo, Inc. is the corporate parent of Kahr Inc. d/b/a Kahr Arms or Kahr Auto-Ordnance Corporation. According to an annual firearms manufacturing and export report of the Bureau of Alcohol, Tobacco and Firearms in 1998, Saeilo, Inc. manufactured 7,386 pistols, of which 5,414 were 9mm, two were .380 cal. and 1,970 were .50 cal.

11. Defendant Machine Industries, Inc. held eighteen percent of Saeilo, Inc. stock as of May 13, 1999. Machine Industries, Inc. is located at 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA. Robert Michael Runyon is president and director of Machine Industries, Inc. Mr. Runyon is also identified as a director of Saeilo, Inc. in that entity's Foreign Corporation Certificate filed with the Secretary of State of Massachusetts on March 18, 1999. His business address is listed as 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA.

12.    Defendant One Up Enterprises, Inc., also located at 7777 Leesburg Pike, Suite 406N, Falls Church, VA 22043, County of Fairfax, VA., is a holding company for Saeilo Inc. and Saeilo Machinery (USA), Inc. According to Dunn & Bradstreet, Robert Michael Runyon is and has been president of Defendant One Up Enterprises, Inc. from 1977 to present. One Up has over 10 wholly or majority owned subsidiaries. Two of the major ones are News World Communications, Inc. Washington D.C. and Ginseng Up Corporation, New York, NY, started in 1981.

13.    According to the Foreign Corporations Certificate ("FCC"), Kahr Inc.'s principal office is located at 630 Route 303, Blauvelt, New York 10913. Saeilo Equity Investments, LP also has its offices at 630 Route 303, Blauvelt, New York 10913. Its principal place of business is located at 184 Prescott St., Worcester, MA, and its assembly plant is located at 130 Goddard Memorial Drive, Worcester, MA.

14.    According to its FCC, Kahr Inc.'s president is Kook Jin Moon, whose residential address is 550 E. Sunnyside Lane, Irvington, NY 10533. Kahr Inc.'s Secretary and Treasurer is Soji Wada, whose residential address is listed as 5 Moody Street, Worchester (sic), MA 01606.

15.    According to the MA Foreign Corporation Annual Report (hereafter "FCAP"), certified 6/14/00, the president of Kahr Inc. is Frank Harris, whose business address is 201 Mountain View Ave. Wallkill, N.Y. 12589. Kook Jin Moon is named as Director and his business address is listed as 50 E Sunnyside Irvington, NY 10533. Kahr Inc.'s treasurer and clerk is Janet Wada with a business address of 48 Barnes Ave #3, Worcester, MA 01605. On the FCAP Kahr Inc.'s resident agent in the Commonwealth of Massachusetts is also listed as H/Q Corporate Services, Inc., 9 Crestway Road, E. Boston, MA 02128.

16.    Defendant, Saeilo, Machinery MA, Inc. became a duly organized corporation in the State of Delaware in 1987. The president of Saeilo, Machinery MA, Inc. is listed as Soji Wada of 161 Providence Street, Worcester, Worcester County, Massachusetts. The treasurer is Soji Wada of the same address. A major shareholder is One Up Enterprises, Inc. The resident Agent/Clerk of Saeilo, Machinery MA, Inc. is CT Corporation System of 101 Federal Street, Boston, MA 02110. Hereafter, reference to Saeilo will also mean Saeilo Manufacturing Industries, the entity's Internet marketing name.

17.    Defendant, Saeilo Machinery (USA), Inc. became a duly organized corporation in the State of New York in 1981. The president of Saeilo Machinery (USA), Inc. is listed as Soon Jung Hong of 36719 Ruschin Dr., Newark, CA. Also identified as president of Saeilo Machinery (USA), Inc. in a September 10, 1996 FFL Application to the BATF is David Konn. The treasurer of Saeilo Machinery (USA), Inc. is William Lee Flowers of 42-17 Bowne Street, Flushing, NY. The resident agent of this company is Chris Garcia of 184 Prescott Street, Worcester, Worcester County, Massachusetts.

18.    According to the Chief Financial Officer of Saeilo Machinery, (USA) Inc., in a September 19, 1997 letter to an Inspector of the Bureau of Alcohol, Tobacco and Firearms, The only significant shareholders of Saeilo Machinery are One Up Enterprises, Inc. and Saeilo (USA),

Inc. The only individual other than the officers and directors of Sae
exercises, "directly or indirectly, the power to direct or cause the dir
management and policies of the corporation..." as specified in 18 U.
923(d)(1)(B), is Kook Jin Moon, who has an ownership interest in S
president of Saeilo, Inc. an affiliate of Saeilo Machinery. A copy of
letter is attached as Exhibit 3.

19.    Defendant, Saeilo, Inc. became a duly organized corporation in the S
1992. Kook Jin Moon is listed as president with an address of 630 Rt
10913. Soji Wada of 184 Prescott Street, Worcester, Worcester Cour
listed as Treasurer, and the resident Agent/Clerk of this company is li
1205 Tucker Road, North Dartmouth, MA 02747.

20.    From approximately April of 1994, until August of 1999, defendants
(USA), Inc., Saeilo Machinery MA, Inc., Saeilo, Inc. and Kahr, Inc. n
place of business at 184 Prescott Street, and more recently at Goddar
Worcester, Worcester County, Massachusetts.

21.    From approximately August of 1999, until the present, defendants Sae
Inc., Saeilo Machinery MA, Inc., Saeilo, Inc. and Kahr, Inc. have mai
manufacture at 130 Goddard Memorial Drive, Worcester, Worcester C

22.    Defendant Robert Jachimczyk at all times relevant hereto had a princi
Jade Hill Rd., Auburn, MA.

23.    Defendant Mark Cronin at all times relevant hereto had a principal plac
Huntington Avenue, Apt. 1B, Worcester, MA.    At all times relevant to
Cronin was an employee of Kahr Arms, Inc., acting within the scope o

24.    Defendant Edwin Novas, identified as the shooter of decedent, at all tin
had a principal place of abode at 6 Elizabeth Street, Worcester, MA. M
large. A Grand Jury indictment concluded that Novas did shoot and kil
Danny Guzman and did also shoot Armando Maisonet, Jr. with said ha
24, 1999. This information is derived from Grand Jury Indictment No.

25.    On information and belief defendant Scottsdale Insurance Company, an
defendant per order of Justice Billings on April 23, 2004, is an Arizona
principal place of business in Scottsdale, Arizona that does business in t
Massachusetts. Scottsdale is an insurer of defendant Saeilo, Inc. d/b/a K
Manufacturing Industries (Insured amended to read SMI-MA Inc.)

26.    On information and belief defendant General Star Management Compan
a defendant per order of Justice Billings on April 23, 2004, is a Connecti
its principal place of business in Stamford Connecticut that does substan
Commonwealth of Massachusetts, and is an insurer of defendant Kahr A

4

27.    Based on information and belief defendant Utica Mutual Insurance Company is a Massachusetts corporation with offices at 401 Edgewater Place, Suite 200, Wakefield Massachusetts and an insurer of defendants Saeilo USA and Saeilo, Inc.

## JURISDICTION/LONG ARM STATUTE

28.    Jurisdiction against the corporate defendants is based on the Massachusetts Long Arm Statute.

## VENUE

29.    Venue in this action properly lies in Worcester or the next judicial district contiguous to where either of the parties lives pursuant to G.L. c. 223 ss. 2.

## FACTS

### KAHR INC. AND ALL CORPORATE DEFENDANTS

30.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 29 of the Complaint into the statement of facts.

31.    At all times material to this matter, the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did manufacture and sell handguns under the brand name of Kahr Arms.

32.    The defendants at all times material hereto were the sole manufacturers of the Kahr Arms line of handguns. Kahr Arms promotional literature displayed and distributed from the defendants' Internet web site describes these weapons as a patented line of compact, powerful and precision-engineered handguns. (Exhibit 4)

33.    Kahr Arms' promotional literature describes the defendants' handguns under a headline banner of the motto: "ABSOLUTE CONCEALED POWER." (Exhibit 4)

34.    Kahr Arms' promotional literature states that Kahr Inc. specializes in the manufacturing of .45 caliber, .40 caliber and 9mm handguns. (Exhibit 4)

35.    The Chief Designer of Kahr Inc., Justin Moon is a principal of the company according to company promotional materials. (Exhibit 4)

36.    The defendants' promotional literature boasts that Kahr Arms' weapons are the "the smallest, flattest, most reliable full power compact handguns made." (Exhibit 4)

5

37.  The defendants' promotional literature states that Kahr Arms incorporates "professional technical expertise into all of its operations" and "unmatched combination of power and performance."

38.  At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, had sole and exclusive possession and control of certain premises in the city of Worcester, Worcester County, Massachusetts, where they manufactured the Kahr Arms line of handguns.

39.  At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did keep the handgun components and machinery necessary for production and shipment of finished Kahr handguns at 184 Prescott Street, Worcester, MA and at 130 Goddard Memorial Drive, Worcester, MA and at no other place.

40.  At all times material hereto the defendants, acting by and through Kahr Inc. and by and through their agents and employees, did manufacture their Kahr Arms line of handguns under license by the Unites States Bureau of Alcohol, Tobacco and Firearms (hereafter "the BATF").

SERIAL NUMBERS AND GUN LICENSES

41.  The defendants' handgun manufacturing operation was, at all times material hereto, subject to various federal law and regulations the requirements of which include:

-  stamping or casting of a unique serial number into the frame of each handgun produced;
-  transfer of each handgun produced only to a person duly licensed to possess that individual weapon;
-  positive measures to prevent and detect the unlawful transfer within handgun manufacturing facilities of handguns to persons not licensed to possess them
-  reporting the theft or the unexplained disappearance from inventory of any handgun to the BATF.

42.  Typically, in Massachusetts, law enforcement authorities can trace the possession history of a legally owned handgun by means of the weapon's serial number and the owners' license records.

43.  The possession history of a handgun becomes more difficult after the weapon is stolen or if it does not have the required serial number.

44.  Thus, handguns not stamped with serial numbers have value to criminals because they do not implicate the registered owner when used in the commission of a crime.

RECOVERY OF STOLEN GUNS WITHOUT SERIAL NUMBERS TRACED TO KAHR ARMS

45.     **Recovery of Firearm #1** – In early December, 1999, officers of the Worcester Police Department, conducted a traffic stop of Robert Jachimczyk in Worcester, MA, and searched the vehicle. The police recovered, from underneath the front seat, a Kahr Arms K-40 .40 caliber handgun with a full magazine of ammunition. There was no serial number engraved or cast on the weapon. The police also recovered what they believed to be a small quantity of marijuana from the car. During a search incident to the arrest of the driver of vehicle, the police recovered what they believed to be small quantities of crack cocaine and powder cocaine.

46.     **Recovery of Firearm #2** - At the end of December, 1999, officers of the Worcester Police Department recovered a firearm from the yard of an apartment building in the vicinity of Main Street, in Worcester, MA. The firearm was found by a four-year-old child, who lived in the apartment building. The firearm had a round of ammunition in the chamber. The firearm was identified as a Kahr Arms 9mm handgun. There was no serial number engraved or cast on the weapon. See Memorandum of Probable Cause and Decision on Government's Motion for Detention, Criminal Action No. 00-1623-CBS, dated 3/23/00 and signed by The Honorable Charles B. Swartwood, III, Magistrate Judge. A Copy of that Memorandum is attached as Exhibit 5.

47.     Both recovered firearms, submitted by the Worcester Police Department to the Massachusetts State Police Firearms Identification Section, test-fired with no malfunctions noted.

48.     Detective James Heffernan, of the Worcester Police Department, has custody of both of recovered weapons in this case. Detective Heffernan told Special Agent Curran of the BATF that neither weapon has an engraved or cast serial number. Also, he told Special Agent Curran that the name "Kahr" is prominently displayed on the slide of each weapon.

49.     On March 13, 2000, Special Agent Curran observed both firearms and noted that there was no serial number or any marking on the receiver of the firearms. Special Agent Curran could see the name "Kahr" prominently displayed on the slide of both firearms.

## LACK OF THEFT PREVENTION MEASURES OR EMPLOYEE BACKGROUND CHECKS

50.     Upon information and belief, at all times material hereto, the defendants:
-   did not conduct criminal background or general background checks on prospective employees and hired persons with criminal records;
-   did not test present or prospective employees for indications of drug addiction;
-   did not safeguard handguns and their components with metal detectors, x-ray machines, or other devices capable of detecting handguns or components secreted on persons or in their effects;
-   did not have a security guard to check employees upon the completion of their shift to prevent theft of handguns or handgun components;
-   did not keep clear and current inventory tracking records which would timely reveal unauthorized removal of weapons or weapons parts from the premises;
-   did not supervise its employees/did not have television security cameras; and

7

- allowed individuals with criminal backgrounds and individuals addicted to illegal, controlled substances to work, manufacture, assemble and come in contact with handguns and handgun components

51.     It is logical and foreseeable that a gun manufacturing plant not employing human or mechanical devices (e.g. X-ray machines, metal detector machines, hand held metal detectors), not checking employees upon the conclusion of their work shift to prevent theft, allowing unqualified employees to participate in the assembly of manufacturing firearms, is more likely to suffer gun/gun component theft. It is equally foreseeable that stolen weapons from a Federal Firearms Licensee could end up being used in the commission of crimes.

52.     It is foreseeable that handguns lacking a serial number or handgun components not yet stamped with a serial number will be used in future crimes.

## CARELESS INVENTORY TRACKING AT KAHR ARMS

53.     On or about February 8, 1999, ATF Special Agent Michael P. Curran responded to Kahr Arms at 184 Prescott St. in Worcester, MA on a report of 10 lost firearms from a UPS shipment originating from Kahr Arms. The weapons shipped on December 17, 1998, did not arrive at the intended destination. Five of the missing weapons were 9mm. and five were .40 cal. Discussions between Special Agent Curran and Kahr Arms representatives revealed that in the year prior to February 8, 1999, there had been 15 or 16 shipments of firearms that never reached their intended destination.

54.     From February of 1998 to February of 1999, approximately 16 shipments of handguns from Kahr Arms to legal buyers failed to arrive at their points of destination and there has been no accounting for the weapons lost.

55.     In December 1998, Kahr reported to the United States Bureau of Alcohol, Tobacco and Firearms (BATF) that 10 handguns, which Kahr Arms had shipped from Worcester, MA did not reach their destination.

56.     According to one April 2, 2000, news article from the Worcester Sunday Telegram, "as many as 17 Kahr shipments may not have reached their destinations." In another article, dated April 29, 2000, Worcester Police Detective Capt. Paul F. Campbell said that, "going back to 1998, as many as 50 weapons manufactured at the plant may be missing. I'm just trying to find out how many are missing and what happened to them." In the same article, Shaun Sutner a Telegram & Gazette reported wrote about a reporter who "was able to proceed through the public entrance one recent afternoon without being greeted by a security guard or passing through a metal detector. The reporter signed the guest book, then waited unaccompanied for several minutes before a manager told him to leave the premises". In another instance, Kahr shipped a 'Tommy gun' that never arrived. Worcester Telegram & Gazette, May 11, 2000.

57.     Prior to April 1, 2000, Kahr did not use inventory-tracking records, which would timely reveal unauthorized removal/loss of weapons or weapons parts from its premises.

58.     On March 16, 2000, inspectors of the Federal Bureau of Alcohol, Tobacco and Firearms reviewed records of the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. The records indicated that the 9mm. handgun bearing serial number GC0913 was theoretically still in Kahr's secured weapons inventory, though it had already been stolen by Scott Anderson.

59.     On March 16, 2000, the Worcester Police Department confirmed security problems at the Kahr Arms facility had been discovered and Kahr had been ordered by WPD to take corrective action. Among the shortcomings the department identified were unsecured storage of handgun components, and inadequate tracking of handgun components.

60.     On or about April 1, 2000, Captain Paul F. Campbell of the Worcester Police Department who was responsible for overseeing corrections to Kahr Arms security system stated that the department had found record keeping at the Kahr Arms plant at 130 Goddard Memorial Drive to be so "shoddy" that it was possible to remove handguns from inventory without detection. At all times material weapons were stolen because of Kahr's shoddy inventory system that allowed criminals to steal weapons without detection.

61.     The Violent Crime Control and Law Enforcement Act of 1994 included a requirement for Federal Firearm Licensees to report theft or loss of firearms from their inventory or collection to the ATF and local law enforcement within forty-eight (48) hours after discovery. However, not until April 7, 2000, and April 8, 2000, did Kahr Inc.'s Randall Cassidy report to the Worcester Police Department and to the Bureau of Alcohol, Tobacco & Firearms that forty-one (41) handguns manufactured years earlier with serial numbers were missing from the inventory of the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. These include but are not limited to: three 9mm handguns made between 10/3/95 and 12/19/95; nine 9mm handguns and one .40 cal. made between 1/17/97 and 8/21/97; one 9mm made in 1998, three 9mm made between 1/20/99 and 9/23/99 and one .40 cal made on 7/19/99. (Exhibit 6).

62.     At all times material to this matter, the defendants' inventory tracking system at the Kahr Arms plant in Worcester did not reveal the unauthorized removal of weapons or weapon components from the inventory. In particular, the inventory system did not safeguard against illicit removal of weapons before identification numbers were engraved or cast into them as required by law before such firearms can be released into the stream of commerce.

MARK CRONIN

63.     On or about March of 1999, the defendants, acting by and through Kahr, Inc., did hire one Mark M. Cronin to work at the Kahr Arms manufacturing facility in Worcester.

64.     Public Court records revealed that Mr. Cronin had previously been arrested on various charges and had an extensive criminal background:
-       Probate and Family Court records indicate that as early as December, 1995, Mr. Cronin was addicted to cocaine and was habitually stealing money to support his cocaine habit.

- In addition, in the Complaint for Divorce filed on or about July 2, 1996, Stephanie Cronin alleges, among other things, that "On or about December, 1995, the defendant (Mark Cronin) had a serious addiction to (crack)."
- Assault and battery in March of 1998, in Worcester. The case was continued without a finding, on condition that Mr. Cronin undergo assessment and counseling for alcohol abuse.
- Domestic assault and battery in November of 1997 in Worcester. The case was continued without a finding after the defendant admitted to facts sufficient to prove the charge, on condition that he seek counseling for anger management.
- In 1998, an operating under the influence charge was continued without a finding (1 year probation, 24D Program)
- Also in 1998 Cronin filed a guilty plea to operating vehicle after suspension of license.
- Also in 1998 a charge of giving a false name to a police officer was dismissed.
- On July 29, 1999 Stephanie Cronin filed a complaint in the Worcester Division of the Commonwealth of Massachusetts, Probate and Family Court, against Mark Cronin, Defendant. The complaint alleges, among other things, that Mark Cronin violated a previous order of support by "not reporting new 2nd job as well as overtime at current position at Saeilo on Prescott St. in Worcester."

65.    These records of prior arrests were public records that were readily available to the agents, servants and employees of the defendants to determine whether Mr. Cronin was suitable for employment at their handgun manufacturing facility and to determine whether, under federal law, his criminal record disqualified him from such employment. Section 922 of the Gun Control Act of 1968, Public Law 90-618, Title 18, U.S. Code (which would have been in effect in 1999), makes it unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year or been convicted in any court of a misdemeanor crime of domestic violence, to ship, transport or possess any firearm or ammunition or to receive any firearm or ammunition. Clearly, the policy behind this law is to prevent criminals like Mr. Cronin from handling handguns. A simple record review would have revealed that Mr. Cronin should not be working in a gun manufacturing facility.

## A COOPERATING WITNESS (JACHIMCZYK) LEADS INVESTIGATORS TO KAHR EMPLOYEE, MARK CRONIN

66.    On or about December 2, 1999, the Worcester Police Department recovered a loaded Kahr Arms .40 caliber handgun with no serial number from a motor vehicle in the possession of one Robert Jachimczyk.

67.    According to Docket 9962CR012118, on or about December 2, 1999, before Judge Elliott L. Zide, Robert W. Jachimczyk was charged with the following offenses: 1) Possession of Cocaine; 2) Possession of Marijuana; 3) possession of a Kahr .40 cal. handgun with one full magazine without a Firearm ID; 4) operating a motor vehicle with a suspended license; 5)

Failed to use care, in violation of C9 18 of the City or town of Worcester. An additional count for 269/10/J Firearm, Carry without a license c 269 Section 10 was dismissed upon the Commissioner's request.

68.   In or about December, 1999, ATF Special Agent Curran was contacted by the Worcester Police Department, in relation to the recovered firearms and had an opportunity to interview a Cooperating Witness (Jachimczyk).

69.   On or about December 29, 1999, Jachimczyk provided Special Agent Curran with the following information in relation to firearms. On evening of December 1, 1999, Jachimczyk exchanged two "half grams" of cocaine, valued at approximately $80, for a firearm which was provided to Jachimczyk by Mark Cronin (hereinafter Cronin). Jachimczyk has known Cronin for several years.

70.   Jachimczyk reported that shortly after obtaining the firearm from Cronin, the weapon was seized by the Worcester Police Department in the course of a traffic stop. Jachimczyk went on to provide additional information about an earlier transaction involving Cronin in which Cronin provided a seven shot 9mm firearm to Jachimczyk in exchange for approximately $80 worth of cocaine. This weapon, as well, did not have a serial number. This exchange took place a few months earlier than the December, 1999 exchange. Jachimczyk traded the 9mm to a third-party, in exchange for two bundles of 'dope' [heroin].

71.   On or about March 3, 2000, Jachimczyk provided Special Agent Curran with the following information. Specifically, in November 1999, Cronin approached Jachimczyk at the Green Island Pub in Worcester, MA, and asked Jachimczyk if he would like to buy a firearm. Cronin told Jachimczyk he worked at a local firearm manufacturer. Cronin told Jachimczyk that he had taken the firearm out of the company, that he "does it all the time, and that [he] can just walk out with them." Cronin told Jachimczyk that the firearm he had for sale does not have a serial number because it bypassed the serial number stamping process at the factory. Cronin told Jachimczyk that the firearm was a 9mm caliber. Cronin told Jachimczyk that he knew the firearm functioned because he test-fired it at work. Jachimczyk and Cronin went to a Worcester residence where Jachimczyk was staying, and made the exchange.

72.   Jachimczyk provided Cronin with 2 'half grams' of powder cocaine in exchange for the 9mm Kahr Arms firearm. After the exchange, Cronin drove Jachimczyk to a third-party's house, at which point Jachimczyk went into an apartment where he traded the firearm to a third-party for 2 bundles of heroin. Cronin stayed in the car during this transaction. Following the exchange, Jachimczyk returned to the car operated by Cronin.

73.   Again, in connection with the proffer agreement, Jachimczyk provided information in relation to a second transaction with Cronin. On December 1, 1999, Cronin came into the Green Island Pub and asked Jachimczyk if he wanted to purchase another firearm. Cronin stated that it was a bigger firearm, a .40 caliber, and it was his personal gun. Jachimczyk and

Cronin agreed to trade two 'half grams' of cocaine for the firearm. Cronin left the bar and returned shortly thereafter with the firearm. Cronin stated that he had to go home and get the firearm.

74. Cronin returned to the bar a short while later and showed Jachimczyk the firearm. Jachimczyk and Cronin left the bar and left in the car operated by Jachimczyk. A short distance from the bar, Cronin removed a safety lock from the weapon and gave the firearm to Jachimczyk, who placed it under the front seat of the car. Jachimczyk gave Cronin 2 'half-grams' of powder cocaine, as well as a crack cocaine rock, in exchange for the firearm. Following the exchange, Jachimczyk and Cronin drove back to the bar. Cronin went inside the bar, leaving Jachimczyk outside in the car.

75. Shortly thereafter, the Worcester Police Department stopped the car operated by Jachimczyk and recovered a firearm from underneath the front seat. Jachimczyk was provided with a photocopy of a photograph of Cronin and identified the person depicted as Mark Cronin.

76. Jachimczyk has a criminal record. In addition to the offenses described above, in 1995, Jachimczyk was arrested for possession of marijuana and operating under the influence of liquor. Both charges were dismissed. Jachimczyk has history of drug use, including the use of heroin, cocaine, crack, and marijuana. In addition, Jachimczyk has distributed controlled substances and supplied various customers in the past.

77. Law enforcement agents provided Jachimczyk with a hidden recording device, which enabled law enforcement agents to monitor and record conversations between Jachimczyk and others. On March 8, 2000, at the direction of law enforcement, Jachimczyk went to Cronin's apartment and engaged Cronin in a conversation in relation to the firearms, which Cronin provided to Jachimczyk. Jachimczyk told Cronin that Jachimczyk and Jachimczyk 's friend had been subpoenaed to provide information in relation to the origin of the firearms. Among other things, Cronin encouraged Jachimczyk to falsely tell authorities that Jachimczyk obtained "the gun off some guy off the street."

78. Cronin admitted in the tape recording that he provided Jachimczyk with the guns: "[G]ranted, I shouldn't have got you the gun, but second of all it's not like the minute you asked me you got it. It was a couple of months in between from that second from that next gun." Also, during the conversation, Cronin removed from a nearby bureau a loaded magazine and demonstrated that a magazine holds six rounds of ammunition.

79. Because of his cooperation in convicting Cronin, on October 30, 2000, Jachimczyk received the following sentences for his crimes:

Drug possession class B: guilty plea, sentenced to pre trial probation consisting of 6 months in House of Corrections, 12 days to serve, balance suspended until 10/23/02

Class D: guilty plea, sentenced to pre trial probation consisting of 6 months in House of Corrections, 12 days to serve, balance suspended until 10/23/02

Carrying firearm without a license c. 269 Section 10 (which carries a mandatory jail term of a year in House of Correction for a first offense): dismissed upon request of Commonwealth

Carrying firearm without a federal ID card Section 10(G): guilty plea – 6 mo. House of Correction, 12 days to be served, credit time served/ balance suspended and 2 years probation

Ultimately, in violation of his probationary terms, Jachimczyk was reprobated on June 13, 2001.

80.    On or about March 16, 2000, Mark Cronin was arrested on charges of stealing handguns from the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester. He later pleaded guilty and was convicted.

81.    In summary, in mid-October of 1999, Mark Cronin did in the course of his employment at the defendants' Worcester plant, obtain a Kahr Arms 9 millimeter handgun with no identification numbers cast or engraved into the body of the gun.

79.    Mr. Cronin obtained the 9mm in violation of federal and state law and as a direct and proximate result of defendants' failure to have such reasonable measures in place for the prevention, deterrence, or detection of handgun theft as are prevalent throughout the handgun manufacturing industry in Massachusetts and the United States - metal detectors, X-ray scanners, effective inventory tracking, etc. In addition, defendant Kahr Arms failed to adequately supervise or monitor him.

80.    By his own admissions and as shown by other evidence in the federal district court, Mr. Cronin removed the 9mm handgun from the Kahr Arms facility in Worcester with the intent of exchanging it for crack cocaine.

81.    In October or November of 1999, Mr. Cronin introduced the 9 millimeter handgun into the stream of commerce, selling the stolen gun to Robert Jachimczyk, in exchange for one gram of cocaine - Mr. Jachimczyk in turn traded this firearm to a third party, defendant Edwin Novas in exchange for heroin with deadly consequences. The identity of this third party is unknown to the plaintiff but upon information and belief the party was Edwin Novas, a Dominican national, who is a fugitive from justice. Mr. Novas had had numerous encounters with the criminal justice system in the Commonwealth of Massachusetts months before December 24, 1999.

<u>DANNY GUZMAN IS KILLED WITH A STOLEN KAHR ARMS HANDGUN</u>

82.    On December 24, 1999, at approximately 1:54 a.m., Danny Guzman, an innocent bystander, was shot in the 800 block of Main Street in Worcester in front of the Tropigala nightclub with the 9 mm handgun defendant Cronin had easily stolen from his employer, defendant Kahr Inc. Tragically, Danny Guzman was pronounced dead at St. Vincent's Hospital in Worcester, Massachusetts at approximately 0212 of a single gunshot wound to the chest which created two (2) holes in his heart – one entrance, one exit. The attending physicians listed the mechanism of injury as a "? 9 mm bullet".

83.    At the time of this senseless and preventable homicide, Kahr Arms manufactured 13 different types of 9 mm handguns.

84.    On or about December 30, 1999, the Worcester Police Department recovered a loaded Kahr Arms 9 millimeter handgun (similar to the 7 round magazine K9 model) with no serial number in a lot on Benefit Street in Worcester, near the place where Mr. Guzman was shot. The gun was found by a four year old child. Ballistics tests determined that this very Kahr handgun fired the shot that struck and killed Danny Guzman. A photo of a K9 model 9 mm is attached as Exhibit 7.

85.    On March 23, 2000, the Honorable Charles B. Swartwood, III, found in his Memorandum of Probable Cause and Decision of Government's Motion For Detention and Findings of Fact at paragraphs 1,2,3,4 and 5 that the 9mm firearm used in the homicide of Danny Guzman was the Kahr Arms 9mm provided by Cronin. Specifically at paragraph 2, Judge Swartwood, III writes, "In late December 1999, a four year old child found a loaded 9 mm Kahr firearm in the yard of an apartment building in the vicinity of Main Street, Worcester, MA. This weapon was traced to a homicide outside the Tropicala (sic) Night Club located in the Main South area of Worcester." Exhibit 5 at p. 2.

86.    As late as September 2000, the WPD continued with its active investigation into handguns lost or stolen from Kahr Arms at 130 Goddard Memorial Drive, Worcester, Massachusetts.

SCOTT ANDERSON- ANOTHER KAHR EMPLOYEE PLEADS GUILTY TO STEALING GUNS FROM KAHR

87.    On or about March of 1999, the defendants, acting by and through Kahr, Inc., did hire one Scott R. Anderson to work at the Kahr Arms manufacturing facility in Worcester.

88.    On March 16, 2000, ATF Agents and Worcester Police Department officers, in connection with an investigation regarding firearm thefts from Kahr Arms, interviewed Scott Anderson, a Kahr Arms employee.

89.    ATF Special Agent Thomas Lyster and Worcester Police Department Captain Paul Campbell interviewed Anderson in a conference room at Kahr Arms. Special Agent Lyster advised Anderson that he was implicated in the theft of firearms at Kahr Arms, and he told Anderson that he was not under arrest.

90.    Anderson admitted stealing a Kahr Arms handgun approximately four or five months before

the interview (March 16, 2000). Anderson said that the handgun was in a box in his bedroom closet. Anderson admitted that he stole a slide for another Kahr Arms handgun that he had legally purchased. Anderson provided a written statement to law enforcement and admitted taking the Kahr Arms handgun and slide from his place of employment, Kahr Arms.

91.   Following the interview, ATF Agents accompanied Anderson to his residence. Anderson gave verbal consent and also signed a form authorizing ATF Agents to enter and search his apartment. After signing the agreement, Anderson brought ATF Agents Thomas Lyster and Seref McDowell into his apartment. Anderson retrieved a Kahr Arms semi-automatic handgun, model MK9 9mm, serial number GC0913, and an additional slide for a Kahr Arms model K9 handgun that was unlawfully taken from Kahr Arms. Anderson turned over firearm and additional slide to Special Agent Lyster.

92.   On March 16, 2000, special agents of the Federal Bureau of Alcohol, Tobacco and Firearms interviewed Scott Anderson. Anderson confessed that he had stolen a 9mm. Kahr Arms handgun and a major handgun component from the Kahr Arms plant. The BATF agents recovered such a weapon, bearing serial number GC0913, from Mr. Anderson's home.

93.    On April 27, 2000, Scott Anderson was charged in the U. S. Massachusetts District Court, with stealing a 9mm handgun from the Kahr Arms plant at 130 Goddard Memorial Drive, Worcester, Massachusetts. Anderson pleaded guilty. On March 20, 2001, he was sentenced to nine months home detention as part of a three-year probation for stealing the firearm.

### COUNT I – KAHR INC., D/B/A. KAHR ARMS, INC. or KAHR AUTO ORDNANCE GROSS NEGLIGENCE/ NEGLIGENT HIRING AND SUPERVISION/ RESPONDEAT SUPERIOR/WRONGFUL DEATH. G.L. c.229, Section 2

94.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 93.

95.    As a result of Kahr Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

96.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

97.    As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT II – SAEILO, INC. GROSS NEGLIGENCE/ NEGLIGENT HIRING AND SUPERVISION/ RESPONDEAT SUPERIOR/WRONGFUL DEATH. G.L. c.229, Section 2

98.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 97.

99.    As a result of Saeilo, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

100.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

101.    As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

COUNT III – SAEILO MACHINERY MA, INC.
WRONGFUL DEATH, G.L. c.229, Section 2

102.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 101.

103.    As a result of Saeilo Machinery MA, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

104.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

105.    As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

COUNT IV - SAEILO MACHINERY USA, INC.
WRONGFUL DEATH, G.L. c.229, Section 2

106.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 105.

107.    As a result of Saeilo Machinery USA, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

108.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

109.    As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

## COUNT V - SAEILO MANUFACTURING INDUSTRIES
## WRONGFUL DEATH, G.L. c.229, Section 2

110.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 109

111.    As a result of Saeilo Manufacturing Industries' wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

112.    As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

113.    As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT VI - MACHINE INDUSTRIES, INC.
### WRONGFUL DEATH, G.L. c.229, Section 2

114.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 113

115.    As a result of Machine Industries, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

116.    As a direct and proximate result, an unlicensed, serial number-less 9 mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

117.    As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT VII - SAEILO EQUITY INVESTMENTS, LP
### WRONGFUL DEATH, G.L. c.229, Section 2

118.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 117

119.   As a result of Saeilo Equity Investments, LP's wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

120.   As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

121.   As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

## COUNT VIII - ONE UP ENTERPRISES, INC.
## WRONGFUL DEATH, G.L. c.229, Section 2

122.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 121.

123.   As a result of One Up Enterprises, Inc.'s wanton, reckless, and grossly negligent conduct, including, but not limited to, failing to implement reasonable safeguards to prevent theft of guns and gun components, ignoring industry standards for preventing theft of guns and gun components, ignoring industry standards for inventory control, failing to conduct rudimentary background checks and failing to supervise employees, and failing to report stolen firearms, Kahr Inc. employees were able to remove untraceable handguns and components from defendants' facilities in Worcester, MA undetected, and place them in the stream of commerce.

124.   As a direct and proximate result, an unlicensed, serial number-less 9mm Kahr Arms handgun was introduced into the stream of commerce by a Kahr Inc. employee, and was instrumental in the death of Daniel Guzman or Daniel Nicacio.

125.   As a direct and proximate result, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT IX – EDWIN NOVAS
### NEGLIGENCE/HOMICIDE/WRONGFUL DEATH
### GEN. LAWS c.229, Section 2

126.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 125.

127.   As a direct and proximate result of the carelessness and negligence of Edwin Novas, who negligently or intentionally discharged a Kahr 9mm handgun, Daniel Guzman suffered grievous injury and eventual death, and the daughters of Daniel Guzman, and Juana Hernandez, individually, have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT X – MARK CRONIN
### NEGLIGENCE/WRONGFUL DEATH
### GEN. LAWS c.229, Section 2

128.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 127.

129.   As a direct and proximate result of the carelessness and negligence of Mark Cronin, who negligently intentionally placed a Kahr 9mm handgun into the stream of commerce, when it was likely and foreseeable that it would be used in a crime, Daniel Guzman suffered grievous injury and eventual death, and the daughters of Daniel Guzman, and Juana Hernandez, individually, have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT XI – ROBERT JACHIMCZYK
### NEGLIGENCE/WRONGFUL DEATH
### GEN. LAWS c.229, Section 2

130.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 129.

131.   As a direct and proximate result of the carelessness and negligence of Robert Jachimczyk, who negligently intentionally placed a Kahr 9mm handgun into the stream of commerce, when it was likely and foreseeable that it would be used in a crime, Daniel Guzman suffered grievous injury and eventual death, and the daughters of Daniel Guzman, and Juana Hernandez, individually, have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death, and the estate is entitled to compensation for decedent's pain, suffering and awareness of impending death, medical and burial expenses, loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance and counsel sustained by decedent's next of kin and for the plaintiff's shock, emotional pain and suffering such as caused physical injury and disability, and for punitive damages commensurate with said reckless and wanton conduct.

### COUNT XII – ALL DEFENDANTS
### JOINT AND SEVERAL LIABILITY

132.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 131 into this count.

133.   As direct result of the joint negligence of the defendants in this action, Daniel Guzman, the estate of Daniel Guzman, the daughters of Daniel Guzman, and Juana Hernandez have suffered damages, including damages separate from Daniel Guzman's pain and suffering and eventual death.

### COUNT XIII - KAHR INC., D/B/A. KAHR ARMS, INC. or KAHR AUTO ORDNANCE and
### SAEILO, INC.
### PUBLIC NUISANCE

134.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 133 into this count.

135.   Kahr Arms' utter lack of security and lax practices have caused injury to the public, and specific injury to decedent Daniel Guzman and the plaintiffs by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

136.   Kahr Arms' behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT XIV – ALL CORPORATE DEFENDANTS
## PUBLIC NUISANCE

137.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 136 into this count.

138.    The corporate defendants' utter lack of security and lax practices have caused injury to the public, and specific injury to decedent Daniel Guzman and the plaintiffs by providing the criminal market with difficult-to-trace guns, knowing stolen guns would likely be used in the commission of crimes.

139.    This behavior constitutes an unreasonable interference with a public right, because the aforementioned conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, the public convenience, and the safety of the plaintiff and thus by definition amounts to a public nuisance.

## COUNT XV
## UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)
## SCOTTSDALE INSURANCE COMPANY ("SCOTTSDALE")

140.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 139 into this count.

141.    Scottsdale's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

142.    Scottsdale has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

143.    Plaintiff suffered damages as a result of Scottsdale's unfair or deceptive conduct.

## COUNT XVI
## UNFAIR INSURANCE PRACTICES UNDER G.L.c.93A
## SCOTTSDALE INSURANCE COMPANY ("SCOTTSDALE")

144.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 143 into this count.

145.    Scottsdale's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

146.   Plaintiff contends Scottsdale is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

147.   Scottsdale has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

148.   Plaintiff has suffered damages as a result of Scottsdale's unfair or deceptive conduct.

## COUNT XVII
### UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)
### GENERAL STAR MANAGEMENT COMPANY ("GENERAL STAR")

149.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 148 into this count.

150.   General Star's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

151.   General Star has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

152.   Plaintiff has suffered damages as a result of General Star's unfair or deceptive conduct.

## COUNT XVIII
### UNFAIR INSURANCE PRACTICES UNDER G.L.C.93A
### GENERAL STAR MANAGEMENT COMPANY ("GENERAL STAR")

153.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 152 into this count.

154.   General Star's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

155.   Plaintiff contends General Star is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

156. General Star has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

157. Plaintiff has suffered damages as a result of General Star's unfair or deceptive conduct.

COUNT XIX

UNFAIR INSURANCE PRACTICES UNDER G.L.C.176D, SECTION 3(9)

UTICA MUTUAL INSURANCE COMPANY ("UTICA")

158. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 157 into this count.

159. Utica's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.176D, Section 3(9)(f).

160. Utica has never made a formal offer to the plaintiff despite plaintiff's severe injuries and despite the fact that liability is reasonably clear.

161. Plaintiff has suffered damages as a result of Utica's unfair or deceptive conduct.

COUNT XX

UNFAIR INSURANCE PRACTICES UNDER G.L.C.93A

UTICA MUTUAL INSURANCE COMPANY ("UTICA")

162. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 161 into this count.

163. Utica's failure to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

164. Plaintiff contends Utica is in violation of M.G.L.c.93A—i.e. for failure to effectuate prompt, fair and equitable settlement of a claim in which liability has become reasonably clear, and such behavior constitutes unfair or deceptive conduct within the meaning of G.L.c.93A.

165. Utica has never made a formal offer to plaintiff despite his severe injuries and despite the fact its liability has become reasonably clear.

166. Plaintiff has suffered damages as a result of Utica's unfair or deceptive conduct.

COUNT XXI
REQUEST FOR DECLARATORY DETERMINATIONS UNDER G.L.c.231a

167.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 166 into this count.

168.   Plaintiff has been informed by representatives of Scottsdale and Utica that coverage is being denied Kahr Arms et al. relative to the instant action, on the basis of various alleged exclusions contained in their respective policies of insurance.

169.   Scottsdale and Utica contend there is no coverage afforded their respective insureds on grounds that a so-called "completed product" exclusion applies.

170.   A real controversy has arisen as to whether or not this exclusion applies in the instant dispute.

171.   On information and belief, after carefully reviewing the policies of both carriers (Scottsdale and Utica) plaintiff believes that the exclusion claimed has no merit.

172.   Plaintiff is requesting that the Court make a determination regarding the application of the exclusion and consequently the obligations of the insurers Scottsdale and Utica.

173.   Also, plaintiff hereby requests a binding declaration by this Court that General Star's eroding policy of insurance, which is being used to finance Kahr's defense in this action, not be further depleted by: 1) any work or appearances related to disputes of insurance coverage; and 2) any work or appearances related to defense of plaintiff's 93A claims.

DEMANDS FOR RELIEF

The Plaintiffs hereby respectfully request the following relief:

1.   All compensatory damages recoverable;

2.   All punitive damages recoverable (in an amount no less than five thousand dollars pursuant to the tenets of as provided in M.G.L. c. 229 § 2);

3.   Compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent;

4.   The reasonable funeral and burial expenses of the decedent as provided in M.G.L. c. 229 § 2;

5.   All attorney's fees, costs and expenses allowable;

6.   A binding declaration of the inapplicablility of the completed product exclusion and the coverage obligations of insurance carriers Scottsdale and Utica;

7.    A binding declaration that General Star's eroding policy of insurance, which is being used to finance Kahr's defense in this action, not be further depleted by: 1) any work or appearances related to disputes of insurance coverage; and 2) any work or appearances related to defense of plaintiff's 93A claims.

8.    Any and all other relief as the Court deems just and proper.

<u>PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS RAISED IN THE COMPLAINT.</u>

Respectfully submitted,
Plaintiffs' Co-counsel,

Hector E. Pineiro, Esquire, BBO # 555315
Robert H. Beadel, Esquire, BBO # 632447
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600

And

Dennis Henigan, Esquire, Director, Legal Action Project
Brian J. Siebel, Esquire
Daniel R. Vice, Esquire
Brady Center To Prevent Gun Violence
1250 Eye St., N.W., Suite 802
Washington, D.C. 20005
Tel. (202) 289-7319

DOCKETED

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,   )
                            )
                            )
vs.                         )   CRIMINAL ACTION
                            )   NO. 00-1623-CBS
MARK M. CRONIN,             )
        Defendant,          )
                            )

MEMORANDUM OF PROBABLE CAUSE AND
DECISION ON GOVERNMENT'S MOTION FOR DETENTION
March 23, 2000

SWARTWOOD, M.J.

I.  Nature of the Offense and the Government's Motion

On March 15, 2000, a Criminal Complaint was filed, charging
Mark M. Cronin ("Mr. Cronin"), with stealing a firearm from a
licensed manufacturer in violation of 18 U.S.C. § 924(m).

At Mr. Cronin's initial appearance on March 16, 2000, in
connection with this Complaint, the Government moved for a
detention hearing pursuant to 18 U.S.C. §§ 3142 (f)(1)(A)(Mr.
Cronin is charged with a crime of violence, (f)(2)(A)(risk of
flight) and (f)(2)(B)(risk that Mr. Cronin will obstruct or attempt
to obstruct justice or threaten or intimidate a perspective
witness).  The Government further asserts that it is entitled to



the rebuttable presumption contained in 18 U.S.C. 3142(e) in detaining Mr. Cronin on the grounds of dangerousness.

On March 21, 2000, a consolidated hearing was held in connection with Mr. Cronin's right to a preliminary examination (probable cause hearing) in accordance with Fed. R. Crim. P. 5.1 and Mr. Cronin's right to a hearing on the Government's motion for detention. At this hearing, Michael P. Curran, Special Agent of the United States Bureau of Alcohol, Tobacco and Firearms ("ATF"), testified on behalf of the Government and was cross-examined by Mr. Cronin's counsel.

## II.  Findings of Fact

1.  In early December 1999, as a result of a traffic stop, Worcester Police officers found a 40 caliber Kahr firearm under the front seat of an automobile then being operated by an individual who subsequently became a cooperating witness ("CW"). Also recovered in this traffic stop were a quantity of drugs. Govt. Exs. 1 (bottom picture) and 4.

2.  In late December 1999, a four year old child found a loaded 9mm Kahr firearm in the yard of an apartment building in the vicinity of Main Street, Worcester, Massachusetts. This weapon was traced to a homicide outside the Tropicala Night Club located in the Main South area of Worcester. Govt. Exs. 1 (top picture) and 4.

3.  Both firearms were subsequently test-fired without any malfunctions. Govt. Exs. 2 and 3.

4.  Neither of the recovered firearms had serial numbers as required of federally licensed manufacturers.  Govt. Exs. 1 and 4.

5.  Saeilo, Inc., which uses the trade name Kahr Arms/AutoOrdance ("Kahr") is a federally licensed firearms manufacturer with a facility located in Worcester, Massachusetts. Govt. Ex. 4.

6.  Mr. Cronin was employed at Kahr from March 1999 until the end of February 2000, when he was fired because of a disagreement with his employer.  Govt. Ex. 6.

7.  After the Worcester Police discovered the 40 cal. Kahr firearm and a quantity of drugs in the CW's automobile, he agreed to cooperate and told law enforcement officials that he had purchased both firearms from Mr. Cronin in exchange for a quantity of drugs.  Govt. Ex. 4.

8.  The CW further agreed with ATF Special Agents to wear a wire and engage Mr. Cronin in a conversation concerning the sale of the Kahr firearms.  On March 8, 2000, the CW went to Mr. Cronin's residence where his conversation with Mr. Cronin was recorded. During this conversation, Mr. Cronin encouraged the CW to make up a story concerning how he obtained the 40 cal. Kahr firearm and admitted selling the two firearms to the CW.  Govt. Ex. 4.

9.  Mr. Cronin was arrested on March 16, 2000 and after signing a waiver of his Miranda rights, he gave a statement to Special Agent Curran admitting that he had stolen two firearms and ammunition from his employer, Kahr; that he obtained the firearms prior to a serial number being affixed to the firearms as required

- 3 -

by federal law; and that he sold the firearms to the CW.  <u>Govt.</u>
<u>Ex. 6</u>.

10.  The CW, who is an admitted, habitual drug user, told law
enforcement officials that he purchased the Kahr firearms from Mr.
Cronin in exchange for drugs.  <u>Govt. Ex. 4</u>.  Mr. Cronin told
Special Agent Curran that he sold the Kahr firearms to the CW for
cash.  <u>Govt. Ex. 6</u>.

11.  As a result of the execution of a search warrant of Mr.
Cronin's apartment, the following items were seized: a trigger
lock, 15 rounds of 9mm ammunition, a separate lot of 13 rounds of
45 cal. and 9mm ammunition, a 40 cal. pistol magazine with 10
rounds of ammunition and another 40 cal. pistol magazine with 2
rounds of ammunition.

### III. <u>Probable Cause</u>

As a result of Mr. Cronin's recorded conversation with the CW
admitting that he stole two firearms and ammunition from his
employer and from his voluntary written statement admitting these
offenses, I find probable cause for the offense for which he is
charged in this Complaint.

### IV.  <u>Discussion of Whether Mr. Cronin Should Be Detained</u>

#### 1.  <u>History and Characteristics</u>

Mr. Cronin is twenty-eight years old and was born in
Worcester, Massachusetts on September 6, 1971. Mr. Cronin has
lived in Worcester all of his life except from approximately 1992-
1993 when he lived in Rutland, Vermont.

Mr. Cronin's father lives in Arizona and Mr. Cronin last saw his father approximately thirteen years ago.

Mr. Cronin lives in a basement apartment at his mother's residence at 44 Huntington Avenue, Worcester, Massachusetts and maintains daily contact with his mother and his eleven year old half sister, who both live in the main part of the residence at 44 Huntington Avenue.

Mr. Cronin was married in 1994 and he and his wife have been separated for the past two and one-half years. Mr. Cronin and his wife have one child, Kassie, age five, and Mr. Cronin adopted Mrs. Cronin's other son, Kevin, age ten. Mr. Cronin provides support for both children.

As noted earlier, Mr. Cronin was employed at Kahr Arms from March 1999 until late February 2000. Prior to that employment, Mr. Cronin worked as a carpet installer for approximately six months and prior to that, at Astra Pharmaceutical in Westboro, Massachusetts for three years. At the time of Mr. Cronin's arrest, he was unemployed.

Mr. Cronin has no record of criminal convictions.

2. <u>Whether Mr. Cronin Poses A Danger to the Community</u>

First, the Government argues that the rebuttable presumption in 18 U.S.C. § 3142(e) applies to this case because there is sufficient evidence to warrant a finding that Mr. Cronin allegedly

sold firearms in exchange for drugs.[1]    I disagree.  First,  Mr.
Cronin is being charged with stealing firearms from a licensed
manufacturer in violation of 18 U.S.C. § 924(m) and not with any
drug offenses.  Section 3142(e) may be invoked only in connection
with offenses for which the defendant has been charged.  United
States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  Second,
even if I took the position that Section 3142(e) may apply if there
is probable cause to believe that a defendant committed an offense
enumerated therein for which he was not charged, I do not find that
the Government has established probable cause to believe that Mr.
Cronin violated Section 924(c).   I tend to believe Mr. Cronin's
voluntarily signed statement admitting this offense in which he
stated clearly that he sold the guns to the CW for cash.  After Mr.
Cronin was arrested, he had no reason to lie to the ATF since I am
sure he did not understand any subtle legal difference between
selling firearms for cash or selling firearms in exchange for
drugs.  Mr. Cronin seemed to be forthright in his statement to
Special Agent Curran, in not only admitting the offense but
revealing a location outside of his apartment where he had hidden
one of the firearms.   Therefore, even if I were to adopt the
Government's argument that Section 3142(e) may be invoked in
connection  with an offense for which the defendant has not been

---

[1]Section 3142(e) provides there is a rebuttable presumption that a
defendant is a risk of flight and danger to the community if there is probable
cause to believe that the person committed an offense under 18 U.S.C. §
924(c)(use or possession of firearm in connection with drug trafficking crime).

charged, I would not find that it applies in this case. I will now address whether Mr. Cronin may be held on dangerous grounds.

Mr. Cronin argues that he has not been charged with a crime of violence under 18 U.S.C. § 3142(f)(1)(A) and therefore, the Government cannot seek to detain him on dangerousness grounds. In support of his position, Defendant argues that the Court must look to the nature of the offense with which a defendant has been charged and that theft of a firearm is not a crime of violence. The Government, on the other hand, argues that the Court may consider the facts underlying the offense for which the defendant has been charged and determine on a case-by-case basis whether a defendant has been charged with a crime of violence.

For sentencing purposes, the First Circuit has held that in determining whether an offense is a crime of violence, the trial court "should employ a `formal categorical approach', that is, look to the statutory definition of the offense. <u>United States v. Sacko</u>, 178 F.3d 1, 3 (1999). However, the court may go beyond the statutory definition in "those cases where the statute encompasses both violent felonies (e.g. generic burglary) and non-violent felonies (e.g., burglary of a vehicle rather than a building)." <u>Id.</u> The great weight of authority favors applying the categorical approach for purposes of determining whether an offense is a crime of violence under Section 3142(f)(1)(A). <u>See United States v. Singleton</u>, 182 F.3d 7, 11 (D.C.Cir. 1999) and cases cited therein.

Although most courts apply the categorical approach, there is a split of authority as to whether gun related offenses which do

- 7 -

not involve the use of the firearm constitute "crimes of violence" for purposes of Section 3142(f)(1)(A).  At the same time, I have not found any cases which hold that violation of Section 924(m) constitutes a "crime of violence".  However, I do not need to resolve this issue because even assuming that Mr. Cronin has been charged with a crime of violence, I find that there are conditions that can be imposed for Mr. Cronin's release that will assure the safety of any person or persons in the community.  I make this finding, in part, because Mr. Cronin no longer works at Kahr Arms and therefore, has no access to firearms.  Furthermore, when Mr. Cronin's residence was searched pursuant to a warrant, no firearms were found and the police seized all materials they found relating to firearms.

The Government also argues that Mr. Cronin should be detained pursuant to 18 U.S.C. § 3142(f)(2)(B)(threat to obstruct justice). I do not accept the Government's argument that Mr. Cronin's suggestion to the CW that he lie to the police as to how he obtained the 40 cal. Kahr firearm is sufficient evidence for me to find that Mr. Cronin poses a risk to either obstruct justice or intimidate witnesses.  This statement was made during a friendly conversation in which the CW and Mr. Cronin discussed in some detail various aspects of the problems the CW faced as a result of the Worcester Police finding the 40 cal. Kahr firearm in the CW's automobile.  In fact, during the course of Mr. Cronin's recorded conversation with the CW, Mr. Cronin seemed to acknowledge that the CW or his girlfriend or their lawyer would eventually reveal Mr.

Cronin's name to police as the source of the 40 cal. Kahr firearm. <u>Govt. Ex. 4</u>, Transcript pp 13-15. Therefore, I do not find that the Government has presented evidence that Mr. Cronin poses a risk of obstructing justice or intimidating witnesses as provided in Section 3142(f)(2)(B).

I further find that Mr. Cronin does not pose a risk of flight. First, Mr. Cronin has lived practically all of his life in Worcester, where his mother, half sister, two children and wife reside. Second, Mr. Cronin has never failed to appear in Court as required. Third, Mr. Cronin has voluntarily admitted the offense for which he is presently charged. Therefore, considering the totality of those circumstances, I cannot find that Mr. Cronin poses a risk of flight.

### 3.  <u>Proposed Conditions of Release</u>

I have scheduled a further hearing on Friday, March 24, 2000 at 2:45 p.m. at which I will consider conditions for Mr. Cronin's release. Presumptively those conditions would include: (1) a $2,000 cash surety bond; (2) a third-party custodian; (3) regular reporting to Pretrial Services; (4) random drug testing; (5) curfew; (6) that he seek employment; (7) that he refrain from any possession or use of illegal drugs; (8) that he refrain from excessive use of alcohol; (9) that he not possess a firearm, ammunition or other destructive device; (10) that his travel be restricted; (11) that  he not commit any local, state or federal

criminal offenses; and (12) that he report any arrests or change of residence to Pretrial Services within twenty-four hours.


CHARLES B. SWARTWOOD, III
MAGISTRATE JUDGE

# EXHIBIT 3

Speech of Senator DeWine

# FLOOR STATEMENT: OPPOSITION TO S. 397 -- GUN LIABILITY BILL

**Contact:** Jeff Sadosky
Thursday, July 28, 2005

Click here for

Mr. President, when this bill was before us in the 108th Congress, I opposed it because it denied certain gun crime victims their day in court. It singled out a particular group of victims and treated them differently than all other victims in this country. It set them apart. It set them aside.

Unfortunately, the bill before us today is no better than the one we rejected last year. In fact, it is worse. Not only does it grant immunity to the gun industry, the bill also prevents federal, state and local government agencies from shutting down gun dealers who violate the law. Local and state governments are responsible for ensuring that restaurants are clean, that doctors are properly licensed, and that stores do not sell alcohol and cigarettes to our children. Why can't they also ensure that gun dealers and manufacturers operate responsibly? I have great respect for the many firearms dealers and manufacturers around this country who are legitimate, honest, and hard working. The vast majority of dealers have no tolerance for buyers who circumvent gun laws. These dealers are also responsible, ensuring that they have adequate inventory control systems in place so guns don't get lost or become missing.

This bill will not help them. The responsible dealers don't need this bill. Cases filed against responsible dealers and manufacturers who have done nothing wrong can already be tossed out if they have no merit. Who then, will benefit by the passage of this bill? The irresponsible dealers and the irresponsible manufacturers -- that's who. Let me describe some cases to you.

Everyone remembers all too well the tragedies of the DC sniper cases. Some of the victims of the DC snipers sued Bull's Eye Shooter Supply, the gun dealer that negligently allowed a Bushmaster rifle to reach the hands of John Allen Muhammad and Lee Boyd Malvo. That suit was successful. In a settlement, the negligent dealer agreed to pay the victims and their families $2.5 million. If this bill had been in effect just a few years ago, these victims would have been thrown out of court.

Or, perhaps you remember Danny Guzman from Wooster, Massachusetts. On December 24, 1999, Danny Guzman was shot and killed by gun that had been taken from a factory run by Kahr Arms. Unfortunately, Kahr Arms had hired Mark Cronin, an individual with a history of crack cocaine addiction and theft.

Mr. Cronin was given unfettered access to the untraceable, unstamped guns in the factory. He bragged, in fact, that it was so easy to remove guns that he "does it all the time, and that he can just walk out with them." Cronin removed one of these guns from the factory. That gun ended up on the streets, and it was used to kill Danny Guzman.

Danny Guzman's estate, on behalf of his widow and two young daughters sued Kahr Arms, alleging that it operated its plant in a grossly negligent manner. In the Spring of 2003, a state judge allowed that case to proceed. If this bill passes, however, the widow and children of Danny Guzman would be out of court.

As you can see, this bill cuts to the core of civil liability law and guts it. As my colleagues know, right now under current law throughout this country, the victim only needs to prove the defendant acted in an unreasonable manner -- that the defendant failed to meet his or her duty to act in a responsible fashion and that the failure led to harm to the victim. Nothing more is required. That is the standard.

When you study law, one of the first things you learn is the difference between civil law and criminal law. Someone who didn't commit a crime can still be held liable in civil law to someone else and have to pay monetary damages. That is a basic concept.

This bill, however, changes that fundamental idea of civil law. Under this bill, a victim cannot sue a gun dealer for damages resulting from illegal actions of a third party without also showing that a dealer is guilty of a violation of the law, even if the

dealer has been negligent. If this bill were to become law, a plaintiff would not only have to demonstrate that a gun dealer acted negligently but also that the gun dealer broke the law. In other words, the plaintiff would -- with one lone exception -- have to prove the gun dealer violated a statute or was guilty of a crime.

We do not require this in any other place in our law. Why do we want to do it in this case?

If those who support this bill think that is such a great idea -- that you have to violate criminal law before you can be sued -- then why not just pass that law for everything. So in any civil suit in this country, you would have to find a violation of criminal law. I don't think we want to do that.

Mr. President, I would like to talk for a moment about the language in this bill that might well prevent the government from enforcing our gun laws against irresponsible gun dealers. This provision goes well beyond barring civil suits by private citizens who have been wronged. This provision potentially curtails the ability of the Bureau of Alcohol, Tobacco, and Firearms (ATF) from enforcing the gun laws that are currently on the books.

Even two former ATF Directors recognize the potential harm that come from this provision. According to Stephen Higgins, ATF Director from 1982 to 1995, and Rex Davis, ATF Director from 1970 to 1978, this broad new language would likely prohibit the ATF from initiating proceedings to revoke a gun dealer's license, even when that dealer supplies guns to criminals.

I think that everyone in this body can agree that it is important for us to enforce the gun laws that we have on the books. Why, then, have we attached a provision to this bill that would make it harder potentially for ATF to enforce our laws and shutdown wayward and dangerous gun dealers? Why in the world would we do that?

The answer, Mr. President, is quite simple. This bill ties the ATF's hands, along with the hands of private citizens and state and local agencies, because it wants to shield a certain group of defendants -- gun manufacturers and dealers -- from liability. This bill grants immunity. It overturns over 200 years of civil law -- 200 years of tort law -- 200 years of common law. If it passes, this bill would fundamentally change our justice system. It would do this by denying one group of citizens access to the court system, in order to protect another group.

So, why are we doing this? The reason is that there are the votes -- and the will -- to do it. I can count -- and I know which way this vote is going to come out. But, might does not make right. And, just because there are the votes to pass this legislation does not mean that it is the right bill for the American people.

I said this last year, and I'll say it again. I will make a prediction about this bill, and the effect it will have on this group of victims. Yes, the passage of this bill will get rid of some frivolous lawsuits. There will be lawsuits that will never be filed because of this bill. There is no doubt about that. But, mark my words -- if this bill passes, in the future there will be a case or cases that will be so egregious and so bad that when you read about them, and find out that the victim could not file a lawsuit because this Senate voted to block that victim from the courthouse, it will be so bad, it will turn your stomach. Mark my words. That will happen if we pass this legislation.

There is an additional aspect of this bill that has not been talked about a lot, and that is the fact that it is retroactive. It would actually kick existing cases out of court. How dare we in this Congress come to the Senate Floor and wipe out every lawsuit that has been filed in this country that would come within the parameters of this bill? How arrogant of us to do that. Did we really get elected to the Senate to tell crime victims that their case is frivolous without first knowing the facts?

If passed, this bill would kick people out of court. It would not just bar people from coming to the courthouse. Apparently that is not enough. No, what this bill does is kick people out who are already in court. It kicks people out who have already survived motions to dismiss and motions for summary judgment. And, it likely even tosses out victims who have won at trial and are defending their cases on appeal. To me, that is just plain wrong.

Mr. President, the courts are supposed to decide these cases. That is how our system works. It is not my job to judge these cases. It is not my job to determine whether one of these cases should or should not proceed. It is not my job to determine whether someone is negligent or not. I also think it is not my job to tell a victim that he or she does not have the right to go to court and present a case to a judge or a jury. People are supposed to have their day in court. That is fundamentally the American way.

This bill creates two classes of victims in this country. If you are injured by any industry in America, you can file a lawsuit in state court in an attempt to redress your injury. After the passage of this bill, however, if you are injured by the gun industry, you are likely out of luck.

Other industries face legal challenges. Other industries have had lawsuits filed against them they don't like. Other industries face suits that in their eyes many times are frivolous. Other industries are involved in cases where many people die. We understand that. But, we don't grant this kind of immunity from civil liability.

Mr. President, I support the Second Amendment. I support individuals' rights to own guns. I support gun manufacturers. I support legitimate gun dealers. And, I support responsible tort reform. I certainly understand that there are some abuses in the system, and that sometimes Congress needs to act to prevent those abuses. For example, just recently I voted in favor of class action reform, and we passed that legislation to modify certain class action procedures. But, this is wrong. This bill keeps victims out of court altogether. This bill is unfair to victims. But, more important than that, it is a horrible precedent.

If we do it this one time, what is to stop a future Congress, where the votes are maybe configured differently, from saying, "Oh, there is another group of victims, and we are not going to protect them." If we deny this group of victims their rights, what is to stop a future Congress from denying another group of victims their rights?

Let us think about that before we cast our vote.

I thank the Chair and yield the Floor.





Home | Constituent Services | Legislative Resources | Press Room

Cons
‹ Cont
‹ Cas
‹ Fede
‹ Flag
‹ Inter
‹ Servi
‹ Tour
‹ Kids

Legi
‹ This
‹ Com
‹ Votin
‹ Legi
‹ Con
‹ Staff

Pres
‹ New
‹ Floo
‹ Mon
‹ Biog
‹ Phot
‹ Audi
‹ Vide
‹ Offic

Senate Floor Statement of Senator Sessions

**Base Realignment and Closure (BRAC)**

Tuesday, July 26, 2005

Mr. SESSIONS. Mr. President, a majority of the Senate is going to vote for this bill. We have 61 cosponsors. It ought to have already been passed a long time ago. We will be pleased to get this bill done. It is something that is needed.

Mr. President, there will be more opportunity tomorrow. What happened today was that I voted to invoke cloture on the Defense bill so we can complete the Defense bill, and that was not passed by the votes on the other side. So when cloture was not invoked, we went to this bill, which has strong bipartisan support and which will be passed. However, some on the other side did choose to filibuster the motion to proceed, as they have a right to do. That is what we are doing today. Then we will have a filibuster of the bill and we will have cloture, which I believe will be invoked. Certainly the votes appear to be there for it. I think we will get this bill done. There are other things we need to do this week that can still be done.

Mr. President, does Senator Reed have any comments?

Mr. REED. Yes. Mr. President, we have had a long discussion today about the legislation. I think some of the points the Senator from Illinois made are very pertinent.

First, there is the erroneous presumption that people who would be sued would be sued because of the actions of others, when in fact the negligent suits lie in showing that first an individual had a duty to someone else--a victim--and that duty was not fulfilled. Essentially, that is the essence of negligence. If you cannot show that, you cannot get into court. This is not about somebody being punished or imposed upon for the actions of others. It goes right to the actions of the individuals--the seller, manufacturer or, in this case, trade associations.

There is a perception also, I think, that has been given that the legislation as drafted actually provides exceptions that will cover the meritorious suits, the ones that should be before the court and eliminate the frivolous suits. In fact, that is not the case. As Senator Durbin pointed out in the situation with respect to the Washington, DC, snipers, there a gun dealer in Washington State was grossly negligent. He had 230 unaccounted for weapons and they should have been accounted for. He allowed a teenage boy to walk in and pick up a sniper rifle off the counter and walk out and didn't know it was missing until it was discovered to be the weapon of the assassins here in Washington, DC. That suit would have been barred by this legislation if it had passed. The two police officers--Lemongello and his partner-- responded to a call and they were in a shootout. They were seriously hurt, both of them. It turns out that the criminal firing that gun got it from a gun trafficker who walked into a store, a gun dealership, with another woman as a straw purchaser and acquired 12 weapons for cash and walked out the door. In fact, they were so obvious that the gun dealer called ATF and said he sold them the weapons, but watch out for them, which is negligent to me. Both cases were settled. Those cases would be thrown out. The lives of all of the families in Washington, DC, have already been totally changed because of the loss of their loved ones. Conrad Johnson was a bus driver, waiting to go on his bus run, and he was shot, leaving a wife and

children. They would have been out of luck because they could not have brought a suit like this. And there were others. We all lived in fear ourselves. We drove around here looking over our shoulders wondering whether the assassins were out here in Washington, DC. One woman who was an employee of the FBI and was walking in the parking lot of Home Depot in suburban Virginia was shot. Those families, those victims, could not have come to the court of justice if this bill passed.

There are other suits that are pending today. There is a case in Massachusetts, where a young man, Danny Guzman, an innocent bystander, was shot and killed in front of a nightclub in Worcester. Six days later, police recovered a 9 mm Kahr Arms handgun without a serial number behind an apartment building, near where Mr. Guzman was shot. In fact, I am told a 4-year-old child discovered the weapon first. Ballistic tests determined that the gun was the one used to kill Danny Guzman. This gun was one of about 50 guns that disappeared from Kahr Arms' manufacturing plant. Some of the guns were removed from the plant by employees that Kahr Arms hired despite criminal records and histories of drug addiction. The case is being pursued now. The issue is not what Mr. Guzman did. It is what this company failed to do. They failed to have background checks on employees who handled weapons. They failed to have security devices that would monitor if these weapons would be taken out of Kahr Arms. I am told, interestingly enough, Kahr Arms is owned by a holding company for the benefit of the Reverend Sun Myung Moon's Unification Church. So one of the beneficiaries of this bill, if it passes, will be Reverend Moon's financial enterprises because they will be protected from allegations of recklessness, not just negligence.

Now, the first exception to the bill is title 18 United States Code section 924(h). This simply permits cases against sellers who sell guns they know will be used to commit a violent or drug trafficking crime. First, in the Kahr case, the guns were not sold; they were taken surreptitiously out of the factory. This exception would not apply. Second, you have to show they knew that the guns would be used to commit a violent or drug trafficking crime—not that they were negligent in allowing guns in circulation, but that they had to know they would be used in a violent or drug trafficking crime. The next exception is negligent entrustment. This applies where a gun dealer knows, or should know, that a purchaser will shoot someone with the gun, and that individual shoots a person. This exception only applies to a gun ``seller.'' Once again, Kahr Arms was not, in this situation, a seller. Moreover, Kahr Arms did not entrust its guns to its employees. Rather, Kahr's employees removed the guns from the plant because of Kahr's negligent security, inventory tracking, and hiring of employees with histories of criminal conduct and drug addiction. So that exception doesn't apply. There is another exception, negligence per se. Under this provision, gun sellers whose negligence causes injury could not be liable unless, at a minimum, they also violated a law or regulation which the court found an ``appropriate basis'' for a negligence per se claim and which proximately caused the injury. The exception only applies to a gun seller, and the bill defines sellers to include only importers or dealers, not manufacturers.

Moreover, in many States—and Massachusetts is one—negligence per se claims are not allowed under their practice and, therefore, the exception would not apply.

Knowing violation of the law exception: This exception applies where a gun seller or manufacturer knowingly violates a State or Federal statute when it makes a sale that leads to an injury. Here, Kahr Arms did not violate statutes related to the sale or manufacturing of a gun. Rather, Kahr's employees surreptitiously took the guns out.

Breach of contract or warranty exceptions once again do not apply. It merely allows gun purchasers to sue if the seller or manufacturer did not provide the product or service it promised in its sales contract. This exception clearly does not apply. Defective design is a narrow exception for actions for some deceptive design or manufacturing cases. But that exception does not apply.

Rather than being legislation that allows the good suits through and the frivolous ones out, this legislation effectively denies people, such as the family of Danny Guzman, their day in court, and many others. It would have denied the two police officers from New Jersey their day in court. It would have denied the victims of the snipers their day in court. For these

reasons and many others, I am opposed to the legislation and join others who are and look forward to continuing our discussions in the hours and days ahead.

Mr. SESSIONS. Mr. President, I thank my able colleague and will say, it is such a state we are in America that a company whose employees steal the guns and go out and shoot somebody with them gets sued for it. That is a fact of what my friend is saying, that these companies ought to be sued as a result of the theft of a gun by their employees. If the law required them to do a background check and they failed to do so, they clearly would be liable under this act. The fact of filing off a serial number is, in fact, a criminal offense for which I have prosecuted quite a number of criminals. In addition, it would trigger, of course, a civil liability.

Gosh, we can talk about it a lot, and I will be glad to continue to discuss it, but the basic fact is a lot of these lawsuits are claiming that if they know, if manufacturers or distributors or sellers either know or should know that some guns will be used illegally, they should be responsible for it. That is not good law. This is against what we are about in this country. All this legislation does is say if you sell the firearm according to law, if you manufacture it according to law and somebody commits an intervening criminal act with it and shoots somebody, you should not be sued. But we have this anti-gun crowd which doesn't care about general principles of law that have stood us in good stead for hundreds of years. They have learned to manipulate the matter as effectively as they can to maintain lawsuits. The letter from Beretta I read earlier indicates that in the District of Columbia, the gun manufacturers who sold a gun in Minnesota and it was transported some way to Washington, DC, and was used in a crime and somebody was shot, the gun manufacturer is liable for that. And, in fact, that one jurisdiction that allows that kind of lawsuit can be enough to take down every gun manufacturing company in the United States. They have had some tough years and a lot of litigation going on.

Mr. President, I have spoken again, and unless my colleague would like to reply, we will close. It has been a good debate, and I have enjoyed it.

---

Home | Constituent Services | Legislative Resources | Press Room

© 2004 United States Senator Jeff Sessions, Alabama.
All rights reserved.

have a duty to hold the administration accountable for its actions.

Mr. President, on the matter we have before the Senate at the present time, here we go again on the issue of legal immunity for the gun industry. Without shame, the Republican leadership has brought back this special interest, anti-law enforcement bill that strips away the rights of victims to go to court.

Why the urgency to take up this bill now? This is a critical moment in this country's future. Surely, the Republican leadership can take some time to address other priorities before attempting to give a free pass to the gun industry. Why aren't we completing our work on the Defense authorization bill? That is what was before the Senate. Why have we displaced a full and fair debate on the issue of the Defense authorization bill—which has so many provisions in there concerning our fighting men and women in Iraq and about the National Guard and defense—in order to consider special interest legislation?

That is what is before the Senate, and that is what we are considering at the present time, as a result of the Republican leadership. Surely, the Congress can do more for our citizens than rush to pass unprecedented special interest legislation. We can and should be acting to meet our real challenges.

Last year, the Federal Government recalled a water pistol, the Super Soaker, just a few days before the assault weapons ban expired. America does more to regulate the safety of toy guns than real guns, and it is a national disgrace. The gun industry has worked hard to avoid Federal consumer safety regulation. Where are our priorities? Where is the logic in passing a bill that makes it harder to sue for harm caused by real guns than harm caused by a plastic toy gun?

The industry has conspicuously failed to use technology to make guns safer. It has attempted to insulate itself from its distributors and dealers, once guns leave the factory. Under this bill, it will not even matter if the guns are stolen by factory employees and snuck out of the factory in the middle of the night.

The overwhelming majority of Americans believe gun dealers and gun manufacturers should be held accountable for their irresponsible conduct, similar to everyone else.

Cities, counties, and States incur billions of dollars in costs each year as a result of gun violence. Studies estimate that the public cost of firearm-related injuries is over $1 million for each shooting victim. Yet this bill would take a fierce toll and dismiss even pending cases where communities are trying to get relief.

This bill would bar the legal rights of hard-working law enforcement officers, such as Ken McGuire and David Lemongello. These two police officers from Orange, NJ, were seriously wounded in a shootout with a burglary

suspect. The gun used by the suspect was one of 12 guns sold by a West Virginia pawnshop to an obvious straw purchaser for an illegal gun trafficker. Fortunately for the officers, this bill did not become law last year, and their case was able to proceed.

Recently, David Lemongello was able to obtain a $1 million settlement. Significantly, the settlement required the dealer and other area pawnshops to adopt safer practices. These reforms go beyond the requirements of current law and are not imposed by any manufacturers or distributors. This is not about money. This is about public safety, and I commend these brave officers for their courageous battle to change the system.

It is clear what will happen if Congress gives the gun industry this unprecedented legal immunity, on top of its existing exemption from Federal consumer safety regulations. Guns will be more dangerous. Gun dealers will be more irresponsible. More guns will be available to terrorists and criminals. There will be more shootings and more dead children.

The Nation's response to this death toll has been unacceptable. Yet, year after year, little changes in our approach to regulating guns. How can we justify this neglect? How can we continue to ignore the vast discrepancy in gun deaths in the United States compared to other nations? How can we possibly justify this effort to give the gun industry even greater protection for irresponsible behavior?

Mr. President, this bill is nothing short of Congress aiding and abetting the provision of guns to criminals. It takes the gun industry off the hook when their guns are sold to the wrong people who are out to hurt us. Under this administration, we have seen the budget cuts to the Bureau of Alcohol, Tobacco and Firearms, so our law enforcement do not have the resources they need to keep guns out of criminal hands. That is why these citizen lawsuits are so important. If the police cannot do their job, then citizens should be able to do it. But this legislation will throw the citizens out of court. It is wrong.

I yield the floor.

The PRESIDING OFFICER. The Senator from California.

Mrs. FEINSTEIN. Mr. President, I come to the floor to speak in opposition to the motion to proceed on the gun liability bill.

Before I begin, I want to say I find it incongruous that we had the Defense Authorization bill up, an important bill—we were about to consider some amendments affecting enemy combatants and detainees, I think very important amendments, by Senator McCAIN, Senator WARNER, and Senator GRAHAM. The bill was up for an unprecedented short time, and had to have cloture, according to the Republican side. Well, some of us wanted to hear what Senators McCAIN, WARNER, and GRAHAM had to say. So, we voted against clo-

ture. Then, the leader took down the bill, and now we are on a bill for a real special interest in this country, the National Rifle Association.

Mr. President, I have carefully reviewed this bill, and in my assessment is it is mistitled. The Protection of Lawful Commerce in Arms Act has nothing to do with protecting lawful commerce; rather, it protects one segment of industry against the lawful interests of our States in remedying and deterring negligent conduct.

The bill pretends to be part of the long-ranging and important debate about gun regulation. Its proponents argue that lawsuits need to be stopped in order to defend their view of the second amendment. But that is pretense. This bill is a simple giveaway to one industry—the gun lobby. It is a special-interest windfall.

I, for one, do not believe we should be giving the gun industry sweeping and unprecedented protection from the type of lawsuits that are available to every individual involving every other industry anywhere in America.

We have to recognize that guns in America are responsible for the deaths of 30,000 Americans a year. If we remove this one avenue for enforcing responsibility, individuals will have no recourse. Gun owners and gun victims alike will be left virtually powerless against an industry that is already immune from so many other consumer protections. So we find ourselves today on the cusp of yet another NRA victory.

Simply put, we are considering legislation that would ensure that it is not in the financial interests of gun manufacturers or sellers to take reasonable care in administering their business. We are removing the incentives of the tort system to encourage responsible behavior. No longer will those incentives to responsible behavior be present.

Let me be clear, if this bill is approved, it will not be a victory for law-abiding gun owners who might someday benefit from the ability to sue a manufacturer or dealer for their negligent conduct. No, this will be a victory for those who have turned the NRA into a political powerhouse, unconcerned with the rights of a majority of Americans who want prudent controls over firearms and who want to maintain their basic legal right in our civil law system.

Now, I do not support meritless lawsuits against the gun industry. I do not think anybody does. It is my belief gun manufacturers and dealers should be held accountable for irresponsible marketing and distribution practices, as anyone else would be, particularly when these practices may cause guns to fall into the hands of criminals, juveniles or mentally ill people.

This legislation has one simple purpose: to prevent lawsuits from those harmed by gun violence as a result of the wrongful conduct of others. These include lawsuits filed by cities and

counties responding to crimes often committed using guns that flood the illegal market, with the full knowledge of the distributors that the legal market could not possibly be absorbing so many of these weapons—that is why so many mayors have written strongly against this legislation—and lawsuits filed by organizations on behalf of their members and victims of violent crimes and their families who are injured or killed as a result of gun violence facilitated by the negligence of gun manufacturers or sellers.

This issue is not an abstract one. The bill is going to hurt real people—victims not only of criminal misuse by a well-designed firearm, but victims of guns that have been marketed in ways which, quite frankly, should be illegal.

Essentially, this bill prohibits any civil liability lawsuit from being filed against the gun industry for damages resulting from the criminal or unlawful misuse of a gun by a third party, with a number of narrow exceptions.

In doing so, the bill effectively rewrites traditional principles of liability law which generally hold that persons and companies may be liable for their negligence, even if others are liable as well. This bill would essentially give the gun industry blanket immunity from civil liability cases of this type, an immunity no other industry in America has today. This is truly a remarkable aspect of the legislation. It is a radical approach to our Nation's laws and the principles of federalism.

The bill does allow certain cases to move forward, as its supporters have pointed out, but these cases can proceed only on the narrowest of circumstances. Countless experts have now said that this bill would stop virtually all of the suits against gun dealers and manufacturers filed to date which are based on distribution practice, many of which are vital to changing industry practice and compensating victims who have been horribly injured through the clear negligence or even borderline criminal conduct of some gun dealers and manufacturers.

With any other business or product, in every other industry, a seller or manufacturer can be liable if that seller or manufacturer is negligent, but not here. Since money, rather than life or liberty, is at stake in a civil case, the standard of proof is lower. There need not be a criminal violation to recover damages. In the overwhelming majority of civil cases, there is no criminal violation. But here, contrary to general negligence law covering almost every other product, the bill allows negligent gun dealers and manufacturers to get off the hook unless they violated a criminal law. This is dreadful. It is despicable. This bill would create a special area of law for gun manufacturers and says that unless they violate a law, they can be careless in how they stock, secure, and sell dangerous weapons.

The judge in Washington State, presiding over the case brought by the DC area sniper victims—the case where a sniper lay in the trunk of a car with a hole punched through the trunk, went to different gasoline stations, schools, parks, and stores, and simply fired at people, indiscriminately killing them—has ruled twice that the dealer of the weapon used in the shooting, Bull's Eye Shooters Supply, and its manufacturer, Bushmaster Firearms, may be liable in negligence for enabling the snipers to obtain their weapon. But even with the new modifications of this bill, the sniper victims' cases will likely be thrown out of court under this legislation. So guess whose side this Senate is coming down on. Not the side of the victims of the DC sniper but the side of Bull's Eye Shooters Supply and the manufacturer, Bushmaster Firearms.

Let's make that clear. This is the most notorious sniper case in America. There is negligence on the part of the gun dealer who sold that gun. He didn't report it until very late. He allowed the snipers to get the gun. Now we are passing a law to prevent the victims from suing under civil liability. Nowhere else in the law does this concept exist in this form. It is a special carveout for the DC sniper gun manufacturer and gun seller.

In another case, a Massachusetts court has ruled that gun manufacturer Kahr Arms may be liable for negligently hiring drug-addicted criminals and enabling them to stroll out the plant door with unmarked guns to be sold to criminals. But with these proposed changes, the case against Kahr Arms would be dismissed. A case would be dismissed where a gun manufacturer negligently hired drug-addicted criminals and let them go out the plant door with unmarked guns to be sold to criminals. That is what this does.

This conduct, though outrageous, violated no law—negligent, yes; criminal, no. Contrary to current law which allows judges and juries to apportion blame and damages, this bill would bar any damages against a manufacturer if another party was liable due to a criminal act.

Why should firearms get special treatment? In our society, we hold manufacturers liable for the damage their negligence causes. We do this across the board for every industry, such as the automobile industry if they build a faulty gas tank or if they are negligent putting it together. Lawsuits filed against the gun industry provide a way for those harmed to seek justice from the damages and destruction caused by firearms. Just as important, they create incentives to reform practices proven to be dangerous. I will bet Kahr Arms will make every effort not to hire drug addicts to sell guns to criminals. If that case is dismissed, they can hire them. They can sell to criminals. That is not going to make a difference.

When this bill was introduced in the last Congress and again in this Congress, its supporters spoke about the need to protect the industry from frivolous lawsuits and the need to protect the industry from the potential loss of jobs brought on by future lawsuits. These claims are unfounded. This bill is simply the latest attempt of the gun lobby to evade industry accountability. The suits against the gun industry come in varying forms, but they all have one goal in common—forcing the firearms industry to become more responsible. What is wrong with that? Under the principles of common law, all individuals and industries have a duty to act responsibly. What is special about the gun industry that they should be exempt from this most basic of civil responsibilities? Answer: Nothing. This is an industry that is less accountable under law than any other in America right now. The only avenue of accountability left is the courtroom. This bill attempts to slam the courtroom door in the face of those who would hold the industry responsible for its negligent actions.

We ought to hold the industry responsible for taking the proper precautions to ensure law-abiding citizens are able to obtain the guns they choose while criminals and other prohibited individuals are not.

Let me read from a letter that was sent by more than 50 full professors from law schools all across this Nation, from the University of Michigan School of Law, UCLA Law School, the University of Oregon School of Law, Indiana University School of Law, Harvard Law School, Syracuse University College of Law, Brooklyn Law School, Georgetown University Law Center, Lewis and Clark Law School, Roger Williams University School of Law, Northwestern School of Law, University of Chicago Law School, William Mitchell College of Law, University of Colorado School of Law, Duke Law School, Albany Law School, University of California Hastings College of Law, Houston Law Center, Widener University School of Law, Rutgers, Tulane, Boston, Albany, Temple University Beasley School of Law, Case Western Reserve University School of Law, Cornell Law School, Salmon P. Chase College of Law, Northern Kentucky University, NYU School of Law, The George Washington University Law School, Boston College Law School, Tulane University Law School, Columbia Law School, New York Law School, University of Alabama School of Law, Emory University School of Law, University of California Boalt School of Law, and on and on.

Let me tell you what they say. I will read parts of it. They have reviewed this bill, S. 397.

No other industry enjoys or has ever enjoyed such a blanket freedom from responsibility for the foreseeable and preventable consequences of negligent conduct.

S. 397 . . . would abrogate this firmly established principle of tort law. Under this bill, the firearms industry would be the one and only business in which actors would be free utterly to disregard the risk, no matter how high or foreseeable, that their conduct

might be creating or exacerbating a potentially preventable risk of third party misconduct. Gun and ammunition makers, distributors, importers, and sellers would, unlike any other business or individual, be free to take no precautions against even the most foreseeable and easily preventable harms resulting from the illegal actions of third parties. And they could engage in this negligent conduct persistently, even with the specific intent of profiting from the sales of guns that are foreseeably headed to criminal hands.

They could engage in the conduct in an unlimited way and profit from the sales of guns that are foreseeably headed for criminal hands.

Under this bill, a firearms dealer, distributor, or manufacturer could park an unguarded open pickup truck full of loaded assault weapons on a city street corner, leave it there for a week, and yet be free from any negligence liability if and when the guns were stolen and used to do harm.

Mr. President, this is what we are doing. This isn't just my view, this is the view of more than 50 professors of law at major law schools all across the Nation. We are facilitating criminal conduct by providing this protection against liability.

It goes on to say:

A firearms dealer, in most states, could sell 100 guns to the same individual every day, even after the dealer is informed that these guns are being used in crime—even, say, by the same violent street gang.

That is a direct quote. So you are facilitating a situation where somebody could sell a hundred guns a day to a street gang and have no liability for that action. That is what I think is really despicable—all because of the power of one lobby.

Again, it goes on to say:

It might appear from the face of the bill that S. 397 and H.R. 800 would leave open the possibility of tort liability for truly egregious misconduct, by virtue of several exceptions set forth in Section 4(5)(I). Those exceptions, however, are in fact quite narrow and would give those in the firearm industry little incentive to attend to the risks of foreseeable third party misconduct.

One exception, for example, would purport to permit certain actions for "negligent entrustment." The bill goes on, however, to define "negligent entrustment" extremely narrowly.

The exception applies only to sellers, for example, and would not apply to distributors or manufacturers, no matter how egregious their conduct.

So when somebody comes to the floor and argues this bill provide for negligent entrustment, don't believe it. It is so limited that it doesn't cover the whole field of those who handle firearms.

And then it goes on to say:

Even as the sellers, the exception would apply only where the particular person to whom a seller supplies a firearm is one whom the seller knows or ought to know will use it to cause harm. The "negligent entrustment" exception would, therefore, not permit any action based on reckless distribution practices, negligent sales to gun traffickers who supply criminals—

That is the pickup that is parked on the street corner containing loaded assault weapons and sold to anybody who comes by.

The negligent entrustment exception would, therefore, not permit any action based on reckless distribution practices, negligent sales to gun traffickers who supply criminals, careless handling of firearms, lack of security, or any of a myriad of potentially negligent acts.

Another exception would leave open the possibility of liability for certain statutory violations, variously defined, including those described under the heading of negligence per se. Statutory violations, however, represent just a narrow special case of negligence liability. No jurisdiction attempts to legislate standards of care as to every detail of life, even in a regulated industry, and there is no need. Why is there no need? Because general principles of tort law make clear that the mere absence of a specific statutory prohibition is not carte blanche for unreasonable or dangerous behavior. S. 397 and H.R. 800 would turn this traditional framework on its head, and free those in the firearms industry to behave as carelessly as they would like, so long as the conduct has not been specifically prohibited. If there is no statute against leaving an open truckload of assault weapons on a street corner, or against selling hundreds of guns to the same individual, under this bill there could be no tort liability.

That is what this bill is opening up.

Again, this represents a radical departure from traditional tort principles.

Again, this isn't just me saying this; this is more than 50 law professors from almost 50 different law schools.

As currently drafted, this bill would not simply protect against the expansion of tort liability, as has been suggested, but would in fact dramatically limit the application of longstanding and otherwise universally applicable tort principles. It provides to firearm makers and distributors a literally unprecedented form of tort immunity not enjoyed, or even dreamed of, by any other industry.

Mr. President, I know the motion to proceed will pass. I also know that what is being engaged upon is the most stringent test of germaneness I have ever seen take place in this body to prevent amendments from being offered once cloture is invoked, which is going to happen. This Senate is going to do the people it represents an enormous harm. They are going to protect the most powerful lobby in the United States and open millions of Americans to egregious injury from negligent practices by distributors and sellers of firearms in this country.

That is not what we were elected to do. No one in this body was elected to be the Senator from the National Rifle Association. Although they have a point of view, and although this point of view is popular in many places, should we still protect the public welfare?

I say to you we do not protect the public welfare, as more than 50 professors of law have pointed out.

Additionally, I will put into the RECORD a letter of opposition from law enforcement. I ask unanimous consent that it be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. CONGRESS,
U.S. SENATE,
*Washington, DC.*

DEAR SENATOR: As active and retired law enforcement officers, we are writing to urge your strong opposition to any legislation granting the gun industry special legal immunity. S. 397 would strip away the legal rights of gun violence victims, including law enforcement officers and their families, to seek redress against irresponsible gun dealers and manufacturers.

The impact of this bill on the law enforcement community is well illustrated by the lawsuit brought by former Orange, New Jersey police officers Ken McGuire and David Lemongello. On January 12, 2001, McGuire and Lemongello were shot in the line of duty with a trafficked gun negligently sold by a West Virginia dealer. The dealer had sold the gun, along with 11 other handguns, in a cash sale to a straw buyer for a gun trafficker. In June 2004, the officers obtained a $1 million settlement from the dealer. The dealer, as well as two other area pawnshops, also have implemented safer practices to prevent sales to traffickers, including a new policy of ending large-volume sales of handguns. These reforms go beyond the requirements of current law and are not imposed by any manufacturers or distributors.

If immunity for the gun industry had been enacted, the officers' case would have been thrown out of court and justice would have been denied. Police officers like Ken McGuire and Dave Lemongello put their lives on the line every day to protect the public. Instead of honoring them for their service, legislation granting immunity to the gun industry would deprive them of their basic rights as American citizens to prove their case in a court of law. We stand with officers McGuire and Lemongello in urging you to oppose such legislation.

Sincerely,

International Brotherhood of Police Officers (AFL–CIO Police union); Major Cities Chiefs Association (Represents our nation's largest police departments); National Black Police Association (Nationwide organization with more than 35,000 members); Hispanic American Police Command Officers Association (Serving command level staff and federal agents); National Latino Peace Officers Association; The Police Foundation (A private, nonprofit research institution); Michigan Association of Chiefs of Police; Rhode Island State Association of Chiefs of Police; Maine Chiefs of Police Association. Departments listed for identification purposes only:

Sergeant Moises Agosto, Pompton Lakes Police Dept. (NJ); Sheriff Drew Alexander, Summit County Sheriff's Office (OH); Sheriff Thomas L. Altiere, Trumbull County Sheriff's Office (OH); Director Anthony F. Ambrose III, Newark Police Dept. (NJ); Chief Jon J. Arcaro, Conneaut Police Dept. (OH); Officer Robert C. Arnold, Rutherford Police Dept. (NJ); Chief Ron Atstupenas, Blackstone Police Dept. (MA); Sheriff Kevin A. Beck, Williams County Sheriff's Office (OH); Detective Sean Burke, Lawrence Police Dept. (MA); Chief William Bratton, Los Angeles Police Dept. (CA); Special Agent (Ret) Ronald J. Brogan, Drug Enforcement Agency; Chief Thomas V. Brownell, Amsterdam Police Dept. (NY).

Chief (Ret) John R. Ceass, Wilmington Police Dept. (NC); Chief Michael Chitwood, Portland Police Dept. (ME); Chief William City, Oklahoma Police Dept. (OK); Chief Kenneth V. Collins,

judges and juries are not indiscriminately finding against gun manufacturers. Most are probably gun owners and hunters as well.

Despite what the NRA pedals to its members to justify its existence and their dues, the second amendment is accepted and respected by the overwhelming majority of Americans and there is no threat to responsible manufacturers, dealers, lawful buyers, or owners of the millions of guns in America. There is no justification for this special legislation and the special treatment it gives to that industry.

Of course, the gun industry is accustomed to getting special treatment from Congress. Firearms and tobacco are the only two consumer products specifically exempt from regulation by the Consumer Products Safety Commission. What an exemption. I have to hand it to the NRA, whether I agree with them or not, they sure know how to operate around here. Many industries and even individual corporations pour a lot more money into lobbying and into political contributions than the NRA and they do not get nearly the special treatment, special favors from Congress the gun lobby does—a complete exemption from consumer product safety laws and regulations, and now almost complete immunity for lawsuits from negligence or product malfunctions. All other businesses and industries in America are in discount coach while the gun lobby has special privileges flying first class on Air America under this Congress and preceding Congresses.

It is because there is that exemption from the consumer product safety laws of this country that some of these lawsuits, not frivolous, but determined by a judge or jury through the process to be legitimate and bona fide, and the resulting civil damages are necessary to move the industry to take some of the safety actions it can technologically and financially certainly afford to make that it probably would not do otherwise.

For example, take Bushmaster. Their dealer lost the sniper's assault rifle along with 238 other guns that were then used by the snipers against the innocent victims in Washington, DC. As a result of its settlement with the victims of those families, they agreed also to inform their dealers of safer sales practices that hopefully will prevent other criminals from obtaining the guns, something that had never been done before.

In June of 2004, two former New Jersey police officers were shot in the line of duty with a trafficked gun negligently sold by a West Virginia dealer. They won a $1 million settlement, and the dealer who sold the gun, along with 11 other handguns in a cash sale to a straw buyer for a gun trafficker—after that lawsuit that dealer, as well as two other area pawnshops, agreed to implement safer practices to prevent sales to traffickers, including a policy of ending large-volume sales of handguns.

In 2004 also, Tennille Jefferson, whose 7-year-old son was unintentionally killed by another child with a trafficked gun, won a settlement from a gun dealer that amounted to $850,000. The handgun was one of many the dealer sold to the trafficker despite clear signs the guns were headed for the underground market. That, too, resulted in changes in policies and sales practices that hopefully will prevent other mothers from suffering that terrible fate of losing a child.

I am not saying every one of those cases filed against the manufacturers or dealers is proper. Again, that is for the process to determine. But there is no evidence, no evidence at all, that there is anything about the nature of these suits, the outcomes of them, the jury awards relative to the damages that have occurred, that indicates this industry is being prejudiced or plagued by those who they contrive to be doing so, to justify this legislation. If we are going to reform the tort system in this country, let's do it openly and aboveboard with all industries, all of American businesses affected equally by those changes. To single out one industry, particularly one that manufacturers products, potentially, as dangerous as guns, is just a terrible day for the Senate.

Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Illinois.

Mr. DURBIN. Mr. President, this is a sad day in the Senate. It is a sad day in two respects. Yesterday, we were debating a bill, the Department of Defense Authorization Act. It is an important bill. It is a $440 billion bill for our American military: our soldiers, sailors, marines, airmen, members of the Coast Guard, Guard and Reserve. We were trying, in that bill, to help our fighting men and women and their families.

We had a long list of amendments that we wanted to consider: extra pay for totally disabled veterans, help for the widows and orphans of combat soldiers who die in the line of duty, fair compensation for Guard and Reserve when they are activated and they are Federal employees, daycare for the families of soldiers who are activated, quality-of-life issues for the men and women in uniform who are fighting for America.

A decision was made by the Republican leadership to leave that bill, leave that issue, to come to this one. What could be more important for us to consider than the safety, the lives, and fortunes of the men and women who serve our country and risk their lives, on military duty, and their families?

Well, in the estimation of the Republican leader, Senator FRIST, there was one issue that was more important than talking about our men and women in uniform. That issue was providing immunity from liability for one industry in America, to say that of all the businesses in America that provide us

with goods and services, all of the businesses that are currently held responsible for wrongdoing, we will create one exception. We will say, if the gun industry is guilty of wrongdoing, they cannot be sued. That is right. The firearms industry, which sells millions of firearms each year in the United States, should not be held responsible for their bad conduct and wrongdoing.

It is hard to say those words and not shake your head. If personal responsibility is what it means to be an American and an American business man or woman, why in the world would you exempt one industry and say they are special, they are political royalty, they cannot be held liable for their misconduct? And why did we move to this bill and away from the Department of Defense authorization bill to help our soldiers and their families? The answer is too obvious. It is because of the political clout of the National Rifle Association and the gun lobby. It is the only group I can think of which would just go straightforward with the concept they are more important to the Senate calendar than the fighting men and women who are now risking their lives for our country. They have done it many times.

The NRA runs certain people in this Chamber and on the other side when it comes to the agenda. They decide what will be taken up and what amendments will pass—an extremely powerful group. The NRA succeeded in having the Senate debate guns—and that is a rare debate—but only when it comes to this question of gun immunity.

Isn't it interesting, we want to put an amendment on this bill that says when you sell a firearm you have to check to see if the purchaser is on a watch list of terrorists. Is that unreasonable? If you have computer access through your store—and these stores do—shouldn't you check to see if that person standing across the counter from you is on the watch list for terrorism in America? That concept is rejected by the National Rifle Association. Background checks: extremely limited. Information gathered about criminal people is to be destroyed so quickly that it is of little value to law enforcement.

A March 2005 report from the Government Accountability Office found that between February and June of 2004, people on U.S. lists of suspected terrorists applied 44 times to buy guns. It is not unheard of. It happens in this country. In only nine instances were they turned down. In the months since the study ended, 12 more suspected terrorists had the green light to buy or carry guns.

FBI Director Bob Mueller—whom I respect very much—said he was forming a group to study the problem. Why aren't we talking about this instead of granting immunity for the gun dealer who sells a weapon to someone he should have known could misuse it for a crime or for terrorism? We are shielding them from civil liability for not

living up to their responsibility when it comes to the sale of lethal firearms.

Or we could talk about ways to solve the problem in America of guns being trafficked, many crossing State lines, and used in crimes. The ATF says 90 percent of the guns recovered in crimes were used by persons other than the original purchaser, other than "straw men," people who bought them to sell them to criminals. One-third of all crime guns cross State lines.

In my State of Illinois, 47 percent of guns traced to crimes committed in Illinois originated in other States. One State, Mississippi—the little State of Mississippi—is far and away the per capita leader in selling guns exported from their State and used in crime. Do you know why? Because firearms laws are not really strictly enforced in Mississippi, and some other States.

From 2000 to 2002, Department of Justice prosecutors filed three cases in Mississippi for violations of gun trafficking laws. In contrast, 32 cases were filed in Kentucky, 28 in Tennessee. So we have gun dealers in Mississippi selling trunkloads of guns to people who get on the interstate and drive up to Illinois and, perhaps, your State, too, selling them to gun gangs and drug gangs on the streets, and then spreading out these guns to kill innocent people. And the people pushing this bill are arguing that we should not hold those firearms dealers responsible because they did not, "know" that a crime was going to be committed.

One hundred "Saturday night specials" to stick in the trunk of your car, junk guns, that you would never use for sports or hunting, and they didn't know? They should have known. That is a standard in law almost everywhere: that you knew or should have known. They are changing the law. They are saying, for firearms dealers, we are not going to hold them to this same standard that we hold every other business in America to when people buy products.

There are lots of other issues we could talk about, the gun show loophole, and others. But I think one of the most important things we could talk about is why this bill is on the floor today. It is not because gun manufacturers and gun dealers are facing bankruptcy and a lot of litigation. I read into the RECORD yesterday—and will not repeat—the major gun manufacturers in this country have no problems in terms of profitability. In fact, one of the leading companies, Smith & Wesson, said:

In the nine months ended January 31, 2005, [Smith & Wesson] incurred $4,535 in [legal] defense costs, net of amounts received from insurance carriers, relative to product liability and municipal litigation.

Mr. President, $4,500—does that sound like a business crisis that would move a gun immunity bill to the front of the calendar in front of the Department of Defense authorization bill? What it comes down to is this gun lobby has a lot of clout, and they are pushing for this sweeping immunity.

What kind of cases are we talking about? I said to my staff, you can talk about the law. And I could stand here as a person trained in law school and go through the obvious problems with this bill. But I think it is more important to talk about real-life situations. It is more important to give illustrations of why this is such a terrible bill.

Let me tell you about Anthony Oliver. Anthony Oliver was 14 years old. He was shot and killed on July 23 of last year while he was playing video games with his friend who was 13. Anthony's friend, his 13-year-old friend, had just bought a gun on the street for $50. He told the police he bought the gun with his allowance near his home because he was intimidated by a group of kids who jumped his friend and threatened to beat him up. He said he thought the safety was on when he accidentally killed Anthony with one shot to the stomach.

Federal investigators traced the gun. It was a "Saturday night special," one of those cheap guns just used for crime. They traced it to Lou's Jewelry and Pawn store in Upper Darby, PA. From 1996 to the year 2000, this pawnshop in Pennsylvania sold 441 guns traced to crime. It ranks as the No. 1 dealer in Pennsylvania in selling guns to criminals and 43rd in the Nation among all gun dealers.

In 2003, the last year for which we have statistics, Lou's sold 178 guns traced to crime. That year, less than 1 percent of the more than 3,000 dealers in Pennsylvania sold even one gun traced to crime. So you have a handful of dealers, just a small percentage, who are not paying attention or ignoring openly the fact that they are selling guns over and over and over again to gun traffickers and to straw purchasers.

How is that done? Well, the person who has a criminal record and cannot buy a gun brings his girlfriend in, and while he is standing there picking out the guns, the girlfriend is handing over the credit card or the cash to pay for them. They cannot sell to him. He is a criminal. He has a record of felonies, so the girlfriend buys it. So should the gun dealer be aware of that? Why, of course. It is obvious.

Should they be held accountable if they should have known that gun, through that girlfriend, is going straight into the hands of a felon, straight on to the street, killing innocent people? In America, a jury decides that. They will not be able to when this bill is passed. When this bill is passed, those who vote for it have decided they will be the jury forever when it comes to those questions of liability. We are taking that matter out of the hands of American citizens. We are putting it in the hands of a handful of Senators.

The gun that killed Anthony was sold in 2003 by Lou's to a trafficker who had purchased six guns in a very short period. They bought multiple guns, including many "Saturday night spe-

cials," which are small, easily concealed, low-quality handguns sought basically by kids, drug gangs, and those who are going to have a fast crime experience on a Saturday night.

The purchase of multiple firearms at once should have been a red flag to Lou, but Lou doesn't pay any attention to that: Give me some cash—I'll give you a gun; no questions asked.

When this bill passes, the family of Anthony Oliver will lose their lawsuit, the lawsuit they brought against Lou's pawnshop that continues to sell these guns used in crime. So what a great piece of news for that family: the tragedy of losing your 14-year-old son to a "Saturday night special" from a pawnshop which specializes in selling guns to gun traffickers and criminals. This is a great bill, isn't it?

Let me tell you about another case. Danny Guzman was a 26-year-old father of two from Worcester, MA, killed by a stray bullet fired outside of a nightclub on Christmas Eve in 1999.

After the shooting, the loaded gun used in the shooting was found behind an apartment building by a 4-year-old child. The gun had no serial number. They determined the gun was one of several stolen from Kahr Arms, a Worcester gun manufacturer, by their own employees, who hired many of these employees and, it turns out, never checked whether they had criminal records.

One of the thieves, Mark Cronin, who worked for this gun manufacturer, had been hired despite his history of crack addiction, theft, alcohol abuse, violence, and assault and battery. They did not check it. The gun manufacturer hired people to make guns and did not do a criminal background check on their employees.

Cronin told an associate that he took guns out of the Kahr company "all the time" and that he could just walk out the door with them. He took the gun that was used to kill Danny right off the assembly line. And he was pretty smart about it. He took it off the assembly line before it was stamped with a serial number. Smart guy. Can't be traced.

The investigation also led to the arrest of another employee, Scott Anderson, who had a criminal history, who pled guilty to stealing guns from the company.

Fifty Kahr firearms disappeared in a 5-year period. The local police captain classified the recordkeeping at that facility as "shoddy," that it was possible to remove weapons without detection because they did not keep their records well.

Danny Guzman's family brought a wrongful death suit in Massachusetts State court against the owner of the gun manufacturing company, saying: You should have kept your records so you could see that guns were being stolen. And you certainly should have done a background check on your employees. Hiring somebody who has such a criminal record to work in a plant

CONGRESSIONAL RECORD — SENATE *July 27, 2005*

that makes guns is clearly a question of negligence.

The trial judge denied the efforts of the company to dismiss the lawsuit, and it is still pending. Do you know what happens to that lawsuit by the family of Danny Guzman against that arms manufacturer if we pass this bill? It is immediately removed. They have no rights in court to pursue that. Why? Why would we say to a person who owns a company that makes guns that you are held to a lesser standard than a person who owns a company that makes toys? That is what it boils down to. You are doing it because the gun lobby insists on it. They want this immunity.

The case that has brought many policemen forward—and I will close with this—involves police officers. The last time we debated this bill, we said: Shouldn't we at least create an exception that if the gun is used to kill a police officer in the line of duty, that we are going to hold a gun dealer responsible if they should have known that? Wouldn't we hold a gun manufacturer responsible if they were involved in supplying guns to Lou's Pawnshop, which ranks one of the highest in the Nation of turning guns over to criminals? So we asked for an exception for law enforcement. It was defeated. All the people here who talk about law and order and how much they love policemen in uniform defending our communities and neighborhoods with their lives voted against them when they had a chance to put that exception in the law.

Let me give you a specific example. On January 12, 2001, police officers in Orange, NJ, were performing undercover surveillance at a gas station that had been robbed repeatedly. Someone acting suspiciously walked up to the gas station and then turned away. When Detective David Lemongello approached the man a few blocks away to question him, he responded by turning and opening fire. Detective Lemongello was hit in the chest and left arm, and the suspect fled. When additional officers, including Kenneth McGuire, found the man hiding beneath some bushes, the man started shooting again. Officer McGuire was hit in the abdomen and right leg. McGuire and two other officers returned fire and killed the man, even though they had been shot. Although Detective Lemongello and Officer McGuire survived, they have suffered serious, debilitating injuries.

The man who shot them was wanted for attempted murder and had been arrested several times. So how did he get a gun? How did this man come into possession of a gun? Gun trafficker James Gray traveled from New Jersey to West Virginia to buy his guns. He and his companion, Tammi Lea Songer, visited Will's Jewelry and Loan, a pawnshop in South Charleston, WV, and Songer acted as a "straw purchaser" by buying the gun for Gray who couldn't purchase it himself be-

cause he was a three-time convicted felon and out-of-State resident. The girlfriend bought the gun while he was standing there. Good old Will's Jewelry and Loan took the cash and handed the gun over.

They returned to Will's 17 days later, purchased 12 more guns—see the pattern—which the girlfriend bought and paid for with thousands of dollars in cash. Should the gun dealer have been saying at this point, This looks a little fishy? I think so. Reasonable people would. Gray picked out the guns for the girlfriend to purchase in full view of Will's Jewelry and Loan pawnshop personnel, a clear signal this was a "straw purchase." One of those guns was the gun used to shoot these police officers, McGuire and Lemongello.

Will's personnel had reservations regarding the nature of the transaction but went through with it anyway before contacting the ATF to report their suspicions. The ATF then contacted the girlfriend, Tammi Lea Songer, who agreed to assist them in a sting operation that resulted in the capture of Gray. However, in the time it took the ATF to set up its sting, Gray had already trafficked the gun—sold it on the street—which was used to shoot these police officers.

The police officers and their families are suing the gun dealer, saying: You didn't use good sense and any reasonable standard of conduct in selling to this guy's girlfriend when you should have known something fishy was up. So they have a lawsuit against them and the manufacturer. Do you know what happens to this lawsuit from these policemen if this bill passes? It is over. Not another day in court. No chance for these wounded policemen or their families to recover.

Will's settled, incidentally, with Officers McGuire and Lemongello for a million and agreed to change its practices in terms of underground traffickers. If the current bill passes before this settlement is reached and final, justice will not have been done. The shop would not have agreed to take the steps to make the streets safer.

That is what we are up against—people who want to stand behind and protect gun dealers who are selling guns that they should know are going out on the street to menace and threaten innocent people.

How in the world have we reached this point that we leave the Department of Defense bill to come to this? It is a sad day for the Senate. It is sad to think that one lobby has so much power over the Senate that they can move us away from the men and women in uniform, to whom we have a first responsibility, to protecting gun dealers like Will's pawnshop in Virginia or Lou's in Pennsylvania. What in the world are we doing here? We owe it to the men and women in uniform and the policemen who risk their lives for us to defeat this bill. We owe it to the mothers and fathers who want their kids to come home safe every

night and not be menaced by driveby shootings and "Saturday night specials" to defeat this bill. It is time to decide who you are working for in the Senate. Is it the gun lobby or the policemen and families of America?

I yield the floor.

The PRESIDING OFFICER. The Senator from Vermont.

Mr. LEAHY. Mr. President, I realize we are up against a time limit. I ask unanimous consent that my comments appear as though in morning business.

The PRESIDING OFFICER. Without objection, it is so ordered.

NOMINATION OF JOHN ROBERTS

Mr. LEAHY. Mr. President, I wish to take a few moments to bring people up to date on where we are on the John Roberts nomination to the Supreme Court.

It is now a little over a week since President Bush made a dramatic evening announcement of his intention to nominate John Roberts to succeed Justice Sandra Day O'Connor on the U.S. Supreme Court. In the Senate, we haven't received this nomination. It has not come up yet. Nonetheless, we are well on the way to preparation for the Senate's process in considering the nomination.

During the past weeks, some of us have met with Judge Roberts. He has urged him to be forthcoming at his upcoming hearing. The Judiciary Committee has already sent him a questionnaire seeking background information. Most importantly, Chairman SPECTER and I have already begun laying the groundwork for full and fair hearings which we are both committed to holding. I expect that we will soon be able to announce the Judiciary Committee's schedule for those hearings.

Late yesterday, the White House provided some documents from Mr. Roberts' time when he served as special counsel to Attorney General William French Smith during the Reagan administration. None of us had requested these particular documents but, of course, we are always happy to receive anything they want to send. There are at least three categories of documents from Mr. Roberts' years in the executive branch that are relevant to this nomination.

The second group relates to Mr. Roberts' work from 1982 to 1986 as an associate White House counsel under the supervision of White House Counsel Fred Fielding. These are apparently kept in the Reagan Library in California.

Yesterday, in our continuing effort to expedite the process, we sent a letter to the White House asking that the files from those years be made available as quickly as possible, and to help speed it up, we identified by name the files we wished to be priorities. I hope the reported statements by White House officials over the last couple of days indicating they expect it will take 3 or 4 weeks to make these materials available are in error and, instead,

they can be made available on a prompt basis, not a delayed basis. Otherwise, it would almost appear—I certainly wouldn't want to suggest the White House would do this—that they are trying to make sure the documents arrive after the hearings and not before them or arrive so close to the time of the hearings, there would be no time to review them. I trust there will be those at the White House who would understand this would be the wrong way to proceed and would actually in the long run end up adding more time to the process.

The third category of files is from Mr. Roberts' work when he was a political appointee in the Justice Department's Office of the Solicitor General. He served as Kenneth Starr's principal deputy during the prior Bush administration. The reason I say these are important, the President said that his work at this time was one of the reasons he selected Judge Roberts as his nominee. Of course, the President has every right to consider whatever reasons for a Supreme Court nominee. Having said that, however, in carrying out our responsibilities, it is appropriate that the Senate also is entitled to the same kind of information that the White House weighed in making its decision about this nomination. In other words, if this work is one of the reasons they say he is qualified to be on the Supreme Court, all the more reason the 100 Members of the Senate should be able to see it and make up our own minds.

Actually, it might be the most informative of the documents we are going to seek. We could get a practical sense of how, when, and why politics and the law intersect for him. I am not expecting to seek production of all the files and the hundreds of matters on which Mr. Roberts worked in those critical years. Nobody is asking for that. Rather, in our effort to cooperate and expedite the process, we are putting together a targeted catalog of documents. I hope we can work with Chairman SPECTER to send a reasonable bipartisan request for a selected group of those files.

In that regard, I ask unanimous consent that a copy of the letter we sent to the White House yesterday be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. SENATE,
COMMITTEE ON THE JUDICIARY,
*Washington, DC, July 26, 2005.*
Hon. GEORGE W. BUSH,
*The White House,*
*Washington, DC.*

DEAR MR. PRESIDENT: We are disappointed that the White House appears to have so quickly moved to close off access by the Senate to important and informative documents written by Supreme Court nominee John Roberts while he was at the Department of Justice. According to news reports today, your Administration may be preemptively protecting thousands of documents not even requested yet by the Committee—documents that could very well hold important informa-

tion necessary to evaluate Judge Roberts' judicial philosophy and legal reasoning.

While many documents are being delivered today from Judge Roberts' work for Attorney General William French Smith at the Reagan Justice Department, it is far too early to determine whether these documents are relevant, adequate, or even helpful. It may be that this group of documents, along with the upcoming hearings, will give us enough information to fulfill our constitutional duty to advise and consent on this nomination. But it would be premature for either the Senate or the White House to make that determination now. Judge Roberts spent some four years working for President George H.W. Bush, and it may very well be that documents from that time will be helpful to the Committee as well.

It is our hope that the confirmation process moves swiftly and smoothly over the coming weeks. We can assure you that no Senator is attempting to unduly delay the proceedings. We intend to work with Chairman Specter if and when further requests for documents or information appear appropriate. But in the meantime, we believe that judgment should be withheld on which and how many documents regarding this nominee might be released to the Senate. The history of past nominations is varied but clear—each confirmation process is different, and the type and number of documents shared between the White House and the Senate has depended on the nature of the debate, the needs of the Committee, and a cooperative negotiation between the Senate and the White House. A blanket statement that entire groups of documents are off limits is both premature and ill advised.

Finally, it is our understanding that many more publicly available documents will soon be sorted and delivered to the Committee. In the interests of speeding up the process, we have attached a list of the document areas within that group we feel would be most helpful to the Committee. To the extent your staff can assist in expediting the delivery of those documents, we would be grateful.

Sincerely,

PATRICK LEAHY.
DICK DURBIN.
JOE BIDEN.
EDWARD M. KENNEDY.
CHARLES SCHUMER.
DIANNE FEINSTEIN.
RUSSELL D. FEINGOLD.
HERB KOHL.

PARTICULAR MATTERS OF INTEREST

JGR/Law of War; JGR/Texas Redistricting; JGR/Abortion; JGR/Acid Rain; JGR/Affirmative Action Correspondence; JGR/Appointment Correspondence 1985; JGR/Appointee Memos, Clearance, Announcements, etc.; JGR/Appointments Clause; JGR/Asbestos Legislation; JGR/DC Chadha; JGR/Change in Presidential Term; JGR/Civil Rights Commission; JGR/Comparable Worth; JGR/Conflicts of Interest; JGR/Death Squads Investigation—SSCI; JGR/DOJ Daily Reports; JGR/EEOC; and

JGR/Equal Opportunity in Education; JGR/Ethics; JGR/Exclusionary Rule; JGR/First Amendment; JGR/Flag, American; JGR/Independent Counsel; JGR/Iran Emergency; JGR/Jones, Bob—Univ. Decision; JGR/Judges; JGR/Legal Services Corporation; JGR/Pardons; JGR/Political Activity; JGR/Pro Bono; JGR/Reagan—Bush Rallies Guidance; JGR/Recess Appointments; JGR/School Prayer; JGR/Supreme Court; and JGR/War Powers.

Mr. LEAHY. When we review the documents volunteered by the White House, obviously, we are going to be asking, Is this more of the old trick of

flooding us with stacks of really unimportant materials in order to divert attention from those that matter the most? I hope the White House will begin to work with us instead of acting unilaterally.

There is one very easy way. They could send up documents that make no sense. They could say, Here is 400 pages of something he had on his desk every day when he was working as a political appointee of the Justice Department, and send us the telephone book. That is 400 pages. It was on his desk. It is not very helpful.

So the bottom line is this: The White House is eager to supply documents it selected and certainly provided with great fanfare, but we have yet to receive the documents we have; in fact, requested. It is an unfortunate pattern we have seen too often. Of course, the White House has available to it all the documents. The President has spoken about the designee's work in the Reagan White House and at the Bush Justice Department. But they have yet to share those materials with the Senate.

Other nominations have run into trouble when this White House has decided to let the Senate see only what the White House wants the Senate to see. If the White House's midnight announcement on Monday that was reportedly embargoed to deny Democratic Senators an opportunity to comment is, contrary to appearances, actually intended to begin a dialog about documents, then I welcome it. Of course, if it is intended to unilaterally preempt a discussion about documents the Senate may need and is entitled to, then this is regrettable.

Past administrations, Republican and Democratic, have been willing cooperatively to work with the Senate to accommodate its requests for documents. There are ample precedents in both parties documenting such cooperation. I believe the Senate is going to need the White House's full cooperation to expedite the scheduling of this process as the President has requested.

Let us be serious. Now that the White House has gotten the stagecraft out of the way, let's go back to working on the substance of the Senate's work on this very important nomination. The President has, rightfully so, announced his choice. Now the Senate must rise to the challenge and do its work. To fulfill our constitutional duties, we need to consider this nomination as thoroughly and carefully as the American people deserve. A Supreme Court Justice is not there to represent either the Republican or Democratic Party; they are there to represent all 280 million Americans. The Senate is supposed to find, Is this the person the American people deserve, all 280 million of them?

That takes time, it takes the cooperation of the nominee, and it takes the cooperation of the administration. It means that Republicans, as well as Democrats, have to take our constitutional obligations on behalf of the American people seriously.

I look forward to the final act of decommissioning and the verification that paramilitary activity and criminality have ended. The all-important restoration of the Northern Ireland Assembly is reestablished. Peace and violence cannot coexist in Northern Ireland, and all who care about peace and stability look forward to these final actions.

---

## PROTECTION OF LAWFUL COMMERCE IN ARMS ACT

Mr. KENNEDY. Mr. President, I wish to speak on another subject, the underlying legislation, the gun immunity bill. This bill is deceptively named the Protection of Lawful Commerce in Arms Act, but it will make it virtually impossible to bring lawsuits against the gun industry, even in circumstances in which the industry's conduct contributes to unlawful gun violence.

The bill purports to exempt suits in which the manufacturers and sellers engage in illegal or negligent conduct, but these exemptions are poorly defined and clearly would not cover many types of bad conduct.

The Senate majority leader says this bill is of urgent importance, taking precedence over the Defense bill because the Department of Defense faces the real prospect of having to outsource side arms for our soldiers to foreign manufacturers. But the real story is that the Republican leadership and the Bush administration will do whatever it takes to give the gun industry all that it wants.

The NRA wants gun dealers and manufacturers to be protected from lawsuits. The NRA expects—the NRA demands—that this body remove the last resort for victims of gun violence against negligent and often complicit gun dealers and manufacturers by barring all types of cases.

Let's be clear about what this bill does not do.

It does not help our law enforcement officials fight crime or terrorism.

It does not meet the urgent need to strengthen any of our gun control laws.

It does not affect—it does not address at all—the rights or ability of law-abiding citizens to purchase and own a gun.

It does not have anything to do with the second amendment, no matter how you interpret the language of that amendment.

This bill has one motivation: payback by the Bush administration and the Republican leadership of the Congress to the powerful special interests of the National Rifle Association.

As the New York Times reported less than 2 weeks ago, Wayne LaPierre, the executive vice president of the NRA, made it clear that the NRA expected total support from its allies—or else.

Mr. LaPierre said, "It's simply bad politics to be on the wrong side of the second amendment at election time," asserting that Vice President Al Gore lost the 2000 Presidential election because he supported gun control, including a Federal ban on assault weapons.

That is the same assault weapons ban that President Bush told the American people he supported but then allowed to expire.

We know what happened when the NRA pushed this special interest bill last year. When the Senate voted to reauthorize the assault weapons ban as part of the bill, the NRA called their supporters and instructed them to vote against the bill for which it had just lobbied. What a disgraceful spectacle, Members of this great body reversing themselves on the Senate floor minutes before a vote because of a single call from the NRA.

That same kind of raw special interest power is now being used again to take the Senate away from the important business of protecting our men and women who are fighting in Iraq and Afghanistan so that a few unsavory gun dealers and gun manufacturers can channel powerful killing machines into the hands of criminals and terrorists in this country without any regulation or judicial oversight whatever.

The manufacturing of guns, unlike the manufacturing of nearly every other consumer product in the country, is not subject to consumer product safety standards. As it stands, manufacturers and sellers in the industry are free to design, make, and market these products with no independent review of their potential risk.

The gun industry is the only industry whose products are not subject to basic consumer health and safety regulation. Why stop with the gun industry? Why not make tire manufacturers immune from lawsuits or car manufacturers or bicycle manufacturers or toy manufacturers? Obviously, it would be absurd to shield any negligent manufacturers from liability for their action. But when it comes to shielding the gun industry, the NRA is calling the tune and too many Members of this body are tragically dancing to it.

The other side also tells us that it is too burdensome on the gun industry to fight these lawsuits. After all, we are told there are thousands of gun laws on the books and the Government can enforce them. Let us look at some of those gun laws and how the gun lobby has systematically made it more difficult, and in some cases even impossible, for the Government to police negligent gun dealers and manufacturers while making it easier for criminals to get their hands on guns.

Federal gun dealers are regulated under Federal law and required to perform background checks of gun buyers, but at the urging of the gun lobby several years ago, Congress drastically narrowed the definition of gun dealer. Now there are many unregulated individuals who do not meet the new definition. These reckless and unlicensed dealers are now selling millions of guns to people, including criminals and terrorists, without background checks. All of that is legal because the U.S. Congress kowtowed to the NRA.

In the case of Afghanistan, our troops found an al-Qaida manual that instructed terrorists on how to buy guns legally in the United States without having to undergo a background check. Al-Qaida understands that we have created a mess that allows, even encourages, criminals and terrorists to traffic in guns. But we will not do anything about the so-called gun show loophole because the NRA has snapped its fingers and said no.

We are told by the other side that victims of gun violence do not need recourse to the courts because the Government is already inspecting and overseeing the businesses of gun dealers. But is that the whole story? Absolutely not. At the direction of the NRA, Congress limited Federal inspection of gun dealers to once a year, and passed laws making it virtually impossible for agents to conduct inspections more than once a year. If an agent happens to inspect a negligent or even grossly negligent gun dealer in January, the dealer does not have to worry about the feds showing up for at least another year.

Federally regulated financial institutions can be inspected without notice whenever and as often as the regulators deem appropriate. Meatpacking companies, shipyards, iron foundries, gas refineries can all be inspected without notice whenever and as often as the regulators deem appropriate, but not gun dealers. Congress and the NRA have said they can be inspected only once a year.

What difference does that make in the life of the average citizen? It makes a lot of difference. Just ask the innocent victims of the DC sniper attacks. When the regulators cannot keep tabs on gun dealers it means the companies like Bull's Eye Shooter Supply Store, the dealer that supplied the Bushmaster rifle to the DC snipers, can get away with supposedly losing the rifle that ended up in the hands of DC snipers and losing more than 200 other guns that ended up who knows where.

The DC sniper victims had only the courts to turn to for recourse because Congress made it impossible for Federal agents to police unsavory gun dealers such as Bull's Eye. Now the NRA is telling us, take away the courts, too. Why? An obvious answer is that gun dealers and manufacturers want to sell more guns.

Our laws are designed by the NRA to increase the sales of guns by dealers and manufacturers even if they are sold to or by criminals. The NRA is lavishly rewarded for lobbying successes and so are the Members of Congress who do their bidding. It is hard to reach any other conclusion. The unholy alliance and control of the legislative process against the safety of our citizens is immoral and it is a disgrace. But let us look at the other outrageous actions that this body has taken because the NRA has demanded it.

Congress has cut Federal funding for the agency that oversees gun dealers

and manufacturers. In fact, the GAO has recently reported that the ATF is so underfunded that it would take 22 years to inspect the records of all gun dealers in this country just once. The GAO report has also found that terrorists and people on the terrorist watch list are not automatically barred from purchasing guns and are routinely buying guns in this country. This must stop.

The gun industry must have some accountability. That is why I am offering my amendment that would ensure that cases could be brought against gun manufacturers and dealers aiding or abetting a representative of a designated foreign terrorist organization. One can find a list of the designated foreign terrorist organizations on the Internet, and it includes al-Qaida and Hamas among others.

How can Congress deny victims the right to challenge a manufacturer or dealer that provided guns to a foreign terrorist organization which caused them harm?

This administration continuously says that we are engaged in a war on terror, but it takes a position that the war on terror does not allow us to prevent terrorists from buying guns in this country. Because of the actions of this administration, this Congress is caving to the NRA. Terrorists can now add assault weapons to their arsenals, all to appease the NRA so they will give campaign contributions and get out the vote. This is not only a disgrace, it is criminal and it has to stop.

The hypocrisy is mind-boggling. After 9/11, the worst terrorist attack in the history of the Nation, the Justice Department, over the objection of the FBI, at the urging of the NRA, decided that the Government had to destroy within 24 hours the background check records of all gun purchases. What is the rationale for the destruction of background checks of records in 24 hours? Former Attorney General Ashcroft and the NRA decided that it was a violation of privacy rights of law-abiding citizens to have their records held on file for 90 days, as they have been for years since the passage of the Brady bill.

This is the same John Ashcroft who, in the immediate aftermath of 9/11, prohibited—that is right, he prohibited—the FBI from examining the gun purchasing records of any of the 19 hijackers or any of the 1,200 other terrorist suspects who were detained for questioning. What kind of society are we turning into? We are supposed to be protecting this Nation from terrorism, not aiding and abetting terrorists.

Within days of the 9/11 attacks, we knew who the hijackers were. We knew where they sat on the planes. We saw some of their faces on surveillance videos. We know what they had charged on their credit cards. We know where they had gone to school. We know where they had lived, where they traveled. We know that they had tried to get pilots licenses. We know they had looked for ways to transport hazardous chemicals, but we did not know where they or their terrorist friends had purchased their firearms because we were worried about their privacy rights and their rights to bear arms. Give me a break.

Every day, law-abiding Americans have their every move videotaped by surveillance cameras. They are required to take off their shoes and jackets and be searched at airports, have their luggage inspected and opened. Yet our Government worries about the privacy rights of terrorist gun owners and refuses to let the FBI look at gun purchase records of suspected terrorists? The Justice Department refuses to stop suspected terrorists from buying guns, and then it destroys those records in 24 hours? Something is rotten here, and it has to stop.

I ask again, whose side are we on? Instead of addressing the real issues that can make our country and our communities safer, we are considering a bill that will close the courthouse door to victims of gun crimes and give a free pass to the handful of gun dealers and gun manufacturers who sell firearms to terrorists and criminals. We are doing it to appease the special interests of the NRA.

Law-abiding citizens who sell or purchase firearms do not want to give criminals a free pass, but that is exactly what this bill will do. If we vote for it, we will be aiding and abetting these wrongdoers, just as Congress has done for years at the command of the NRA. This bill gives greater protection to the gun industry than Congress gave to the health care industry, to teachers and volunteers under the headline of tort reform. The legislation is so extreme that it requires the immediate dismissal of any cases pending in either State or Federal court.

By doing so, the bill denies victims their day in court. It amounts to an unprecedented interference with the judicial branch of Government and is an outrageous violation of the rule of law.

The bill's supporters misrepresent the real goal of the lawsuits filed against this industry. These lawsuits are not filed in an effort to bankrupt the industry. Like all tort suits, the victims turn to the courts to obtain compensation for their injuries and demand responsible conduct.

Let's be clear and debunk a few myths that the other side is spinning. The gun industry is not uniquely burdened with lawsuits. They just do not like what the public discovers about the industry and its practices when documents are produced in litigation.

This immunity bill is not aimed only at frivolous lawsuits. The truth is, it bars almost all actions for negligence. If this bill had become law last year, the families of the victims of the DC snipers would have been barred from suing and receiving the settlement from the gun dealer in Washington State that lost and could not account for more than 200 guns in its inventory, like the assault rifle used by the DC snipers, that were used in the commission of other crimes.

If passed, the bill forces the dismissal of a lawsuit filed by the family of Massachusetts victim Danny Guzman, an innocent bystander shot on Christmas Eve in 1999. Danny was killed by a gun stolen by an employee working in a gun manufacturing plant. Danny, here in the picture with his cousin, was a true victim of negligent conduct. This gun factory lacked adequate security, recordkeeping, and other reasonable safeguards to prevent employees from taking guns in their pockets out of the plant. The lack of security was so bad that the owners of the plant did not even know the guns were missing. Danny's mother and his two surviving daughters sued the manufacturer claiming that it had negligently hired criminals to work in its plant and had such irresponsible security that allowed them to walk out of the plant with guns that did not have serial numbers. One of these guns was used to shoot Danny. This case should not be dismissed.

This bill will result in the automatic dismissal of a case just filed in Pennsylvania. Anthony Oliver, a 14-year-old boy, was killed by a handgun that discharged accidentally when he was playing with his friends. Anthony's life was cut short due to the gun seller's reckless conduct. His family filed a case against the gun companies that negligently allowed one of Anthony's friends to obtain a handgun. The dealer who sold the gun had a history of supplying guns to criminals and did not even take the minimum step to screen the purchasers. Over a 4-year period, Lou sold over 400 guns traced to criminals. Under this bill, Anthony's family will not get their day in court, and the irresponsible activities of this gun dealer and its supplier will not be stopped. This case should not be dismissed.

This bill would also bar municipal lawsuits. If this case passes, four pending cases involving New York City, the District of Columbia, Gary, IN, and Cleveland, OH, will all be dismissed. This bill is not about protecting the gun industry from bankruptcy. This bill is a blatant special interest bill to protect gun manufacturers and sellers who provide guns to criminals and even terrorists.

With this bill, Congress is aiding and abetting in the perpetuation of these crimes. Enough is enough is enough. I urge my colleagues to join me in saying no to this shameful bill and get back to the serious issues that face our country.

Mr. DURBIN. Will the Senator yield for a question?

Mr. KENNEDY. I am glad to.

Mr. DURBIN. I first commend the Senator from Massachusetts for explaining what is before the Senate, not only today but yesterday and the day before. Would the Senator be kind enough to tell those who are observing and following this debate which bill we

Professor Barbara Bader Aldave, University of Oregon School of Law; Professor Mark F. Anderson, Temple University Beasley School of Law; Professor Emeritus James Francis Bailey, III Indiana University School of Law; Professor Elizabeth Bartholet, Harvard Law School; Professor Peter A. Bell, Syracuse University College of Law; Professor Margaret Berger, Brooklyn Law School; Professor M. Gregg Bloche, Georgetown University Law Center; Professor Michael C. Blumm, Lewis and Clark Law School; Professor Carl T. Bogus, Roger Williams University School of Law; Professor Cynthia Grant Bowman, Northwestern University School of Law; Director of the MacArthur Justice Center and Lecturer in Law, Locke Bowman, University of Chicago Law School; Professor Scott Burris, Temple University Beasley School of Law; Professor Donna Byrne, William Mitchell College of Law; Professor Emily Calhoun, University of Colorado School of Law; Professor Erwin Chemerinsky, Duke Law School; Associate Clinical Professor Kenneth D. Chestek, Indiana University School of Law; Associate Professor Stephen Clark, Albany Law School; Professor Marsha N. Cohen, University of California Hastings College of the Law.

Professor Anthony D'Amato, Northwestern University School of Law; Professor John L. Diamond, University of California Hastings College of Law; Professor David R. Dow, University of Houston Law Center; Professor Jean M. Eggen, Widener University School of Law; Associate Professor Christine Haight Farley, American University, Washington College of Law; Associate Professor Ann E. Freedman, Rutgers Law School-Camden; Professor Gerald Frug, Harvard Law School; Professor Barry R. Furrow, Widener University School of Law; Associate Clinical Professor Craig Futterman, University of Chicago Law School; Professor David Gelfand, Tulane University Law School; Professor Phyllis Goldfarb, Boston College Law School; Professor Lawrence Gostin, Georgetown University Law Center; Professor Stephen E. Gottlieb, Albany Law School; Professor Phoebe Haddon, Temple University Beasley School of Law; Professor Jon D. Hanson, Harvard Law School; Professor Douglas R. Heidenreich, William Mitchell College of Law; Professor Kathy Hessler, Case Western Reserve University School of Law; Professor Eric S. Janus, William Mitchell College of Law; Professor Sheri Lynn Johnson, Cornell Law School;

Professor David J. Jung, University of California Hastings College of Law; Associate Professor Ken Kalkin, Salmon P. Chase College of Law, Northern Kentucky Univ.; Professor David Kairys, Temple University Beasley School of Law; Professor Kit Kinports, University of Illinois School of Law; Professor Martin A. Kotler, Widener University School of Law; Professor Bailly Kuklin, Brooklyn Law School; Professor Arthur E. LaFrance, Lewis and Clark Law School; Professor Sylvia A. Law, NYU School of Law; Professor Ronald Lasing, Lewis and Clark Law School; Professor Robert Justin Lipkin, Widener University School of Law; Professor Hugh C. Macgill, University of Connecticut School of Law; Professor

Mari J. Matsuda, Georgetown University Law Center; Associate Professor Finbarr McCarthy, University Beasley School of Law; Director (Retired Professor) Christine M. McDermott, Randolph County Family Crisis Center, North Carolina; Professor Joan S. Meier, George Washington University Law School; Professor Naomi Mezey, Georgetown University Law Center; Professor Eben Moglen, Columbia Law School; Professor Dawn C. Nunziato, George Washington University Law School; Professor Michael S. Perlin, New York Law School; Clinical Professor Mark A. Peterson, Northwestern School of Law, Lewis and Clark College.

Professor Mark C. Rahdert, Temple University Beasley School of Law; Professor Denise Roy, William Mitchell College of Law; Professor Joyce Saltalamachia, New York Law School; Clinical Assistant Professor David A. Santacroce, University of Michigan School of Law; Professor Niels Schaumann, William Mitchell College of Law; Professor Margo Schlanger, Washington University School of Law; Professor Marjorie M. Shultz, University of California Boalt School of Law; Senior Lecturer Stephen E. Smith, Northwestern University School of Law; Professor Peter J. Smith, George Washington University Law School; Professor Norman Stein, University of Alabama School of Law; Professor Duncan Kennedy, Harvard Law School; Professor Frank J. Vandall, Emory University School of Law; Professor Kelly Weisberg, University of California Hastings College of the Law; Professor Robin L. West, Georgetown University Law Center; Professor Christina B. Whitman, University of Michigan School of Law; Professor William M. Wiecek, Syracuse University College of Law; Professor Bruce Winick, University of Miami School of Law; Professor Stephen Wizner, Yale Law School; Professor William Woodward, Temple University Beasley School of Law.

Mr. CRAIG. Mr. President, as the sponsor of this legislation, I rise to clear up any questions that might arise when trying to understand the intent of S. 397 and what its enactment would accomplish. The Protection of Lawful Commerce in Arms Act will eliminate predatory lawsuits that would otherwise cripple an entire industry.

First, let me make two points about what the bill will not do. Nothing in the bill is intended to allow "leap-frogging" over the gun dealer to the manufacturer. The negligent entrustment provision applies specifically to the situation where a dealer knows or reasonably should know that a dangerous person is purchasing a firearm with the intent to commit, and does commit a crime with that firearm. When the manufacturer has done nothing but sell a legal, nondefective product according to the law, the negligent entrustment provision would not allow bypass of the gun dealer to get to the deeper pockets of the manufacturer.

It is also important to make sure that it is clear that the "administrative proceedings" section will have no effect on the ability of the Department of Alcohol, Tobacco, and Firearms or any administrative agency to revoke

licenses or otherwise engage in administrative proceedings to punish bad acting manufacturers, distributors, or dealers, or otherwise enforce the laws and regulations that apply to them.

The bill's definition section describes abusive suits in which a party is seeking relief resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." This definition clearly does not describe ATF enforcement proceedings. ATF is authorized to begin enforcement proceedings when a violation of our Nation's Federal gun laws has occurred. The use or misuse of the product is irrelevant to whether ATF may begin an administrative proceeding.

In fact, ATF does not use administrative enforcement proceedings to seek "relief" for the "misuse" of a product. The law does not require there be a "use"—let alone a "misuse" of the product—in order for ATF to act. ATF can begin a license revocation proceeding against a dealer for even a single violation of Federal firearms laws, regardless of whether the gun is ever "used" or "misused" by anyone. ATF can begin proceedings based on record-keeping violations, for instance, even if no firearm ever leaves the dealer's place of business.

Some have tried to suggest that a dealer selling a gun without doing the proper paperwork or meeting other legal requirements might count as "misuse." This stretches the term "use" beyond all rational meaning, and I believe the courts of our Nation would agree. For instance, the Supreme Court has held that firearms "use" in a violent or drug-trafficking crime requires "active employment." *Bailey v. U.S.*, 516 U.S. 137 (1995). If there is no "use" of the gun—only a sale—then there can be no "misuse."

But even if we were to consider an illegal sale to be "misuse," we must look at the last part of the definition: A "qualified civil liability action" involves the "criminal or unlawful misuse of a qualified product by the person or a third party." If we were talking about an ATF action, then "the person" would be ATF itself. Obviously, that is not what ATF claims in an administrative proceeding. So we could only be speaking of a misuse by "a third party"—and in an enforcement proceeding, neither the dealer nor the ATF is a "third party."

For all of these reasons, I think it is very clear that the language in this bill about "administrative proceedings" should in no way prevent any action by ATF to enforce the firearms laws of the United States. It is only intended to prevent—and, I believe, only does prevent—abuse of the courts and of various administrative processes that could be manipulated unfairly at the State or local level. Furthermore, it is worth noting that since the term "administrative proceeding" is part of the definition of a "qualified civil liability action," then all of the exemptions of the bill permitting an action to proceed would

# EXHIBIT 4

House Subcommittee on Commercial and Administrative Law

## TESTIMONY OF DENNIS A. HENIGAN
### DIRECTOR, LEGAL ACTION PROJECT
### BRADY CENTER TO PREVENT GUN VIOLENCE

### IN OPPOSITION TO H.R. 800

### March 15, 2005

Chairman Cannon, Ranking Member Watt, Members of the Subcommittee, I appreciate this opportunity to appear before you today.  On behalf of Jim and Sarah Brady, and their organizations, let me state my position on H.R. 800 in the most direct and unequivocal terms: *this bill is nothing but a special interest giveaway to the gun lobby and a shameful attack on the legal rights of innocent victims of gun violence.*

As Director of the Legal Action Project at the Brady Center to Prevent Gun Violence,[1] I have the honor to represent, on a pro bono basis, innocent victims of gun violence whose rights would be trampled by this legislation.  I have a difficult time explaining to these clients, who have personally faced the horror of gun violence, why the response of the United States Congress to their personal tragedies, and to the continuing national tragedy of gun deaths and injuries, is to give special legal protection to the most reckless members of the gun industry.

Just last week, the GAO reported that suspected terrorists, who are not permitted to board airplanes or cruise ships, repeatedly have been allowed to purchase guns over-the-counter.

The Department of Homeland Security recently issued an alert to all its law enforcement personnel about a Belgian gun maker selling a handgun in America that shoots bullets that penetrate police body armor.

Another gun maker is selling .50 caliber sniper rifles with such extraordinary range and power that they can bring down airplanes.

And gun deaths in America, after a seven-year decline, have started to rise again and are now over 30,000 a year.  In the last two weeks, our Nation has learned, once again, that no one is truly safe from gun violence:  a judge's family slain in Chicago, a judge and two others murdered in an Atlanta courtroom and, on Saturday, seven worshippers shot and killed while attending church services in Milwaukee.

What is the response of the United States Congress to these clear and present threats to our national safety and security?  Is it to move quickly to strengthen the Brady background check system to stop terrorist suspects from buying guns?  Is it to ban cop-killer guns and terrorist

---

[1] The Brady Center, and its affiliate, the Brady Campaign to Prevent Gun Violence united with the Million Mom March, are the largest organizations dedicated to creating an America free from gun violence.

sniper rifles? No. It is to hold hearings on a bill that would protect from legal accountability the most reckless gun sellers in America.

Mr. Chairman, this Congressional response is beyond rational explanation. I suggest the only explanation is the power of the gun lobby.

## GUN INDUSTRY IMMUNITY LEGISLATION IS A SHAMEFUL ATTACK ON THE LEGAL RIGHTS OF GUN VIOLENCE VICTIMS

The proponents of this legislation claim it would block only "frivolous" lawsuits against gun sellers brought only to bankrupt the gun industry. Not only is this assertion a gross misrepresentation of the bill, it also is an insult to gun violence victims who have sought justice in the courts – justice that would be denied if this bill became law.

This legislation would provide legal immunity in many cases to grossly irresponsible gun dealers who supply the criminal gun market, as well as to manufacturers of defectively designed firearms. It would throw out of court innocent victims of gun violence, even where courts have found their cases justified by general and established principles of law. Never before has a class of persons harmed by the dangerous conduct of others been so wholly deprived of the right to legal recourse. As Senator Mike DeWine (R-Ohio) stated so eloquently in opposing this legislation of the Floor of the United States Senate a year ago: "I oppose this bill because…it singles out one particular group of victims and treats them differently than all other victims in this country…It denies them their access to court."

When this bill was debated in the last Congress, two lawsuits, then pending in the courts, were at the center of the debate. Lawyers at the Brady Center represented the victims in both cases. Had this legislation been passed into law last year, these lawsuits would have been blocked.

### *Gun Industry Immunity Legislation Would Have Deprived Two New Jersey Police Officers of their Legal Rights Against a Reckless West Virginia Pawnshop*

The first suit had been filed by two brave New Jersey police officers, David Lemongello and Ken McGuire. Almost two years ago, Officer Lemongello testified before this Subcommittee and told their story. In January of 2001, Dave Lemongello was on a stakeout of a gas station in Orange, New Jersey that had been the target of several armed robberies. He spotted an individual walking near the station who matched the description of a suspect in the robberies. When the officer approached, the individual, career criminal Shuntez Everett, opened fire with a Ruger pistol. Lemongello was hit three times, fell to the ground, and radioed for help. Officer McGuire responded, chased Everett into a nearby backyard, and the two exchanged fire. McGuire also was seriously wounded, but was able to return fire. Everett died from his wounds. The shootings ended the police careers of the two officers.

How was a convicted felon like Shuntez Everett able to obtain a handgun? It turned out that the gun used in the shooting was one of twelve handguns purchased from a West Virginia pawnshop six months before by a gun trafficking team. Tammi Lea Songer, acting as a straw

purchaser for gun trafficker James Gray, paid $4,000 in cash for the guns, after Gray pointed out which guns he wanted. The pawnshop, Will Jewelry and Loan in Charleston, West Virginia, completed the sale, even though it was obvious that the handguns were headed directly into the illegal market. Indeed, the sale was so suspicious that Will reported it to ATF the next day, long after the shop had pocketed the profits and the guns were headed to New Jersey. Ironically, another one of the twelve guns was taken by Ken McGuire from a criminal suspect months before the gas station shooting. Because of the recklessness of a West Virginia gun dealer, Orange, New Jersey became a more dangerous place and the careers of two police officers were ended.

We represented Officers McGuire and Lemongello in a civil damages lawsuit against Will's pawnshop. The suit charged the pawnshop with negligence, and contributing to a public nuisance, in the sale of guns, creating a foreseeable risk that the guns would be used in criminal activity. In March of 2003, Judge Irene Berger of the Kanawha County Circuit Court denied Will's motion to dismiss our case, finding that the officers had stated a legally valid claim under general principles of West Virginia law. If the last Congress had enacted the predecessor of H.R. 800, Judge Berger's ruling would have been superceded and Officers McGuire and Lemongello would have been denied their day in court.

Because gun industry immunity legislation was defeated in the Senate a year ago, the case against Will's pawnshop went forward. In June of last year, Will's settled the case by paying $1 million in damages to the two officers. As a result of the suit, the pawnshop changed its policies and now no longer engages in large-volume gun sales. Two other gun dealers in the Charleston area have adopted similar policies.

I ask the Subcommittee to consider the outcome of this lawsuit. For these two brave police officers, justice was done. Will's pawnshop was properly held accountable for its reckless sale to a gun trafficking team and it now operates more responsibly. And no one declared bankruptcy. This outcome was possible only because this special interest immunity legislation did not become law.

### *Gun Industry Immunity Legislation Would Have Deprived the DC-area Sniper Victims of Their Legal Rights Against a Reckless Washington State Gun Dealer and the Assault Weapon Manufacturer that Supplied It*

A second lawsuit that would have been blocked by this legislation is the civil damages action brought by the victims of the DC-area sniper shootings. Certainly no one on this Subcommittee will ever forget the paralyzing fear inflicted on this community by the snipers John Lee Muhammad and Lee Boyd Malvo in the Fall of 2002. For some families, that fear became tragedy, as 10 people were killed and four more injured by the snipers. When the snipers were arrested, they were found with the Bushmaster XM-15 assault rifle that had been used in the shootings. The gun was traced back to Bull's Eye Shooter Supply, a Tacoma, Washington gun shop. Incredibly, though, Bull's Eye had no record of what happened to the gun. The shop had no record of sale, no record of a background check, and had not reported the gun lost or missing. The gun had mysteriously disappeared. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) audits showed that Bull's Eye had mysteriously "lost" 238 other

guns in a three-year period, an average of more than one gun missing every week. Bull's Eye was one of the most irresponsible gun dealers in the Nation. It ranked in the top .27% of gun dealers nationwide in number of missing guns and in the top 1% in the number of guns traced to crime.

Neither Malvo nor Muhammad could legally have purchased a gun. Malvo was a juvenile; Muhammad had a disqualifying domestic violence restraining order on his record. Only through the gross negligence of Bull's Eye could they have obtained the Bushmaster assault rifle. The Brady Center represented eight of the sniper victims and their families in a lawsuit against Bull's Eye, charging that the shop's negligence put a deadly assault rifle in the hands of the killers. We also sued Bushmaster, the manufacturer of the gun, on the ground that companies that make high-firepower assault weapons have a special duty to ensure that their retailers are responsible corporate citizens. Bushmaster did not even require its retail dealers to report to it the results of ATF audits, which would have revealed Bull's Eye's chronic problem of "missing" guns. Indeed, even after the press reported the gun shop's record, Bushmaster stated that it still considered Bull's Eye a "good customer".

In June of 2003, a Washington State trial judge denied motions to dismiss by both Bull's Eye and Bushmaster, deciding that the victims' claims were legally valid under general principles of Washington State law. The Washington State Court of Appeals denied Bushmaster's appeal of this ruling.

As former White House Counsel Lloyd Cutler concluded, after conducting his own independent analysis, the immunity bill that reached the Floor of the Senate in the last Congress would have superceded the judge's ruling and required the sniper case to be dismissed. Because the legislation was defeated, however, the lawsuit brought by the sniper victims went forward. In September of last year, the parties reached a settlement, resulting in the payment, by both Bull's Eye and Bushmaster, of a combined total of $2.56 million in damages to the victims. Bushmaster also agreed in the settlement to make its dealers aware of programs to encourage safe sales practices by gun retailers – something the company had never done before.

Again, consider the outcome of this lawsuit. The sniper victims received justice. Bull's Eye and Bushmaster were made accountable for their shoddy business practices. And, again, no one declared bankruptcy.

No one can seriously argue that these were "frivolous" lawsuits, and yet they would have been blocked by the immunity legislation. It is hardly surprising that in February of last year, Henry Cohen, a 28-year veteran of the Congressional Research Service and the author of a report on gun industry immunity legislation, stated "it does not appear the bill would be limited to frivolous lawsuits. That's my neutral assessment."[2]

*Gun Industry Immunity Legislation Would Protect a Careless Gun Manufacturer that Hired Criminals and Allowed Them to Walk Away with Guns*

---

[2] Steve Volk, *Specter Shoots Blanks*, Philadelphia Weekly, February 18, 2004.

4

H.R. 800 would also affect currently pending cases brought by gun violence victims. An example is the lawsuit brought by the family of a young man named Danny Guzman, an innocent bystander who was shot on the street in Worcester, Massachusetts on Christmas Eve in 1999. After the shooting, the loaded gun used in the shooting was found behind an apartment building by a four-year-old child. The gun had no serial number.

Police investigators determined that the gun was one of several stolen from Kahr Arms, a Worcester gun manufacturer, by Kahr's own employees who were hired despite their long criminal records. One of the thieves, Mark Cronin, had been hired by Kahr to work in its plant despite his history of crack addiction, theft to support that addiction, alcohol abuse and violence, including several assault and battery charges. Cronin had been able to walk out of the factory with stolen guns, even before they had been stamped with serial numbers. Cronin told an associate that he takes guns from Kahr "all the time" and that he "can just walk out with them." Cronin later pled guilty to the thefts. The investigation also led to the arrest of another Kahr employee, Scott Anderson, who also had a criminal history and who pled guilty to stealing guns from Kahr. At least fifty Kahr firearms disappeared from its manufacturing plant in a five-year period. Worcester Police Captain Paul Campbell classified the record keeping at the Kahr facility as so "shoddy" that it was possible to remove weapons without detection.

Brady Center attorneys represent Danny Guzman's family in a wrongful death suit against Kahr arms, charging Kahr with negligence in completely failing to screen its employees for criminal history and in maintaining a security system so inadequate that employees repeatedly were able to walk out of the plant with unserialized guns. In April, 2003, a Massachusetts trial judge denied Kahr's motion to dismiss the suit, finding it supported by general principles of Massachusetts law. It is now in pretrial discovery. Had immunity legislation been passed, the ruling of the Massachusetts court would have been nullified and Danny Guzman's family would be denied the right to justice against a gun maker that allowed drug criminals to "help themselves" to free lethal weaponry.

## GUN INDUSTRY IMMUNITY LEGISLATION WOULD BE A "BREATHTAKINGLY RADICAL" REVISION OF LIABILITY LAW FOR THE BENEFIT OF A SINGLE INDUSTRY

Far from affecting only "frivolous" lawsuits, H.R. 800 would exempt the gun industry from the oldest principle of our civil liability law: that persons, or companies, who act negligently should be accountable to the foreseeable victims of their negligence. Indeed, in the last Congress, over sixty law professors, from across the country, joined a letter calling the legislation "breathtakingly radical" because it "affords to a handpicked few – those who make, distribute, and sell guns – special protection against the most commonplace, long-established form of tort liability: accountability to the standard of care required by principles of negligence." The professors called the immunity bill "one of the most radical statutory revisions of the common law of torts that any legislature – federal or state – has ever considered, let along passed."

Proponents of this legislation try to obfuscate its radicalism through arguments that simply misstate the law.

5

First, they assert that it is unfair to hold the seller of a product responsible for the conduct of a criminal. However, the cases brought by Officers McGuire and Lemongello and the sniper victims did not seek to hold the defendant gun sellers liable simply because guns they sold were used by criminals. Rather, these victims sought to hold the gun sellers liable for their *own* irresponsible conduct that enabled criminals to be armed and to commit violent crimes. The courts in West Virginia and Washington State based their rulings on the longstanding legal doctrine that a defendant can be liable when his own negligent conduct creates a foreseeable risk that a third party will commit a criminal act. Courts, for example, have applied this doctrine to hold landlords liable when their failure to secure their buildings allows criminals to victimize their tenants. It has been applied to drivers who leave their keys in the ignition in high-crime areas, allowing thieves access to a car that is then used to inflict injury on others. Courts in these cases are holding the landlords and the drivers liable for their *own* negligence that enabled someone else to commit a criminal act.

Second, proponents of the bill argue that it is unfair to hold a gun company liable if its product, and its conduct, are entirely legal. This argument confuses criminal liability, which requires a showing of illegal conduct, with civil liability, which does not. The issue in a civil negligence case is whether the defendant has acted with reasonable care, not whether the defendant has violated a statute. For example, when a doctor leaves forceps in a surgical patient, he can be liable for his failure to use reasonable care. There is no requirement that his conduct violate a statute. It is particularly telling that the exception from immunity in H.R. 800 for illegal conduct applies only where a gun manufacturer *"knowingly* violated" a State or Federal gun statute. In other words, under this bill, a gun company is immunized from liability *even if it has violated the law*, as long as the company can demonstrate its ignorance of the law. It is also telling that the proponents of gun industry immunity opposed, and defeated, an amendment offered last year by Senator Levin (D-Mich.) that would have permitted lawsuits where a gun injury or death was caused by "grossly negligent or reckless" conduct by a gun company. Can there be any doubt that the purpose of this legislation is to protect gun manufacturers and dealers from civil liability, *even if their conduct has been grossly negligent, reckless or even illegal*?

Third, the legislation's supporters assert that they are merely asking the Congress to do what over 30 states have already done. *It is flatly untrue that over 30 states have enacted radical legislation of this kind.* The vast majority of state immunity statutes apply only to suits brought by local governments and have no effect on the legal rights of individual gun violence victims. In fact, *only five states have enacted legislation that limits the legal rights of individual gun violence victims to the extent of H.R. 800.* For those in Congress who regard themselves as guardians of state prerogatives against federal encroachment, it is fair to ask: Why should Congress override the decisions of 45 states not to strip away the legal rights of gun violence victims?

In virtually all states, victim claims against gun sellers are judged by the courts according to age-old principles of law that apply to everyone else. H.R. 800 is an effort by the United States Congress to impose a special set of legal rules on state courts that apply only to suits against gun companies. This bill is the worst form of special interest legislation. Its passage would be a tribute to the power of the gun lobby and an embarrassment to the country.

6

**GUN INDUSTRY IMMUNITY LEGISLATION WOULD ENDANGER COMMUNITIES BY DESTROYING A STRONG INCENTIVE FOR GUN SELLERS TO BEHAVE RESPONSIBLY**

Mr. Chairman, irresponsible conduct by gun sellers has tragic real-world consequences. As the Brady Center lawsuits dramatically show, reckless gun sellers put guns into the hands of criminals and endanger innocent lives. ATF has found from its own gun trafficking investigations that licensed gun dealers are the largest single source of guns trafficked into the underground market.[3] Because of irrational statutory limitations on its enforcement powers, and limited resources, ATF is hampered in its efforts to ensure that gun dealers obey the law. The Office of the Inspector General of the Justice Department recently estimated that, at ATF's current rate of inspections, it will take the Bureau *twenty-two years* to inspect all of the approximately 100,000 current federal firearms licensees.[4] When ATF does inspect dealers, violations of the law often are found, but severe statutory constraints on ATF's license revocation powers make it difficult for the Bureau to take meaningful action. According to the Inspector General, in FY 2003, ATF found that 1,812 of its inspections had revealed violations, *with an average of over 80 violations for each inspection.* However, ATF had issued only 54 notices of license revocation.[5]

The National Rifle Association has worked for years to weaken ATF's enforcement of federal gun laws. It has been tragically successful in this endeavor, by limiting ATF's legal authority and its resources. As a result, it is all the more important to maintain a strong civil liability system to give gun sellers a powerful incentive to behave responsibly. One of the recognized purposes of civil liability is to encourage individuals and companies to use reasonable care to prevent injury to others by ensuring that wrongful and dangerous conduct will result in damages liability. Having weakened ATF's enforcement powers, now the gun lobby seeks to remove the only remaining incentive for gun sellers to consider public safety in their business practices. The importance of civil liability was noted by former gun industry insider Robert Ricker, who wrote in a sworn declaration that "until faced with a serious threat of civil liability for past conduct, leaders in the industry have consistently resisted taking constructive voluntary action to prevent firearms from ending up in the illegal gun market."[6]

Far from pursuing legislation to strengthen ATF, proponents of immunity in Congress would rather reassure reckless gun sellers that they need no longer worry about the prospect that courts will hold them accountable to the victims of their conduct. If H.R. 800 passes, it will mean more gun sellers acting with utter contempt for public safety, with disastrous consequences for communities throughout the Nation. This is why, Mr. Chairman, there is substantial

---

[3] *Following the Gun: Enforcing Federal Firearms Laws Against Firearms Traffickers*, Bureau of Alcohol, Tobacco and Firearms (June 2000), at 13.

[4] *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives*, Report No. I-2004-005, U.S. Dept. of Justice Office of the Inspector General (July 2004), at iii.

[5] Id. at vi.

[6] Mr. Ricker is a former NRA lawyer and former Executive Director of the American Shootings Sports Council, an industry trade association. His revelations about the gun industry are discussed in greater depth in the attached Brady Center special report, *Smoking Guns: Exposing the Gun Industry's Complicity in the Illegal Gun Market*, which details much of evidence against the gun industry uncovered in litigation.

opposition to this legislation in the law enforcement community, including the Major Cities Chiefs Association, the International Brotherhood of Police Officers, the Police Foundation, the National Black Police Association, the Hispanic Police Command Officers Association and several state associations of police chiefs.[7]  In addition to recognizing that police officers like David Lemongello and Ken McGuire may be among the gun victims whose rights are infringed by this bill, these organizations also understand that H.R. 800 will only mean more illegal guns on the streets.  It only takes a few "bad apple" gun dealers to funnel thousands of guns to criminals.  ATF has found that only one percent of licensed gun dealers account for 57% of the guns traced to crime.[8]  These law enforcement organizations agree with us that *good gun dealers don't need legal immunity; bad gun dealers don't deserve it.*

## GUN INDUSTRY IMMUNITY LEGISLATION IS FAR MORE RADICAL THAN TORT REFORM

Finally, it is important to distinguish H.R. 800 from other legislation this Congress has considered, and will consider, to reform our civil justice system.  This bill is far more radical than any other proposal the Congress will address.  Unlike class action reform, H.R. 800 does not simply change the legal forum in which gun liability cases are considered; it protects reckless gun sellers from liability in any forum.  Unlike medical malpractice reform, H.R. 800 does not simply limit the amount and kind of damages that can be recovered by gun violence victims against reckless gun sellers; it deprives victims of any recovery.  Unlike the asbestos litigation reform proposals, H.R. 800 sets up no alternative to the court system for victims to be compensated; it denies all avenues for compensation.  In short, *H.R. 800 gives the gun industry special legal privileges that other industries can only dream about.  And it makes the victims of reckless gun sellers into "second-class" citizens, who lack the basic civil liberties of other Americans who have been injured by the wrongful conduct of others.*

For these reasons, on behalf of the Brady Center to Prevent Gun Violence, and the brave gun violence victims we represent in court, I urge you to oppose this legislation.  Thank you again for the opportunity to share my views.

---

[7] A letter opposing H.R. 800 from these organizations, and other members of the law enforcement community, is attached.

[8] *Commerce in Firearms in the United States*, Bureau of Alcohol, Tobacco and Firearms (February 2000), at 2.